People v Trump (2025 NY Slip Op 04756)

People v Trump

2025 NY Slip Op 04756

Decided on August 21, 2025

Appellate Division, First Department

MOULTON, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: August 21, 2025
Dianne T. Renwick, P.J., Peter H. Moulton, David Friedman, John R. Higgitt, Llinét M. Rosado

Index No. 452564/22|Appeal No. 2834-2835-2836|Case No. 2023-04925, 2024-01134, 2024-01135|

[*1]People of the State of New York, by Letitia James, 
 Attorney General of the State of New York, Plaintiff-Respondent,
v
Donald J. Trump, et al., Defendants-Appellants. Robert & Robert, PLLC, et al., Nonparty-Appellants. 
 Jeffrey Supinsky, Witkoff, Rubin Schron, Haim Chera, South Carolina Attorney General on behalf of South Carolina, Alabama, Alaska, Florida, Iowa, Louisiana, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Dakota, Utah, West Virginia, New Civil Liberties Alliance, Professor Philip Hamburger, Grant Cardone, Cardone Capital, Job Creators Network Foundation, The American Center for Law and Justice, Manhattan Institute for Policy Research, Citizens United, Citizens United Foundation, The Presidential Coalition, LLC, America's Future, Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Free Speech Coalition, Free Speech Defense and Education Fund, U.S., Constitutional Rights Legal Defense and Education Fund, The Republican National Hispanic Assembly of New York and Tim Brown, Amici Curiae. 

 
Defendants and certain 
nonparties appeal from a Judgment, Supreme Court, New York County (Arthur F. 
Engoron, J.), entered February 23, 2024, pursuant to an order, same court and 
Justice, entered September 27, 2023, which, among other things, denied 
defendants’ motion for summary judgment, granted plaintiff’s motion for partial 
summary judgment on its first cause of action for a violation of Executive Law § 
63(12) and granted plaintiff’s separate motion for sanctions against defendants’ 
counsel, and a posttrial order, same court and Justice, entered February 16, 
2024, which, following a bench trial, found defendants liable under the second, 
third, fourth, fifth, and seventh causes of action for violations of Executive 
Law § 63(12), predicated on violations of  New 
York’s Penal Law, found defendants Allen Weisselberg and Jeffrey McConney liable 
under the sixth cause of action for a violation of Executive Law § 63(12), 
predicated on a violation of New York’s Penal Law, and awarded disgorgement in 
the amount of $363,894,816, plus prejudgment interest, for a total amount of 
$464,576,230.62, and extensive injunctive relief, the continuation of an 
Independent Monitor, and the installation of an Independent Director of 
Compliance.
Robert & Robert, PLLC, Uniondale (Clifford S. Robert and Michael Farina of counsel), James Otis Law Group, LLC, St. Louis, MO (Dean J. Sauer of the bar of the State of Missouri, admitted pro hac vice, of counsel), Continental PLLC, Tallahassee, FL (Christopher M. Kise of the bar of the State of Florida, admitted pro hac vice, of counsel), for President Donald J. Trump, Donald Trump Jr., Eric Trump, The Donald J. Trump Revocable Trust, The Trump Organization, Inc., Trump Organization LLC, DTJ Holdings LLC, DJT Holdings Managing Member, Trump Endeavor 12 LLC, 401 North Wabash Venture LLC, Trump Old Post Office LLC, 40 Wall Street LLC and Seven Springs LLC, appellants. 
Habba Madaio & Associates, LLP, New York (Alina Habba and Michael Madaio of counsel), for President Donald J. Trump, Jeffrey McConney, The Donald J. Trump Revocable Trust, The Trump Organization, Inc., Trump Organization LLC, DTJ Holdings LLC, DJT Holdings Managing Member, Trump Endeavor 12 LLC, 401 North Wabash Venture LLC, Trump Old Post Office LLC, 40 Wall Street LLC and Seven Springs LLC, appellants. 
Morian Law PLLC, New York (Armen Morian of counsel), for Allen Weisselberg, appellant. 
Pollack, Pollack, Isaac & DeCicco, LLP, New York (Brian J. Isaac of counsel), and Law Offices of Michael S. Ross, New York (Michael S. Ross of counsel), for Robert & Robert, PLLC, Clifford S. Robert, Michael Farina, Continental PLLC, Christopher M. Kise, Armen Morian, Morian Law PLLC, Habba Madaio & Associates, LLP and Michael Madaio, appellants. 
Letitia James, Attorney General, New York (Barbara D. Underwood, Daniel S. Magy, Judith N. Vale and Sarah Coco of counsel), for respondent. 
Meister Seelig & Fein PLLC, New York (Stephen B. Meister of counsel), for Jeffrey Supinsky, Witkoff, Rubin Schron and Haim Chera, amici curiae. 
Golden Law, Inc., New York (Andrew D. Cherasky of counsel) and Alan Wilson, Attorney General of South Carolina, Columbia, SC (Joseph D. Spate of the bar of the State of South Carolina, admitted pro hac vice, of counsel), for the States of South Carolina, Alabama, Alaska, Florida, Iowa, Louisiana, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Dakota, Utah, West Virginia, amici curiae. 
New Civil Liberties Alliance, Washington, DC (Gregory Dolin of the bar of the District of Columbia, admitted pro hac vice, of counsel), for New Civil Liberties Alliance, Professor Philip Hamburger, amici curiae. 
Lucia Maria Ciaravino, Old Westbury, for Grant Cardone and Cardone Capital, amici curiae. 
Murray-Nolan Berutti LLC, New York (Ronald A. Berutti of counsel), and America First Legal Foundation, Washington, DC (Reed D.  Rubinstein, Andrew J. Block and Ryan T. Giannetti, of the bar of the District of Columbia, admitted pro hac vice, of counsel), for Job Creators Network Foundation, amicus curiae. 
Law Offices of Alexander Lonstein, Ellenville (Alexander Lonstein of counsel), and American Center for Law & Justice, Washington, DC (Jay Alan Sekulow, Jordan A. Sekulow, Stuart J. Roth, Andrew J. Ekonomou, Walter M. Weber, Benjamin P. Sisney and Nathan J. Moelker of counsel), for the American Center for Law and Justice, amicus curiae. 
The McBride Law Firm, PLLC, New York (Joseph Daniel McBride of counsel), and The Manhattan Institute for Policy Research, New York (Ilya Shapiro of counsel), for The Manhattan Institute for Policy Research, amicus curiae. 
Harfenist Kraut & Perlstein, LLP, Lake Success (Steven J. Harfenist of counsel), William J. Olsen, P.C., Vienna, VA (William J. Olson and Jeremiah L. Morgan of counsel), Patrick M. McSweeney, Powhatan, VA, Mark J. Fitzgibbons, Manassas, VA, Law Office of Joseph W. Miller, LLC, Fairbanks, AK (Joseph W. Miller of counsel), Integrity Law Firm, PLLC, Lynchburg, VA (Rick Boyer of counsel), Citizens United, Washington, DC (Michael Boos and Daniel H. Jorjani of counsel) and Schilman, Leroy & Bennett, P.C., Nashville, TN (John I. Harri III of counsel), for Citizens United, Citizens United Foundation, The Presidential Coalition, LLC, America's Future, Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Free Speech Coalition, Free Speech Defense and Education Fund, amici curiae. 
Jed Rubenfeld, New Haven, CT and Alan Dershowitz, Cambridge, MA for The Republican National Hispanic Assembly of New York and Tim Brown, amici curiae.
Judgment, Supreme Court, New York County (Arthur F. Engoron, J.), entered February 23, 2024, pursuant to an order, same court and Justice, entered September 27, 2023, which, among other things, denied defendants' motion for summary judgment, granted plaintiff's motion for partial summary judgment on its first cause of action for a violation of Executive Law § 63(12) and granted plaintiff's separate motion for sanctions against defendants' counsel, and a posttrial order, same court and Justice, entered February 16, 2024, which, following a bench trial, found defendants liable under the second, third, fourth, fifth and seventh causes of action for violations of Executive Law § 63(12), predicated on violations of New York's Penal Law, found defendants Allen Weisselberg and Jeffrey McConney liable under the sixth cause of action for a violation of Executive Law § 63(12), predicated on a violation of New York's Penal Law, and awarded disgorgement against defendants Donald J. Trump, the Donald J. Trump Revocable Trust, The Trump Organization, Inc., Trump Organization LLC, DJT Holdings LLC, DJT Managing Member, Trump Endeavor 12 LLC, 401 North Wabash Venture LLC, Trump Old Post Office LLC, 40 Wall Street LLC, and Seven Springs, jointly and severally, in the amount of $168,040,168, plus prejudgment interest related to interest rate savings, awarded disgorgement against defendants Donald J. Trump the Donald J. Trump Revocable Trust, The Trump Organization, Inc., Trump Organization LLC, jointly and severally, in the amount of $126,828,600 plus prejudgment interest related to the sale of a lease, awarded disgorgement against Donald J. Trump, the Donald J. Trump Revokable Trust, The Trump Organization, Inc., Trump Organization LLC, jointly and severally, in the amount of $60,000,000 plus prejudgment interest related to the sale of a license, awarded disgorgement in the amount of $4,013,024 against each defendant Donald Trump Jr. and Eric Trump related to the sale of a lease, awarded disgorgement in the amount of $1,000,000 against defendant Allen Weisselberg related to an employment separation agreement, modified, on the law, to vacate the disgorgement awards in their entirety, to vacate the sanctions imposed on defendants' counsel, and otherwise affirmed, without costs. Appeals from aforesaid orders, unanimously dismissed, without costs, as subsumed in the appeal from the judgment.

 Renwick, P.J and Moulton, J., concur in an Opinion by Moulton, J., Higgitt and Rosado, JJ., concur in part, and dissent in part in a separate Opinion by Higgitt, J., Friedman, J. concurs in part and dissents in part in a separate Opinion. 

 

MOULTON, J.

(concurring)

Defendants appeal from two decisions (and the resulting judgment) holding that defendants violated Executive Law § 63(12) by repeatedly submitting deceptive business records to banks, insurance companies, and the New York City Parks Department.
Presiding Justice Renwick and I find that Supreme Court correctly found defendants liable. We agree with Supreme Court that the Attorney General acted well within her lawful power in bringing this action, and that she vindicated a public interest in doing so. We also find that Supreme Court properly ruled only on claims that are timely under the applicable statute of limitations. However, we would modify the remedy ordered by Supreme Court. While the injunctive relief ordered by the court is well crafted to curb defendants' business culture, the court's disgorgement order, which directs that defendants pay nearly half a billion dollars to the State of New York, is an excessive fine that violates the Eighth Amendment of the United States Constitution.
This decision is one of three issued by this Court today. Presiding Justice Renwick and I agree with our colleagues on certain points. Most importantly, we agree with Justice Higgitt, who is joined by Justice Rosado, that the Attorney General is empowered by Executive Law § 63(12) to bring this action. However, our remaining disagreements with our colleagues' decisions are profound. In sum, Justice Friedman finds that Supreme Court's rulings are infirm in almost every respect and would hold that the Attorney General had no power to bring this case under Executive Law § 63(12). He would dismiss the complaint outright. Justice Higgitt, while agreeing that the Attorney General had the power to bring this lawsuit, finds that errors made by Supreme Court require a new trial limited to only some of the transactions in question.
Respectfully, Presiding Justice Renwick and I cannot harmonize our approach with that of our colleagues. Justice Friedman's decision runs athwart our prior rulings in this case and misconstrues Executive Law § 63(12) and the case law that has interpreted that statute. While he justly criticizes comments made by the Attorney General about defendants when she was running for that office, he ignores that this issue has already been considered, and rejected, by this Court. Justice Higgitt's decision contains cogent criticisms of aspects of Supreme Court's two written decisions. However, this Court has the power to independently analyze the record made below in evaluating those decisions. That record amply justifies Supreme Court's findings of fact and conclusions of law. Returning this action to Supreme Court for a new trial as urged by Justice Higgitt is both unnecessary and likely terminal. It is difficult to imagine that a trial could proceed while one of the principal defendants, and a central witness, is President of the United States. The inevitable elapse of time and the attendant difficulties in recreating a vast record of testimony and documents — an exercise that is both Sisyphean and unneeded, because an extensive trial record already exists — would likely consign this meritorious case to oblivion.
Because none of the three decisions garners a majority, Justices Higgitt and Rosado join the decretal of this decision for the sole purpose of ensuring finality, thereby affording the parties a path for appeal to the Court of Appeals. Like Justice Friedman, we commend them for doing so. Unlike Justice Friedman, we do not find that this necessary measure is unfair to defendants. This Court previously imposed a stay on the judgment, a stay that defendants can seek to extend pursuant to CPLR 5519(e) until the Court of Appeals rules.
 
 
 Procedural History
 The Attorney General launched an investigation into the Trump Organization in March 2020 in the wake of Congressional Testimony by Michael Cohen, a former senior executive and attorney for the Trump Organization.[FN1] In this testimony, which was heavily covered in the press and social media, Cohen claimed, among other things, that President Trump "inflated his total assets when it served his purposes, such as trying to be listed amongst the wealthiest people in Forbes," and deflated them on other occasions when it was to his business advantage.[FN2] Cohen claimed that executives at various Trump entities essentially reverse-engineered President Trump's financial records to reflect valuations chosen by President Trump. Cohen submitted three years of President Trump's personal financial statements, which are referred to as "statements of financial condition," to support his testimony (Cohen's Oversight Committee Testimony at 10, 13), and he noted that inflated statements were provided to financial institutions such as Deutsche Bank (id. at 10, 13, 39) to obtain better loan terms for Trump entities.
President Trump's statements of financial condition (referred to herein as SFCs) are at the heart of this litigation. As a private person leading nonpublic business entities, President Trump's SFCs were not publicly available. However, Cohen's very public testimony changed that, and thrust hitherto private business practices of President Trump and the Trump Organization into the public arena.[FN3] Justice Friedman correctly points out that Cohen is a "convicted perjurer," but many investigations, whether civil or criminal, begin with just such a compromised, implicated, and knowledgeable insider. Certainly, Cohen's information led to avenues of investigation.
In August 2020, the Attorney General initiated a Special Proceeding in Supreme Court to compel production of documents and testimony, and to oversee compliance with her investigatory subpoenas (the Special Proceeding). The Special Proceeding was assigned to Justice Arthur F. Engoron in Supreme Court in Manhattan.
After reviewing millions of pages of documents and interviewing more than 65 witnesses, the Attorney General commenced this action in 2022, claiming that defendants engaged in a decade-long pattern of financial fraud. Defendants are President Trump, the Trump Organization, several LLCs, DJT Holdings Managing Member, and the Donald J. Trump Revocable Trust (of which President Trump is the sole beneficiary). The Attorney General also sued the following individuals in the Trump Organization: executives Donald Trump, Jr. and Eric Trump, former executive vice president Ivanka Trump, Chief Financial Officer Allen Weisselberg, and Controller Jeffrey McConney. The matter was assigned to Justice Engoron as a related case.
According to the complaint, defendants' fraudulent actions entailed submitting President Trump's inflated SFCs to lenders and others for the purpose of obtaining favorable business deals in New York. The complaint alleges that the SFCs inflated President Trump's net worth by as much as $2.2 billion per year, employing various deceptive strategies that inflated the "estimated current value" of President Trump's assets. The complaint also alleges that defendants violated United States generally accepted accounting principles (GAAP).
All causes of action in this lawsuit are based on Executive Law § 63(12). Passed by the New York State Legislature in 1956, Executive Law § 63(12) is a "broadly worded anti-fraud provision[]" (People v Greenberg, 21 NY3d 439, 446 [2013]). It applies to all fraudulent or illegal business activity within New York State (see National Coalition on Black Civic Participation v Wohl, 661 F Supp 3d 78, 132 [SD NY 2023]). The statute provides the Attorney General with the authority to regulate businesses in New York "in the interest of securing an honest marketplace" (People v Coventry First LLC, 52 AD3d 345, 346 [1st Dept 2008], affd 13 NY3d 108 [2009]). As discussed at length below, the statute does not require proof of all the elements of common-law fraud.
Less than one month after filing the complaint, the Attorney General moved for a preliminary injunction against certain defendants and for the appointment of an independent monitor to oversee the Trump Organization. In opposition, defendants argued, among other things, that the Attorney General lacked standing and capacity to bring this action pursuant to Executive Law § 63(12), and that the SFCs contained disclaimers which precluded a finding that the commercial counterparties had reasonably relied on them.
On November 3, 2022, Supreme Court entered a preliminary injunction order (the Preliminary Injunction Order) that directed the appointment of a monitor and prohibited defendants from selling, transferring, or otherwise disposing of non-cash assets without notice to the Attorney General and the court (see People v Trump, 2022 NY Slip Op 33771[U] [Sup Ct, NY County 2022]). The court found that the Attorney General had standing and capacity to bring this action, reasoning that the Legislature had specifically empowered her to bring the suit by enacting section 63(12) and that disgorgement was an available remedy even in the absence of individual losses incurred by counterparties to the relevant deals. The court also concluded that the Attorney General was likely to succeed on the merits. Defendants did not appeal the Preliminary Injunction Order.
Shortly thereafter, defendants separately filed five pre-answer motions to dismiss the complaint on various grounds, including the Attorney General's lack of authority, the statute of limitations, and lack of personal jurisdiction. On January 4, 2023, Supreme Court contacted the parties by email regarding potential sanctions against defendants' counsel for repeating arguments relating to the Attorney General's standing, capacity to sue, and authority to seek the remedy of disgorgement. The court viewed those issues as already decided by the Preliminary Injunction Order.
By order entered January 6, 2023, Supreme Court denied defendants' motions to dismiss (see People v Trump, 2023 NY Slip Op 30027[U] [Sup Ct, NY County 2023]). The court did not sanction defendants' counsel. However, with respect to defendants' arguments that the Attorney General did not have capacity to sue, the court noted that these arguments were "borderline frivolous" the first time they were made in opposition to the motion for a preliminary injunction and that Executive Law § 63(12) was "tailor-made" for enforcement actions such as this one (id. at *3).
In denying defendants' motion to dismiss, the court found that the complaint was not time-barred against any defendant because the continuing wrong doctrine "potentially" applied to the case. The court rejected Ivanka Trump's argument that she should be dismissed from the action, concluding that the Attorney General had sufficiently alleged her involvement in defendants' fraudulent and illegal scheme. The court also rejected defendants' argument that the claims should have been subject to the heightened pleading requirement for common-law fraud, noting that Executive Law § 63(12) claims are "premised on deceptive acts or practices that do not include intent or reliance as an element of those claims" (id. at *6 [internal quotation marks omitted]).
By order dated June 27, 2023, this Court modified Supreme Court's order but allowed the case to proceed (see People v Trump, 217 AD3d 609 [1st Dept 2023]) (Trump I). Trump I dismissed as time-barred the claims against Ivanka Trump. In addition, Trump I dismissed the claims against the remaining defendants subject to an August 2021 tolling agreement to the extent that they accrued prior to July 13, 2014, or, if defendants were not subject to the agreement, dismissed the claims to the extent that they accrued prior to February 6, 2016 (id. at 611-612).[FN4] This Court modified the caption to reflect that Donald J. Trump, Jr., was sued both personally and in his capacity as trustee for the Donald J. Trump Revocable Trust, and otherwise affirmed (id. at 612).
On August 30, 2023, the Attorney General filed a motion for partial summary judgment as to liability on the first cause of action for violation of Executive Law § 63(12). The Attorney General's motion was limited to defendants' submission of allegedly false and misleading SFCs and certification of their accuracy "to defraud banks and insurers." The Attorney General submitted evidence regarding five loans (three loans from Deutsche Bank, one loan from Ladder Capital Finance LLC, and one loan from Royal Bank of Pennsylvania/Bryn Mawr). She also submitted evidence regarding a surety bond program from Zurich (the Zurich Policy) and Directors & Officers insurance (the D&O Policy) from Tokio Marine HCC (HCC). Defendants (who no longer included Ivanka Trump) opposed the motion, moved for summary judgment dismissing most claims as time-barred based on Trump I, and sought dismissal of the remaining claims on other grounds. Among other things, defendants argued that the Attorney General abandoned her arguments regarding the Ferry Point License, which was executed in 2012, and was not mentioned in her summary judgment papers. Defendants also argued that the evidence conclusively established that there was no legal or factual basis to maintain an Executive Law § 63(12) claim, because the counterparties to the transactions never complained or viewed defendants' submissions as fraudulent, and because the record was devoid of evidence of harm. The Attorney General opposed, but did not respond to defendants' argument that the contract for the Ferry Point License was time-barred.
On September 5, 2023, the Attorney General filed a separate motion for sanctions against defendants' counsel for raising arguments on summary judgment that were previously rejected below or on appeal. Defendants opposed, asserting that the standard of review and the evidence available when they had opposed the preliminary injunction motion differed from the standard of review and evidence available in the later summary judgment motion. According to defendants, the evidence proffered on summary judgment demonstrated that the Attorney General could not establish fraud, entitlement to relief, or a legitimate statutory interest under Executive Law § 63(12).
By order entered September 26, 2023, Supreme Court granted the Attorney General's motion for partial summary judgment on the first cause of action and denied defendants' motion for summary judgment dismissing the complaint (see People v Trump, 2023 NY Slip Op 33314 [U] [Sup Ct, NY County 2023]) (the Summary Judgment Order). The court found that the Attorney General demonstrated that defendants "repeatedly submitted fraudulent financial documents to obtain financial benefits which otherwise they would not have received" in their business dealings by fraudulently overvaluing assets between $812 million to $2.2 billion (id. at *5, *19).
In the Summary Judgment Order, Supreme Court reiterated its prior holdings that the Attorney General had standing and capacity to bring the action, and that disgorgement was available notwithstanding defendants' arguments that there was no default, no complaint about the deals from any of the counterparties, and very few claims that were timely under the applicable statute of limitations. Concerning the statute of limitations, the court rejected defendants' argument that the claims accrued when the parties initially entered the transactions, i.e., when the loans closed. Rather, relying on the continuing wrong doctrine, the court reasoned that because a review of each SFC would require a separate exercise of judgment, a new claim would accrue each time defendants used a separate SFC. The court additionally reasoned that the "plain language" of Executive Law § 63(12) supported the conclusion that the claims accrued when each SFC was used because each statement involved a separate and distinct fraudulent or illegal act (id. at *18). Because Supreme Court also found that all remaining defendants were bound by the Tolling Agreement, it concluded that all claims based on SFCs submitted after July 13, 2014, were timely.
As a result of these violations, the court ordered the cancellation of corporate certificates filed under General Business Law § 130 for Trump entities and directed the parties to recommend potential receivers to manage the dissolution. The court also ordered the continuation of the independent monitorship. Finally, the court sanctioned counsel in the Summary Judgment Order in the amount of $7,500 per each counsel for raising frivolous arguments which intentionally disregarded controlling authority and law of the case. The court reserved for trial the issue of liability on the second through seventh causes of action and the amount of disgorgement.
In an emergency appeal to this Court, defendants sought to delay the trial and suspend the cancelation of corporate certificates. This Court declined to delay the trial, but it did place a stay on cancellation of the corporate certificates. That remedy was ultimately not ordered by Supreme Court and is not at issue herein.
From October 2, 2023, to December 13, 2023, Supreme Court presided over an 11 week bench trial which included testimony from 40 witnesses, hundreds of exhibits, and almost 7,000 pages of trial transcript. On February 16, 2024, the court issued a posttrial order (Posttrial Order) (2024 NY Slip Op 30493[U] [Sup Ct, NY County 2024]). The court found that defendants violated five of the six remaining Executive Law § 63(12) claims, which all concerned Penal Law violations discussed below (falsifying business records, issuing false financial statements, conspiracy to falsify business records, conspiracy to issue false financial statements, and conspiracy to commit insurance fraud). Supreme Court also determined that Weisselberg and McConney were liable on the sixth cause of action for a violation of Executive Law § 63(12), predicated on the Penal Law's insurance fraud prohibition. As discussed below, proving the elements of such Penal Law violations is how the Attorney General may demonstrate "illegality," as opposed to fraud, "in the carrying on, conducting or transaction of business" under Executive Law § 63(12).
Supreme Court awarded disgorgement in a combined amount of $464,576,230.62 ($363,894,816.00 of what the court called "ill-gotten gains" and $100,681,414.62 in prejudgment interest). Because the court found that defendants were likely to commit future misconduct, it issued broad injunctive relief. The court cited to evidence that defendants had engaged in repeated and persistent fraud and illegality, that violations persisted even after the appointment of the monitor, that defendants lacked adequate corporate governance or internal controls to prevent fraud, and that defendants would not accept responsibility for their misconduct. Accordingly, Supreme Court (1) enjoined President Trump and the corporate defendants from applying for loans from any financial institution chartered by or registered with the New York State Department of Financial Services for three years, (2) barred President Trump, Weisselberg, and McConney from serving as corporate officers or directors in New York for three years, and barred Donald Trump Jr. and Eric Trump from doing so for two years, (3) permanently prohibited Weisselberg and McConney from serving in financial management roles in New York, (4) extended the independent monitor's term for three years, and (5) required the Trump Organization to retain an independent director of compliance. Supreme Court modified its Summary Judgment Order to the extent of removing the language ordering the cancellation of business certificates, finding that this relief was no longer necessary, and that the "restructuring and potential dissolution of any LLCs shall be subject to individual review by the Court appointed Independent Director of Compliance" (id. at *89) in consultation with the court appointed monitor.
Judgment was entered on February 23, 2024, in favor of the Attorney General in the amount of $464,576,230.62 and included the Posttrial Order injunctive relief (the Judgment). This appeal ensued.
By notices dated February 26, 2024, defendants appealed from the Posttrial Order and the Judgment. Two days later, on February 28, 2024, defendants moved by order to show cause for a stay of enforcement of the Judgment pending their appeals. Among other things, defendants maintained that it would be impossible to secure a bond covering the full amount of the Judgment and that defendants would be irreparably injured if forced to sell their real estate holdings in a fire sale to secure the bond. The Attorney General opposed the motion.
On that day, a single justice of this Court denied the stay with respect to enforcement of the money judgment but granted an interim stay of the Judgment to the extent, inter alia, that defendants could not serve as corporate officers or directors in New York. On March 25, 2024, a full bench granted a stay with respect to the bulk of the Judgment, including to the extent the Judgment ordered disgorgement to the Attorney General of $464,576,230.62. The stay was conditioned on defendants posting an undertaking in the amount of $175 million and perfecting the appeals for the September 2024 Term. Defendants posted the bond and timely perfected the appeals.
By order dated March 14, 2024, this Court denied a motion by defendants' counsel to sever the sanctions appeal from defendants' appeal of the Summary Judgment Order. After more motion practice, in a June 25, 2024 order, this Court consolidated the appeals from the Summary Judgment Order, the Posttrial Order, and the Judgment into this appeal. The parties filed briefs and a record that spans 49,280 pages.[FN5]
Discussion
A. The Scope of Executive Law § 63(12)
Executive Law § 63(12) gives the Attorney General extensive powers to police commercial transactions in New York State. As previously explained, Executive Law § 63(12) is a "broadly worded anti-fraud provision[]" (Greenberg, 21 NY3d at 446) that applies to all fraudulent or illegal business activity within New York State (see Wohl, 661 F Supp 3d at 132). The statute provides the Attorney General with the authority to regulate businesses in New York "in the interest of securing an honest marketplace" (Coventry First LLC, 52 AD3d at 346). As discussed below, the statute does not require proof of all the elements of common-law fraud.
Before setting forth the elements of an Executive Law § 63(12) claim, and applying those elements to the factual record established below, we must first deal with a fundamental question of the statute's reach raised by defendants in their motion for summary judgment.
Defendants and Justice Friedman assert that the Attorney General exceeded her powers and misused the Executive Law in continuing this action after it became clear from discovery that defendants did nothing wrong. Because all of the transactions that underlie this case were private bilateral deals between sophisticated parties who were satisfied with the results, defendants argue that the transactions are beyond the scope of Executive Law § 63(12), which is a statute that can only be used to vindicate a public interest. According to defendants, because the private deals at issue did not affect the public, the Attorney General has no power to scrutinize them. Defendants depend on this premise to argue, variously, that the Attorney General lacks standing, or capacity to sue, and/or that the complaint fails to state a claim.
We agree that the Attorney General must demonstrate a public nexus before invoking her broad powers under Executive Law § 63(12). Executive Law § 63(1) provides that the Attorney General "shall . . . [p]rosecute and defend all actions and proceedings in which the state is interested . . . in order to protect the interest of the state."
However, this Court has already ruled in Trump I that the facts of this case warrant the application of Executive Law § 63(12), and that the Attorney General is vindicating the public interest in challenging the transactions in question (see People v Trump, 217 AD3d at 610). The law of the case doctrine "is designed to eliminate the inefficiency and disorder that would follow if courts of coordinate jurisdiction were free to overrule one another in an ongoing case" (People v Evans, 94 NY2d 499, 504 [2000]). This Court departs from the doctrine only when a prior holding is clearly erroneous, or where there has been a change in law or evidence (see Gliklad v Cherney, 140 AD3d 598, 598 [1st Dept 2016]). None of those circumstances are present here. Defendants cannot relitigate the issue of the scope of Executive Law § 63(12) under the guise that Trump I that was decided at the motion to dismiss stage (where the Attorney General is entitled to the presumption of the truth of her allegations and the benefit of all favorable inferences), as opposed to the summary judgment stage (where the Attorney General is held to the record evidence). Both stages involved the same alleged facts: "sophisticated, private parties" who engaged in the same "complex, bi-lateral commercial transactions." If defendants' arguments pertaining to the scope of Executive Law § 63(12) were persuasive, we would have dismissed the complaint in Trump I because the Attorney General would not have had the standing or capacity to pursue the case and would not have alleged "facts in support of an element of the claim" or "an enforceable right of recovery" (Connaughton v Chipotle Mexican Grill, Inc., 29 NY3d 137, 142 [2017] [motion court properly dismissed the plaintiff's complaint for failure to state a fraudulent inducement claim because actual harm was an element of the tort and the plaintiff's claims did not involve any out-of-pocket losses]).
In a futile attempt to discard the ruling in Trump I, which is now law of the case, Justice Friedman advances three arguments. First, according to Justice Friedman, Trump I does not bind us under that doctrine because that appeal involved a pre-answer motion to dismiss. Second, he argues that Trump I does not bind us because it did not "state" that the Attorney General could ultimately prevail without establishing some sort of state interest. Third, he argues that Trump I does not bind us because it did not "state" that it was the Court's intention to relieve the Attorney General of her burden to "prove" her standing under the common-law doctrine of parens patriae (which, like Executive Law § 63[12], permits a state to commence an action to protect the public interest).
That Trump I resulted from the appeal of a pre-answer motion to dismiss is of no moment. Standing "is a threshold issue" (Saratoga County Chamber of Commerce v Pataki, 100 NY2d 801, 812 [2003], cert denied 540 US 1017 [2003]).[FN6] Supreme Court recognized that "legal standing and capacity to sue are threshold litigation questions of justiciability" when it rejected defendants' standing and capacity arguments (see People v Trump, 2023 NY Slip Op 30027[U], *3). It is therefore no surprise that defendants' appellate brief in Trump I addressed this threshold issue, asserting that "the Complaint fails to identify any quasi-sovereign interest in the public's well-being, much less one that touches a substantial segment of the population, and neglects to vindicate any right that is separate and apart from the interests of private corporate titans," and that "the Complaint makes clear the only involved parties are a select few major banks and insurers who engaged in a discrete number of complex, bi-lateral transactions . . . [which are] simply not a 'substantial segment of the population,' nor can any alleged wrongdoing against a limited subset of sophisticated private parties to complex commercial agreements possibly implicate the public interest."
In rejecting defendants' very prominent arguments regarding the Attorney General's lack of authority to litigate this case, Trump I affirmed Supreme Court's denial of defendants' standing and capacity arguments, holding that:
"The Attorney General is not suing on behalf of a private individual, but is vindicating the state's sovereign interest in enforcing its legal code — including its civil legal code — within its jurisdiction (see Alfred L. Snapp & Son, Inc. v Puerto Rico ex rel. Barez, 458 US 592, 601 [1982]; see also People v Coventry First LLC, 52 AD3d 345, 346 [1st Dept 2008] [finding that claims including a claim under Executive Law § 63(12) 'constituted proper exercises of the State's regulation of businesses within its borders in the interest of securing an honest marketplace'], affd 13 NY3d 108 [2009])" (Trump I, 217 AD3d at 610).
We agree with Justice Friedman that we must not close our eyes to the fact that the parties are sophisticated or that the transactions involve complex bilateral commercial agreements (HSH Nordbank AG v UBS AG,95 AD3d 185, 207 [1st Dept 2012] [common-law fraud claim brought by sophisticated German bank was dismissed for legal insufficiency]). Clearly, Trump I did not ignore what the complaint made plain from the outset of this case nearly three years ago: that the section 63(12) claims have always involved "sophisticated, private parties" engaged in "complex, bi-lateral commercial transactions." These facts did not change because, as Justice Friedman argues, we now have a "fully developed evidentiary record" which is "tens of thousands of pages." That record still centers around the same "sophisticated, private parties" engaged in the same "complex, bi-lateral commercial transactions."
Justice Friedman's reliance on People v Grasso (11 NY3d 64, 69 n 4 [2008]), for the proposition that the Attorney General must "prove" a quasi-sovereign interest distinct from that of a particular party under the common-law doctrine of parens patriae, fares no better. There, the existence of a quasi-sovereign interest was determined at the outset of the case by reviewing the allegations in the complaint (see id. at 66-67). The Court of Appeals used the word "prove," but the decision did not cite or consider any evidentiary proof (see id. at 69 n 4). In fact, Grasso relied on Alfred L. Snapp & Son, Inc. v Puerto Rico (458 US 592, 607 [1982]), which like Grasso, determined the existence of a quasi-sovereign interest at the outset of the case by reviewing the allegations in the complaint (see Alfred L. Snapp & Son Inc., 458 US at 609). In lieu of using the word prove, Alfred L. Snapp & Son, Inc. used the words "articulate" or "express" to explain the common-law doctrine of parens patriae:
"In order to maintain such an action, the State must articulate an interest apart from the interests of particular private parties, i.e., the State must be more than a nominal party. The State must express a quasi-sovereign interest. Although the articulation of such interests is a matter for case-by-case development — neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract — certain characteristics of such interests are so far evident. These characteristics fall into two general categories. First, a State has a quasi-sovereign interest in the health and well-being — both physical and economic — of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system" (Alfred L. Snapp & Son, Inc., 458 US at 607).[FN7]
Even if Trump I had not already rejected defendants' argument, we would have no problem doing so at this juncture. It is simply not the case, as defendants and Justice Friedman argue, that if the counterparties to a financial transaction do not complain or bring suit, then there is no role for a governmental actor such as the Attorney General empowered by appropriate legislation to scrutinize the transaction in question in order to protect the market in which the transaction is embedded. Defendants' argument appears to rest on the premise that market actors will police themselves and, if sophisticated parties in a business transaction walk away happy, governmental intervention of any kind is illegitimate. If that were the case, we would have no antitrust law, no Securities and Exchange Commission, and no Martin Act, to cite three examples among many. In some circumstances fraudulent or illegal business conduct occurs in the absence of any harm to a counterparty. It might be too costly for the counterparty to pursue a claim. Additionally, a counterparty may have little incentive to pursue a claim because its interests are aligned with the fraudster's, rather than with the public's. Justice Friedman questions how a counterparty could be defrauded if its interests are aligned with the fraudster's. Notably, this question overlooks the purpose of Executive Law § 63(12) which is to protect the public at large from fraud and illegality.
A governmental entity with a legislative mandate may determine that it needs to intervene precisely when sophisticated counterparties reap gains with no evident effect on the public, if one or both of the counterparties do so by engaging in fraudulent or illegal behavior that could cascade in subsequent transactions into disaster. We have, in the not-too-distant past, the wreckage of the residential mortgage-backed securities market in the first decade of this century and the ensuing Great Recession as examples of government's failure to attend to market hygiene. Faced with the very public Congressional testimony of Michael Cohen, the Attorney General had the power under the Executive Law to investigate whether the transactions in question were infected by fraud or illegality, and, if they were, to seek redress from the actors responsible for the fraud and illegality. This power to deter defendants, and others, from engaging in future malfeasance in New York's credit markets, is within the core purpose of the statute.[FN8] The Legislature could find that prophylactic intervention in markets can avert harm to the public at large.
According to Justice Friedman, all we have before us are "run-of-the-mill transactions," allegations from Michael Cohen that "were no different than those made in hundreds of business tort actions filed in this state every year," and Michael Cohen's testimony about the SFCs that were "no more compelling than the allegations in hundreds of lawsuits pending in New York County." We disagree. Given the context in which this case arose nothing here was "run-of-the-mill." Once Cohen testified before Congress, and alleged that President Trump inflated his assets in conducting New York business, the Attorney General's "interest of securing an honest marketplace" in which to conduct business in New York was implicated (Coventry First LLC, 52 AD3d at 346), as well as her interest in securing a "marketplace that adheres to standards of fairness" (New York v Amazon.com, Inc., 550 F Supp 3d 122, 131 [SD NY 2021]).
Defendants and several amici argue that the Attorney General's use of Executive Law § 63(12) constitutes too broad a conferral of power, and that this case represents an exercise of governmental overreach that will have a severely negative effect on New York's business environment. It is not the role of courts to determine the wisdom of economic oversight and intervention allowed by the Legislature, so long as such interventions do not run afoul of the state or federal constitutions. The Lochner era in the early years of the twentieth century provides a cautionary example of damage caused by court-made economic doctrine.[FN9] Our job here is simply to determine if the legislature gave the Attorney General power to use Executive Law § 63(12) as she did herein. Courts "must read statutes as they are written and, if the consequence seems unwise, unreasonable or undesirable, the argument for change is to be addressed to the Legislature, not to the courts" (People v Kupprat, 6 NY2d 88, 90 [1959]; see also Morales v County of Nassau, 94 NY2d 218, 224 [1999]; Jensen v General Elec. Co., 82 NY2d 77, 84 [1993]). Thus, "[w]here the practical construction of a statute is well known, the Legislature is charged with knowledge and its failure to interfere indicates acquiescence" (Engle v Talarico, 33 NY2d 237, 242 [1973]).
It is not surprising that the amici supporting defendants have a different view. Their predictions of future harm to New York's business communities, and thus to the public interest, are based in general preferences for less governmental intervention in markets. That is not to say that their point of view is invalid; only that their predictions are based in a certain economic agenda and not in undisputed fact. If New York's business communities are concerned that the Executive Law gives the Attorney General too much power, then their remedy is to persuade the Legislature to cabin that power. It is worth noting that the Legislature has long been aware of section 63(12)'s critics, who, like defendants, have claimed that the statute gives the Attorney General too much power.[FN10] Notably, the statute has never been amended to circumscribe the Attorney General's power.[FN11] As Justice Friedman points out, Executive Law § 63(12) cases have predominately involved the interests of consumers or investors. However, the statute does not textually limit the type of case that the Attorney General may bring "in the name of the people of the state of New York" (Executive Law § 63[12]).
Justice Friedman finds, in conclusory fashion, that certain statements made by the Attorney General before she assumed that office demonstrate that "this action certainly appears to constitute an instance of selective enforcement of section 63(12) in retaliation for President Trump's exercise of his First Amendment right to participate in the political process." These statements included criticisms of President Trump, asserting that he was "incompetent," and "ill-equipped to be president." She also stated, among other things, that she had her "eyes on Trump Tower" and on the business practices of defendants. One can reasonably question whether a candidate running for the top law enforcement position in statewide government should make such pointed statements. However, soon after her election, the Attorney General was confronted by Michael Cohen's Congressional testimony. Refusing to investigate because of any appearance of bias that may have been caused by her earlier campaign remarks would have been a derogation of duty. In all events, this Court has already put this issue to rest.
Justice Friedman exhumes this constitutional argument even though we previously rejected it in the Special Proceeding and on the prior appeal of the motion to dismiss. Defendants did not make this argument on their motion for summary judgment, or at trial, or on this appeal. "It is well settled that an appellate court's scope of review is generally limited to those issues that have been appealed" because litigants should not "be blindsided by a decision based on issues not even raised or addressed in their briefs, as to implicate due process concerns" (McHale v Anthony, 41 AD3d 265, 266-267 [1st Dept 2007]; see also Williams v State of New York, 235 AD2d 776, 777 [3d Dept 1997], lv denied 90 NY2d 806 [1997] [constitutional issues not raised on appeal are deemed abandoned]).[FN12] Moreover, constitutional issues not raised at summary judgment or at trial are unpreserved for appellate review (see Matter of East 85th Garage LLC v New York City Dept. of Bldgs., 233 AD3d 535, 536 [1st Dept 2024] [constitutional argument based on the Eighth Amendment of the United States Constitution was not raised at an OATH hearing, and therefore was unpreserved for appellate review]).[FN13]
The evidence relied upon by Justice Friedman is the same evidence that defendants proffered in support of their motions to quash various subpoenas in the related Special Proceeding. On their appeal from Supreme Court's denial of their motions to quash, defendants referenced, as Justice Friedman does here, "the many inappropriate public statements made by Ms. James [that] demonstrates her unrequited bias," and that those statements demonstrated that she acted with "malicious[,] bad faith intent" and the intent to "inhibit or punish [defendants] constitutional rights—namely those afforded under the First Amendment—since it is clear that she impermissibly targeted them based on their political views, affiliations, ideologies and/or beliefs, which are diametrically opposed to her own."
However, this Court rejected that argument, holding that:
"To the extent a selective prosecution claim may, in some circumstances, defeat a subpoena in a civil investigation, the court properly rejected appellants' arguments. A claim of selective prosecution requires a showing "that the law has been administered 'with an evil eye and an unequal hand'" (People v Goodman, 31 NY2d 262, 269 [1972], quoting Yick Wo v Hopkins, 118 US 356, 373-374 [1886]). A party must show that it was selectively treated, compared with others similarly situated, and that such treatment was based on impermissible considerations (see Bower Assoc. v Town of Pleasant Val., 2 NY3d 617, 631-632 [2004]). OAG began its investigation after public testimony of a senior corporate insider and reviewed significant volumes of evidence before issuing the subpoenas. Appellants have not identified any similarly implicated corporation that was not investigated or any executives of such a corporation who were not deposed. Therefore, appellants have failed to demonstrate that they were treated differently from any similarly situated persons (see id. at 632; compare Matter of 303 W. 42nd St. Corp. v Klein, 46 NY2d 686, 696 [1979] [the petitioner established selective prosecution by showing at least 21 similarly situated entities that had been treated more favorably])" (Matter of People v Trump Org., Inc., 205 AD3d 625, 626-627 [1st Dept 2022]).
Defendants again raised a selective prosecution argument in this action when they moved to dismiss the complaint. This was proper given that the issue was previously decided in a different context: that is, in opposition to a prelitigation investigation. In the instant action, defendants again argued that the Attorney General misused Executive Law § 63(12) "as applied" to defendants because she selectively prosecuted them in violation of the Equal Protection Clause of the United States and New York State Constitutions. Bower Assoc. v Town of Pleasant Val. (2 NY3d 617 [2004]), which was cited in Matter of People v Trump Org., Inc. (205 AD3d at 627), is instructive. In Bower Assoc., the Court of Appeals opined that "a violation of equal protection arises where first, a person (compared with others similarly situated) is selectively treated and second, such treatment is based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person" (2 NY3d at 631). Whether someone is similarly situated depends on "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent" (id. [internal quotation marks omitted]). However, even if someone is similarly situated, "[w]hat matters is impermissible motive: proof of action with intent to injure—that is, proof that the applicant was singled out with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances" (id. [internal quotation marks omitted]).
Given this relevant standard, defendants argued in their motions to dismiss that the Attorney General singled them out with "an unequal hand," because she had not previously intervened in private transactions to enforce the contract rights of sophisticated parties, and that she did so with "an evil eye," as proven by her statements as a political candidate to fulfill a personal and political agenda. However, Trump I, which is now law of the case, did not dismiss the complaint when faced with these arguments. That is not surprising because 1) a novel application of a statute is not evidence that defendants were treated differently than a similarly implicated person or organization and 2) no facts changed between the decision in Matter of People v Trump Org., Inc. and Trump I to show that defendants "were treated differently from any similarly situated persons" (Trump Org., Inc., 205 AD3d at 627).
Defendants also raised and lost a First Amendment argument in federal court. Attempting to outflank the Attorney General's investigation, defendants brought a declaratory judgment action in the Northern District of New York against the Attorney General, alleging, among other things, that she commenced the Special Proceeding against them in bad faith and without a legally sufficient basis in violation of the due process clause of the Fourteenth Amendment and in retaliation for President Trump's political views in violation of the First Amendment (see Trump v James, 2022 US Dist LEXIS 95250 [ND NY, May 27, 2022, No. 1:21-cv-1352 (BKS/CFH)]). The District Court dismissed the complaint based on, among other things, defendants' failure to establish that the bad faith exception to the Younger abstention doctrine applied.[FN14] The District Court found that "the subpoena enforcement proceeding has a legitimate factual predicate" noting, among other things, that "the investigation was opened" following the Congressional testimony of Michael Cohen (id. at *38). The federal court also reasoned that "[w]hile [the Attorney General's] public statements make clear that she disagrees vehemently with Mr. Trump's political views, Plaintiffs do not identify what protected speech or conduct [the Attorney General] allegedly retaliated against them for or demonstrate any causal connection between any such protected activity and the decision to commence the subpoena enforcement proceeding" (id. at *39). Consequently, that case was dismissed.
If the constitutional arguments had any merit, defendants and their sophisticated counsel would have placed the issue squarely before us. In any event, defendants' argument that this case does not implicate a public interest does not, in turn, implicate constitutional concerns. Defendants concern about future viewpoint discrimination only implicates the constitutional concern that we, as judges, do not render advisory opinions, especially where the issues are not before us.
Justice Friedman invokes Gonzalez v Trevino (602 US 653 [2024]), but that case does not support his position. The plaintiff in Gonzalez, a recently elected office holder, alleged that her First Amendment rights were abridged by a retaliatory arrest orchestrated by her political opponents. The general rule in retaliatory arrest cases is that a plaintiff must plead and prove the absence of probable cause for the arrest. Gonzalez involved an exception to that general rule, known as the "Nieves" exception, articulated in Nieves v Bartlett (587 US 391 [2019]). Under the Nieves exception, the presence of probable cause does not defeat a plaintiff's constitutional claim if the plaintiff "presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been" (id. at 407). The Nieves exception was created because officers can use their discretion not to arrest someone where probable cause exists and "an unyielding requirement to show the absence of probable cause could pose a risk that some police officers may exploit the arrest power as a means of suppressing speech" (id. at 406 [internal quotation marks omitted]). Gonzalez merely clarified that the Nieves exception does not demand "virtually identical and identifiable comparators" (Gonzalez, 602 US at 658).
Justice Friedman seizes on Gonzalez's reasoning that a plaintiff is more likely to fall within the Nieves exception where "the criminal prohibition is longstanding and the conduct is not novel" yet the officer exercises his or her discretion to arrest the plaintiff but not the similarly situated comparators (id. at 658). In Justice Friedman's view, because this case involves a new application of Executive Law § 63(12) and because defendants' conduct is not novel but "typical" of the real estate industry, the Attorney General must have brought this action in retaliation for defendants' exercise of their First Amendment rights.
Justice Friedman's invocation of Gonzalez fails for several reasons. First, Justice Friedman's argument is based on his view that this case does not involve a public interest. Four Justices of this Court disagree, as well as the panel in Trump I. Second, Gonzalez is a case that concerns the burden of proof in pleading a retaliatory arrest case, which is not at all what this case is about. The Nieves exception was created because in retaliatory arrest cases the plaintiff usually has the burden to plead and prove the absence of probable cause. Here, no one argues that defendants bear the burden to plead and prove the absence of a public interest. Third, unlike Gonzalez, defendants have not produced evidence that they were treated differently from any comparators. Here, the unusual application of the statute is readily explained by the unusual facts of this case, which includes Michael Cohen's testimony before Congress. Finally, Justice Friedman's position overlooks that "[w]here false claims are made to effect a fraud or secure moneys or other valuable considerations, say, offers of employment, it is well established that the Government may restrict speech without affronting the First Amendment" (United States v Alvarez, 567 US 709, 723 [2012]).
Justice Friedman also speculates, as defendants do, that the position of a majority of this panel will "inevitably make the use of the statute so selective and arbitrary as to create serious doubts as to its constitutionality, as applied, under the First Amendment to the United States Constitution" and that "we may expect" that the statute will be used as a tool of viewpoint discrimination. It has long been established that courts of this state "do not give advisory opinions" which "is not the exercise of the judicial function" (Self-Insurer's Assn. v State Indus. Commn., 224 NY 13, 16 [1918] [Cardozo, J.]). This principle "is not merely a question of judicial prudence or restraint; it is a constitutional command defining the proper role of the courts under a common-law system" (New York Pub. Interest Research Group v Carey, 42 NY2d 527, 529-530 [1977]).
In this appeal, we have before us an actual record which demonstrates clearly that defendants committed fraud and illegality squarely within the ambit of Executive Law § 63(12). We do not have before us some hypothetical future misuse of the statute. The record also refutes Justice Friedman's implication that the judicial system is being used for "political ends" in this litigation. The antithesis is true. Given the evidence uncovered during the Attorney General's investigation, which is discussed at length below, the "political" choice would have been to not bring this case, thereby avoiding a fight with a powerful adversary. Her allegations have been tested at every stage of this maximalist litigation and for the most part have been upheld. We now have before us the evidence the Attorney General amassed and it demonstrates that defendants engaged in a decade-long pattern of financial fraud and illegality.
We next turn to the specific findings of Supreme Court below. Because the parties' respective evidentiary burdens vary at summary judgment and trial, it is necessary to analyze the Summary Judgment Order and Posttrial Order separately, even though there was a great deal of overlap in the evidence presented by the parties in both procedural postures.
At the outset, we find that the proper burden of proof for claims under Executive Law § 63(12), whether based in fraud or illegality, is preponderance of the evidence. We agree with Justice Higgitt that the case law cited by the parties on this point is not "particularly compelling." It may be that this dearth of authority comes from courts' assumption that the preponderance of the evidence standard applies because it is the default burden of proof in civil cases. Certainly, we have found no state appellate authority that has adopted in Executive Law § 63(12) cases the heightened "clear and convincing" burden of proof, which is the burden urged by Justice Friedman. The few lower court decisions that specify a burden under Executive Law § 63(12) have adopted the preponderance of the evidence standard (see e.g. People v Exxon Mobil Corp., 65 Misc 3d 1233[A], 2019 NY Slip Op 51990[U] [Sup Ct, NY County 2019]; People v Nationwide Asset Servs., Inc., 26 Misc 3d 258, 278 [Sup Ct, Erie County 2009] [applying the clear and convincing burden to common-law fraud, and the lesser burden to Executive Law § 63(12)]).
Justice Friedman cites only two inapposite cases in support of his argument that Executive Law § 63(12) claims must be proven by clear and convincing evidence. Neither case concerns Executive Law § 63(12). People v Wyatt (89 AD3d 112 [2nd Dept 2011, lv denied 18 NY3d 803 [2012]) involves the People's burden of proof under the Sex Offender Registration Act (SORA) to show a sex offender's likelihood of reoffense or danger to the community. Addington v Texas (441 US 418 [1979]) involves the burden of proof under a Texas civil commitment law. These two cases require a heightened burden of proof because they involve both the stigma of branding a person a continuing risk to society and the deprivation of that person's liberty.[FN15] Here, defendants are accused of financial malfeasance, and face remedies that do not curtail their physical liberty. There is no analogy.
In any event, even if we were to apply the clear and convincing burden of proof, we would find that the evidence presented by the Attorney General on summary judgment and at trial amply satisfies that standard.
B. The Summary Judgment Decision
The proponent of a motion for summary judgment must "make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985]). The evidence must be viewed in the "light most favorable" to the nonmoving party (Branham v Loews Orpheum Cinemas, Inc., 8 NY3d 931, 932 [2007]). "It is not the function of a court deciding a summary judgment motion to make credibility determinations or findings of fact, but rather to identify material triable issues of fact (or point to the lack thereof)" (Vega v Restani Constr. Corp., 18 NY3d 499, 505 [2012]). Only after a prima facie showing is made does the burden shift to the party opposing summary judgment to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action (see Zuckerman v City New York, 49 NY2d 557, 562 [1980]).
Supreme Court correctly awarded partial summary judgment to the Attorney General, and correctly denied defendants' motion for summary judgment, after determining that the Attorney General proved that there were no triable issues of fact concerning the Executive Law § 63(12) cause of action insofar as it was based on fraud (not illegality). This type of section 63(12) claim is sometimes called a "standalone claim" because it is not predicated on violation of another statute.
The record before the court on summary judgment was voluminous. However, volume does not inevitably demonstrate the existence of issues of fact. For the reasons set forth below, we find that the record made on summary judgment clearly demonstrates defendants' liability under Executive Law § 63(12). Moreover, as discussed in section C below, even if Supreme Court erred in granting summary judgment to the Attorney General, the record at trial overwhelmingly supports Supreme Court's finding of liability for violations of the Penal Law.
1. Elements of an Executive Law § 63(12) Fraud Claim
As currently amended, Executive Law § 63(12) states that:
"Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, to the supreme court of the state of New York, on notice of five days, for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages and, in an appropriate case, cancelling any certificate filed under and by virtue of the provisions of . . . [General Business Law § 130], and the court may award the relief applied for or so much thereof as it may deem proper."
Executive Law § 63(12) was modeled on the Martin Act, which was originally passed in 1921 (see Mem of Atty Gen Louis J. Lefkowitz to Governor, Bill Jacket, L 1965, ch 666 at 3, 1965 NY Legis Ann at 30) and is New York's version of federal "Blue Sky" laws (see People v Credit Suisse Sec. [USA] LLC, 31 NY3d 622, 630 [2018]). The Martin Act applies to fraudulent conduct in the limited context of securities, whereas Executive Law § 63(12) applies to fraudulent conduct in a much broader context.
In 1965, Executive Law § 63(12) was amended to "equate the meaning of the words 'fraud' and 'fraudulent' as used in the statute with the provisions of the Martin Act" (Credit Suisse Sec. [USA] LLC, 31 NY3d at 633). Thus, courts look to the Martin Act for guidance in interpreting Executive Law § 63(12) because the definition of "fraud" and "fraudulent" under Executive Law § 63(12) "is virtually identical to language found in section 352 of the Martin Act" (id.; see also State of New York v Rachmani Corp., 71 NY2d 718, 721 n 1 [1988]).
This definition of fraud does not incorporate all the elements of common-law fraud.[FN16] Executive Law § 63(12) and the Martin Act expand liability beyond that recognized under common-law fraud and dispense with the common-law fraud requirements of justifiable reliance and fraudulent intent (see Matter of People v Trump Entrepreneur Initiative LLC, 137 AD3d 409, 417 [1st Dept 2016] ["the Attorney General may rely on [section] 63(12) for a cause of action and need not limit itself to claims for common-law fraud only"]; Credit Suisse, 31 NY3d at 632 [the Martin Act "expands upon, rather than codifies, the common law of fraud" and "imposes numerous obligations—or 'liabilities'—that did not exist at common law"]; State of New York v Sonifer Realty Corp., 212 AD2d 366, 367 [1st Dept 1995] [the "fraudulent practices targeted by the [Martin Act] need not constitute fraud in the classic common law sense"]).
Defendants and the Attorney General agree that to establish a violation of the statute, the SFCs must have had "the capacity or tendency to deceive, or create[d] an atmosphere conducive to fraud" (People v General Elec. Co., 302 AD2d 314, 314 [1st Dept 2003]). However, as discussed at greater length below, the parties disagree on how to apply the test under the facts of this case, and whether the Attorney General must establish materiality in connection with this test.
In support of her motion for partial summary judgment the Attorney General relied primarily on the SFCs and other documents, as well as defendants' deposition testimony, to prove her prima facie case. The Attorney General did not rely on expert testimony. She may have done this to avoid even the appearance of a "battle of the experts," as courts, sometimes reflexively, often find that dueling expert opinions demonstrate issues of fact that preclude summary judgment. By contrast, in opposing the Attorney General's motion and in advancing their own, defendants relied heavily on expert testimony. As discussed at greater length below, this expert testimony did not rebut the Attorney General's prima facie case and create an issue of triable fact because it relied solely on general business concepts that are untethered to defendants' actual business practices as revealed in the documentary evidence and the undisputed facts established by the record submitted on summary judgment.
2. The SFCs' Content, Use and Preparation
Based on the documentary evidence, the Attorney General carried her prima facie burden to show that the 2014-2021 SFCs fraudulently inflated the estimated current value of President Trump's assets. Defendants repeatedly and persistently used the SFCs in conducting business in New York, employing deceptive strategies that varied from year to year to inflate the estimated current values of President Trump' s assets (see e.g. People v Greenberg, 95 AD2d 474 [1st Dept 2012] [scheme converting insurer's underwriting loss to a capital loss was per se deceptive under Executive Law § 63(12)], affd 21 NY3d 439 [2013]; Matter of People v Orbital Publ. Group, Inc., 169 AD3d 564 [1st Dept 2019] [solicitations were per se materially misleading under Executive Law § 63(12) despite disclaimers]; Matter of Lefkowitz v Bull Inv. Group, 46 AD2d 25 [3d Dept 1995] [an investment group's promotion of the Golden Book of Values was prima facie fraudulent and the dealership franchise plan was inherently fraudulent under Executive Law § 63(12)]).
The Attorney General identified the following primary deceptive strategies, among others, used by defendants to improperly inflate assets:
1. Cash, Cash Equivalents, and Marketable Securities. Between 2013 and 2021, defendants included "cash" holdings of as much as $93.1 million for President Trump's minority stake in Vornado Partnership Interests (Vornado). Defendants did so even though President Trump did not control the partnership, and thus did not have the right to use or withdraw funds held by Vornado.[FN17]
2. Trump Park Avenue. Defendants valued Trump Park Avenue, a residential building in Manhattan, between $90 million and $350 million between 2011 and 2021, despite an appraisal of only $72.5 million. The appraisal, unlike defendants' valuations, correctly accounted for many of the unsold residential units as rent-stabilized units, not market rate units. Rent-stabilized units are less valuable than market rate units.
3. 40 Wall Street. Defendants valued 40 Wall Street between $525 million and $796 million between the years of 2011 and 2021, despite appraisals ranging between $200 million and $540 million.
4. Seven Springs. Defendants valued Seven Springs, a 212-acre parcel of land in Westchester, between $261 million and $291 million between 2011 and 2021, despite a 2000 appraisal reflecting that the "as-is" market value for residential development was only $25 million.
5. The Triplex. Defendants misrepresented that President Trump's condominium apartment in Trump Tower (the Triplex) occupied 30,000 square feet, instead of its actual 10,996 square footage and inflated the price per square foot, resulting in valuations ranging between $80 million and $327 million from 2011 through 2021, and inflating its value by up to $200 million through 2017. In October 1994, President Trump executed a consent to the First Amendment to the Declaration of Trump Tower Condominium that reflected the Triplex was 10,996.39 square feet. It was only after Forbes published a May 2017 article entitled "Donald Trump has Been Lying About the Size of His Penthouse," which estimated the value of the Triplex as $64 million, that SFCs from 2017 through 2021 used the correct square footage although the price per square foot continued to be inflated.
6. Mar-a-Lago. Defendants' valuations for Mar-a-Lago did not consider land restrictions and limitations that were agreed to and signed by President Trump, and which precluded the use of the property for anything other than a social club in exchange for reduced real estate and income tax benefits. As discussed at greater length below, each SFC between 2014 and 2021 overvalued Mar-a-Lago as if it could be sold as an unrestricted private residential property, contrary to the reality that Mar-a-Lago's use was restricted to a social club.
7. Aberdeen. Defendants valued the Aberdeen golf property in Scotland as if over 2,500 private residences could be constructed and sold, when defendants obtained approval to develop less than 1,500 accommodations — most of which were unprofitable short-term rentals. Subsequently, defendants based their valuations on the assumption that 2,035 private homes could be developed and sold despite the Trump Organization's application to reduce the project to 550 residences due to lack of profitability, which was approved. From year to year, the SFCs inflated the value of this property between $59 and $283 million.
8. Brand Premium. Defendants inflated the values of golf club properties between 15% to 30% based on the value purportedly associated with the Trump brand name, even though the SFCs provided that "goodwill attached to the Trump name has significant financial value that had not been reflected in the preparation of this financial statement."
The inflation of these assets varied sometimes from year to year, but the court correctly found based on the documentary evidence that the SFCs for 2014 through 2021 fraudulently inflated President Trump's net worth by material amounts, ranging between $812 million and $2.2 billion.
Because the SFCs are at the center of this case, it is important to first understand how they were prepared. The SFCs, which reflect President Trump's net worth as of June 30 of each relevant year, were prepared using the format of the single authoritative source of nongovernmental GAAP known as Accounting Standards Codification (ASC) 274. President Trump was responsible for "the preparation and fair presentation" of the 2014 and 2015 SFCs in accordance with GAAP, and the Donald J. Trump Revocable Trust (the Trust) bore that responsibility for the 2016 through 2021 SFCs.[FN18]
President Trump's personal accountants only "compiled" the SFCs based on information given to them by the Trump Organization.[FN19] McConney, and later junior Trump Organization employee Patrick Birney, forwarded the valuations to the outside accountants with supporting documents and excel spreadsheets denominated as "Jeff's supporting data" or "Jeff's supporting schedule" (referring to McConney). The distinction between "compiled" and "audited" is significant. An audited statement provides the highest level of assurance to a user because the accountant is obligated to, among other things, ensure that the financial statements and information provided by management is reliable and GAAP-compliant (see William Iselin & Co. v Mann Judd Landau, 71 NY2d 420, 424 [1988]). By contrast, as defendants and their experts acknowledged, a compilation provides the lowest level of assurance to the user because the accountant is not required to perform any procedures to verify the accuracy or completeness of the information provided by management, and the accountant has no obligation to assess fraud risk.[FN20]
Mazars, which compiled all but one of the SFCs, ultimately became so concerned with the reliability of SFCs that they terminated their long-term relationship with the Trump Organization by letter dated February 9, 2022, citing "a non-waivable conflict of interest." The letter also advised the Trump Organization that, in light of the Attorney General's litigation and Mazars's own investigation based on internal and external sources, the "Statements of Financial Condition for Donald J. Trump for the years ending June 30, 2011 - June 30, 2020, should no longer be relied upon and you should inform any recipients thereof who are currently relying upon one or more of those documents that those documents should not be relied upon."
In her motion for partial summary judgment, the Attorney General demonstrated that defendants used the false and misleading SFCs in connection with five loan transactions:
1. A $125 million Deutsche Bank loan issued in connection with purchasing and developing the Doral Golf Resort and Spa in Miami, Florida, which closed on June 11, 2012 (the Doral Loan).
2. A Deutsche Bank loan issued in connection with refinancing an existing $130 million loan for Trump Chicago, a hotel owned and managed by Trump entities, which closed on November 9, 2012 (the Trump Chicago Loan).
3. A $170 million Deutsche Bank construction loan issued in connection with redeveloping the Old Post Office in Washington, D.C. into a luxury hotel, which closed on August 12, 2014 (the OPO Loan).
4. A Ladder Capital Finance LLC loan issued in connection with refinancing a $160 million mortgage for the Manhattan building known as 40 Wall Street, which closed in November 2015 (the 40 Wall Street Loan).
5. An $8 million loan from Royal Bank of Pennsylvania (later acquired by Bryn Mawr Bank), to Seven Springs LLC, which closed sometime in 2000, and was modified in 2014 and 2019 (the Seven Springs Loan), for a parcel of land in Bedford, New York.
Each of these loans required recourse in the form of a personal guaranty from President Trump. The SFCs were required components of the guaranties, and, as discussed at greater length below, the loan documents required the annual submission of the SFCs during the lives of the loans. With respect to the three Deutsche Bank loans, by personally guaranteeing the loans President Trump was able to apply to Deutsche Bank's Private Wealth Management Division for loans with significantly lower interest rates than would otherwise have been available from the bank's Commercial Real Estate Division.
The Attorney General also submitted evidence that defendants used the false and misleading SFCs in connection with the two insurance transactions at issue herein: the Zurich Policy underwritten between 2007 and 2021, and the D&O Policy underwritten by HCC starting in December 2016.
The documentary evidence supports Supreme Court's conclusion that the Attorney General made a prima facie showing that each defendant participated in the fraudulent scheme. The following evidence is gleaned from the summary judgment record.
Weisselberg was Chief Financial Officer of the Trump Organization from at least 2011 until he resigned and became a Senior Advisor to the Trump Organization in August of 2022, after pleading guilty to charges of tax fraud. Weisselberg had a primary role in preparing the SFCs together with McConney and Birney, both of whom reported to him. Weisselberg was not a Certified Public Accountant and, as he stated at trial, he only "[knew] of GAAP" having "heard the term used before, but I — that's about it."
After January 2017, Donald Trump Jr. and Weisselberg, as the co-trustees of the Trust, were ultimately responsible for the preparation and accuracy of the SFCs. From 2014 through 2020, Weisselberg signed letters to Mazars representing that the asset valuations in each of the corresponding year's statement were accurate and that no relevant information was withheld.
McConney was Controller of the Trump Organization from the early 2000s through at least 2022 and he led the preparation of all SFCs since the 1990s. As noted above, McConney was responsible for assembling the SFC documentation and sending it to the accountants along with his supporting data spreadsheets.
President Trump controls and has beneficial ownership of approximately 500 entities that do business as the Trump Organization, including ownership of the assets listed in the SFCs, which are owned through the Trust. He was also responsible for the 2014 and 2015 SFCs. Weisselberg testified in his deposition that he would provide the SFCs to President Trump for his review, editing, and approval. McConney similarly testified in his deposition that President Trump would have "the final review" of the SFCs with Weisselberg.
Since 2011, Donald Trump Jr. and Eric Trump were Executive Vice Presidents in the Trump Organization. In January 2017, they became co-chief executives of the organization and acted as agents with power of attorney to execute certificates of compliance for the loans on behalf of President Trump. Donald Trump, Jr. signed the representation letters to the outside accountants for the SFCs from 2016 through 2021, along with Allen Weisselberg, representing to the accountants that the asset valuations in the statements were accurate and that no relevant information was withheld. He also signed guarantor compliance certificates for the loans, as attorney-in-fact for his father, certifying that the 2016, 2017, 2018, and 2019 SFCs "present[] fairly in all material respects the financial condition of Guarantor at the period presented." Eric Trump signed guarantor compliance certificates in connection with the loans, as attorney-in-fact for his father, in October 2020 and October 2021. In 2019, Eric Trump signed a loan modification agreement in connection with the Seven Springs Loan, in his capacity as President of Seven Springs LLC, and an agreement as attorney-in-fact for President Trump reaffirming his obligation as guarantor on the loan. The entity defendants participated either through the conduct of their officers or trustees (including President Trump, Donald Trump Jr., Eric Trump, Allen Weisselberg, and Jeffrey McConney), or as a borrower on one of the loans.
3. The SFCs' Capacity and Tendency to Deceive and Create an Atmosphere Conducive to Fraud
Defendants and the Attorney General agree that to establish a violation of the statute, the SFCs must have had "the capacity or tendency to deceive, or create[d] an atmosphere conducive to fraud" (General Elec. Co., 302 AD2d at 314). However, as discussed at greater length below, the parties disagree on how to apply the test to the facts of this case, and whether the Attorney General must establish materiality in connection with this test. According to defendants, the deceptive nature of the SFCs must be viewed through the lens of a sophisticated bank or insurance company. The Attorney General disagrees, arguing that the question is properly viewed from the lens of an ordinary person, including the "ignorant, the unthinking, and the credulous." We agree with defendants.
To support her argument, the Attorney General cites People v General Elec. Co.,a consumer case brought by a previous New York State Attorney General alleging deceptive practices in the marketing and sale of dishwashers in violation of Executive Law § 63(12) and General Business Law § 349. To determine whether the conduct was fraudulent under section 63(12), the General Electric Court looked to "whether the targeted act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud" (302 AD2d at 314). Of course, that is the standard we apply here, but the business context in General Electric, which involved unsuspecting consumers, was different from the one herein. The General Electric Court held that section 63(12) protects not only the average consumer, but "the ignorant, the unthinking and the credulous who, in making purchases, do not stop to analyze but are governed by appearances and general impressions" (Guggenheimer v Ginzburg, 43 NY2d 268, 273 [1977]).
Because Executive Law § 63(12) is modeled on the Martin Act, and not General Business Law § 349, it makes no sense to view the test through the lens that the Attorney General proposes. Contrary to the Attorney General's position, the capacity or tendency to deceive sophisticated banks and insurance companies cannot be equated with the capacity or tendency to deceive the average consumer, let alone one who does stop to think when making purchases. Accordingly, we agree with defendants, Justice Friedman, and Justice Higgitt, and find that the test must be viewed in the context of commercially sophisticated counterparties.
Viewing the SFCs through the lens of a sophisticated counterparty, however, does not mean that common-law fraud principles such as due diligence and justifiable reliance are then engrafted on the statute. Notably, defendants and Justice Friedman share the view that even if the estimated current values were calculated based on undisclosed false facts and fallacious assumptions internal to the Trump Organization, a fraud claim under Executive Law § 63(12) would still fail because sophisticated counterparties are obligated by New York law to perform their own due diligence and must protect themselves from fraud (see HSH Nordbank AG, 95 AD3d at 193-195). Justice Higgitt also adopts the concept of due diligence but finds that evidence of "[r]ecorded property restrictions and the availability of independent assessment" raises issues of fact. We disagree with these arguments.
Executive Law § 63(12) does not tie the determination of whether a defendant commits "fraud" or "fraudulent" acts in carrying on, transacting, or conducting New York business to whether a counterparty exercised due diligence or justifiably relied on the fraudulent conduct or whether the practice in the counterparty's industry is to conduct due diligence. The statute does not mention the conduct of the counterparty that is the subject of the fraudulent or illegal acts or industry practices. Rather, the statute is violated "[w]henever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business." Because only the conduct of the person alleged to have violated the statute is relevant, due diligence has no relevance to a section 63(12) claim.
Moreover, we disagree with Justice Higgitt's reasoning that issues of fact are raised considering the sophisticated counterparties' "means and inclination to test [the SFCs] accuracy." Common-law fraud principals are inapt in the application of Executive Law § 63(12) for good reason. As illustrated by HSH Nordbank AG, even a sophisticated counterparty with the means and inclination to test the risks of a transaction can incur huge losses (there, allegedly $500 million), because the counterparty is "lax" in protecting itself (HSH Nordbank AG, 95 AD3d at 188-189, 197 [internal quotation marks omitted] [common-law fraud claim asserted by a German commercial bank with assets of � billion was dismissed for legal insufficiency because the bank could have protected itself from the alleged misrepresentations through the exercise of due diligence]).
As noted above, Executive Law § 63(12) and the Martin Act expand liability beyond that recognized under the common law (see Matter of People v Trump Entrepreneur Initiative LLC, 137 AD3d at 417 ["fraud under [section] 63(12) may be established without proof of . . . reliance," and "the Attorney General may rely on [section] 63 (12) for a cause of action and need not limit itself to claims for common-law fraud only"]; see also Credit Suisse, 31 NY3d at 632 [the Martin Act "expands upon, rather than codifies, the common law of fraud" and "imposes numerous obligations—or 'liabilities'—that did not exist at common law"]; Sonifer Realty Corp., 212 AD2d at 366, 367 [the "fraudulent practices targeted by the [Martin Act] need not constitute fraud in the classic common law sense"]). The two anti-fraud statutes dispense with the common-law fraud requirement of justifiable reliance (see Matter of People v Trump Entrepreneur Initiative LLC, 137 AD3d at 417 ["fraud under section 63 (12) may be established without proof of . . . reliance"]; see also Credit Suisse, 31 NY3d at 632 [the Martin Act similarly dispenses, among other things, with any requirement that the Attorney General prove justifiable reliance on the part of investors]). We are not permitted to "rewrite the plain words of the statute by adding, through judicial gloss, a . . . new element not provided by the Legislature" (People v Nelson, 11 Misc 3d 126(A), *2, 2006 NY Slip Op 50201[U], *2 [App Term 1st Dept 2006], lv denied 7 NY3d 760 [2006]).
The Attorney General established, prima facie, that the fraudulent SFCs had the capacity and tendency to deceive a sophisticated party (i.e., a sophisticated bank).[FN21] The SFCs had this deceptive quality because the inflated estimated current values were calculated based on undisclosed false facts and fallacious assumptions known to the Trump Organization but kept from its counterparties. To illustrate just one example of how the estimated current values were inflated in a way that would not be apparent to a counterparty, we turn to the estimated current values for Mar-a-Lago.
Because the Trump Organization believed that Mar-a-Lago was too expensive for one individual to own and maintain, in the early 1990s it commissioned a report for the Town of Palm Beach Building and Zoning entitled "The Mar-a-Lago Club: A Special Exception Use and Preservation Plan" (the Use and Preservation Plan). The report, which was received by the town on March 12, 1993, proposed a private social club as the property's only viable use. Because the use was not residential, the operation of a private social club would significantly reduce Mar-a-Lago's real property taxes. Months later, the Palm Beach Town Council approved the Use and Preservation Plan as a special exception use to the area's residential zoning.
On August 10, 1993, the Mar-a-Lago Club, Inc., Donald J. Trump, as Owner, and the Town of Palm Beach executed a Declaration of Use Agreement (Use Agreement) governing Mar-a-Lago's use as a social club. The Use Agreement, which runs with the land, bound President Trump and the Club to the Use and Preservation Plan, including the preservation of certain "Critical Features." It also contained a provision that "the use of the Land shall revert to a single family residence and the ownership of the Owner" in the event that the Club is "intentionally abandoned at any time" or "unintentionally abandoned" after one year of operation. It additionally required that the documents relating to Club membership include a provision "agreeing to the reversion of the Land to the Owner and its return of the Land to use as a single family residence."
In March 1995, President Trump signed a Deed of Conservation and Preservation Easement (the Deed of Conservation and Preservation) in favor of the National Trust for Historic Preservation in the United States (the National Trust), which enabled him to obtain an income tax benefit. The Deed of Conservation and Preservation conveyed "a conservation and preservation easement . . . in perpetuity with respect to the Critical Features and the Property of the nature and character and to the extent hereinafter set forth." It prohibited "constructing or erecting new buildings and structures within and upon" the areas described as Critical Features. The deed's restrictive covenants were "deemed to run with the land in perpetuity and to burden the Critical Features and the Property in perpetuity." It additionally barred actions that were not attached to, part of, or contained within, the Critical Features without the approval of the National Trust, which could be "withheld or conditioned in [the National Trust's] sole discretion" including barring "new permanent structures" and "the right to subdivide the property." The Deed of Conservation and Preservation also prohibited any amendments that would negatively affect the "perpetual duration" of the easement or "adversely impact the overall architecture, historic, scenic, and open spaces protected by this Easement."
Seven years later, the Mar-a-Lago Club, LLC (formerly the Mar-a-Lago Club, Inc.), Donald J. Trump, and the National Trust executed a Deed of Development Rights, recorded on October 17, 2002 (the Deed of Development Rights). The deed refers to the intent of President Trump and the Club "to extinguish their right to develop or use the Property for any purpose other than club use." Consequently, President Trump and the Club "[did] hereby transfer, grant, bargain, sell, alien remise, release, convey and confirm unto the National Trust . . . any and all of their rights to develop the Property for any usage other than club usage." The Property (i.e., the real property known as Mar-a-Lago) is described in Exhibit A to the Deed of Development Rights.
The Deed of Development Rights describes President Trump as the "holder of a contingent reversionary interest in the Property," which is a reference to the Use Agreement's provision that "the use of the Land shall revert to a single family residence and the ownership of the Owner" upon intentional abandonment of the Club at any time, and the provision that Club Bylaws require that members agree to "the reversion of the Land to the Owner and its return of the Land to use as a single family residence."
The deed also reaffirms that the earlier Deed of Conservation and Preservation "limits changes to the Property including, without limitation, division or subdivision of the Property for any purpose, including use as single family homes, the interior renovation of the mansion, which may be necessary and desirable for the sale of the Property as a single-family residential estate, the construction of new buildings and the obstruction of open vistas." It further concludes that because the Deed of Conservation and Preservation "required the approval of changes that would be necessary for any change in use" it "therefore confines the usage of the Property to club usage without the express written approval of the National Trust."
Even if the status of Mar-a-Lago as a social club in perpetuity was not clear in the Deed of Conservation and Preservation, by executing the Deed of Development Rights, President Trump gave up his reversionary interest under the Use Agreement allowing him to intentionally (or unintentionally) abandon the Club use and have the use of the land revert back to a single family residence and President Trump's ownership. Justice Friedman wrongly concludes that the Deed of Development Rights did not extinguish President Trump's contingent reversionary interest. The contingent reversionary interest provided for in the Use Agreement states that "the use of the Land shall revert to a single family residence and the ownership of the Owner" only "if the Club use is unintentionally abandoned for a period of 1 (one) year after the Club has been in operation or, is intentionally abandoned at any time." The Use Agreement also provides that the Club members shall specifically agree "to the reversion of the Land to Owner, and its return of the land to use as a single family residence, in the event of intentional or unintentional abandonment of the Club Use."
Justice Friedman concedes that the Deed of Development Rights transferred "any and all . . . rights to develop the Property for any usage other than club usage." He effectively reads out of existence this language (despite acknowledging it) by contending that President Trump still holds a contingent reversionary interest in the Land. This interpretation impermissibly rewrites the Deed of Development Rights, as it would allow President Trump to intentionally abandon the Club at any time, and as defendants argue, close the Club, which contrary to the clear statement that "the Club and Trump intend to forever extinguish their right to develop or use the Property for any purpose other than club use" and to the undeniable purpose of the Deed to confine "the usage of the Property to Club usage."
Although Mar-a-Lago's value was substantially depressed by these restrictions, the SFCs for 2014 through 2021 inflated the property's estimated current value on the fallacious assumption that the restrictions had no effect. The deception was accomplished by lumping Mar-a-Lago into a group of more than a dozen properties categorized as "Club Facilities and Related Real Estate" with a total combined estimated current value for all properties.[FN22] Note 3 to the SFCs discloses that the valuations in this category were made either by President Trump or the Trustees and discloses that in "those cases where a residential component exists, comparable sales were utilized in arriving at their values." While note 3 briefly describes Mar-a-Lago, and its use as "an exclusive private club," it does not break out the property's individual value, it does not disclose the fact that the property was valued as if it could be sold to an individual who could use the property as an "exclusive private residence," and it does not disclose the fact that the "unique" property, one which presumably would have no comparable sales, was valued by using sales of other Palm Beach residential properties that had no use restrictions to generate a "Value per acre" which defendants then multiplied by the total acres of Mar-a-Lago, even though the Club occupies the "Land."[FN23]
Contrary to Justice Friedman's view, this valuation is deceptive because the per-acre value was generated based on values of unrestricted Palm Beach residential properties even though Mar-a-Lago is a heavily restricted property. It is also deceptive to multiply a per-acre value by the total acreage of Mar-a-Lago, because much of the property is occupied by Club amenities and is used by Club members. The record describes many of Mar-a-Lago's Club amenities which include a pavilion building, a kitchen building, guest cottages, a main dining hall, a 20,000 square feet ballroom, beach cabanas, a large pool, tennis courts, a croquet lawn, and a spa. Even if defendants could sell Mar-a-Lago's "exclusive private residence," their valuation fails to account for the "non-exclusive" nature of the property upon which that residence sits. Assuming that someone could and would buy Mar-a-Lago to reside only at the mansion house, preserve the Critical Features, abide by other building restrictions, and overlook the up to 500 Club members (and their guests) using the "Land" on a daily basis, the plain language of the Deed of Development Rights completely undercuts Justice Friedman's argument that Mar-a-Lago was correctly valued. In supporting his position, Justice Friedman points to the evidence that in 2019 a 4.72 acre unrestricted property sold at the fair market value of $105 million, and he notes that Mar-a-Lago has "more than 16 acres." He also contends that defendants' valuations are conservative because Mar-a-Lago cannot be "recreated in terms of size." His argument might have had merit if someone could purchase Mar-a-Lago and use all of the Land, but that is not the case because the Land is occupied by the Club and used on a daily basis by up to 500 Club members and their guests.
The Attorney General also established, prima facie, that the SFCs created "an atmosphere conducive to fraud," the second, disjunctive, portion of the fraud test under Executive Law § 63(12). Because defendants' accountants only compiled the financial information they were fed by their clients, they were not required to perform any procedures to verify the accuracy or completeness of the information provided to them by management. Relying on the compilation method, the Trump Organization created an atmosphere conducive to fraud by concealing the assets' inflated estimated current values from view (see e.g. Matter of People v Northern Leasing Sys., Inc., 193 AD3d 67, 77 [1st Dept 2021] [the defendants "chose methods for procuring [equipment finance leases] that created an enterprise conducive to fraud," thus violating Executive Law § 63(12)], lv dismissed 37 NY3d 1088 [2021]; Matter of People v Compact Assoc., Inc., 22 AD2d 129, 131 [1st Dept 1964] ["the method by which sales were induced . . . and concealment of the nature of the product until the sales talk developed — created an atmosphere conducive to fraud"], affd 17 NY2d 758 [1966]).
4. The Record Establishes That the Valuations in The SFCs Were Objectively Material to Loan and Insurance Transactions
The Attorney General argues that a showing of materiality is not required to establish a standalone fraud claim under Executive Law § 63(12). By contrast, defendants, Justice Friedman, and Justice Higgitt assert that the Attorney General must demonstrate materiality, which is relevant to whether the SFCs have the tendency or capacity to deceive or create an atmosphere conducive to fraud.[FN24]
We agree with defendants, Justice Friedman, and Justice Higgitt that the Attorney General must establish materiality, (among other things) to establish a violation of a section 63(12) standalone claim in this case. Because the definition of "fraud" and "fraudulent" under Executive Law § 63(12) "is virtually identical to language found in section 352 of the Martin Act" (Credit Suisse, 31 NY3d at 633; see also Rachmani Corp., 71 NY2d at 721 n 1), we look to the Martin Act for guidance. Under the Martin Act, the determination of whether conduct has the tendency to deceive or mislead the purchasing public necessitates that the Attorney General establish, among other things, a material misrepresentation or an omission of a material fact (see e.g. Rachmani Corp., 71 NY2d at 725-726; E. F. Hutton & Co. v Penham, 547 F Supp 1286, 1297 [1982]). To decide what constitutes "a material omission which would be actionable under the Martin Act," the Rachmani court adopted the federal standard articulated in TSC Indus., Inc., v Northway, Inc. (426 US 438 [1976]) (Rachmani Corp., 71 NY2d at 726). Defendants, Justice Friedman, and Justice Higgitt agree that this is the standard that applies here.[FN25]
In TSC Indus., a shareholder sued the defendants for allegedly violating Securities and Exchange Commission (SEC) proxy solicitations rules barring "the use of proxy statements that are false or misleading with respect to the presentation or omission of material facts" (TSC Indus., 426 US at 440). The shareholder maintained that the defendants' joint proxy statement, which described the degree of control that one corporation had over another corporation, and recommended a stock exchange, was incomplete and materially misleading (id. at 441-443). Because the federal court decisions were in conflict, the United States Supreme Court determined that it was necessary to set "the definition of a material fact under those rules" and to address "the appropriateness of resolving the question of materiality by summary judgment in this case" (id. at 440).[FN26]
In formulating the standard of materiality under SEC Rule 14a-9, the United States Supreme Court held that "[t]he question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor" (426 US at 445). TSC Indus. further held:
"An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote . . . It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available" (id. at 449).
Thus, "it is well-established that a material fact need not be outcome-determinative; that is, it need not be important enough that it 'would have caused the reasonable investor to change his vote' . . . [r]ather, the information need only be important enough that it 'would have assumed actual significance in the deliberations of the reasonable shareholder'" (Folger Adam Co. v PMI Indus., Inc., 938 F2d 1529, 1533 [2d Cir 1991] [internal quotation marks and citation omitted]).
Materiality is often decided by a trier of fact because "[d]oubts as to the critical nature of information misstated or omitted will be commonplace" (TSC Indus., 426 US at 448). Nevertheless, "particularly in view of the prophylactic purpose of the Rule and the fact that the content of the proxy statement is within management's control, it is appropriate that these doubts be resolved in favor of those the statute is designed to protect" (id.). Consequently, "[o]nly if the established omissions are 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality' is the ultimate issue of materiality appropriately resolved 'as a matter of law' by summary judgment" (id. at 450 [internal citation omitted]).[FN27]
Applying this standard, the SFCs were objectively material to the Doral Loan, the Trump Chicago Loan, the OPO Loan, the 40 Wall Street Loan, and the Seven Springs Loan as a matter of law. We know this because the plain language of the loan documents tells us so. For the Doral Loan, the Trump Chicago Loan, and the OPO Loan, President Trump signed a guaranty representing that he submitted the SFCs "[i]n order to induce [Deutsche Bank] to accept this Guaranty and to enter into" the loan and that the loan was "conclusively presumed to have been created in reliance" on the guaranty and its representations, including the representations that each SFC presents "fairly" Trump's financial condition. Additionally, the loan documents required defendants to provide SFCs every year during the life of the loan. The guaranties required President Trump to certify that each annual SFC presents "fairly" in all material respects his financial condition. The loan documents further provided that defendants would be in default if they provided an SFC that misrepresented the guarantor's financial condition.
Further confirmation of the SFCs' materiality comes from Deutsche Bank's actions after some of the discrepancies contained in the SFCs came to light in 2020. Deutsche Bank requested further information from the Trump Organization regarding the SFCs and warned that the submission of misleading valuations could result in the loans being placed in default. While the loans were never placed in default, the Trump Organization never responded to Deutsche Bank, and the bank ultimately stopped doing business with the Trump Organization.
The 40 Wall Street Loan similarly provided that the "[l]ender is not willing to make the Loan, or otherwise extend credit, to Borrower unless Guarantor unconditionally guarantees" the loan, which was "an inducement to make the Loan." The 40 Wall Street Loan also required submission of annual financial statements prepared in accordance with GAAP and the guarantor's certification that they were "true, correct and complete and fairly presenting the financial condition and results of such Guarantor." The loan documents included, as an event of default, the guarantor's submission of a financial statement that "shall have been false or misleading in any material respect as of the date such representation . . . was made." Thus, the plain language of the 40 Wall Street Loan objectively demonstrates the importance and significance of SFCs "fairly" presenting the Guarantor's financial condition, satisfying the materiality test.
Supreme Court's finding of liability was also properly predicated on the Seven Springs Loan, which was guaranteed by President Trump. The original loan was procured in 2000, but the maturity date was extended by loan modifications in 2014 and 2019. In connection with the modifications, President Trump reaffirmed his guaranty, signing a Consent and Joinder providing that it was made "[i]n order to induce" the lender to modify the original loan. The 2014 and 2019 SFCs were submitted in connection with the modifications. Although the 2019 loan modification permitted defendants to modify the loan without providing a personal guaranty, defendants opted not to do so because that would have required additional escrow money at closing and would have increased the interest rate by about half a percentage point per annum. Defendants fail to point to any countervailing evidence undermining the objective materiality of the SFCs to the Seven Springs Loan.
The loan documents' insistence on the annual submission of accurate SFCs is definitive objective evidence of the SFCs' materiality. The quantitative factor (which Justice Higgitt refers to as the "magnitudes of disparity") is also objectively material to the loans as the disparities ranged between $812 million to $2.2 billion, or 17.27% to 38.51% of President Trump's net worth, depending on the year. The objective materiality test in securities fraud cases considers both qualitative and quantitative factors (see ECA & Local 134 IBEW Joint Pension Trust of Chicago v JP Morgan Chase Co., 553 F3d 187, 204 [2d Cir 2009]). Supreme Court considered only the quantitative factor. The "context" in ECA, was that an investment bank's alleged $2 billion mischaracterization in its financial disclosures was not "staggering" (and thus, not quantitatively material) because $2 billion amounted to approximately 0.3% of the bank's total assets of $715 billion (id.). Indeed, as ECA noted, the federal courts have used a "five percent numerical threshold [as] a good starting place for assessing the materiality" of a misstatement or omission (id.). Here, placed in context, the disparities were quantitatively material as a matter of law as the amounts were significatively over the five percent numerical "starting place."[FN28]
The SFCs were similarly objectively material to the Zurich Policy, but for different reasons. Between 2007 and 2021 Zurich North America underwrote a $6 million (single) and $20 million (aggregate) surety bond program for the Trump Organization. Under the surety bond program, President Trump was required to personally indemnify Zurich for any claims paid under the program and to disclose his SFCs to Zurich annually in an "onsite" review, where documents could be reviewed but not copied or taken from the meeting.
Zurich underwriter Claudia Mouradian started working on the Trump Organization account in October or November 2017. She testified at her deposition that in reviewing President Trump's 2018 and 2019 SFCs onsite, she wrote notes on the amount of cash that was reflected in the SFCs. She testified that the amount of available cash was important because Zurich looks to an insured's cash assets for repayment on claims. She explained that it would have been important for her to have known that President Trump did not control approximately $24 million that the SFCs included as cash because then "the true amount of cash held by the Trump Organization would be less, less than what is stated." Mouradian further testified that during her review, Weisselberg told her that the real estate valuations in the SFCs were done by professional appraisers, which was important to her because she might not have relied on the valuations in the same way had she known that the statement was not true. Based on her onsite review of the 2018 and 2019 SFCs, Zurich renewed the Trump Organization's coverage for 2019 and 2020 with the same premium.
Contrary to defendants' arguments, Mouradian's testimony supports the conclusion that the SFCs were objectively material to the surety bond program. Defendants argue that the SFCs were not material because liquidity was more important to Zurich than assets, because the Attorney General claimed that $24.7 million was fraudulently included as cash, which left sufficient "undisputed" liquidity, and because Zurich was "pleased" with the relationship. However, as previously explained, the objective materiality test only requires that the material fact or omission is important enough or has significance, which is established by Mouradian's testimony.
The SFCs were also material to the D&O Policy, underwritten by HCC, which commenced in December 2016. Michael Holl was the underwriter for HCC who attended a January 10, 2017 meeting wherein, among other things, the agenda included review of the most recent SFC. Holl specifically recalled that Weisselberg was at the meeting along with other Trump Organization employees. Because Holl's review was only onsite, as soon as the meeting concluded, he prepared and sent an email to two HCC employees memorializing the information that he obtained during the meeting. In that email, which is in the record, Holl stated that he "[s]aw very few financials, but did see the balance sheet for year ends 2015 . . . [t]hey have total assets of 6.6 BB. cash of 192 mm," reflecting the inflated numbers in the 2015 SFC.
Holl explained that the cash figure was "a meaningful, useful figure" in his analysis. This testimony supports the conclusion that the 2015 SFC was objectively material to the D&O coverage. Defendants' argument that the misstatement concerned "only a tiny fraction of the cash on the balance sheet" does not negate the significance of the misstatement. Holl further testified that he was informed that there was no material litigation or inquiry that could lead to a claim under the D&O coverage. However, there was an ongoing investigation by Attorney General into the nonparty Trump Foundation and the Trump Organization directors and officers. Based on this false and material information, HCC offered the Trump Organization $10 million in D&O coverage with a premium of $295,000, which the Trump Organization accepted. In January 2019, the Trump Organization submitted a claim to its insurers, including HCC, for D&O coverage for an enforcement action arising out of the Attorney General's investigation of the Trump Foundation. When the D&O Policy expired, HCC offered to renew the policy for a premium of $1.6 million, more than five times the existing premium, and the Trump Organization declined.
Faced with evidence of the materiality of the loans and the insurance transactions, defendants pivot and attempt to reframe the objective materiality test adopted by the Rachmani Court as one based on "impact." According to defendants, the Attorney General must establish that the inflated estimated current values had an "impact on the deals," had an "impact on any business decision," or "affected the terms of any agreement."
This "impact" test is an invention of defendants. It finds no support in the statute or caselaw. Defendants do not trouble themselves to define "impact" or explain how to determine when impact occurs. Does the impact test contemplate that the Attorney General bears the burden to demonstrate justifiable reliance or causation? Does the impact test contemplate that the Attorney General must establish damages? We do not know. In any event, whatever defendants had in mind with this test, the only applicable standard is the objective materiality standard adopted by the Court in Rachmani. As previously established, the valuations in the SFCs were certainly objectively material to the loans, and were objectively material to the insurance transactions.
Defendants make other attempts to skew the objective materiality test. Defendants point to testimony from defendants' witnesses that Deutsche Bank considered other factors "in the mix" in determining whether to make the loans, such as President Trump's prior real estate experience and Deutsche Bank's desire to cultivate a relationship with the Trump family. However, the "total mix" formulation refers to "facts that are important enough to assume actual significance," not "facts that are so important that they would change an investor's decision whether to consummate the transaction" (Folger Adam Co., 938 F2d at 1533). Materially misleading facts or omissions do not have to be so important that the result is "outcome-determinative" (id.). Thus, even if other factors had objective importance and significance "in the mix," that would not lessen the objective importance of President Trump truthfully reporting his net worth.
Defendants also fail to undermine the materiality of the SFCs based the testimony of David Williams, Deutsche Bank's managing director. According to defendants President Trump "would have easily qualified for recourse loans (at the same interest rates) if his net worth had been $1 billion or less . . . or even $100 million." However, Williams only testified that President Trump reported a net worth that was "well in excess of our minimum requirements" (which were a net worth in excess of $100 million and $10 million in liquid assets). Meeting the bank's minimum requirements is not the equivalent of being qualified for any loan that the bank makes.[FN29] In fact, the record establishes that the Trump Organization vetted other commercial real estate loans, but the Doral Loan, the Trump Chicago Loan, and the OPO Loan offered the best terms. Those loans required a minimum net worth of $2.5 billion in assets and $50 million in liquid assets, not a net worth of $100 million and $10 million in liquid assets.[FN30] In any event, defendants' argument misses the mark because it fails to undermine the objective importance and significance of President Trump's net worth to the loans that he guaranteed.
Justice Friedman's view that President Trump's "undisputed billionaire status" and "undisputed extraordinary wealth" demonstrate that "any overstatement of his net worth in the SFCs had [no] effect on the terms of the transactions" also fails to undercut the objective materiality of the estimated current values of his assets in the SFCs. Justice Friedman also adopts defendants' argument that the Attorney General found by her "own estimation" that President Trump's net worth "was never less than $2 billion." However, the argument is irrelevant to the objective materiality test. In addition, the Deutsche Bank loans required that President Trump maintain a minimum net worth of $2.5 billion in assets, not $2 billion in assets.
Nor is the objective materiality of the estimated current values any less important because, as testified to by defendants' witnesses, the sophisticated counterparties would have understood that the SFCs were only a "roadmap" or a "starting point" for performing their own analysis and/or because they performed their own due diligence.[FN31] By characterizing the SFCs as a roadmap or a starting point, defendants concede that the sophisticated lenders did rely on SFCs.[FN32] Moreover, that the banks performed due diligence but failed to uncover the fraudulent conduct does not alter the evidence that defendants engaged in repeated or persistent fraudulent acts in violation of Executive Law § 63(12).
Finally, defendants and Justice Friedman argue that the disclaimers in the SFCs negate the objective materiality of the SFCs, as a matter of law. In Justice Higgitt's view, the "broad" disclaimers presented to sophisticated parties raise issues of fact. These arguments are untenable where, as here, the disclaimers did nothing to alert the user to the undisclosed false facts and fallacious assumptions used to calculate the estimated current values in the SFCs.[FN33]
The disclaimers provide:
"Assets are stated at their estimated current values and liabilities at their estimated current amounts using various valuation methods. Such valuation methods include, but are not limited to, the use of appraisals, capitalization of anticipated earnings, recent sales and offers, and estimates of current values as determined by [President Trump or the Revocable Trust] in conjunction with his associates and, in some instances, outside professionals. Considerable judgment is necessary to interpret market data and develop the related estimates of current value. Accordingly, the estimates presented herein are not necessarily indicative of the amount that could be realized upon the disposition of the assets or payment of the related liabilities. The use of different market assumptions and/or estimation methodologies may have a material effect on the estimated current value amounts."
Defendants argue that the disclaimers nullify every other representation in the SFCs. As Supreme Court correctly observed, the disclaimers did not "use the words 'worthless' or 'useless' or 'ignor[e]' or 'disregard' or any similar words" and the undisclosed false facts and fallacious assumptions used to generate the estimated current values in the SFCs were "unquestionably based on information peculiarly within defendants' knowledge" (People v Trump, 2023 NY Slip Op 33314[U], *13-14). Rather than alerting the user to the inflated values, the language "conveys the unequivocal impression that it is a good-faith attempt to approximate . . . value" (Joel v Weber, 166 AD2d 130, 137 [purported disclaimer in personal financial statements discussing the use of a cost basis to approximate the current market value of assets did not insulate the accountant from claims based on common-law fraud and aiding and abetting fraud]).
The fact that the disclaimers disclose in general certain valuation methods (i.e., that "valuation methods include, but are not limited to, the use of appraisals, capitalization of anticipated earnings, recent sales and offers, and estimates of current values as determined by [President Trump or the Revocable Trust] in conjunction with his associates and, in some instances, outside professionals") is not enough.[FN34]
Defendants' disclaimer argument overlooks the preparer's obligation to make "a good-faith attempt" to approximate value in statements of financial condition (Weber, 166 AD2d at 137). Because the SFCs included valuations derived from undisclosed false facts and fallacious assumptions, the preparer did not make a good-faith attempt to approximate estimated current value. Defendants' argument, that generating values from disclosed real estate valuation methodologies did not lie within their unique knowledge, also lacks merit. While the methodologies used by the Trump Organization were disclosed, the estimated current values were based on undisclosed false facts and fallacious assumptions that could not be gleaned from the SFCs. Defendants' argument, adopted by Justices Friedman and Higgitt, is really premised on their view that under common-law fraud precedent,the Trump Organization had no "obligation to disclose internal analyses" (i.e., the false and misleading facts and assumptions) (HSH Nordbank AG, 95 AD3d at 198). However, as previously explained, common-law fraud concepts cannot be engrafted on the statute.
5. Defendants Fail to Raise Any Issues of Fact in Opposition to The Attorney General's Motion for Partial Summary Judgment
As the evidence reviewed above shows, the Attorney General amply met her prima facie burden on summary judgment. To rebut the Attorney General's prima facie showing of the deceptive nature of the SFCs and the materiality of the valuations, defendants submitted the reports, affidavits and/or deposition testimony of 12 experts supporting their position that the SFCs complied with GAAP and/or were not fraudulent. While Supreme Court did not engage in lengthy analyses of defendants' expert evidence, it correctly found that the experts failed to raise any issue of fact.
Supreme Court erred by reasoning that "real property valuations are to be judged objectively, not subjectively" and that, contrary to certain relevant GAAP principles, "the price for which you can sell it" is what "matters to lenders who want adequate collateral" (People v Trump, 2023 NY Slip Op 33314[U], *19, *29). On this point, we agree with our colleagues. However, we are not bound by the court's reasoning, and can "affirm, for reasons different than those given by the motion court" (Merrill Lynch Mtge. Invs. Trust, Series 2006-RM4 v Merrill Lynch Mtge. Lending, Inc., 118 AD3d 555, 556 [1st Dept 2014]; see also Zafarani v Gluck, 40 AD3d 1082, 1083 [2d Dept 2007]).[FN35]
The fundamental problem with all of defendants' expert opinions is their generality, and their failure to grapple with the facts that pertain to this case. "It is settled and unquestioned law that opinion evidence must be based on facts in the record or personally known to the witness" (Cassano v Hagstrom, 5 NY2d 643, 646 [1959]). An expert cannot testify, "despite his lack of knowledge, as to what he assumed or believed defendant had done" and then draw an inference from those assumptions, because that opinion is "worthless as evidence" (id.). An opinion is also considered "worthless" if "predicated on the speculations of [an] expert, which were in turn based on assumed facts not supported by the evidence" (Cooke v Bernstein, 45 AD2d 497, 500 [1st Dept 1974]).
Thus, we disagree with Justice Friedman's position that the expert opinions "may provide plausible explanations for the valuations at issue." Moreover, contrary to Justice Friedman's view, once the Attorney General made out her prima facie case, it was incumbent on defendants to raise an issue of fact that each valuation had a reasonable, good-faith basis. That assets may be valued based on different methodologies which produce different results does not provide blanket cover for the valuations at issue here. Justice Friedman appears to believe that it does, considering that he concludes that the valuations were not false or misleading "however contestable the assumptions on which they were based may have been." If that were true, then no valuation could ever be deemed fraudulent. Thus, in my view, Justice Friedman unsuccessfully attempts to reframe the established Executive Law § 63(12) violations as mere "real estate business" premised on "optimistic asset valuations that banks expect to receive, as a matter of course, from their high-net-worth loan customers." What Supreme Court found was fraud, not optimism, and that finding is supported by the record.
On summary judgment (and at the bench trial) defendants primarily relied on the expert opinion of Eli Bartov, a professor at NYU's Stern School of Business. In his affidavit in support of defendants' motion for summary judgment, Professor Bartov opines that "Trump's [SFCs] for 2011 through 2021 were prepared in a personal statement format in accordance with ASC 274 and the valuation of the investment properties recognized in those [SFCs] were generally consistent with the notion of Estimated Current Value."[FN36]
Professor Bartov's professional qualifications are impressive. However, in this case his opinion merely provided general guidance on asset valuations and accounting methodologies.[FN37] It did not engage with defendants' actual business practices and therefore, lacked probative value (see Diaz v New York Downtown Hosp., 99 NY2d 542, 544 [2002] ["[w]here the expert's ultimate assertions are speculative or unsupported by any evidentiary foundation . . . the opinion should be given no probative force and is insufficient to withstand summary judgment"]; Amatulli v Delhi Constr. Corp., 77 NY2d 525, 533 [1991] [the plaintiff's expert's affidavit containing "only bare conclusory assertions" was insufficient to raise a triable issue of fact]). Nor does the mere fact that Professor Bartov's opinion is "unrebutted" raise an issue fact as to whether defendants' conduct was deceptive under Executive Law § 63(12) (see Greenberg, 95 AD3d at 496-497 [Catterson, J. concurring] [unrebutted expert affidavit opining that two officers of American International Group, Inc. did not violate GAAP and engaged in conduct consistent with industry practice did not raise an issue of fact as to whether the conversion of underwriting losses to capital losses was prima facie improper under Executive Law § 63(12)]).
In his affidavit, Professor Bartov explains that GAAP often relies "on subjective and hard to calibrate estimates (or forecasts) of future events." However, Professor Bartov did not set forth, much less ratify, the means actually used by defendants in estimating or forecasting any future events to determine estimated current values of President Trump's assets. Indeed, the professor conceded at his deposition that he did not consider McConney's valuations. These valuations were the bases for the SFCs, and they contained information that did not make its way into the SFCs. Bartov found that McConney's valuations were not relevant to his opinion as Bartov was not hired to provide an opinion as a valuation expert or as an auditor.
The professor also asserts that with respect to the estimated current values for Trump Park Avenue "[b]ased on planned courses of action, Mr. Trump projected the cash receipts from the sales based on the assumption that he would be able to free those apartments from rent stabilization [and] was entitled to take the long view during which vacancy decontrol would have eventually released the stabilized units from those restrictions." Professor Bartov bases this conclusion on ASC 274-10-55-6.b, which permits estimated current value to be calculated on "discounted amounts of projected cash receipts and payments relating to the property or the net realizable value of the property, based on planned courses of action."[FN38]
Putting aside whether President Trump's long term "planned courses of action" for Trump Park Avenue can be based on his speculation as to the future plans of the New York State Legislature, Professor Bartov has no knowledge of President Trump's planned courses of action for this asset (including, as the professor testified at trial, when President Trump would "complete all [his] plans for the asset").[FN39] Professor Bartov has no knowledge of how the Trump Organization discounted projected cash receipts under ASC 274-10-55-6.b or what assumptions, if any, were made in connection with the valuations.
The speculative and conclusory nature of Professor Bartov's opinion is also revealed with respect to his view that the estimated current values for the golf property in Aberdeen, Scotland complied with ASC 274. In his affidavit, Professor Bartov speculates that the "assumption (i.e., prediction)" that defendants could build and sell far more residential homes than were approved by the Scottish government complied with GAAP because it "may represent Mr. Trump's business plan and belief at the time of the preparation of the [SFCs]." Professor Bartov's opinion of what "may" represent President Trump's business plan for Aberdeen is "worthless" because it is "predicated on the speculations of his expert" (Cooke, 45 AD2d at 500). Similarly, while the professor opines that the estimated current values for Aberdeen complied with GAAP as "a forecast based on Mr. Trump's business plan and belief that he could convince local authorities to approve a development of that magnitude" subject to a "forecast error," there is no evidence regarding President Trump's business plan and belief in the record, and Professor Bartov was not privy to that information.
As a final example, the professor's opinion fails to raise an issue of fact as to the inflated valuations for the Triplex. The SFCs from 2011 through 2016 calculated the estimated current values on a square footage of 30,000 feet. The summary judgment record includes evidence that in October 1994 President Trump executed a consent to the First Amendment to the Declaration of Trump Tower Condominium that reflected the Triplex was 10,996.39 square feet. The record includes an email from the Trump Organization's Vice President of Marketing in connection with a Forbes inquiry regarding the size of the Triplex. That email states, "I spoke to Allen W" and refers to a decision to "leave [it] alone." Although the inflated square footage could have been corrected in the 2016 SFCs based on this inquiry, if not earlier, prior to the inquiry, the square footage was not corrected until the 2017 SFCs which was after the Forbes article was published.
Given this evidence, Professor Bartov acknowledges in his affidavit that the estimated current values were inflated for the Triplex, but he attributes the inflated square footage to "inadvertent error." Professor Bartov's opinion, which is based on his unsupported characterization of "Mr. Trump's convincing explanation for the error in his deposition testimony," fails to raise an issue of fact because it is improperly based on what he "assumed or believed defendant had done" (Cassano, 5 NY2d at 646).[FN40] In other words, the claim of inadvertent error is "predicated on the speculations of [Professor Bartov], which were in turn based on assumed facts not supported by the evidence" (Cooke, 45 AD2d at 500).
Nor does Professor Bartov's recitation of general GAAP principles "help to clarify an issue calling for professional or technical knowledge" (De Long v County of Erie, 60 NY2d 296, 307 [1983]). Professor Bartov explains that ASC 274 affords preparers of SFCs "significant latitude to choose valuation methods they may use to value assets, including investment properties, and leaves it to the discretion of the preparer which method and assumptions to use as long as they are consistent with economic theory." This statement is correct as far as it goes, but it does not help clarify the issues before us.[FN41] The professor does not tie the enumerated general GAAP principles to how the valuations were made in this case. Thus, we disagree with Justice Higgitt's view that "the legitimacy and permissibility of valuation methods" raises an issue of fact given that the problem lies with the fallacious descriptions of the assets.
For example, Justice Higgitt cites to Mar-a-Lago, adopting defendants' explanation that many of the assets are "simply too unique" for there to be relevant market data. The problem, however, is not that an attempt to appraise Mar-a-Lago within the meaning ascribed by the Attorney General and Supreme Court would be futile, as Justice Higgitt reasons. Rather, the problem is that the Trump Organization lumped Mar-a-Lago into a group of more than a dozen properties in the SFCs, which hid that they overvalued the property. Mar-a-Lago was overvalued because the Trump Organization ignored the reality that the "Land," as described in the Deed of Development Rights, was conveyed to the National Trust for perpetual use as a social club. The Trump Organization ignored this reality when they used sales of other Palm Beach residential properties that had no use restrictions to generate a "Value per acre" which they then multiplied by the total acres of Mar-a-Lago even though the Club occupies the "Land." In addition, Note 3 to the SFCs regarding "Club Facilities and Related Real Estate" valuations provides that in "those cases where a residential component exists, comparable sales were utilized in arriving at their values." This is another indicia of the SFCs' fraudulent nature. How can defendants say that Mar-a-Lago is "simply too unique" for there to be relevant market data but value the property using "comparable sales"?
Professor Bartov states correctly that there is "no requirement under ASC 274 to determine the Estimated Current Value of investment properties based on appraisals."[FN42] However, that general statement is emblematic of the entirety of Professor Bartov's testimony, in that it is not anchored to the facts of this case. It is like a buoy that has lost its mooring and drifted far from the channel it is meant to mark; at best it provides no navigational assistance and at worst it leads us aground. Here, the record demonstrates that defendants used the appraisal method on occasion, but simultaneously possessed undisclosed appraisals that valued certain assets at significantly lower amounts. Professor Bartov's general statement about appraisals does not address defendants' selective and misleading use of appraisals. Donald Bender, the partner at Mazars who was responsible for the compilations, testified at his deposition that he asked Jeffrey McConney whether he had any appraisals, to which McConney responded, "I have nothing else." Thus, while there is no requirement under ASC 274 to use appraisals, that observation does not raise an issue of fact because it fails to contradict the evidence that the Trump Organization provided certain records to the accountants and withheld others, despite their statements in their representation letters that financial records were made available to the accountants and no relevant information was withheld (see AR § 80.03 ["[m]anagement is responsible for making all financial records and related information available to the accountant"]).
Professor Bartov's trial testimony confirmed the conclusory and speculative nature of his opinion. For instance, at trial, the professor testified that valuations are derived from "valuation models" and those models are dependent on the "assumptions" that are used and on the valuations that are generated by those assumptions. Professor Bartov did not review defendants' valuation models, if there were any, or the assumptions upon which any putative models may have been based.[FN43]
In any event, even if defendants had complied with GAAP, that would not foreclose the court's finding of fraud (see United States v Rigas, 490 F3d 208, 220 [2d Cir 2007] [the prosecution was not required to prove that the defendants violated GAAP to establish that they committed securities fraud], cert denied 552 US 1242 [2008]). "GAAP neither establishes nor shields guilt . . . [i]nstead, compliance with GAAP is relevant only as evidence of whether a defendant acted in good faith" (id.; see Vista Outdoor Inc. v Reeves Family Trust, 234 F Supp 3d 558, 566 n 5 [SD NY 2017], affd 725 F Appx 17 [2d Cir 2018] [a defendant who has engaged in a "pump and dump" scheme does not act in good faith merely because the purchases and sales were recognizable under GAAP]). Thus, GAAP does not shield "accounting methods known to be misleading—although perhaps at times fortuitously in compliance with particular GAAP rules—[when] used for the express purpose of intentionally misstating . . . financial condition" (United States v Ebbers, 458 F3d 110, 126 [2d Cir 2006], cert denied 549 US 1274 [2007]). Defendants do not discuss good faith in their appellate briefs, let alone establish it.
Defendants' other experts failed to raise any triable issues of fact precluding the court's award of partial summary judgment. Attorney John Shubin's opinion that Mar-a-Lago's unambiguous deed restrictions did not prohibit the use of the property as "an exclusive private residence" or a "private residence" does not, as defendants claim, raise factual questions subject to expert analysis. Rather, Shubin's opinion is a legal conclusion, and an improper attempt to usurp the court's function as the sole determiner of issues of law (see Buchholz v Trump 767 Fifth Ave., LLC, 5 NY3d 1, 7 [2005]; Russo v Feder, Kaszovitz, Isaacson, Weber, Skala & Bass, 301 AD2d 63, 68-69 [1st Dept 2002]). Indeed, in opposing the Attorney General's motion for partial summary judgment, defendants raise the very same legal, not factual, arguments that appear in Shubin's opinion.
High-end real estate broker Lawrence Moens' opinion that Mar-a-Lago was worth $655,000,000 in 2011 and more than $1.2 billion as of 2022 completely ignored the property's use restrictions described above. Accordingly, this affidavit failed to raise any issues of fact. In his report, Moens explained how he valued Mar-a-Lago as a "unique property" based on his "over forty-five years" of experience, "some basic formulas" (which he clarified at his deposition were "an equation in my head") and his "review of market conditions, considering recent sales." His analysis of recent sales was based on 1) the Evans Report which analyzed Town of Palm Beach Single Family Home Sales from 2003-2017, and 2) the Palm Beach Multiple Listing Service, Property Search including Average Median, Low and High Statistics, May 26, 2023. Moens also disclosed that he valued the property based on the assumption that "any buyer could continue to operate the existing club, close the club and utilize the property as a single-family residence, or close and re-open the club to as many as 500 new members." Contrary to defendants' argument, Moens's valuations fail to raise an issue of fact because his valuations are speculative, conclusory, and improperly based on assumed facts that are not supported anywhere in the record.
Contrary to Justice Higgitt's view, Moens's opinion cannot be rehabilitated based on his professional or personal experience because his ultimate conclusions are still "speculative and conclusory" (Romano v Stanley 90 NY2d 444, 451 [1997]), and "unencumbered by any trace of facts or data" (Amatulli v Delhi Constr. Corp., 77 NY2d 525, 533 n 2 [1991] [internal quotation marks omitted]; see also Stevenson v Ghosh-Hazra, 203 AD3d 641, 641 [1st Dept 2022] [a credentialed neurosurgeon did not raise an issue of fact where, among other things, his expert opinion regarding the rate of brain tumor growth was "speculative and conclusory"]).
Accounting expert Jason S. Flemmons, and real estate experts Dr. Steven Laposa and Frederick Chin merely echo aspects of Professor Bartov's opinion, and, like the professor, they lack any knowledge regarding how the estimated current values were actually calculated in this case. Banking expert witness Robert Unell's opinion about industry standards does not raise any issues of fact because, as previously explained, the determination of whether defendants committed "fraud" or "fraudulent" acts in carrying on, transacting or conducting New York business in violation of Executive Law § 63(12) has nothing to do with whether the counterparty has exercised due diligence or justifiably relied on the SFCs.
6. Supreme Court Did Not Improperly Value the Real Property
Defendants and Justice Friedman contend that Supreme Court erred in awarding the Attorney General partial summary judgment because it made valuation errors, specifically pointing to the court's valuations for Mar-a-Lago. In Justice Friedman's view, the court made a "glaring error" by relying on Palm Beach County's assessed value for property taxes, which considered the restrictive use of the property and valued it in the range of $18 million to $27.6 million. Justice Friedman additionally cites evidence in "recent years" demonstrating that Mar-a-Lago generated more than $50 million in annual revenue.
We disagree. To determine whether defendants violated the statute, the relevant inquiry is whether the estimated current values were fraudulently inflated by amounts that were material to the user. To that end, Supreme Court compared defendants' valuations for Mar-a-Lago with Palm Beach County's assessed value for property taxes, which is one method that the preparer may use to calculate the estimated current values (see ASC 274-10.55-6e). Defendants' valuations for Mar-a-Lago ranged between $347 million to $739 million for the periods 2014 through 2021 and did not consider the property's restrictive use. Palm Beach County's valuations ranged between $18 million to $27.6 million and considered the property's restrictive use as a private club, not a private residence. The fact that a property's assessed value does not necessarily equate to market value is irrelevant to Supreme Court's determination that the estimated current values for Mar-a-Lago were materially inflated.
Justice Friedman is skeptical that President Trump would have agreed to restrictions which would so negatively impact the property's value. However, it was the Trump Organization that believed that Mar-a-Lago was too expensive for one individual to own and maintain, and therefore, rationally proposed the restrictive use in their Use and Preservation Plan report. Moreover, defendants did not disagree with the County's valuations. For the 2020 tax assessment, defendants' representative filed an appeal of the County's tax valuation, but later withdrew the appeal checking a box indicating "the petitioner agrees with the determination of the property appraiser or tax collector." Supreme Court properly concluded that defendants' valuations for Mar-a-Lago were substantially inflated based on the substantial discrepancy between the County's tax valuation and defendants' valuations. Justice Friedman mischaracterizes my argument when he states that I fail to explain "why the restrictions would push the property's market value from multiple hundreds of millions of dollars all the way down to the $18-$27 million range." Neither the Attorney General, nor Supreme Court, ever valued Mar-a-Lago at precisely $18 million at the low end or $27 million at the high end. Rather, the record demonstrates that Mar-a-Lago's valuations were fraudulently inflated by material amounts based on the substantial discrepancy between the County's tax valuation (valuations to which defendants agreed) and defendants' valuations, which failed to account for the property's restrictions.
Justice Friedman's reliance on evidence that Mar-a-Lago generated more than $50 million annually in recent years is misplaced. This evidence is based on a Posttrial Newsweek article submitted by defendants on appeal. Even if it were proper to consider a posttrial article, the result would be the same. The article described Mar-a-Lago as generating $52.3 million in 2023 and $56.9 million in 2024, which is still a substantial discrepancy from defendants' valuations of $347 million to $739 million. Consequently, the court correctly found that the estimated current values for Mar-a-Lago were fraudulently inflated by material amounts, considering the property use restrictions.
Contrary to Justice Friedman's observation, that President Trump resides at Mar-a-Lago most of the time when he is not at the White House is of no import. As the result of neighbor complaints, the Palm Beach County attorney prepared a 2021 memorandum to the Mayor and Town Council. The attorney concluded that the Use Agreement and the Palm Beach Zoning Code did not prohibit President Trump from residing at Mar-a-Lago as a "bona fide employee" of the Club. The town took no further action against President Trump. Whether President Trump can continue to reside at Mar-a-Lago as a "bona fide employee" of the Club under the Palm Beach Zoning Code has no bearing on how the Trump Organization valued the sale of Mar-a-Lago to another individual.
According to defendants, like President Trump, any new owner could use Mar-a-Lago as an "exclusive private residence." Defendants do not define the term "exclusive" but they point out that the Use Agreement allows Club use to be "intentionally abandoned at any time" and, if that occurs "the use of the Land shall revert to a single family residence and the ownership of the Owner." Thus, defendants appear to argue that they can, as their expert Lawrence Moens assumed, "close the club and utilize the property as a single-family residence." However, President Trump gave up his reversionary interest under the Use Agreement by executing Deed of Development Rights — if he did not do so earlier under the Deed of Conservation and Preservation. The property is therefore burdened by restrictions to continue the Club usage as well as undertaking expensive preservation efforts. In any event, regardless of what defendants intended when they referred to the ability to sell the property as an "exclusive private residence," the estimated current values were fraudulently inflated because the property was misleadingly valued on a per-acre basis, for the reasons previously discussed.
7. Statute of Limitations
In addition to their arguments on the merits on summary judgment, defendants argued that most of the Attorney General's claims are time-barred. Defendants assert that most of the relevant transactions giving rise to the claims herein occurred prior to the accrual of the applicable six-year limitations period. Justices Friedman and Higgitt agree. We disagree.
As noted in the procedural history section above, this is not the first time that questions concerning the statute of limitations have come before this Court. In Trump I we dismissed the claims against Ivanka Trump on statute of limitations grounds (217 AD3d at 612). We held that she was not subject to the August 2021 Tolling Agreement, and that none of the allegations against her occurred after February 6, 2016, the accrual date for claims against defendants absent coverage of that agreement. For claims against defendants that were subject to the Tolling Agreement, we held that claims were timely if they accrued on or after July 13, 2014. We left it to Supreme Court "to determine, if necessary, the full range of defendants bound by the [T]olling [A]greement" (id. at 611). In its subsequent decision on the parties' motions for summary judgment, Supreme Court reached the issue and found that all the remaining defendants were subject to the Tolling Agreement. It also held that the Attorney General asserted timely claims under Executive Law § 63(12) for any preparation or submission of an SFC after July 13, 2014 (People v Trump, 2023 NY Slip Op 33314[U], *14).[FN44]
Defendants first argue that the Tolling Agreement does not apply to the individual defendants or to the Trust. We find, as do Justices Friedman and Higgitt, that the Tolling Agreement binds all the remaining defendants. A corporate tolling agreement binds the corporation's affiliates, officers, and directors when the agreement makes plain that it applies to them (Matter of People v JUUL Labs, Inc., 212 AD3d 414, 417 [1st Dept 2023]). Here, the Tolling Agreement was signed by the Trump Organization's Chief Legal Officer, who confirmed that he had authority to sign for and bind the Trump Organization. The Trump Organization was also defined to include present or former parent entities or affiliates, officers, and directors, and "any other Persons associated with or acting on behalf of" the company. Each of the individual defendants and the Trust fall within this definition.
Defendants argue that President Trump "ceased holding any role" in the Trump Organization as of January 2017 and therefore, was not bound by the Tolling Agreement when it was signed in August 2021. There is no merit to this argument. By the time the Tolling Agreement was signed, President Trump's first term had ended, and he had returned to a high-level decision-making role at the Trump Organization. He clearly was at least "associated" with, and "acting on behalf of," the Trump Organization at that time.[FN45]
Given that the Tolling Agreement applies to defendants, and a six-year statute of limitations applies to this case, the remaining issue involves determining when the statutory claims on the loans accrued.[FN46]
Defendants and Justice Friedman note that we wrote in Trump I that the claims herein were "time barred if they accrued—that is, if the transactions were completed—before . . . July 13, 2014" (Trump I, 217 AD3d at 611 [emphasis added]). Defendants argue that by "completed," we really meant to say that the accrual date fell when the initial transactions "closed." Justice Friedman believes that we really meant to say "closed or consummated." Because the bank loans, except for the OPO Loan and the 40 Wall Street Loan, closed before July 13, 2014, defendants conclude that any claims arising from those transactions are thus time-barred. This argument presupposes that defendants' submission of an SFC on or after July 13, 2014, cannot give rise to an independent claim under Executive Law § 63(12). According to defendants because we said in Trump I that the "continuing wrong doctrine does not delay or extend" the limitations period, we necessarily held that submissions of SFCs after the loan transactions closed could not give rise to independent causes of action under Executive Law § 63(12).
If defendants are correct that we meant to say in Trump I that claims in this case accrued upon "closing," and that submission of SFCs after closing could not give rise to a cause of action under Executive Law § 63(12), then we could have saved the parties a great deal of time and money by using the term "closed" and stating that submissions of SFCs were no longer relevant with respect to the Doral Loan and the Trump Chicago Loan. There would be no need to wait for Supreme Court to determine which defendants were bound by the Tolling Agreement because whether they were bound by it or not, the claims premised on the Doral Loan and the Trump Chicago Loan would have been untimely given that those loans closed before July 13, 2014. Consequently, Trump I would have granted defendants' motion to the extent that the claims were predicated on the Doral Loan and Trump Chicago Loan. Such a holding would have constituted a seismic change in the case as it would have rejected the Attorney General's assertion of the centrality of the SFCs to its claims and radically reduced the transactions that were at issue in the case. But that was not our holding. We did not say "closed," we said "completed." We certainly did not hold that SFCs submitted within the limitations period were irrelevant to the Attorney General's claims. In fact, we did not mention the SFCs in Trump I.[FN47]
To support their positions, defendants, as well as Justices Friedman and Higgitt, also rely on the statement in Trump I that the "continuing wrong doctrine does not delay or extend" the limitations period. This reference is a correct statement of the law but is properly understood in the context of Ivanka Trump's motion to dismiss. In the Trump I appeal, the complaint was dismissed against Ivanka Trump because she persuasively argued that the claims against her were time-barred because 1) she was not subject to the Tolling Agreement, which rendered any claim that accrued prior to February 6, 2016, untimely, 2) she was not involved with the SFCs in any way, and 3) the Doral Loan closed on June 11, 2012, and the OPO Loan closed on August 12, 2014.
The complaint did not allege facts supporting Ivanka Trump's involvement in preparing or submitting the SFCs. As Ivanka Trump pointed out in her brief in the Trump I appeal:
"the Complaint does not allege that Ms. Trump made any misrepresentation about her father's financial resources, that she participated in the preparation of her father's personal financial statements, or even that she knew which assets were included in those statements or how they were allegedly inflated. Given these pleading defects, the trial court's decision to permit the case to proceed was reversible error."
Ivanka Trump further pointed to, and refuted, the Attorney General's argument made below "that two actions by Ms. Trump in 2016 sufficed to render all claims against her timely: (1) a "draw request" she signed in December 2016 under the OPO loan and (2) a February 11, 2016 communication seeking an additional loan secured by Doral (which never materialized)."
Because Ivanka Trump persuasively argued that her approval of a routine draw request did not render the claims against her timely, Trump I stated that the "continuing wrong doctrine does not delay or extend" the limitations period. Trump I also cited Henry v Bank of America (147 AD3d 599, 601 [1st Dept 2017]) to support dismissal of the claims against Ivanka Trump because that case explained that continuing wrong doctrine does not apply to the "continuing effects" of fraud but only to "continuing wrongs." That Trump I's comments regarding the continuing wrong doctrine were made only with respect to Ivanka Trump also explains why Trump I never discussed, or even mentioned, the SFCs which are at the heart of this case.
Justice Higgitt acknowledges that we may very well be correct in our assessment of what Trump I intended but he comes to a different conclusion based on his interpretation of the language, context, and structure of that decision, and in particular Trump I's citations to Boesky v Levine (193 AD3d 403, 405 [1st Dept 2021]) and Rogal v Wechsler (135 AD2d 384, 385 [1st Dept 1987]).
In Boesky, the claims accrued when the parties "entered into the allegedly fraudulent transactions," and in Rogal,the claimsaccrued "at the time of the execution of the contract." Thus, according to Justice Higgitt, Trump I's citation to Boesky and Rogal signaled that any claims related to loans that closed before July 13, 2014, were time-barred regardless of whether defendants had a continuing duty to annually submit the SFCs to retain the loans.
We disagree that the language, context and structure of Trump I compels this conclusion. Notably, if Justice Higgitt's interpretation of Trump I was correct, then Trump I would havegranted defendants' motion to dismiss the Attorney General's claims as time-barred to the extent that they were predicated on the Doral Loan and Trump Chicago Loan. In my view, Justice Higgitt's analogy to Boesky and Rogal also misses the mark. While the plaintiffs in Boesky and Rogal alleged that they were fraudulently induced to execute contracts, the Attorney General's claims do not similarly "include, but are not limited to, the fraudulent inducement of the subject loans, insurance policies and other transactions" as Justice Higgitt maintains, regardless of defendants' characterization that her claims sounded in fraudulent inducement. The Attorney General never asserted claims for fraudulent inducement. The Attorney General only asserted claims under Executive Law § 63(12). However, because Trump I found that the Attorney General failed to assert a viable section 63(12) claim against Ivanka Trump, the citations to Boesky and Rogal are best understood as cases supporting dismissal of the complaint against her.
Notably, Boesky and Rogal were cited with respect to "transactions [that] were completed — before February 6, 2016" and the complaint was dismissed against Ivanka Trump because "[t]he allegations against defendant Ivanka Trump do not support any claims that accrued after February 6, 2016." Trump I stated:
"Applying the proper statute of limitations and the appropriate tolling, claims are time barred if they accrued — that is, the transactions were completed — before February 6, 2016 (see Boesky v Levine, 193 AD3d 403, 405 [1st Dept 2021]; Rogal v Wechsler, 135 AD2d 384, 385 [1st Dept 1987])" (Trump I, 217 AD3d at 611).
The very next sentence in Trump I states that "[f]or defendants bound by the tolling agreement, claims are untimely if they accrued before July 13, 2014." Boesky and Rogal are not cited again. This is not an oversight. Boesky and Rogal involved CPLR 213 (8), which provides for a statute of limitations which is the greater of six years from the date the cause of action accrued or two years from the time the plaintiff discovered the fraud or could have discovered the fraud exercising reasonable diligence. Trump I held that the Executive Law § 63(12) claims were governed by the six-year statute of limitations under CPLR 213(9), which applies to actions brought by the Attorney General under Executive Law § 63(12). The only explanation for why Trump I would cite two cases involving CPLR 213(8), for a case brought under Executive Law § 63(12), is because Boesky and Rogal were only cited as support for dismissing Ivanka Trump, who was not involved with the SFCs and thus, had no potential liability under Executive Law § 63(12).
We agree with Justice Higgitt that correctness is not a part of the calculus when giving appropriate preclusive effect to the binding authority of a prior appellate decision. However, adopting Justice Higgitt's position would mean that Trump I misunderstood the continuing wrong doctrine despite citing CWCapital Cobalt VR Ltd. v CWCapital Invs. LLC (195 AD3d 12, 19-20 [1st Dept 2021]), which held that a contract's ongoing obligations (here, the obligation to submit annual SFCs) gives rise to new claims under the continuing wrong doctrine.[FN48]
The way that defendants briefed the issue in Trump I confirms our position. It was Ivanka Trump, not defendants, who argued in her moving appellate brief (as well as making the argument below) that "[w]here, as here, a claim rests on allegations that a transaction was fraudulently induced, the claim accrues when the transaction closes" citing Boesky and Rogal. Defendants did not cite Rogal in their appellate brief. While they did cite Boesky, they did so to defeat the Attorney General's argument that the statute of limitations did not accrue until the last wrongful act as the result of defendants' alleged participation in a civil conspiracy. Defendants argued, citing Boesky,that "[w]here multiple actionable torts are alleged as part of a single alleged civil conspiracy, a court must assess the timeliness of each tort separately."[FN49]
It was not until defendants' appellate reply brief that they argued for the first time that "[f]or cases alleging fraud in reaching a transaction, which, at base, is what the [the Attorney General] alleges, an action accrues when a transaction closes" and therefore, "any performance thereafter is a mere consequence of an initial wrong, and not a separate act sufficient to compel application of the continuing wrongs doctrine" and that based on the closing dates of the loans, no continuing wrong can be premised on an "ongoing requirement to annually submit the [SFCs] and certify their truth and accuracy."
Certainly, we would not have considered this argument, because it was "unpreserved for our review" (Shackman v 400 E. 85th St. Realty Corp., 161 AD3d 438, 439 [1st Dept 2018]). Contrary to Justice Higgitt's argument, Ivanka Trump, who filed a separate appeal through separate counsel, and not on behalf of any other defendant, did not raise or preserve the argument for them. 
Even if we had considered the argument, we would not have concluded that the continuing wrong doctrine was inapplicable considering President Trump's ongoing annual obligation, as the guarantor of the Doral Loan, the Trump Chicago Loan, the OPO Loan, to certify that the SFCs "fairly" presented the guarantor's financial condition.[FN50]
Consequently, we do not believe that Trump I dismissed claims against defendants sub silentio premised on the bank loans that closed before July 13, 2014. In our view, Supreme Court correctly held that the claims premised on defendants' use of the SFCs after July 13, 2014, are timely under the plain language of Executive Law § 63(12) for the reasons described below.
The time within which an action must be commenced is "computed from the time the cause of action accrued" (CPLR 203[a]). A cause of action accrues "when all of the factual circumstances necessary to establish a right of action have occurred, so that the plaintiff would be entitled to relief" (Gaidon v Guardian Life Ins. Co. of Am., 96 NY2d 201, 210 [2001]). Where the action is "to recover for a liability created or imposed by statute, the statutory language determines the elements of the claim which must exist before the action accrues" (id.).
Here, the relevant statutory language authorizes the Attorney General to sue "[w]henever any person shall engage" in "repeated" or "persistent" fraud or "illegality" (Executive Law § 63[12]).[FN51] The choice of the term "[w]henever" signals that the statute of limitations accrues upon each repetitive or persistent use of a separate and distinct fraudulent or illegal SFC (see Merriam-Webster Online Dictionary, whenever [https://www.merriam-webster.com/dictionary/whenever] ["at any or every time that" or "at whatever time"]).
Defendants do not dispute that Executive Law § 63(12) claims can be based on fraudulent or illegal personal financial statements. Rather, they erroneously propose an accrual date that bears no connection to when the SFCs were repeatedly and persistently used, thereby nullifying the basis for the statutory claims (see McKinney's Cons Laws of NY, Book 1, Statutes § 144 ["Statutes will not be construed as to render them ineffective"]; see also People v Galindo, 38 NY3d 199, 205-206 [2022] [a statute should not be read in a way that "hold[s] it a legal nullity"]).
Accordingly, Supreme Court correctly held that the claims premised on defendants' use of the SFCs after July 13, 2014, are timely under the plain language of Executive Law § 63(12), which evinces that a claim accrues each time defendants "repeatedly" or "persistently" use a separate and distinct fraudulent or illegal SFC (see People v Trump, 2023 NY Slip Op 33314[U], *18; see e.g. People v Allen, 198 AD3d 531, 532—533 [1st Dept 2021] [Attorney General's claim relating to defendant's July 2015 misleading statement about partnership investments was timely and actionable as the "conducting of business" under Executive Law § 63(12), even though the underlying transactions and memoranda were executed outside the limitations period]).
Defendants repetitively submitted SFCs for the years 2014-2021. Each of those SFCs contained information that constituted fraud under Executive Law § 63(12) as detailed above. Nothing more was required for timely, viable claims.
8. Sanctions
Our colleagues agree with Presiding Justice Renwick and me that Supreme Court improvidently levied sanctions on defendants' attorneys. The parties in this litigation had to contend with novel legal issues. In grappling with these issues, defendants offered colorable arguments in their defense. Consequently, their arguments were not "completely without merit" under 22 NYCRR 130-1.1(c)(1) (see Gordon Group Invs., LLC v Kugler, 127 AD3d 592, 594 [1st Dept 2015] [courts should avoid the imposition of sanctions where a party asserts "colorable, albeit unpersuasive, arguments in good faith and without an intent to harass or injure"] [internal quotation marks and citation omitted]). Defendants' summary judgment papers certainly repeated arguments advanced in opposition to the Attorney General's motion for a preliminary injunction and in their motions to dismiss the complaint. However, the court made no findings that the arguments were made primarily to delay or prolong the litigation or to harass or maliciously injure the Attorney General under 22 NYCRR 130-1.1(c)(2).
While we find that Supreme Court erred in imposing sanctions, Justice Friedman is incorrect in divining that this somehow reflects a subliminal "tacit" conclusion that Supreme Court was biased against defendants. We agree that Supreme Court's two decisions are sometimes conclusory and insufficiently rigorous in their legal analysis. However, in the pressured environment of a heavily scrutinized trial Supreme Court produced a clear and complete record for this Court to review. In the course of reading and re-reading that record we found that the court was even-handed at trial, and allowed both sides to "make their case."
C. The Posttrial Order
For the reasons set forth above, we find that Supreme Court properly awarded partial summary judgment on the standalone claim. We disagree with Justice Higgitt's view that Supreme Court engaged in improper fact-finding and credibility determinations in its summary judgment decision. However, even if my colleagues are correct that Supreme Court erred on summary judgment, we also have before us an extensive trial record that amply establishes defendants' liability. At the bench trial Supreme Court was not constrained by the rules of summary judgment. Fact-finding and credibility determinations are among the central tasks of a judge presiding over a bench trial. As set forth below, our de novo review of the trial record supports Supreme Court's findings of illegality. Accordingly, there is no need to remand for another trial.
As noted above, the bench trial was devoted to the "illegality" of defendants' actions under Executive Law § 63(12). The issues at trial were limited to 1) whether defendants violated certain Penal Law provisions, thereby violating Executive Law § 63(12) (the second through the seventh causes of action) and 2) the appropriate remedy, including the amount of disgorgement. Despite these limited issues, much of the trial evidence duplicated the voluminous evidence that was submitted at the summary judgment stage, except that the court also heard from the Attorney General's expert witnesses. The overlap resulted from the fact that the Penal Law violations were predicated on defendants' use of the same fraudulent SFCs which formed the basis for statutory violations at the summary judgment stage. In fact, all but one of defendants' 12 experts who submitted their opinions at the summary judgment stage also testified at trial. Because the experts' trial testimony added nothing new, and merely bolstered their earlier opinions, their testimony fails to support reversal of the Posttrial Order for the same reasons that they fail to support a reversal of the Summary Judgment Order.
When reviewing a determination made after a nonjury trial, this Court has plenary power to render a judgment that is warranted by the facts (Baba-Ali v State of New York, 19 NY3d 627, 640 [2012]). Although we independently review the weight of the evidence, we also give "great deference" to the trial court's credibility determinations (Panattoni Dev Co., Inc. v Scout Fund I-A, LP, 188 AD3d 498, 498 [1st Dept 2020]). Deference is accorded because "[a] decision by a trial court adds up to more than the sum of its parts; it takes into account the judge's firsthand impressions" (TOA Constr. Co., Inc. v Tsitsires, 54 AD3d 109, 114 [1st Dept 2008]). Thus, where the trial court finds certain testimony credible and other testimony incredible, these "determinations are entitled to great deference, and we see no basis to disturb them" (Matter of C.H. v M.J.G., 233 AD3d 540, 542 [1st Dept 2024]).
Consequently, in connection with our review of the Posttrial Order, we defer to the court's findings that the testimony of President Trump, Donald Trump, Jr., Eric Trump, Jeffrey McConney and Allen Weisselberg were not credible, and that the testimony of Michael Cohen was credible. The court cited various reasons for finding that the individual defendants' testimony was not credible which, depending on the witness, included obfuscation, equivocation, evasiveness, gaps in memory, and initial denials until being confronted with contrary evidence. Although Michael Cohen acknowledged at trial that he had pled guilty to perjury, the court nevertheless found his testimony credible, noting the general plausibility of his statements, his demeanor, and the fact that his testimony was corroborated by other trial evidence.
While he is silent concerning Supreme Court's findings that the individual defendants were not credible witnesses, Justice Friedman chooses to devote a number of pages to his own analysis of Cohen's lack of credibility. He quotes at length from Cohen's testimony and draws his own conclusions about its veracity. We do not parse Justice Friedman's exegesis on Cohen's credibility - and do not conduct our own credibility determinations of Cohen or of any other witness - because that is not the job of an appellate judge. Credibility determinations are for the judge who presides at a bench trial. "In a nonjury trial, we defer to the findings of the trial court 'unless it is obvious that the court's conclusions could not be reached under any fair interpretation of the evidence, especially when the findings of fact rest in large measure on considerations relating to the credibility of witnesses'" (Crown Wisteria, Inc. v Cibani, 226 AD3d 585, 587 [1st Dept 2024], quoting Thoreson v Penthouse Intl., 80 NY2d 490, 495 [1992]).
Applying the appropriate standard of review, we find that the record amply supports Supreme Court's determination that the Attorney General established, by a preponderance of the evidence, that the individual defendants violated Executive Law § 63(12) by violating New York Penal Law §§ 175.05 (falsifying business records in the second degree), 175.45 (issuing a false financial statement), 176.10 (insurance fraud in the fifth degree),[FN52] and 105.00 (conspiracy in the sixth degree). The evidence, in turn, also established the liability of the corporate defendants by operation of Penal Law § 20.20.
The record supports a finding of liability on the second cause of action for falsifying business records in the second degree under New York Penal Law § 175.05. The provision requires proof that a person, with intent to defraud, makes or causes to be made a false entry in business records, or omits or prevents the making of a true entry. Business records include "any writing or article, including computer data or a computer program, kept or maintained by an enterprise for the purpose of evidencing or reflecting its condition or activity" (Penal Law § 175.00[2]). Defendants do not dispute the SFCs for 2014 through 2021 qualified as business records. Nor do they dispute that the annual certifications required by the loan guaranties — which stated that the SFCs present "fairly" the financial condition of President Trump — also qualified as a business records. The trial evidence supports the court's finding that the individual defendants either made or caused to be made false entries in the SFCs and/or the certifications and omitted or prevented the making of true entries in the SFCs and/or the certifications. Defendants' argument that Donald Trump, Jr. and Eric Trump had no direct role in preparing the SFCs, because they were prepared by Trump Organization employees and the accountants, is unpersuasive. While McConney and Weiselberg had primary responsibility for the SFCs, and the accountants prepared the compilations, Donald Trump, Jr. and Eric Trump were also directly involved. In January 2017, they became c0-chief executives of the organization and acted as agents with power of attorney to execute certificates of compliance for the loans on behalf of President Trump. Donald Trump, Jr. signed the representation letters to the outside accountants for the SFCs from 2016 through 2021, along with Weisselberg, representing to the accountants that the asset valuations in the statements were accurate and that no relevant information was withheld. The trial record also contains evidence that they were involved with valuing properties, as further described below.
The trial record is also replete with evidence supporting the court's determination that the individual defendants had the requisite intent to defraud, a necessary element of each Penal Law claim. Intent to defraud refers to a "defendant's state of mind in acting with a conscious aim and objective to defraud" (People v Taylor, 14 NY3d 727, 729 [2010]). Crucially, it does not require that a recipient rely on the false information or be "misled to its detriment" (id.). Defendants mischaracterize the intent to defraud standard by conflating evidence of defendants' state of mind with the elements of common-law fraud. After citing the elements of common-law fraud, defendants conclude that "the record is devoid of evidence to support any of these components of intent to defraud." Notably, however, the referenced "components" are not the "components of intent to defraud" but rather, the unrelated elements of a common-law fraud claim.
Because intent "is an invisible operation of the mind," direct evidence is often lacking and circumstantial evidence of intent suffices (People v Rodriguez, 17 NY3d 486, 489 [2011] [internal quotation marks omitted]). Fraudulent intent can be inferred from an overall pattern of misconduct (see People v Vomvos, 137 AD3d 1172, 1173 [2d Dept 2016], lv denied 27 NY3d 1140 [2016]), from a person's knowledge of the deceptive nature of the business practices (see People v Sala, 258 AD2d 182, 189 [3d Dept 1999], affd 95 NY2d 254 [2000]), from repeated submission of misleading documents (see Taylor, 14 NY3d at 729), from the existence of a financial motive (see People v Garrett, 39 AD3d 431, 432 [1st Dept 2007], lv denied 9 NY3d 844 [2007]) and based on the lack of credibility (see People v Credel, 99 AD3d 541, 541 [1st Dept 2012], lv denied 20 NY3d 1060 [2013]).
Turning to the facts here, the trial record supports the court's conclusion that individual defendants possessed the requisite intent to defraud based on their overall pattern of misconduct, their knowledge, and their repeated submission of the SFCs and the annual certifications required by the loan guarantees.
The trial record supports the court's inference that President Trump had the intent to defraud. Michael Cohen testified that he was tasked by President Trump to increase the value of President Trump's net worth based upon a number that President Trump arbitrarily selected. According to Cohen's testimony, both he and Weisselberg had to "reverse engineer" the different asset classes in the SFCs by increasing their value to achieve President Trump's desired number. Birney's testimony, that Weisselberg told him that President Trump wanted to see his net worth in the SFCs go up, is consistent with this testimony.[FN53] In his testimony, President Trump acknowledged that he would discuss property valuations with Weisselberg and McConney "[o]n occasion . . . [i]f [he] disagreed" and that Weisselberg and McConney "might" ask him to provide his opinion on valuation.
Cohen described the reverse engineering process as starting with a phone call, generally from President Trump's executive assistant, asking him to come to President Trump's office. Weisselberg would either be there or come in with Cohen. According to Cohen, President Trump would look at the total assets and say something like, "I'm actually not worth four and a half billion dollars. I'm really worth more, like, six." Cohen testified that President Trump would then direct him and Weisselberg to return after achieving "the desired goal." Cohen testified that after revising the SFCs, which would take a few days, he and Weisselberg would return to President Trump's office for final approval before the information was sent to the accountants. McConney also testified to his understanding that President Trump would have final review of the SFCs. Cohen specifically recalled valuing a few assets including Trump Park Avenue. He testified that to value the Trump Park Avenue rent-stabilized apartments he would find the highest price per square foot for luxury apartments in New York City and then use those numbers to calculate their value, even though the luxury and the rent-stabilized apartments were not comparable.
Cohen's trial testimony is also consistent with his Congressional testimony. At trial Cohen explained why he testified before the House Oversight Committee that he did not recall President Trump specifically asking him to inflate the valuations in the SFCs:
"When I was asked the question did he ask me to inflate the numbers, he did not specifically state 'Michael, go inflate the numbers.' As I stated in my books, and I've stated publicly, Donald Trump speaks like a mob boss and what he does is he tells you what he wants without specifically telling you. So when he said to me 'I'm worth more than five million. I'm actually worth maybe six, maybe seven, could be eight,' we understood what he wanted. So when they asked me did Mr. Trump direct you or Mr. Weisselberg to inflate the numbers for his personal statement and I stated 'no, not that I recall, no,' that's what I was referring to."
Supreme Court was entitled to find this explanation credible. As previously explained, we give great deference to the trial court's credibility determinations, which considers the trial judge's firsthand impressions (see Panattoni Dev Co., Inc., 188 AD3d at 498; TOA Constr. Co., Inc., 54 AD3d at 114). There is "no basis to disturb them" here (Matter of C.H., 233 AD3d at 542).
As the record reflects, President Trump also had knowledge and access to the information contradicting the false and misleading assumptions used to inflate the estimated current values (e.g. the true size of the triplex apartment and his lack of control over his minority stake in Vornado, which the SFCs listed as cash). He knew about Mar-a-Lago's deed restrictions because he personally signed the deeds, he knew that Deutsche Bank would use the SFCs, and he had a financial motive.
The trial record supports the court's inference that Donald Trump, Jr. and Eric Trump possessed the requisite intent to defraud. They both knew that President Trump did not control the Vornado partnership. Donald Trump Jr. was aware that the rent-stabilized apartments at Trump Park Avenue were valued as if they were unrestricted apartments. Donald Trump Jr. testified that he "would have sat with the relevant parties" to discuss preparation of the SFCs. He testified that he understood that Deutsche Bank would rely on the annual certifications that he signed representing that the SFCs "fairly" presented President Trump's financial condition. Birney testified that he met with Donald Trump Jr. and Eric Trump in 2021, to "update them on the status" of the SFCs and to inform them of changes to golf-course valuation methods.
Eric Trump also conceded in his trial testimony that in October 2013 he instructed appraiser David McArdle to hold off on an appraisal of undeveloped land in Briarcliff, New York that was made in connection with a potential conservation easement donation for the purpose of income tax benefits. McArdle valued the property at approximately $45 million based on the assumption that 71 units could be built on the property even though defendants only had the right to build 31 units. However, as reflected in notes to McConney's spreadsheets, Eric Trump instructed McConney to value the Briarcliff land at $101 million in the 2014 through 2018 SFCs. McArdle also testified at trial that Eric Trump "had certain ideas about value" which "may have been a little more lofty and above the $45 million" which he and others believed "would have put some people at risk" and "would not have been credible." The 2014 SFC valued the Seven Springs property in Bedford, New York at $291 million, but the appraiser who evaluated the property for a potential conservation easement donation told Eric Trump that the property was worth, at most, $64 million. Donald Trump, Jr. and Eric Trump had a stake in the success of the Trump Organization as co-chief executives. They had personal stakes in success of the OPO project and were responsible for a portion of the OPO Loan.
The trial record also supports the court's inference that McConney and Weisselberg had the requisite intent to defraud. As previously described, they had the primary responsibility for preparing the SFCs. The record also demonstrates that they submitted the SFCs to lenders, insurers, and others. McConney testified that he and Weisselberg intentionally valued the unsold rent-stabilized apartments at Trump Park Avenue based on an asking price that assumed that the apartments were unregulated, and that they did not inform the accountants of the regulatory status of the apartments. As previously noted, Birney testified that Weisselberg told him that President Trump wanted to see his net worth on the SFCs go up. Consistent with this testimony, the record includes a March 6, 2017, email chain among Trump Organization employees Amanda Miller, Alan Garten, and Matthew Hiltzik. The subject line provides "RE: URGENT Fact Checking Inquiry from Forbes." The email chain reflects that the Forbes inquiry included extensive questions about the size of the Triplex at Trump Tower and questions about Trump World Tower. In the final email, Miller informs Garten and Hiltzik that she spoke Weisselberg about Forbes inquiry and that "we are going to leave those alone." Weisselberg and McConney both admitted in their testimony at trial that President Trump did not control the Vornado partnership, yet they continued to list sums held by the partnership as President Trump's personal cash. McConney testified that he was aware of the Mar-a-Lago deed restrictions and the estimated current values for Mar-a-Lago. Donald Bender, the partner at Mazars who was responsible for the compilations testified at trial that he asked McConney whether he had any appraisals to which McConney responded, "I have nothing else."
Justice Friedman mischaracterizes the record when he asserts that "[t]he Attorney General offered no evidence that the error concerning the Triplex was anything but inadvertent." According to Justice Friedman "the weight of the evidence plainly shows that the error originated from a September 2012 email sent by Kevin Sneddon, a real estate broker then employed by Trump International Realty, to his supervisor, Cathy Kaye, and defendant Jeff McConney." While it is true that Sneddon stated that the Triplex was "30,000 square feet" in that email, it is inaccurate to say that the purported error originated with him. Sneddon testified at trial that Allan Weisselberg asked him to assess the market value of the Triplex; that Sneddon asked if he could view the Triplex but was told "that was not possible"; that Sneddon "asked if there was a floor plan or any specks [sic] to which Weisselberg replied "he didn't have any of that information"; and that Sneddon finally asked "well, you know, what size is it" to which Weisselberg responded "it's quite large" and "it's around 30,000 square feet." Thus, the record amply supports Supreme Court's conclusion that this testimony, along with other evidence, demonstrates that defendants intentionally inflated the estimated current value of the Triplex, premised on, among other things, a square footage that was three times its actual size. The court was also entitled to disbelieve McConney's testimony that he relied on Sneddon's valuation as a broker who "knew the property a lot better than [McConney] did," especially in light of Sneddon's testimony above.
The trial record also supports the court's finding that defendants violated New York Penal Law § 175.45 by issuing a false financial statement (the fourth cause of action). That provision requires proof that a person, with intent to defraud, makes or utters a written instrument regarding some person's financial condition or ability to pay which is inaccurate in some material respect. The evidence establishes that the individual defendants were involved with the preparation, issuance, and submission of the 2014 through 2021 SFCs and/or the certifications which related to President Trump's financial condition. Contrary to defendants' argument, their misrepresentations and omissions were material for the same reasons that they were material on summary judgment. The individual defendants' intent to defraud is established for the reasons previously described.
The record further supports a finding of liability on the sixth cause of action for insurance fraud, which is asserted against Weisselberg and McConney. That provision requires, as is relevant here, proof that in support of an application for commercial insurance, a person "knowingly and with intent to defraud" presents, causes to be presented, or prepares with knowledge of presentation "any written statement" that contains "materially false information concerning any fact material thereto" or "conceal[s], for the purpose of misleading, information concerning any fact material thereto."
Here, the trial record establishes that Weisselberg and McConney prepared and reviewed the SFCs, knew they were misleading, and used them to obtain favorable insurance terms. Weisselberg's and McConney's misrepresentations and omissions were material for the same reasons that we found them material on summary judgment. Weisselberg's and McConney's intent to defraud is established for the reasons described above. Nor does it matter that Weisselberg made oral (not written) statements to Mouradian or Holl, which they transcribed. Penal Law § 176.05 is applicable when among other things, a person "causes to be presented" a false written statement. Weisselberg caused Mouradian and Holl to present a false written statement to Zurich and HCC in connection with their review, which was based on the written statements that they were not permitted to take off premises.
The record supports a finding of liability on the third, fifth, and seventh causes of action against defendants for conspiracy under Penal Law § 105.00 in connection with falsifying business records, issuing false statements, and engaging in insurance fraud. Conspiracy requires "an agreement to cause a specific crime to be committed" (Matter of Robinson v Snyder, 259 AD2d 280, 281 [1st Dept 1999], lv denied 93 NY2d 810 [1999]). It requires "the actual commission of an overt act by one of the conspirators in furtherance of the conspiracy" (id.). The understanding can be "tacit" and participants "need not be fully aware of the details of the venture so long as they agree on the essential nature of the plan" (United States v Amiel, 95 F3d 135, 144 [2d Cir 1996] [internal quotation marks omitted]). Although "mere knowledge" of a conspiracy does not implicate a person in the illicit agreement (People v Reyes, 31 NY3d 930, 931 [2018]), an implied agreement is sufficient (People v Mackell, 47 AD2d 209, 213 [2d Dept 1975], affd 40 NY2d 59 [1976] [to establish conspiracy, "there must be proof of an agreement, express or implied, with a common corrupt intent in the minds of at least two or more persons"]). The trial evidence supports the court's determination that defendants conspired to issue false financial statements, to falsify business records, and to commit insurance fraud. The trial record establishes overt acts and implied and tacit agreements to increase President Trump's net worth by inflating the estimated current value of his assets including the evidence that President Trump directed Weisselberg and McConney to prepare the SFCs with an expectation that his net worth was increasing, and they worked together to accomplish this goal. The evidence also establishes the involvement of Donald Trump Jr. and Eric Trump in the conspiracy through their respective roles in the preparation, review and submission of the SFCs and annual certifications, and as co-chief executives.
Although the court heard at trial all of the expert testimony that Justice Higgitt viewed as necessary to decide this lawsuit at the summary judgment stage, he nevertheless concludes that defendants were deprived of a fair trial. According to Justice Higgitt, the court's improper "focus and reliance on magnitude of disparity" at the summary judgment stage continued into the trial and affected the court's assessment of whether the individual defendants possessed the requisite intent to defraud under the relevant Penal Law provisions.[FN54] Justice Higgitt also maintains that the court improperly admitted evidence related to time-barred transactions, which, when superimposed on the court's misunderstanding of materiality, requires a new trial.
We disagree. Because this Court's authority in reviewing a nonjury decision is as broad as that of the trial court and because the trial record before us is clear and complete, there is no need for a new trial. In other words, we are not bound by any legal or fact-finding errors made by Supreme Court at trial.[FN55] In addition, contrary to Justice Higgitt's position, the court's misunderstanding of materiality at the summary judgment stage had no bearing on the court's assessment of the individual defendants' intent to defraud in connection with the relevant Penal Law provisions. As Justice Higgitt acknowledges, intent to defraud is an element under the Penal Law (but is not an element under Executive Law § 63[12]) and looks only to a defendant's state of mind.
Moreover, the materiality analysis applicable at the summary judgment stage has no bearing on Penal Law § 175.45 and Penal Law § 176.05 (which use, but do not define, the words "material" or "materially"). There is nothing in the plain language of these provisions that supports the view that the definition of materiality changes based on the characteristics of the victim (i.e., whether the victim is sophisticated or not) or based on the amount of money to which the false statement or the fraudulent insurance act relates. Rather, for Penal Law purposes, money is relevant to the different levels of severity or culpability assigned to the offense. Notably, the crime at issue here, insurance fraud in the fifth degree (Penal Law § 176.10), involves the commission of a fraudulent insurance act, irrespective of whether any property of value is secured; the higher degrees for this offense correspond to values from in excess of $1,000 to in excess of $1 million.[FN56]
Finally, it is our view that the court did not, as Justice Higgitt asserts, improperly admit evidence of "any SFC submitted within the limitations period, not just those pertaining to loans and other transactions that were 'completed' within the limitations period." Even assuming the correctness of Justice Higgitt's position that the decision in Trump I bars consideration of the transactions which closed prior to July 13, 2014, the appropriate remedy is not a new trial. Because there were no SFCs "just" pertaining to the loans or the other transactions completed within the limitations period, the SFCs would still have been admissible with respect to the timely transactions.
D. Remedies
In its trial decision, Supreme Court imposed sweeping equitable relief on defendants. The court awarded disgorgement against defendants in a combined amount $464,576,230.62 ($363,894,816.00 of what the court called "ill-gotten gains" and $100,681,414.62 in prejudgment interest). The lion's share of disgorgement was awarded against President Trump, the Donald J. Trump Revocable Trust, and various other Trump entities. Donald Trump Jr. and Eric Trump were ordered to disgorge $4,013,024 each, arising from the sale of the OPO License. Weisselberg was ordered to disgorge $1 million that he received as a severance payment.
Additionally, because the Supreme Court found that defendants were likely to commit future misconduct, it issued broad injunctive relief. Supreme Court (1) enjoined Trump and the corporate defendants from applying for loans from any financial institution chartered by or registered with the New York State Department of Financial Services for three years, (2) barred President Trump, Weisselberg, and McConney from serving as corporate officers or directors in New York for three years, and barred Donald Trump Jr. and Eric Trump from doing so for two years, (3) permanently prohibited Weisselberg and McConney from serving in financial management roles in New York, (4) extended the independent monitor's term for three years and enhanced her authority, and (5) required the Trump Organization to retain an independent director of compliance.
Defendants challenge the massive disgorgement ordered by Supreme Court. Disgorgement is "an equitable remedy rather than a cause of action" (see Teachers Ins. & Annuity Assn. of Am. v CRIIMI MAE Servs. L.P., 681 F Supp 2d 501, 512 n 60 [SD NY 2010], affd 481 Fed Appx 686 [2d Cir 2012], cert denied 586 US 1010 [2012]). "Disgorgement aims to deter wrongdoing by preventing the wrongdoer from retaining ill-gotten gains from fraudulent conduct" (People v Ernst & Young, LLP, 114 AD3d 569, 569 [1st Dept 2014]; see also Securities & Exch. Commn. v Drexel Burnham Lambert, Inc., 956 F Supp 503, 507 [SD NY 1997], affd 133 F3d 170 [2d Cir 1997] [explaining that unlike restitution "disgorgement aims to deprive the wrongdoer of ill-gotten gains"]). The focus is on separating the fraudster from the money that he realized from the fraud, not on compensating any victim of that fraud. Because the Attorney General in this lawsuit is vindicating a public purpose, defendants' "ill-gotten gains" would revert to the State.
Defendants first argue that disgorgement is not a remedy afforded by Executive Law § 63(12), because the text of the statute provides for other forms of equitable relief without specifying disgorgement. That argument fails. The Court of Appeals has held "that disgorgement is an available remedy under the Martin Act and the Executive Law" (People v Greenberg, 27 NY3d 490, 497 [2016], cert denied 580 US 1030 [2016] [emphasis added]). We have already held in this casethat the Attorney General may seek disgorgement under section 63(12) (see Trump I, 217 AD3d at 610; see also Federal Trade Commn. v Shkreli, 581 F Supp 3d 579, 641 [SD NY 2022] ["Executive Law § 63(12) empowers the New York Attorney General to disgorge unlawfully gained profits wherever they were derived"]; Amazon.com,550 F Supp 3d at 130 [SD NY 2021] ["[W]hile Executive Law § 63(12) authorizes the Attorney General to seek injunctive and other relief 'in the name of the people of the State of New York,' the Attorney General can seek disgorgement of profits on the State's behalf"]).
Defendants also argue that Supreme Court's disgorgement award violates the Excessive Fines Clauses of the New York State and Federal Constitutions (US Const, 8th Amend, 14th Amend; NY Const art. I, § 5).
The Eighth Amendment's Excessive Fines Clause laid mostly dormant until 1993 when the United States Supreme Court handed down Austin v United States (509 US 602 [1993]) and Alexander v United States (509 US 544 [1993]). In Austin, the Court ruled for the first time that the Constitution placed substantive limits on punitive civil in rem forfeitures, holding that they are fines subject to the constraints of the Excessive Fines Clause. In Alexander, the Court held that criminal forfeitures constitute fines within the meaning of the Excessive Fines Clause and emphasized that courts must analyze Excessive Fines Clause challenges separately from Eighth Amendment Cruel and Unusual Punishments Clause challenges. In each case the United States Supreme Court left to the lower courts the task of formulating a test for excessiveness. The law in this area is unsettled.[FN57] It was only in the 2019 case Timbs v Indiana (586 US 146 [2019]) that the United States Supreme Court held definitively that the Eighth Amendment's Excessive Fines Clause applied to the States. In any event, the New York Court of Appeals has treated the state and federal clauses as co-extensive (see County of Nassau v Canavan, 1 NY3d 134, 139 [2003]).
Initially, we must determine if the disgorgement award in this case constitutes "fines" within the ambit of the Excessive Fines Clause. No case has dealt with this question in the context of an Executive Law § 63(12) claim, but federal caselaw answers the question in the affirmative. The inquiry centers on whether the payment in question is punitive, rather than remedial. We look at several factors. First, punishment is indicated when the "payment [is] to a sovereign as punishment for some offense" as opposed to a payment of recompense to a victim (Browning-Ferris Indus. of Vermont, Inc. v Kelco Disposal, Inc., 492 US 257, 265 [1989]). That factor applies here. "[A] civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment" (Austin, 509 US at 610 [internal quotation marks omitted]). Again, that is the case here. Finally, in Kokesh v Securities & Exch. Commn. (581 US 455 [2017]) the United States Supreme Court held specifically that disgorgement is a penalty, at least in the context of certain SEC enforcement actions. The Court subsequently sought to clarify Kokesh's holding in Liu v Securities & Exch. Commn. (591 US 71 [2020]) to provide that where disgorgement comports with traditional equitable limitations—including restitution to victims—disgorgement is equitable, not punitive (Liu, 591 US at 82).[FN58] The purpose of both punitive and equitable disgorgement is "to deter violations . . . by depriving violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws" (Kokesh, 581 USat 464, quoting Securities & Exch. Commn. v Fischbach Corp., 101 F3d 1450, 1474 [2d Cir 1996]). However, the disgorgement order here departs from the traditional equitable limitations identified in Liu in two ways: first, it does not provide recompense to any victims, and second, it imposes joint and several liability (compare Liu, 591 US at 82-83). Accordingly, the instant disgorgement order constituted a fine.
The remaining question is whether the disgorgement levied against the defendants in this case is an excessive fine barred by the Eighth Amendment. We believe that it is.
A fine is excessive when it is "grossly disproportional to the gravity of the defendant's offense" (United States v Bajakajian, 524 US 321, 337 [1998]). Defendants' attempt to deny the gravity of their actions with blithe claims that none of the counterparties were harmed ignores a core reality: a bank making a loan seeks not only repayment, but also compensation for the possibility of default. Nicholas Haigh, the managing director of the Deutsche Bank Private Wealth Management Division, the entity that approved the three loans issued by that Bank herein, testified that "just getting repaid on the principal" of the loan "doesn't address at all whether we got properly recompensed for the risk we were taking." However, while harm certainly occurred, it was not the cataclysmic harm that can justify a nearly half billion-dollar award to the State. It is a virtue of the statute that the Attorney General may act, as she did in this case, before a potential catastrophe occurs, to deter further fraudulent business behavior by defendants specifically, and to police market behavior generally. However, having achieved these goals the State is not entitled to compound its victory with a massive punitive fine.
Additionally, a fine cannot be proportionate to the offense unless it is reasonably calculated to encompass only the actual proceeds that defendants realized from their fraud. To obtain disgorgement, the Attorney General bears the initial burden of establishing "a reasonable approximation of profits causally connected" to defendants' violations (Securities & Exch. Commn. v First Jersey Sec., Inc., 101 F3d 1450, 1475 [2d Cir 1996] [internal quotations marks omitted]; see also J.P. Morgan Sec. Inc. v Vigilant Ins. Co., 91 AD3d 226, 232—233 [1st Dept 2011], revd on other grounds 21 NY3d 324 [2013]). Where both legal and illegal conduct is implicated, the Attorney General "must distinguish between the legally and illegally derived profits" (Commodity Futures Trading Commn. v British Am. Commodity Options Corp., 788 F2d 92, 93 [2d Cir 1986], cert denied 479 US 853 [1986]). Only once the Attorney General has satisfied her initial burden are defendants "obliged clearly to demonstrate that the disgorgement figure was not a reasonable approximation" (Securities & Exch. Commn. v First City Fin. Corp., 890 F2d 1215, 1232 [DC Cir 1989]; see also Securities & Exch. Commn. v Razmilovic, 738 F3d 14, 31 [2d Cir 2013] [explaining that the "burden shifts to the defendant to show that his gains were unaffected by his offenses"] [internal quotation marks omitted]).
The Attorney General did not carry her initial burden. Indeed, the calculation of the disgorgement in this case was far from a reasonable approximation. Contrary to Supreme Court's finding, the profits from sales of the Ferry Point License and the sale of the OPO Lease (which, in tandem, accounted for $194.8 million of the disgorgement awarded plus a substantial amount of interest) were not "reasonable approximation[s] of profits causally connected" to defendants' wrongdoing (First Jersey Sec., 101 F3d at 1475).
First, the sale price paid by Bally's to defendants in 2023 for the Ferry Point License ($60 million), should not have been subject to disgorgement as there was no finding of liability by defendants arising from the license or its sale, and no colorable calculation of "ill-gotten gains" associated with this transaction. A short review of the relevant procedural history shows why. The Attorney General's motion for partial summary judgment was predicated on five loan transactions and two insurance transactions, but not on the Ferry Point License. Defendants' own motion for summary judgment argued, among other things, that claims based on multiple transactions, including the one based on the Ferry Point License, were time-barred. As discussed above, in opposition to this argument on summary judgment, and on appeal, the Attorney General asserted that the loans and insurance transactions were timely because the claims accrued with each submission of a false and misleading SFC after the accrual date. However, the Ferry Point License did not require submission of SFCs to the City. Rather, it required the submission of "no material adverse change" letters. Thus, the claims predicated on the Ferry Point License are deemed abandoned (see Murphy v Schimenti Constr. Co., LLC, 204 AD3d 573, 574 [1st Dept 2022] [because the plaintiff did not oppose the defendant's motion to dismiss the Labor Law § 241(6) claim predicated on Industrial Code provisions other than 12 NYCRR 23-1.7 (e) (1), and offered no opposition on appeal, the claim predicated on those Industrial Code provisions was deemed abandoned]). Even if the Ferry Point License claim was timely, the no material change letters were not material to the license because the only remedy for a default was an increase in the security deposit.
The profits from the sale of the OPO lease also provide no basis for disgorgement. The Attorney General maintains that without submission of SFCs to Deutsche Bank, there would have been no OPO Loan and defendants thus would have been unable to develop the property and sell it at a profit. However, the profit realized upon sale of the lease was also causally connected to other legitimate factors, such as defendants' experience in hospitality and in developing high end real estate. Thus, for the sale of the OPO lease there is no readily separable rendering of legal profits from ill-gotten gains. For the foregoing reasons, we vacate the portions of the Posttrial Order directing disgorgement in its entirety.[FN59]
This does not leave the Attorney General without a remedy. In contrast to its order on disgorgement, Supreme Court properly granted injunctive relief.
Executive Law § 63(12) empowers the Attorney General to "apply . . . for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts." Courts may issue permanent injunctive relief "upon a showing of a reasonable likelihood of a continuing violation based on the totality of the circumstances" (Greenberg, 27 NY3d at 496-497). "This is not a 'run of the mill' action for an injunction, but rather one authorized by remedial legislation, brought by the Attorney General on behalf of the People of the State and for the purposes of preventing fraud and defeating exploitation" (id. at 497, quoting People v Lexington Sixty-First Assoc., 38 NY2d 588, 598 [1976]). An award of injunctive relief will be vacated only for an abuse of discretion (State of New York v Princess Prestige Co., 42 NY2d 104, 108 [1977] [remedial orders under section 63(12) are "addressed to the sound judicial discretion of the court"]).
The type of injunctive relief awarded by Supreme Court includes extensive monitoring, thereby providing insight into the defendants' operations and creating guardrails to prevent future malfeasance. Its intrusiveness is its strength which may be more effective in addressing the actions of defendants than the imposition of a one time monetary penalty. For these reasons it would likely have powerful deterrent effects on other actors in New York's credit markets, most of whom no doubt would prefer not to have outsiders monitoring their internal business practices and reporting their findings to a court. Being forced to pay for such monitoring, as defendants must do pursuant to Supreme Court's Trial Order, is an additional disincentive.
On the record before us, we find that Supreme Court properly exercised its discretion in awarding injunctive relief. Defendants persistently and intentionally inflated the asset values reported in their SFCs from 2014 to 2021, for numerous assets per each SFC. Despite the wrongfulness of their conduct, Supreme Court believed that defendants lacked remorse (see People v Trump, 2024 NY Slip Op 30493[U], *67 [Sup Ct, NY County 2024]). Indeed, when asked at trial whether he still approved of McConney and Weisselberg's work in preparing the SFCs, President Trump stated "[y]ou haven't shown me anything that would change my mind."
Further, the court recounted four instances of various defendants' prior corporate malfeasance which indicated a propensity to re-offend, including: 1) allegations of fraud relating to the marketing and operation of the now-defunct Trump University,[FN60] 
2) allegations that the 58th Presidential Inaugural Committee overpaid the Old Post Office LLC to numerous defendants' benefit,[FN61] 3) allegations of fiduciary duty breaches, misadministration of assets, wrongful related party transactions, and waste related to the Donald J. Trump Foundation,[FN62] and 4) Weisselberg, the Trump Organization, the Donald J. Trump Revocable Trust, and the DJT Holdings LLC's tax fraud convictions.[FN63] 
Additionally, the independent monitor noted in her most recent report to Supreme Court that, among other things, the Trump Organization lacked sufficient internal controls over financial reporting (see NY St Cts Elec Filing [NYSCEF] Doc No. 1681, Independent Monitor Report). Without adequate internal controls, Supreme Court reasoned that the Trump Organization "does not have the ability to . . . protect against fraud in the future" (People v Trump, 2024 NY Slip Op 30493[U], *87).[FN64] Considering these factors, Supreme Court had ample bases to find that defendants would continue to engage in fraudulent and illegal activity.
Contrary to defendants' arguments, Supreme Court's injunctive relief was not "breathtakingly overbroad." The Court of Appeals recognized in Greenberg that lifetime bans on business activity may not "be a justifiable exercise of a court's discretion" (Greenberg 21 NY3d at 448).[FN65] Even so, the majority of Supreme Court's injunctive relief spanned two or three years. The court's only permanent injunction barred McConney and Weisselberg—who were primarily responsible for preparing the SFCs and maintaining the Trump Organization's books and records—from controlling the finances of a New York corporation or business entity. Considering the significant likelihood that defendants would reoffend, Supreme Court's injunctions were measured and fair.

HIGGITT, J. (concurring in part and dissenting in part)

All persons and entities are subject to the same equally enforced and applied laws. In our view, under the relevant substantive and procedural laws, the record on appeal, and the issues raised by the parties, the judgment should be vacated and a new trial ordered. Our well-established rules of decision regarding summary judgment and the robust factual record produced on the parties' competing CPLR 3212 motions yield a natural result: reversal of the granting of summary judgment to the Attorney General on the Executive Law § 63(12) fraud claim. Similarly, faithful application of the law of the case doctrine to our prior decision in this case compels the conclusion that Supreme Court erred in the manner in which it applied that prior decision, which related to the critical issue of statute of limitations. In light of our conclusion that summary judgment was improperly granted and that the error in granting summary judgment permeated the ensuing trial, we reach no other issue.
I. Introduction
The Attorney General's complaint against defendants — Donald Trump, his children, the Trump Organization (the Organization), several related entities, and several corporate executives — alleges that all defendants participated in a scheme to fraudulently inflate the value of Trump's assets, and thus his personal net worth, for the purpose of obtaining contractual relationships, or obtaining them at terms more favorable than otherwise possible. This was accomplished through annually-generated statements of Trump's financial condition (SFCs) that were submitted in support of the applications for, and maintenance of, various loans, insurance policies, and other transactions benefitting defendants and advancing and expanding the Organization's business portfolio. These SFCs listed and valued Trump's extensive holdings, and were used to support his personal guaranties of defendants' performance that were required by the banks, insurers and other entities, without which interest rates and premiums charged to defendants would have been far less attractive and advantageous.
The 214-page complaint is premised on the authority granted to the Attorney General by Executive Law § 63, which enumerates various duties conferred upon that office. The particular duty prompting this action is found in Executive Law § 63(12), which relates to the monitoring of commercial activity (arguably one of the most notable societal contributions for which this State is known, both domestically and globally):
"Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, to the supreme court of the state of New York, on notice of five days, for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages and, in an appropriate case, cancelling any certificate filed under and by virtue of the provisions of section four hundred forty of the former penal law or section one hundred thirty of the general business law, and the court may award the relief applied for or so much thereof as it may deem proper."
As used in Executive Law § 63(12), "fraud" and "fraudulent" include "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions" (id.). The terms "persistent fraud" and "illegality" include the "continuance or carrying on of any fraudulent or illegal act or conduct," and "repeated" includes "repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person" (id.).
The Attorney General asserts seven causes of action against defendants. The first alleges that their conduct constituted repeated or persistent fraud under the first aspect of Executive Law § 63(12). The remaining causes of action allege that defendants' conduct also constituted repeated or persistent illegality under the second aspect of Executive Law § 63(12), alleging that their conduct violated Penal Law § 175.05 (falsifying business records in the second degree) and Penal Law § 175.45(1) (issuing false financial statements), that the conduct of defendants Weisselberg and McConney violated Penal Law § 176.05(1) (insurance fraud), and that all defendants conspired to violate the foregoing penal provisions.
At issue in defendants' appeal are two of Supreme Court's decisions: the first granted the Attorney General's motion for summary judgment on her standalone fraud cause of action, granted limited injunctive relief in the Attorney General's favor, denied defendants' motion for summary judgment dismissing the complaint, and granted the Attorney General's motion to sanction defendants' counsel for their purportedly frivolous conduct in repeating legal arguments previously deemed meritless by Supreme Court (the nonparty attorneys separately appeal from that aspect of the decision); and the second disposed of the action after a bench trial, awarding judgment to the Attorney General and granting a significant disgorgement award and multiple forms of injunctive relief against defendants including prohibition, permanently or temporarily, from serving in certain corporate capacities and from performing certain corporate functions.
With respect to the summary judgment decision, defendants argue that Supreme Court "artificially resuscitated long-extinguished claims" when it violated the law of the case doctrine by disregarding this Court's prior finding that "[t]he continuing wrong doctrine does not delay or extend" the statute of limitations (People v Trump, 217 AD3d 609, 611 [1st Dept 2023] [Trump I]). Defendants argue that this error was compounded by Supreme Court's erroneous valuations of the various assets, which influenced both its liability findings and award calculations, and that both errors fatally infected the trial and judgment, requiring reversal of both decisions and vacatur of the judgment.
With respect to the posttrial decision, defendants argue that the Attorney General's pursuit of defendants did nothing to further the public interest, as is required in the exercise of her Executive Law section 63(12) powers; that Supreme Court erred in finding that the Attorney General met her burden of establishing that defendants' conduct met the standard required for fraud as defined in Executive Law § 63(12) or constituted the elements of the crimes underlying the illegality causes of action; and that, in light of the lack of supporting conduct, the awards of disgorgement and injunctive relief must be vacated. Defendants also argue that Supreme Court's disgorgement award was unsupported by proof of any causal relationship between any purported misconduct and the ill-gotten gains, and that, in any event, the award constituted a grossly disproportionate and excessive punitive fine violating the excessive fines and due process clauses of the New York and US Constitutions. They also argue that Supreme Court enjoined plainly lawful conduct that was outside the reach of Executive Law § 63(12).
We and our colleagues generally agree on the facts and evidence. On the import of those facts and evidence, however, we differ with our colleagues — in reasoning, result, or both — on a number of fundamental issues, and the path this action should now take.
For the reasons that follow, we conclude that the judgment must be vacated and a new trial ordered.
II. Factual and Procedural History
In 2019, the Attorney General commenced an investigation into defendants' business practices "after testimony before Congress by Michael Cohen, former Trump Organization senior executive and special counsel, in which Cohen alleged that respondent The Trump Organization, Inc. had issued fraudulent financial statements" (Matter of People v Trump Org., Inc., 205 AD3d 625, 626 [1st Dept 2022], appeal dismissed 38 NY3d 1053 [2022]). During the course of her investigation, which entailed, among other things, reviewing millions of pages of documents and interviewing dozens of witnesses, the Attorney General commenced a special proceeding against defendants and others in August 2020 to compel their compliance with investigative subpoenas she had served on them (see id.). The culmination of her investigation was the commencement of this action in September 2022, alleging the causes of action enumerated above.
The complaint alleges that defendants and others "engaged in numerous acts of fraud and misrepresentation in the preparation of Mr. Trump's annual statements of financial condition," resulting in statements that "grossly inflated Mr. Trump's personal net worth as reported in the statements by billions of dollars and conveyed false and misleading impressions to financial counterparties about how the statements were prepared." The complaint further alleges that defendants, from at least 2011 to at least 2021, "used these false and misleading Statements repeatedly and persistently to induce banks to lend money to the Trump Organization on more favorable terms than would otherwise have been available to the company, to satisfy continuing loan covenants, and to induce insurers to provide insurance coverage for higher limits and at lower premiums." By using various strategies, according to the Attorney General, defendants saved millions of dollars in insurance premiums and loan interest. She alleged that defendants accomplished this through the use of the statements by, among other things, misleading or concealing information from the accountants who prepared the statements, and then misstating the value of assets, valuing assets without regard to conditions that would decrease their value, failing to properly employ valuation methods that ensured accuracy, failing to use the valuation method appropriate for the type of asset, including value components despite expressly representing that such values had been excluded, and including values of assets Trump did not control.
Shortly after commencement of the action, and before any defendant had answered the complaint, the Attorney General sought an injunction to enjoin defendants from engaging in any acts in violation of Executive Law § 63(12), issuing inadequate SFCs, and disposing of material assets. Supreme Court found that Trump's "persistent misrepresentations throughout every one of [his] SFCs between 2011 and 2021" warranted the appointment of an independent monitor to oversee defendants and ensure their compliance with the order, which it believed was an appropriate mechanism to prevent violations during the action; the only conduct it actually enjoined was defendants' disposition of non-liquid assets.
In November 2022, on the day prior to the November 22, 2022 preliminary conference set by the injunction order, all defendants moved pursuant to CPLR 3211 for dismissal of the complaint. While this required Supreme Court to entertain six motions, there was significant duplication of argument. Defendants argued, among other things, that the claims were subject to a three-year, rather than six-year, statute of limitations, rending the action untimely commenced. Ivanka Trump, who was alleged to have negotiated several of the loans, also argued that the complaint alleged no fraudulent or illegal conduct attributable to her, and no conduct occurring within either limitations period.
Supreme Court denied the motions as to all defendants in a January 2023 decision. As to defendants other than Ivanka Trump, it found that a six-year statute of limitations applies to fraud claims brought under Executive Law § 63(12), noted that the claims could be subject to tolls pursuant to an agreement entered into with the Attorney General and pursuant to the Executive Orders issued during the coronavirus pandemic, and further found that the Attorney General had demonstrated the "potential applicability" of the continuing wrong doctrine because the complaint alleged an ongoing scheme existing until at least 2021:
"OAG has demonstrated the potential applicability of the continuing wrong doctrine, in which a series of wrongs is deemed to have accrued on the date of the last wrongful act. Palmeri v Willkie Farr & Gallagher LLP, 156 AD3d 564, 568 (1st Dept 2017). [T]he continuing wrong doctrine is usually employed where there is a series of continuing wrongs and serves to toll the running of a period of limitations to the date of the commission of the last wrongful act. People by Underwood v Trump, 62 Misc 3d 500 (Sup Ct, NY County 2018). As the verified complaint alleges an ongoing scheme by defendants that extends up until at least 2021, dismissal pursuant to the statute of limitations must be denied" (People v Trump, 2023 NY Slip Op 30027[U], *5-*6 [Sup Ct, NY County 2023], mod 217 AD3d 609 [1st Dept 2023] [internal quotation marks omitted]).
As to Ivanka Trump, although her negotiation of the loans occurred more than six years prior to commencement of the action, Supreme Court found that "the nature of the loan contracts at issue renders the application of the continuing wrong doctrine particularly compelling" because the loans "continued in effect for many years . . . and required annual performance by defendants." Supreme Court found that the Attorney General had adequately alleged Ivanka Trump's "participation in continuing wrongs" in light of her "repeated interactions" with the lender arising out of the financial requirements that the loans imposed on defendants, and that "the record establishes that Ms. Trump participated far more in securing the loans than just passively receiving emails" during the course of negotiations (id. at *7-8 [emphasis added]).
On the ensuing appeals from Supreme Court's decision, we found that a six-year statute of limitations and the tolls applied, and further found:
"Applying the proper statute of limitations and the appropriate tolling, claims are time barred if they accrued — that is, the transactions were completed — before February 6, 2016 (see Boesky v Levine, 193 AD3d 403, 405 [1st Dept 2021]; Rogal v Wechsler, 135 AD2d 384, 385 [1st Dept 1987]). For defendants bound by the tolling agreement, claims are untimely if they accrued before July 13, 2014. The continuing wrong doctrine does not delay or extend these periods (see CWCapital Cobalt VR Ltd. v CWCapital Invs. LLC, 195 AD3d 12, 19-20 [1st Dept 2021]; Henry v Bank of Am., 147 AD3d 599, 601-602 [1st Dept 2017])" (People v Trump, 217 AD3d at 611 [emphasis added]).
As to Ivanka Trump, we found that the Attorney General had simply not asserted allegations that would support any cause of action accruing within the limitations period applicable to her (id. at 612), and modified Supreme Court's order to dismiss the claims against her.
That prior decision remains undisturbed.
Two months after our decision, the Attorney General moved for partial summary judgment on the issue of defendants' liability under the first cause of action alleging repetitive or persistent fraud, defendants moved for summary judgment dismissing the complaint in its entirety, and the Attorney General moved to sanction defendants' attorneys for reiterating arguments that Supreme Court had already found meritless in prior motion practice.[FN1]
The Attorney General argued that the manner in which defendants prepared and submitted the SFCs constituted fraud within the meaning of Executive Law § 63(12) because the resulting documents presented a false and misleading picture of the worth of various of Trump's assets through various manipulations, that defendants used the SFCs to defraud multiple banks and insurers in obtaining loans with favorable interest rates and insurance policies with favorable premiums, and that their conduct thus satisfied the requirement of repetition and persistence.
In opposition, defendants argued that the Attorney General was not entitled to summary judgment because she failed to demonstrate that the SFCs were fraudulent, because the valuation methods and disclosures comported with generally accepted accounting principles (GAAP), the purported inflations were unsupported, mere professional disagreement as to the significance of valuations was not indicative of fraud, and the Attorney General's valuations were nevertheless incorrect in any event. They argued that the Attorney General had failed to demonstrate that the SFCs contained misstatements that were material, and that proper application of our prior appeal decision and a tolling agreement entered into with the Attorney General rendered the majority of the Attorney General's claims untimely. Defendants finally argued that the relief sought by the Attorney General was unavailable to her, that Executive Law § 63(12) did not authorize the Attorney General to pursue the action, and that their foregoing arguments entitled them to summary judgment.
The Attorney General replied that defendants had failed to raise issues of fact as to the specific practices they employed to inflate asset values, such as disregarding appraised value, employing methods that did not comport with express representations accompanying the SFCs, and using unsupportable data points. She disagreed with defendants' interpretation of our prior decision with respect to the statute of limitations, and urged Supreme Court to narrow the issues for trial pursuant to CPLR 3212(g).
For their part, defendants sought summary judgment on the ground that the claims were largely time-barred. With respect to the fraud cause of action, they argued that the SFCs were not materially misleading, that defendants were unaware of and did not participate in any alleged fraud, and that the Attorney General was unable to demonstrate any harm flowing from any purported misstatement. With respect to the illegality causes of action, defendants argued that the causes of action predicated on Penal Code violations requiring material misstatements were meritless for the same reasons as the fraud cause of action; that they lacked intent to defraud, a necessary element of all of the causes of action; and that they did not conspire to commit any of the alleged crimes. They argued further that the monetary relief sought by the Attorney General, disgorgement of ill-gotten gains, was not available in an action under Executive Law § 63(12), and that, in any event, there was no evidence that the purported fraud and the monetary advantages claimed by the Attorney General were causally related.
The Attorney General and defendants largely reiterated the above arguments in their respective opposition and reply papers. Defendants additionally argued that whatever investigatory and enforcement power might have permitted the Attorney General to commence the action had dissipated upon the accumulation of an evidentiary record indicating that the defendants had engaged in no actionable wrongdoing.
In support of her motion for monetary sanctions against defendants' attorneys, the Attorney General argued that Supreme Court's prior decisions on the preliminary injunction and dismissal motions and our prior appellate decision had conveyed to defendants the meritless nature of various arguments — that the Attorney General lacked the standing and capacity to pursue private actors whose conduct had no public repercussions and had not inflicted harm of any kind, that the disclaimers accompanying the SFCs rendered any reliance thereon unreasonable, and that disgorgement was not a remedy available to the Attorney General — they had already repeated and now reiterated in opposition to and in support of summary judgment. In light of Supreme Court's prior admonishment responding to this very conduct, she argued that this repetition warranted the imposition of sanctions for frivolous conduct.
In opposition, defendants' counsel argued that at the time of the injunction motion, the case was barely one month old and they had not previously received the Attorney General's evidence that supported her motion. They argued that the focus of their arguments naturally evolved as the case progressed, but the necessity of making them remained constant in light of the particular function of each motion. They argued that they had accordingly tailored their arguments to the relevant stage of the litigation, the burden on each party, and the facts available to them at the time of the motions.
In reply, the Attorney General argued that none of the challenged arguments required the development of a factual record, all relating to issues of law, and that counsels' arguments had in any event remained constant.
Supreme Court then decided the other motions within four days after their September 22, 2023 return date. In the order deciding the summary judgment and sanctions motions, Supreme Court agreed with the Attorney General on the issue of sanctions, finding the conduct of defendants' counsel "egregious" and evincing "intentional and blatant disregard of controlling authority and law of the case."
In denying defendants' motion for summary judgment, Supreme Court found that all defendants were subject to the tolling agreement, and that our prior decision, having referred to "completed" and not "closed" transactions, meant that Supreme Court could consider all SFCs submitted after 2014, including those for transactions that closed outside statute of limitations, if the transactions imposed an obligation to disclose that extended into the limitations period. It found that the disclaimers accompanying the SFCs were not a defense to the Attorney General's claims, because they relied on facts particularly within defendants' own knowledge, and that the disparities between defendants' and the Attorney General's asset valuations were material and did not represent mere disagreement. Supreme Court also found that the Attorney General had raised issue of fact as to whether defendants violated the underlying criminal statutes "intentionally and materially."
With respect to the Attorney General's motion, Supreme Court granted summary judgment in her favor on the first cause of action alleging standalone fraud, finding that defendants had misstated the value of, or had otherwise misrepresented the nature of their disclosures as to, various assets; that each individual defendant was liable by virtue of being the beneficiary of the SFCs, directing the process by which they were generated, providing the source data, or certifying the SFCs as accurate; and that the corporate defendants were liable either as beneficiaries of the various transactions or as the entities through which the individuals acted.
Supreme Court found that defendants' fraudulent misrepresentations included: blatantly overstating the square footage of defendant's triplex apartment by a scalar multiple, disregarding as-is valuations of undeveloped property and valuing it as per its intended yet inchoate use, valuing rent-stabilized apartments as if they had been destabilized instead of at their current values as required, likewise valuing Mar-a-Lago and a planned golf course on the basis of future use that was in any event contrary to land use restrictions, including the value of intangible brand premiums and deal values while simultaneously claiming not to have done so, using valuation methods inappropriate to asset types, disregarding independent appraisals having values far lower than they reported, and classifying as liquid assets that defendant could not access. Supreme Court found that defendants had used the SFCs in business repeatedly and persistently, including submitting them in support of loan applications, and that defendants' explanations for the discrepancies and their lack of materiality to the transactions were unsupportable.
Supreme Court found that, given the foregoing, the Attorney General had demonstrated entitlement to the cancellation of the General Business Law § 130 certificates of defendants and related entities, and to the appointment of an independent monitor to oversee compliance, financial reporting, valuations, and disclosures to lenders, insurers, and tax authorities at the Trump Organization. In conclusion, Supreme Court found that all other issues that it had not decided required a trial.
The day after Supreme Court decided the summary judgment and sanctions motions, Supreme Court denied the Attorney General's motions to strike the reports, opinions and testimony of several of defendants' expert trial witnesses, without prejudice to renewal at trial. The case thereafter proceeded to a widely-publicized bench trial, from October 2023 to January 2024, after we granted a short stay of the trial upon defendant' application. Defendants also unsuccessfully submitted an order to show cause seeking a mistrial.
Supreme Court's February 16, 2024 posttrial decision and order comprehensively reviewed the witnesses and evidence and summarized the conduct of the trial. Supreme Court received hundreds of exhibits in evidence and heard the testimony of 27 party and nonparty witnesses and 13 expert witnesses, including experts in contract procurement; accounting; financial accounting, credit analysis and valuation; investment banking, capital markets, bank loans, and due diligence; commercial insurance and surety underwriting and brokering; commercial real estate development, research, brokerage, valuations and market analysis; and land use planning, entitlement, and zoning.
Supreme Court found that defendants' witnesses established that the SFCs were prepared with concealment or disregard of the variously inflated valuations and flawed methods mentioned above, for the purpose of inflating the net worth depicted therein. Supreme Court found that defendants used the SFCs in support of personal guaranties defendant submitted to obtain four loans at more favorable interest rates and two insurance policies at more favorable premiums than otherwise possible, and a license to operate and maintain a golf course that they then assigned to a third party for considerable profit. Further, one of the loans was a construction loan, which therefore enabled defendants to develop a leasehold from which they profited at its eventual sale. Supreme Court found that, in addition to the fraud established at summary judgment, defendants' conduct constituted the falsification of business records under Penal Law § 175.05, the issuance of false financial statements under Penal Law § 175.45, insurance fraud under Penal Law § 176.05, and defendants' participation in a conspiracy to commit those offenses.
Supreme Court rejected defendants' claims that none of the lenders or insurers had relied on the purportedly fraudulent statements in making their risk assessments, and that the responsibility for any errors lay with the accountants on whom they relied to compile the SFCs, and it found that that the magnitude of defendants' overvaluations were plainly material and could not be explained by resort to accounting conventions or the choice of valuation method.
The money that defendants had saved through the lower interest rates they obtained on the loans, and their profits from the two tainted license and leasehold sales, formed the basis of Supreme Court's disgorgement award to the Attorney General, as did defendants' severance payment to defendant Allen Weisselberg, whom Supreme Court found to be instrumental in coordinating and perpetuating the fraud. While several of the defendants were single-purpose entities formed to enter into single, discrete loans, Supreme Court imposed joint and several liability for the loan-related portion of the disgorgement award. The court also awarded prejudgment interest on the disgorgement award: for the interest rate-derived components, interest was to run from March 4, 2019, the date that the Attorney General commenced her investigation of defendants; for the profit-derived components, interest was to run from the date of those transactions; and for the severance component, interest was to run from January 9, 2023.
Supreme Court also granted multiple forms of injunctive and other non-monetary relief, including permanently enjoining defendants Allen Weisselberg and Jeffrey McConney from serving in the financial control function of any New York corporation or similar business entity registered or licensed in New York State; temporarily enjoining defendants Donald Trump, Allen Weisselberg, Jeffrey McConney, Eric Trump, and Donald Trump, Jr. from serving as an officer or director of any New York corporation or other legal entity in New York; and temporarily enjoining Donald Trump and all defendants, except Seven Springs LLC, from applying for loans from any financial institution chartered by or registered with the New York State Department of Financial Services. In addition, the court continued the appointment of the Independent Monitor, directed defendants' installation of an Independent Director of Compliance to ensure compliance with financial reporting obligations and to establish internal written accounting and financial reporting protocols, and vacated the cancellation of the General Business Law § 130 certificates of defendants and related entities.
Judgment was entered against the defendants on February 23, 2024 for the injunctive, monetary and other relief granted in the posttrial order, together with the prejudgment interest directed therein, for a total judgment in the amount of $464,576,230.62. Defendants sought a stay of enforcement of the judgment from this Court, arguing that they would otherwise suffer irreparable injury through the loss of the assets they would be forced to sell to satisfy the judgment, and through their deprivation of the right to conduct and manage their lawful businesses. They asserted that the Attorney General's rights would be adequately protected by the continued service of the court-appointed Independent Monitor and their posting of a bond. We granted an immediate stay of enforcement of the injunctive portions of the judgment and shortly thereafter granted a stay of both the monetary and injunctive portions, conditioned on defendants' posting of an undertaking and timely perfecting their appeals from the summary judgment and posttrial decisions and the judgment.
Accordingly, we agree that the judgment, as entered, cannot stand. We would vacate the judgment and order a new trial, in contrast to the views of our colleagues.[FN2]
III. The Attorney General's Executive Law § 63(12) Duty
Executive Law § 63(12) empowers the Attorney General to commence an enforcement action "[w]henever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business." Executive Law § 63(12) has "been liberally construed to defeat all unsubstantial and visionary schemes . . . whereby the public is fraudulently exploited" (People v Greenberg, 95 AD3d 474, 483 [1st Dept 2012], affd 21 NY3d 439 [2013] [internal quotation marks omitted]). Executive Law § 63(12) is traditionally viewed as a statute protecting the ordinary "consuming public" (Matter of State of New York v ITM, Inc., 52 Misc 2d 39, 52 [Sup Ct, NY County 1966]; see Matter of Food Parade, Inc. v Office of Consumer Affairs of Nassau, 7 NY3d 568, 574 [2006] [Graffeo, J., dissenting] ["full spectrum of consumer-oriented conduct"]). The reach of the statute, however, is not confined solely to "consumers" in the commonly-understood usage of that term, but has also been used to confront conduct directed at particular populations such as patients, tenants, employees, investors, jobseekers and authors (see New York v Feldman, 210 F Supp 2d 294, 299-300 [SD NY 2002] and cases cited therein; People v Network Assoc., 195 Misc 2d 384, 389 [Sup Ct, NY County 2003] and cases cited therein).
Defendants have questioned the very viability of this action — specifically, they have questioned whether the Attorney General possesses the "standing" or "capacity" to pursue it — since well before its inception. Defendants argue that Executive Law § 63(12) was enacted for the protection of ordinary consumers, not the sophisticated parties involved here; that the statute permits the Attorney General to pursue only conduct having broad commercial impact, not the private transactions at issue here, the repercussions of which did not extend beyond their individual and specific contracts, parties and subject matter; and that the statute is to be used only to advance the government's legitimate sovereign interests, and not as a vehicle to permit the Attorney General to use the weight of her office to vindicate the rights of private parties not otherwise inclined to seek redress. Defendants argue that this action exceeds the Attorney General's legislative mandate on all points. This is an issue on which our colleagues disagree.
Here, the Attorney General alleges that defendants obtained various contractual relationships on terms made more favorable by the submission of SFCs in support of Trump's personal guaranties of repayment. The parties to each of these relationships are large, sophisticated, well-known, and industry-leading corporations and institutions, that is, those who are not necessarily in danger of exploitation. While we agree with Justice Friedman that the Attorney General's application of Executive Law § 63(12) to transactions and parties of this nature does not find much precedent in our jurisprudence, we also agree with Justice Moulton that nothing in the text or legislative history of Executive Law § 63(12) indicates that such use is proscribed.
"The primary consideration of courts in interpreting a statute is to ascertain and give effect to the intention of the [l]egislature and, although the strongest indication of the statute's meaning is in its plain language, the legislative history of an enactment may also be relevant and is not to be ignored, even if words be clear" (People v Badji, 36 NY3d 393, 399 [2021] [internal quotation marks omitted]). The plain language of the statute indicates no limitation of the nature suggested by defendants, and while we are confronted with an unprecedented use of the statutory power, we cannot say that our courts' prior pronouncements assessing the Attorney General's usage of Executive Law § 63(12) exclude or limit the Attorney General's exercise of her duty in the manner at issue here. As Justice Moulton has explained, the plain language of the statute does not support the narrowed reading upon which defendants rely, even if, historically, the exercise of the Attorney General's power has been confined to a particular arena of concern, at least as far as reported cases tell us. Moreover, nothing in the legislative history of Executive Law § 63(12) indicates that the Attorney General's attention was to be directed exclusively to any particular type of consumer or market or to conduct of particular reach (see e.g. Port Jefferson Health Care Facility v Wing, 94 NY2d 284, 293 [1999], cert denied 530 US 1276 [2000]), and our jurisprudence has not so found. The statute also does not attempt to define how widespread the effects of an actor's conduct must be. Significantly, this is not the first time the Attorney General has sought to enjoin or investigate fraudulent activity directed at businesses and businesspersons (see Matter of People v Leasing Expenses Co. LLC, 199 AD3d 521 [1st Dept 2021]; Matter of People v Northern Leasing Sys., Inc., 193 AD3d 67 [1st Dept 2021], lv dismissed 37 NY3d 1088 [2021]; see also Matter of American Dental Coop., Inc. v Attorney General of State of NY, 127 AD2d 274 [1st Dept 1987] [affirming the denial of a motion to quash or modify the Attorney General's subpoena served in the course of antitrust violation investigation]).
As a consequence of the Attorney General's historic exercise of this power, we have, it is true, as can be seen below, developed a jurisprudence with respect to Executive Law § 63(12), the language of which does not mesh neatly with the actors and circumstances with which we are confronted here. But it appears to us that, as Justice Moulton says, to so restrict the Attorney General's duty and the statute's utility in the manner as urged here by defendants, as a matter of law, is an undertaking that requires legislative action.
We cannot say that the actions of a particular type of actors will not have effects far beyond their specialized sphere. That is to say, defendants have not demonstrated that the Attorney General's maintenance of this action serves no purpose in furtherance of her obligations to the general public. As we previously found, by this action the Attorney General is "vindicating the state's sovereign interest in enforcing its legal code — including its civil legal code — within its jurisdiction" (Trump, 217 AD3d at 610). This interest includes maintenance and protection of the honesty (see e.g. Matter of People v Telehublink Corp., 301 AD2d 1006, 1010 [3d Dept 2003]) and the integrity (see e.g. Greenberg, 95 AD3d at 481) of the marketplace. Much like its companion, the Martin Act, Executive Law § 63(12), "in order to be effective in providing a remedy to those who have fallen prey to the exploitation of the public by unscrupulous individuals, must not be strictly interpreted but should be given a pliable yet resilient construction enabling [it] to be applied to individual situations in a manner which best fulfills [its] beneficial purpose" (Matter of Gardner v Lefkowitz, 97 Misc 2d 806, 812-813 [Sup Ct, NY County 1978]).
Justice Friedman posits that the inevitable result of this finding will be the Attorney General's indiscriminate and wholly unfettered abuse of the authority afforded her under Executive Law § 63(12) to reach any and all activity of a commercial nature. His discussion of this putative effect, however, centers on matters that certainly could not have lent themselves to summary disposition. By no means should the historic significance of this case and the issues it presents be minimized; however, many of the issues into which Justice Friedman delves are simply not points to which the parties have directed our attention and which, therefore, have no place in guiding our analysis of the questions presented to us. We cannot accept any invitation to employ a different standard for sophisticated actors merely because of their sophistication, particularly in light of the rapidly evolving and increasingly convoluted markets of which we claim to be on the forefront.
To exclude the Attorney General's reach from certain actors merely because of their sophistication or size, itself, fails to further the purpose of the statute and the Attorney General's duty. It seems particularly contrary to the stated purposes of the statute to exclude from the Attorney General's reach those actors who, by their very market standing and savvy, are particularly positioned to do the most damage to the markets through unscrupulous dealings. Protection and promotion of integrity in the marketplace is an admirable goal, and a power within the Attorney General's jurisdiction, beyond protecting consumers themselves.
IV. Principles of Executive Law § 63(12)
A. Fraud
Given the broad definition of fraud contained in Executive Law § 63(12), a cause of action for fraud under Executive Law § 63(12) is to be differentiated from common-law fraud (see Matter of People v Trump Entrepreneur Initiative LLC, 137 AD3d 409, 417 [1st Dept 2016]), and the Attorney General is not required to plead or prove the elements of common-law fraud (see People v Coventry First LLC, 52 AD3d 345, 346 [1st Dept 2008], affd 13 NY3d 108 [2009]). Instead, "[u]nder Executive Law section 63(12), the test for fraud is whether the targeted act or statement has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud" (Matter of People v Northern Leasing Sys., Inc., 193 AD3d at 75 [internal quotation marks omitted]).
"In weighing a statement's capacity, tendency or effect in deceiving or misleading customers, we do not look to the average customer but to the vast multitude which the statutes were enacted to safeguard — including the ignorant, the unthinking and the credulous who, in making purchases, do not stop to analyze but are governed by appearances and general impressions" (Guggenheimer v Ginzburg, 43 NY2d 268, 273 [1977] [discussing Administrative Code of City of NY § 2203d-4.0, a provision prohibiting statements having misleading capacity, tendency, or effect]).[FN3] "[I]n evaluating a tendency or capacity to deceive, it is appropriate to look not at the most sophisticated, but the least sophisticated consumer" (Federal Trade Commn. v Crescent Publ. Group, Inc., 129 F Supp 2d 311, 321 [SD NY 2001] [internal quotation marks omitted]). A defendant will be liable, at least under General Business Law § 349, for statements having "evident capacity . . . to mislead even reasonable consumers acting reasonably under the circumstances" (Matter of People v General Elec. Co., 302 AD2d 314, 315 [1st Dept 2003], citing Matter of Lefkowitz v E. F. G. Baby Prods. Co., 40 AD2d 364, 368 [3d Dept 1973]). Indeed, the Attorney General recognizes that the Guggenheimer standard applies to the "ordinary person."
Fraud under Executive Law § 63(12) does not require establishment of scienter or knowledge of the falsity of the statement or act (see IKB Intl. S.A. v Morgan Stanley, 142 AD3d 447, 450 [1st Dept 2016]); reliance on the statement or act (see People v Credit Suisse Sec. [USA] LLC, 145 AD3d 533, 539 [1st Dept 2016] [Andrias, J., dissenting], mod 31 NY3d 622 [2018]; Greenberg, 95 AD3d at 483; Matter of People v American Motor Club, 179 AD2d 277, 283 [1st Dept 1992], appeal dismissed 80 NY2d 893 [1992]; Matter of Lefkowitz v Bull Inv. Group, 46 AD2d 25, 28 [3d Dept 1974], lv denied 35 NY2d 647 [1975]); bad faith (see Matter of People v General Elec. Co., 302 AD2d at 315); or intent (see Matter of People v Apple Health & Sports Clubs, 206 AD2d 266, 266-267 [1st Dept 1994], lv dismissed 84 NY2d 1004 [1994]; People v Barysh, 95 Misc 2d 616, 620-621 [Sup Ct, NY County 1978]). Executive Law § 63(12) fraud also does not require that the omission or misrepresentation be material (see Matter of People v General Elec. Co., 302 AD2d at 314-315 [differentiating the requirements for claims asserted under Executive Law § 63(12) and General Business Law § 349]), although the materiality of the omission or misrepresentation may be relevant to determining the tendency or capacity of the challenged act or statement to deceive (see Matter of People v Domino's Pizza, Inc., 2021 NY Slip Op 30015[U], *23 [Sup Ct, NY County 2021]).
While we have held that "false promises are sufficient" (Matter of People v American Motor Club, Inc., 179 AD2d at 283) to establish fraud under Executive Law § 63(12), we merely meant, not that falsity is the sole element of a cognizable claim, but that because scienter is not required, some other measure of proof is required, such as a "finding that the defendant had created an atmosphere conducive to fraud" (State of New York v General Motors Corp., 120 Misc 2d 371, 374 [Sup Ct, NY County 1983]). An atmosphere conducive to fraud considers the circumstances in which the acts or statements were made (see State of New York v Wolowitz, 96 AD2d 47, 66-67 [2d Dept 1983]), and may be demonstrated by, among other things, "[d]eliberately vague and misleading statements" (see Matter of Lefkowitz v Bull Inv. Group, Inc., 46 AD2d at 28), by methods that delay revelation of operative facts or employ subtle psychological manipulation (see Matter of People v Compact Assoc., 22 AD2d 129, 131 [1st Dept 1964], affd 17 NY2d 758 [1966]), omitting or concealing important information (see People v Merkin, 26 Misc 3d 1237[A], 2010 NY Slip Op 50430[U], *3-7 [Sup Ct, NY County 2010]), or evincing a lack of oversight of known questionable conduct (see Northern Leasing Sys., Inc., 193 AD3d at 75).
For purposes of Executive Law § 63(12), it does not matter whether consumers were, in fact, deceived; the question is the "impression conveyed or fostered" by the statements or acts, which requires "examination of [their] meaning and probable effect" (State of New York v General Motors Corp., 63 AD2d 885, 886 [1st Dept 1978] [Silverman, J., dissenting], revd 48 NY2d 836 [1979]; see also Floersheim v Weinburger, 346 F Supp 950, 957 [D DC 1972] ["It is the over-all impression on the consumer that is crucial"]). For Executive Law § 63(12) purposes, the act or statement need only have the "potential" to deceive (see Federal Trade Commn. v Crescent Publ. Group, Inc., 129 F Supp 2d at 319-320, citing Matter of People v World Interactive Gaming Corp., 185 Misc 2d 852 [Sup Ct, NY County 1999]). Even if true, a statement may be actionable if presented in such a way as to be likely to mislead (see General Elec. Co., 302 AD2d at 315).[FN4]
As to the repetition or persistence required by Executive Law § 63(12), "[w]hile the authority of the Attorney-General is restricted to seeking injunctive relief against repeated illegal or fraudulent acts, he [or she] is not required to establish a large percentage of violations" (State of New York v Princess Prestige Co., 42 NY2d 104, 107 [1977]). But some numerical threshold, that may be augmented by proof of an atmosphere conducive to fraud, appears to be necessary (see Matter of People v Compact Assoc., Inc., 22 AD2d at 131-132). A "basic pattern of doing business" may suffice (see ITM, Inc., 52 Misc 2d at 43), and the duration of the offending conduct may be informative (see State of New York v United Parcel Servs., Inc., 253 F Supp 3d 583, 664-665 [SD NY 2017], affd 942 F3d 554 [2d Cir 2019], cert denied — US —, 141 S Ct 242 [2020]). Conduct may be considered "repeated" within the meaning of Executive Law § 63(12) where it "affect[s] numerous individuals" (see Matter of People v Wilco Energy Corp., 284 AD2d 469, 471 [2d Dept 2001]; contra Matter of State of New York v Bel Fior Hotel, 74 AD2d 692, 692 [3d Dept 1980] ["reject[ing] the view that a single act contemporaneously affecting multiple parties is a 'repeated' or 'persistent' act" where, under a previous version of Executive Law § 63(12), the Attorney General commenced a proceeding against a landlord that had retained the entirety of damage deposits pursuant to a clause in identical leases for an identical semester-long least term that were issued to 280 students of a nearby college] [criticized in Matter of State of New York v Wolowitz, 96 AD2d at 65-66]).[FN5]
While Executive Law § 63(12) makes explicit reference only to restitution and damages as monetary components of relief, the deterrent remedy of disgorgement may be awarded to the Attorney General in the appropriate case (see People v Greenberg, 27 NY3d 490, 497-498 [2016], cert denied 580 US 1030 [2016]; Matter of People v Applied Card Sys., Inc., 11 NY3d 105, 125-126 [2008], cert denied sub nom. Cross Country Bank, Inc. v New York, 555 US 1136 [2009]). In the context of Executive Law § 63(12), disgorgement aims to relieve the defendant of its gains from its fraudulent conduct, rather than redress losses caused to victims; the source of the defendant's gains is thus irrelevant (see People v Ernst & Young, LLP, 114 AD3d 569, 569-570 [1st Dept 2014] [holding that it was premature to categorically preclude a disgorgement claim at the pleading stage]; see also Applied Card Sys., Inc., 27 AD3d at 107 [affirming grant of permanent injunction without regard to losses]). Given the purpose of the statute to curb and prevent fraudulent conduct, though, to succeed on the cause of action may not require the Attorney General to demonstrate a defendant's wrongful gains at all, at least not monetarily; indeed, the statute is silent as to profit (see Matter of Evergreen Assn., Inc. v Schneiderman, 153 AD3d 87, 97 [2d Dept 2017]).
B. Illegality
1. 
The Attorney General's Burden
a. Underlying Conduct
The conduct supporting a cause of action under the illegality prong of Executive Law § 63(12) is that "which violates State or Federal law or regulation" (Matter of People v World Interactive Gaming Corp., 185 Misc 2d at 856; see National Coalition on Black Civic Participation v Wohl, 661 F Supp 3d 78, 132 [SD NY 2023]). The Attorney General concedes that illegality under Executive Law § 63(12) incorporates the elements of the underlying illegal conduct that is charged. Accordingly, the Attorney General must establish each element of the crime underlying each cause of action. The failure to allege facts establishing each element of the underlying statutory violation requires dismissal of the cause of action (see People v Sprint Nextel Corp., 26 NY3d 98, 121 [2015] [Stein, J., dissenting in part], cert denied 578 US 1012 [2016]; Matter of State of New York v South Haven Houses Hous. Dev. Fund Co., 63 AD2d 904, 905 [1st Dept 1978], affd 46 NY2d 899 [1979] [failure to establish violation of claimed underlying statute requires dismissal of the Executive Law § 63(12) claim]; Matter of People v Tempur-Pedic Intl., Inc., 30 Misc 3d 986, 997 [Sup Ct, NY County 2011], affd 95 AD3d 539 [1st Dept 2012]).
Both the defendants and the Attorney General generally analyze the elements of the crimes under civil standards, which appears to comport with the approach in the majority, if not all, of Executive Law § 63(12) cases. The approach makes sense because "illegality" under Executive Law § 63(12) may be proven with resort to any appropriate underlying statute, not just Penal or Criminal, thus requiring a uniform standard for civil prosecution. Accordingly, to correctly analyze the claim, the Penal Law and, where applicable, criminal caselaw define the elements of the Attorney General's prima facie case, and the standards of conduct and proof are generally measured by civil metrics.
b. Standard of Proof
The parties disagree about the standard of proof applicable to the Attorney General's case on the illegality causes of action: clear and convincing, as per defendants versus preponderance, as per the Attorney General.
Supreme Court found that "[a] clear and convincing standard applies only when a case involves the denial of, addresses, or adjudicates fundamental 'personal or liberty rights' not at issue in this action" (People v Trump, 2024 NY Slip Op 30493[U], *75 [Sup Ct, NY County 2024], citing Matter of Capoccia, 59 NY2d 549, 552-553 [1983] [listing only the interests at stake in the cases relied on by the proponent there of the clear and convincing standard]). As relevant to the injunctive relief restraining defendants from holding particular offices or working in particular industries, Capoccia likened the right to engage in the profession of one's choosing to a property right, a right generally adjudicated under the preponderance standard (id. at 553).
Neither party presents particularly compelling authority to support their respective positions. Defendants cite People v Wyatt (89 AD3d 112, 127 [2d Dept 2011], lv denied 18 NY3d 803 [2012] [internal quotation marks omitted]) for the proposition that "fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with a significant deprivation of liberty or stigma" demands clear and convincing evidence. Wyatt, however, involved concerns very different from those at issue here. Wyatt evaluated the propriety of the defendant's SORA risk level designation, the stigma there being that imposed by sex offender registration and notification. The Attorney General refers us to People v Allen (2021 NY Slip Op 30334[U], *11-*14 [Sup Ct, NY County 2021], affd 198 AD3d 531 [1st Dept 2021] [illegality: Martin Act (General Business Law § 352)]) and People v Security Elite Group, Inc. (2019 NY Slip Op 33068[U], *18 [Sup Ct, NY County 2019] [illegality: General Business Law Article 22-A (Consumer Protection from Deceptive Acts and Practices)]). Neither case, however, explains why the preponderance standard was warranted.
Defendants cite Gaidon v Guardian Life Ins. Co. of Am. (94 NY2d 330, 349-350 [1999]) for the settled proposition that common-law fraud generally requires clear and convincing proof; however, Supreme Court's posttrial decision raises a significant point — that the primary purpose and function of the statute and the Attorney General's action is to obtain injunctive relief, and, as the Comptroller asserted, in disapproval of the addition to Executive Law § 63 of paragraph 12 when proposed, "[i]n a suit for an injunction, there is no need to prove the charge beyond a reasonable doubt, as in a criminal case — a mere preponderance of evidence would be sufficient" (People v Trump, 2024 NY Slip Op 30493[U] at *2, citing Mem of Off of Comptroller, Feb. 21, 1956 at 2, Bill Jacket, Senate Bill 3289, pr. 4089).[FN6]
While preliminary injunctions generally require proof by clear and convincing evidence (see e.g. Gilliland v Acquafredda Enters., LLC, 92 AD3d 19, 24-25 [1st Dept 2011]), an injunction granted after a bench trial requires only a preponderance of the evidence (see e.g. Icy Splash Food & Beverage, Inc. v Henckel, 14 AD3d 595, 596 [2d Dept 2005]; see also Hidden Ridge at Kutsher's Country Club Homeowner's Assn. v Chasin, 289 AD2d 652, 653-654 [3d Dept 2001]; but see Forest Labs. v Lowey, 106 AD2d 368, 371 [2d Dept 1984], lv denied 64 NY2d 607 [1985] [injunctions specific to patents require clear and convincing evidence]), as does a disgorgement award (see Cottage Intl. Dev. Group, LLC v Finneran, 2019 NY Slip Op 34013[U] [Sup Ct, Westchester County 2019]).
A decision discussing former Penal Law § 964 (the predecessor to General Business Law § 133 [use of name or address with intent to deceive], an anti-market-confusion provision), permitting permanent injunctive relief on five days' notice, however, illustrates an additional reason why the Attorney General appears to be correct:

 "In the present proceeding, under the Penal Law section [964], there will be 
 no trial, so the question is not whether a temporary injunction should issue 
 pending trial but whether a final and permanent injunction should issue 
 without a trial. That difference in the nature and scope of the proceedings 
 should make the courts more cautious in granting the relief requested and 
 insistent upon an even stronger showing in a proceeding under the Penal Law 
 than would be required for the issuance of a temporary injunction in an 
 action. And the statute itself introduces an essential quality into the 
 proceeding which is absent from an action for an injunction. The assumption 
 of a name, to be a violation of the statute and to entitle petitioner to the 
 summary relief provided by the statute, must be 'with intent to deceive or 
 mislead the public.' The court is called upon, therefore, to inquire into 
 the respondents' state of mind quite as much as into the probable effect of 
 their action.

 "There is a division in the decisions of this court as to whether a violation of this statute must be proved 'beyond a reasonable doubt,' because the statute is a provision of the criminal law. (Matter of Schenne v. Benson, 178 Misc 301; Matter of Julius Restaurant, Inc., v Lombardi, 174 Misc 875; Matter of Fainblatt v Leo Sportswear Co., Inc., 178 Misc 760; Matter of Bill's Gay Nineties, Inc., v Fisher, 180 Misc. 721.) This proceeding is, however, a civil proceeding, and the court here prefers to take the view that proof beyond a reasonable doubt is not required. Nevertheless, the nature of the statute and proceeding and the effect of the summary relief contemplated indicate the salutary need of some higher degree of proof than that required for a temporary injunction, and explicitly a showing of that intent upon the part of the respondents which is an essential ingredient of the offense" (Matter of Overseas News Agency, Inc. v Overseas Press, Inc., 183 Misc 40, 42 [Sup Ct, NY County 1944], affd without op 268 App Div 856 [1st Dept 1944]).
The abbreviated Penal Law § 964 procedure thus required a clear and convincing standard (see Matter of Industrial Plants Corp. v Industrial Liquidating Co., 286 App Div 568, 570-571 [1st Dept 1955]). Requirement of a clear and convincing standard is a recognition of the gravity of the particular interest at stake (see People v Johnson, 93 NY2d 254, 258 [1999]), and the truncated review process afforded by an expedited non-summary procedural mechanism (see Association of Contr. Plumbers of City of N.Y. v Contracting Plumbers Assn. of Brooklyn & Queens, 302 NY 495, 498 [1951]).
Here, in contrast, Executive Law § 63(12) permits the Attorney General to, among other things, as she has done here, commence a separate special proceeding to obtain compliance with the subpoenas served upon defendants in support of her investigation of them, commence a plenary action, obtain preliminary relief, engage in protracted discovery, engage in motion practice, conduct a trial, and obtain judgment, including injunctive and monetary relief. Executive Law § 63(12) also does not prevent a defendant from defending and responding as it sees fit.
2. Intent
While defendants assert that the broad disclaimers accompanying the SFCs demonstrate the absence of fraudulent intent, the Attorney General relies on the simultaneously-accompanying certifications of accuracy, and argues that the disclaimers are irrelevant because they are insufficiently specific and refer to facts particularly within defendants' knowledge. Defendants argue that context matters, and that the challenged representations were made under circumstances where justifiable reliance and damages were unlikely or impossible. The Attorney General counters that intent may be seen in entries in the SFCs that are capable of escaping detection, such as values reported as "current" that were, in fact, future values not discounted to present value, and values reported as "estimated" that, in fact, departed wildly from appraisals of the assets.
Whether a statement possesses the "capacity or tendency to deceive" for purposes of satisfying the fraud aspect of Executive Law § 63(12) does not necessarily inform us of a defendant's "intent to defraud" for purposes of satisfying the statute's illegality aspect. "Capacity or tendency," as used in the context of Executive Law § 63(12) fraud, describes the content and quality of the statements made or act performed, and not necessarily the mens rea of the person (or entity) acting or speaking. Significantly, not only does Executive Law § 63(12) fraud not have a scienter component (see Greenberg, 95 AD3d at 483), it does not require intent (see id.; Matter of People v Apple Health & Sports Clubs, 206 AD2d at 266-267; People v Concert Connection, 211 AD2d 310, 320 [2d Dept 1995], appeal dismissed 86 NY2d 837 [1995]).
Intent is an element of each of the alleged underlying Penal Law violations, and therefore must be proven by the Attorney General. Therefore, the effect of the SFCs and disclaimers on the banks and insurers, is not necessarily evidence, direct or circumstantial, or lack thereof, of defendants' states of mind. Accordingly, given the different motivations and aims of the Executive Law and Penal Law, resolving the "capacity or tendency" issue is not necessarily dispositive of the issue of criminal intent, which must be assessed separately from the standalone fraud claim, even if the result is ultimately the same.[FN7]
For the purposes of the Penal Law, "intent to defraud" "refers only to a defendant's state of mind in acting with a conscious aim and objective to defraud" (People v Taylor, 14 NY3d 727, 729 [2010]). "A person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct" (Penal Law § 15.05[1] [emphasis added]). That is, "the intent to commit a crime must be specific to the crime charged" (People v Bailey, 13 NY3d 67, 72 [2009]). "Because intent is an invisible operation of [the] mind, direct evidence is rarely available (in the absence of an admission) and is unnecessary where there is legally sufficient circumstantial evidence of intent" (People v Rodriguez, 17 NY3d 486, 489 [2011] [internal quotation marks and most citations omitted], citing People v Bracey, 41 NY2d 296, 301 [1977] [noting that intent can be inferred from the defendant's conduct and the surrounding circumstances]). Intent may be inferred from a pattern and duration of conduct (see People v Landsman, 93 AD3d 454 [1st Dept 2012], lv denied 2012 NY Slip Op 98110[U] [2012]), lack of credibility (see People v Credel, 99 AD3d 541, 541 [1st Dept 2012], lv denied 20 NY3d 1060 [2013]), actions that evade and conceal wrongdoing (see People v Sosa-Campana, 167 AD3d 464 [1st Dept 2018], lv denied 33 NY3d 981 [2019]), or the effect of the statements or conduct (see People v Anderson, 210 App Div 59 [1st Dept 1924], affd 239 NY 534 [1924]).
Because the underlying criminal statutes here do not specify the object of the fraudulent intent (such as the commission of specific crime), intent, used in these statutes, is a "generalized" intent to defraud (People v Reyes, 69 AD3d 537, 538 [1st Dept 2010]). The object of the fraud need not be pecuniary or proprietary or constitute a crime but may extend to the "rights of . . . others which may be infringed by false records" (People v Schrag, 147 Misc 2d 517, 519 [Rockland County Ct 1990], cited in People v Headley, 37 Misc 3d 815, 829 [Sup Ct, Kings County 2012]), for example, protecting one's presidential aspirations by preventing disclosure of unfavorable information (see People v Trump, 2024 NY Slip Op 30560[U] at *19).
3. Materiality
Where an Executive Law § 63(12) illegality claim is based on a violation of statutes requiring a material omission or misstatement, New York courts have adopted the objective standard of materiality articulated by Federal courts interpreting securities laws, and here we see where the consumer orientation of the bulk of our Executive Law § 63(12) jurisprudence might, at first blush, appear incongruent. The question of materiality asks whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" (State of New York v Rachmani Corp., 71 NY2d 718, 726 [1988] [internal quotation marks omitted]).[FN8] The "total mix" formulation is derived from a securities action in which the Court of Appeals resolved the question of the certainty with which a fact must affect the reasonable investor's judgment:
"[Materiality] does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" (TSC Indus., Inc. v Northway, Inc., 426 US 438, 449 [1976]; see also Schwartz v Genfit, S.A., 212 AD3d 96 [1st Dept 2022]).
The Rachmani standard applies equally to omissions and to the content of the misstatements (see id. at 449; United States v Litvak, 889 F3d 56, 64 [2d Cir 2018]). "Materiality requires proof only that a reasonable investor would deem the content of a misstatement a substantial factor to be considered in the making of the particular investment decision" (Litvak, 889 F3d at 65). "It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant" (Basic Inc. v Levinson, 485 US 224, 238 [1988] [assessing materiality of merger-specific information]).
"[A] material fact need not be outcome-determinative; that is, it need not be important enough that it would have caused the reasonable investor to change his vote" (Folger Adam Co. v PMI Indus., Inc., 938 F2d 1529, 1533 [2d Cir 1991], cert denied 502 US 983 [1991] [quotation marks omitted and emphasis added]). Nevertheless, "[i]t is not sufficient to allege that the investor might have considered the misrepresentation or omission important" (In re ProShares Trust Sec. Litig., 728 F3d 96, 102 [2d Cir 2013] [internal quotation marks omitted and emphasis added]). "[T]he 'might' formulation is 'too suggestive of mere possibility, however unlikely'" (TSC Indus., Inc., 426 US at 449, quoting Gerstle v Gamble-Skogmo, Inc., 478 F2d 1281, 1302 [2d Cir 1973]). Information, omitted or misstated, is not material merely because it is relevant (see Stadnick v Vivint Solar, Inc., 861 F3d 31, 38-39 [2d Cir 2017]) or useful (see e.g. City Trading Fund v Nye, 59 Misc 3d 477 [Sup Ct, NY County 2018]). The misstatement or omission must be assigned its appropriate importance, or lack thereof, in light of all available information, and in context, considering the realities of motivation and goal within the relevant sphere. Disclosure, generally, about a topic may render disclosure of specific details thereof immaterial for the purpose of this analysis (see Kohl v Loma Negra Cia. Indus. Argentina S.A., 195 AD3d 414, 415 [1st Dept 2021] [does not involve Executive Law § 63(12)]; see also Jianming Lyu v Ruhnn Holdings Ltd., 189 AD3d 441, 441-442 [1st Dept 2020], lv denied 36 NY3d 912 [2021] [not involving Executive Law § 63(12)]). Evidence of materiality may be found in the investor's response upon learning of the misrepresentation or omission (see People v Xi Hui Wu, 2024 NY Slip Op 30601[U], *19 [Sup Ct, NY County 2024]).
"[Materiality] necessarily depends on all relevant circumstances" (ECA & Local 134 IBEW Joint Pension Trust of Chicago v JP Morgan Chase Co., 553 F3d 187, 197 [2d Cir 2009]), and cannot be assessed formulaically (Yaroni v Pintec Tech. Holdings Ltd., 600 F Supp 3d 385 [SD NY 2022]). Materiality considers the particular factors attendant to the type of transaction (see Press v Chemical Inv. Servs. Corp., 166 F3d 529, 538-539 [2d Cir 1999]), and remains a factor even where the investor is a sophisticated entity that performed its own due diligence (see Folger Adam Co. v PMI Indus., Inc., 938 F2d at 1534-1535 ["we cannot conclude that a reasonable investor in [the corporate buyer's] position, knowing that [seller's appraisal agent] had performed extensive due diligence on [the assets] and had prepared the offering memorandum on the [assets], would not have factored them into its deliberations on whether to purchase [the assets]"] [emphasis added]).
Thus, depending on the context, even "staggering" amounts of money may not be material (ECA & Local 134 IBEW Joint Pension Trust of Chicago, 553 F3d at 204). So, too, must variability be viewed holistically. In the appropriate circumstances, materiality may be determined by the magnitude of the discrepancy (see Valicenti Advisory Servs. v Securities and Exch. Commn., 198 F3d 62, 65-66 [2d Cir 1999], cert denied 530 US 1276 [2000]). "A numerical threshold is no substitute for a fulsome materiality analysis that also considers qualitative factors, but it can provide a good starting place for assessing the materiality of [an] alleged misstatement" (see Federal Hous. Fin. Agency v Nomura Holding Am., Inc., 873 F3d 85, 147 [2d Cir 2017], cert denied 585 US 1017 [2018] [internal quotation marks omitted]; see also ECA & Local 134 IBEW Joint Pension Trust of Chicago, 553 F3d 187).[FN9] However: "While a comparatively low estimate of . . . damages may, in some instances, lend support to a finding of fraudulent and deceptive practices, such a finding may not be rationally based solely upon a finding of a low estimate without further evidence to show that not only was the estimate low, but that it was so out of line with other estimates that it could not have been attributable to differences of opinion by experts" (Matter of Allstate Ins. Co. v Foschio, 93 AD2d 328, 333 [2d Dept 1983]).
The sophistication of the objectively reasonable investor, and thus the materiality of a misstatement or omission, however, does vary "with the nature of the traders involved in the particular market" (Litvak, 889 F3d at 65). The objectively reasonable investor standard cannot be informed by the subjective features of specific investors within a particular market, such as their particular motivations or market experience (see Federal Hous. Fin. Agency v Nomura Holding Am., Inc., 873 F3d at 151), unless "there [is] evidence of a nexus between a particular trader's viewpoint and that of the mainstream thinking of investors in that market" (Litvak, 889 F3d at 65 [emphasis added]).
Under the law from which Rachmani is derived, a material fact "need not be important enough that it would have caused the reasonable investor to change his [or her] vote" (Folger Adam Co., 938 F2d at 1532-1533 [internal quotation marks omitted]), and the misstatement need not be outcome-determinative. Therefore, that the lenders and insurers at issue here ultimately chose, apparently without regret, to pursue the transactions is not dispositive of the materiality of the misstatements (see id.). Similarly, the lenders' and insurers' assignment of comparatively greater weight to factors other than the SFCs does not disprove materiality, because it is not informative of the significance, if at all, with which the information contained in the SFCs altered the total mix of information (compare the Ferry Point transaction, where the City of New York assigned actual numerical percentages to the decisional value of certain types of information). The question is where on the spectrum of significance — at least substantial, yet not outcome-determinative — the alleged misstatements in the SFCs fall, and this need not be the same for each of defendants' contracting partners.[FN10]
Therefore, that multiple valuation methods may be permissible, from accounting and valuation standards, to reach a wide array of non-fraudulent numbers is not determinative. The relevant analysis is not merely the magnitude of the disparities; the issue is whether the average lender or underwriter, not merely the particular contracting parties, would have found the disparities to have significantly altered the total mix of available information. Therefore, expert evidence is needed not merely to establish acceptance in the accounting community, but also to shed light on the relevant lending or insurance industry's view of the significance of either the disparities generated by differing valuation methods or the magnitude of the variations highlighted by the Attorney General.
V. Summary Judgment
In its disposition of defendants' summary judgment motion, after discussing defendants' purportedly repeated arguments and imposing the sanctions therefor that are the subject of the nonparties' appeal, Supreme Court discussed, and rejected defendants' other arguments: that the disclaimers contained in the SFCs defeated a fraud cause of action; that the August 27, 2021 agreement between the Attorney General and "the Trump Organization," as amended May 3, 2022, that tolled the statutes of limitations for all claims against defendants to include those accruing on or after July 13, 2014, did not bind the individual defendants or the trust; that the statute of limitations, as interpreted by this Court on a prior appeal, barred recovery on the majority of the alleged affected transactions; and that the Attorney General's proof did not support the illegality causes of action. Supreme Court found that our prior determination did not preclude its finding that every SFC issued within the statute of limitations, regardless of the transaction to which it related, was actionable.
As to the Attorney General's motion for summary judgment on the first cause of action, Supreme Court found that Executive Law § 63(12) required that the Attorney General prove only that the SFCs were false and misleading, and found that defendants repeatedly or persistently used the SFCs to transact business. Supreme Court found that "the documents here clearly contain fraudulent valuations that defendants used in business, satisfying the Attorney General's burden." Although defendants submitted the affidavits and reports of 12 experts, Supreme Court discussed, and rejected the opinions of, only two.
Our colleagues have thoroughly and thoughtfully examined and analyzed the parties' arguments and proof and Supreme Court's determinations, reaching opposite conclusions. We find that the application of the same well-known fundamental summary judgment principles leads to the conclusion that summary judgment was improperly granted to the Attorney General. Supreme Court did not view the evidence in the light most favorable to defendants, as the nonmovants; it resolved, rather than identified, questions of material fact; and it did so by applying its own interpretive standard to the evidence without explicitly finding defendants' experts to be incredible as a matter of law or rejecting the bases for their multi-pronged analyses. Central to the motions and Supreme Court's decision, and indeed the action itself, was the valuation of the various assets listed in the SFCs. Defendants argue that Supreme Court's rejection of the expert evidence they submitted in opposition to the Attorney General's motion affected every valuation decision Supreme Court made, and fatally infected the subsequent trial.
As to the valuation of the various assets disclosed in the SFCs, defendants focus primarily on Mar-a-Lago, but more generally argue that Supreme Court unquestioningly adopted the Attorney General's asset valuations wholesale while dismissing defendants' experts completely and, where Supreme Court acknowledged defendants' evidence at all, relied on discrete lines of testimony while ignoring context, distorted witness testimony, and disregarded defendants' unrebutted evidence of the subjectivity of valuations and the acceptability of multiple valuation methodologies other than appraisals. Defendants argue that Supreme Court thus failed to thoughtfully compare the various valuations and the soundness of the methodologies to find that defendants at least raised questions of fact, and then proceeded to make improper credibility determinations, substitute its own judgment, and reject actual accounting standards in favor of its own subjective views without citation to any governing authority. Defendants argue further that the appraisals upon which Supreme Court relied were not dispositive of the values that the lenders' due diligence would have yielded or the risk assessments they made, and that this fundamental misapprehension of the competing evidence continued at trial and thus infected every monetary component of Supreme Court's award.
Defendants submitted numerous affidavits of experts (many of whom had pre-existing relationships with defendants) to establish that the permissible industry-appropriate property valuation methods used by defendants inherently possessed a wide measure of variability, partially due to the particular expertise of the individual evaluator and the uniqueness of the type and market of property, such that even substantial differences from the values submitted by the Attorney General could not be deemed fraudulent or misleading as a matter of law, particularly given the various disclaimers contained in the SFCs and their supporting documentation.
The Attorney General argues that defendants inflated asset value each year by valuing certain assets using false or inaccurate information, such as tripling the square footage of defendant's apartment, and listing the Vornado cash, over which defendant had no control, as his own; disregarding legal restrictions that diminished property values, such as the deed restrictions on Mar-a-Lago's use, rent-stabilization restrictions on apartments, and restrictions on property development; using valuation methods that contradicted specific representations, such as adding "secret" brand premiums to golf properties despite representing that no brand premium was included, and falsely representing hypothetical licensing deals as signed; and valuing assets in contravention of accepted accounting methods, such as falsely representing that professional appraisers had provided certain figures and failing to discount projected future income to present value. The Attorney General argues that these deceptive strategies had a capacity or tendency to deceive because they did not result in de minimis errors.
Supreme Court found (correctly) that materiality was not an element of the Executive Law § 63(12) fraud claim but recognized (correctly) that it is "relevant" to determining "tendency or capacity." Supreme Court found that the magnitude of the difference between defendants' and the Attorney General's valuations, alone, was material and, in essence, the single factor informing "tendency or capacity." According to Supreme Court,
"OAG has submitted conclusive evidence that between 2014 and 2021, defendants overvalued the assets reported in the SFCs between 17.27-38.51%; this amounts to a discrepancy of between $812 million and $2.2 billion dollars. NYSCEF Doc. No. 766 [the Attorney General's memorandum of law in support of summary judgment] at 70. Even in the world of high finance, this Court cannot endorse a proposition that finds a misstatement of at least $812 million dollars to be 'immaterial.' Defendants have failed to identify any authority for the notion that discrepancies of the magnitude demonstrated here could be considered immaterial." (People v Trump, 2023 NY Slip Op 33314[U], *19 [Sup Ct, NY County [2023]).
Supreme Court's rejection of defendants' evidence reduces to an unwarranted (i.e. the Attorney General had not offered competent competing evidence) rejection of the notion of a subjective appraisal. In doing do, Supreme Court relied on an inapt case, its interpretation of which was flawed (see Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack (92 NY2d 179 [1998]). Supreme Court stated, "Accepting defendants' premise would require ignoring decades of controlling authority holding that financial statements and real property valuations are to be judged objectively, not subjectively" (Matter of People v Trump, 2023 NY Slip Op 33314[U] at *19).
For the proposition that subjectivity has no place in real property valuation, Supreme Court cited Matter of FMC Corp. (92 NY2d at 191), and Assured Guar. Mun. Corp. v DLJ Mortg. Cap. Inc. (44 Misc 3d 1206[A], 2014 NY Slip Op 51044[U] [Sup Ct, NY County 2014]). For the proposition that market value is the most reliable valuation method, it cited Matter of Great Atl, & Pac. Tea Co. v Kiernan (42 NY2d 236, 239 [1977]) and Matter of Consolidated Edison Co. of N.Y., Inc. v City of New York (33 AD3d 915, 916 [2d Dept 2007], affd 8 NY3d 591 [2007]). These cases are of little to no value with respect to examination, let alone resolution, of the issues presented by the motions.
FMC Corp. dealt solely with an RPTL article 7 challenge to a governmental tax assessment, where the assessor's valuation is presumptively valid, and is therefore irrelevant as authority. Even considering it, though, it allows for contrary evidence demonstrating "a valid and credible dispute regarding valuation" "based on sound theory and objective data," the "strength, credibility or persuasiveness" of which were, in that context, irrelevant (92 NY2d at 188). Thus, this case does not stand for the proposition that there is only one way to value a property, and it does not stand for the proposition that valuation is a wholly objective exercise within Supreme Court's meaning. In FMC Corp., the "objective evidence" with which the property owner raised an issue of fact was related to the impact on land value of organized community resistance to land development and negative press, inherently subjective factors. This was only one factor involved in the valuation, and the strength of the factor was not discussed; it was enough that the owner met the minimal evidentiary standard.
Supreme Court's parenthetical quotation from Assured Guaranty referred to risk, not real property valuation. In Assured Guaranty, the court was interpreting a contract provision requiring material adverse effect to a party's interest and held that determining whether a false warranty materially and adversely affected the party's interest required evaluation under an objective standard, as opposed to the subjective standard that defendants urged (see 44 Misc 3d 1206[A] at *12). The case on which Assured Guaranty relied — Syncora Guar. Inc. v EMC Mtge. Corp. (874 F Supp 2d 328 [SD NY 2012]) — considered the adverse interests of insurers. And the point of the Syncora discussion cited by Assured Guaranty was to explain that material adverse effect did not require actual loan default, just "increase in risk," which, to an insurer, is the essence of material adversity. In those cases, material adversity meant a detriment to interests. In any event, none of the cases Assured Guaranty discussed actually mentioned objectivity or subjectivity, and their holdings were dependent on specific contract terms. The Assured Guaranty cite also fails to respond to the multiple-permissible-methods issue: defendants' point was not that their expectations permitted seemingly outlandish valuations, but that the exercise of differing legitimate valuation methods could also produce such results. Defendants did not argue that a wholly subjective standard applies to anyone's determinative processes or final determinations. Defendants recognize that "capacity or tendency" requires analysis as applied to reasonable parties similarly situated to those here. That defendants submitted valuations having subjective components did not reduce the decision-making process, or the final resulting figure, to pure subjectivity.
Supreme Court's assessment of "market value" as the preferred valuation method evinced a failure to appreciate that the other valuation methods also sought to determine a commercial value through alternative means. Great Atlantic was a tax certiorari proceeding where the property owner advocated for a market value approach, which compares sales prices of similar properties, to reach the value for assessment purposes. The tax assessor argued that the property was unique, for which there could be no reliable market data, and advocated for a reproduction-cost-less-depreciation method of valuation (which would have yielded a greater sum and, therefore, greater taxes) (see 42 NY2d at 240-241). Because the claimed unique features could be adapted to other commercial uses without excessive expenditure, and because comparable sales were not limited to geographically proximate properties under the circumstances, the Court held that the property was not unique and could therefore be valued using the market approach. More importantly, for present purposes, while the Court of Appeals observed that "market value . . . provides the most reliable valuation for [tax] assessment purposes," it also recognized that other methods are permissible where there is no reliable market data (id. at 239-240 [emphasis added]), and here defendants argue that traditional and conservative valuation methods are insufficient to accurately value many of the holdings at issue, which are allegedly too unique and uniquely situated to permit comparison.
Matter of Consolidated Edison was also a tax matter, and while the Appellate Division recognized that market value remained the standard for assessment to ensure appropriate equitable contribution to the public fisc, the parties there agreed that the characteristics of the subject properties required valuation by means other than market value (see 33 AD3d at 916). Here, not only was the valuation not for tax assessment purposes, but Supreme Court made no finding as to the uniqueness of the subject properties.
Defendants' valuation evidence on summary judgment raised questions not only that varying permissible valuation methods may result in very different figures, but also that the application of a particular method is thus not necessarily indicative of fraud, and also that the varying figures resulting from varying methods could impact the magnitude of difference, basically the sole criterion employed by Supreme Court to reach the finding of "materiality," and materiality of magnitude being essentially the sole criterion employed by Supreme Court to reach the finding of "capacity or tendency to deceive."
The Attorney General claims that methodology was not her concern, arguing that "the fraud did not stem from defendants offering valuations based on alternative appropriate methods. Rather, the fraud resulted from defendants using blatantly false and misleading information, data, and assumptions in valuing Mr. Trump's assets," i.e. the Attorney General challenges the "input" values. She did, however, list choice of valuation method as one of the enumerated ways in which defendants inflated value to deceive. The Attorney General did not show in reply that her valuation methods were the only permissible methods, so she failed to demonstrate that defendant's evidence did not raise a triable issue of material fact.
In this regard, even if defendants' expert Bartov failed, as Justice Moulton asserts, to "engage with defendants' actual business practices," for the purpose of raising an issue of fact in response to a summary judgment motion, his opinions were relevant to a discussion of the legitimacy and permissibility of valuation methods that it is undisputed that defendants employed and that the Attorney General alleges influenced the figures that defendants presented to lenders and insurers. Defendants were not obligated to rely on Bartov to establish every aspect of their defense; defendants submitted the affidavits of a dozen experts.
In any event, whether defendants used the "most reliable" method (Trump, 2023 NY Slip Op 33314[U] at *19) is not the issue here, and Supreme Court cited no authority requiring defendants to do so in this context. And mere falsity should not be conflated with fraudulence. What method is relevant to is the only factor influencing tendency or capacity to deceive that Supreme Court appreciated — materiality by virtue of the magnitude of the difference in valuations. And if magnitude of variation was the sole criterion informing Supreme Court, the numerical variability attendant to method should have created an issue of fact as to the magnitude of the difference, if it was not wholly incredible or unsupported by evidence.
That a buyer and seller are differently motivated to value a property, and will usually arrive at a different valuation figure, already indicates that acceptable valuation methods possess some measure of subjectivity, or at least variability. Implicit in defendants' proof, too, was the proposition that the raw data — the inputs upon which the valuation methods operate — are themselves susceptible to variability, and even Justice Friedman acknowledges that they could be "contestable." Supreme Court's wholesale dismissal of the concept of subjectivity indicates disregard of defendants' evidence (almost in toto) and substitution of its own standard of reasonableness and market understanding. Supreme Court's analysis also assumes that a valuation other than its own Platonic ideal of same reaches something other than fair market value, and disregards that the differing valuation methods all sought to analyze fair market value, or some variation thereof acceptable to parties in the positions of the subject lenders and insurers in the same market and for the same purposes, and thus represented different ways of arriving at the same metric.
It bears noting that no one, including Supreme Court, identified, as a matter of law or fact, singular, correct inputs from which valuation methods should have emanated. Supreme Court declined to acknowledge the validity of alternate valuation methods, disregarding that every method of valuation ultimately seeks the same goal. Therefore, Supreme Court's usage of the word "appraisal" did very little to help us stratify valuation methods into echelons of accuracy. Our jurisprudence with respect to property interests teaches us that every parcel of property is unique, meaning, therefore, that similarly situated properties cannot be presumed to have identical value for comparison. Further, value is made up of many intangible factors, such as proximity to a geographical or topographical feature, remoteness from the nearest neighboring property, and cache, none of which has anything to do with the features of the actual parcel or the construction of the actual structures. The premise from which Supreme Court set out, therefore, was a false one. This is borne out by the fact that the Attorney General was able to identify only very specific misstatements that were truly, objectively "wrong," as opposed to inflated or creative, even expansively so, which is not necessarily fraudulent, given the breadth of permissible valuation methods.
A. 
Materiality
As mentioned above, materiality is not a component of an Executive Law § 63(12) fraud claim, but it can be relevant to the analysis of whether a statement or action possesses the tendency or capacity to deceive. Because of Supreme Court's focus on materiality as defining the SFCs' tendency or capacity to deceive, a more extended discussion is necessary here, particularly because, posttrial, Supreme Court referred to materiality as "one of the great red herrings of this case" (People v Trump, 2024 NY Slip Op 30493[U] at *77).
Under the Attorney General's formulation on appeal, tendency or capacity to deceive requires that "[t]he targeted business conduct is analyzed based on whether an ordinary person, even the 'ignorant, the unthinking, and the credulous' individual, would have been deceived, consistent with the Legislature's intent to protect both the public and the integrity of the marketplace" (citing General Elec. Co., 302 AD2d at 314; and Northern Leasing Sys., Inc., 193 AD3d at 75).
While we need not determine here that there is no permutation of circumstances in which a single factor could be so compelling as to be determinative of tendency or capacity, it is plainly inapt to analyze the transactions at issue here with reference to an ordinary, unthinking person. The most sophisticated audience member protected by Executive Law § 63(12) heretofore has been the average consumer (see General Elec. Co., 302 AD2d at 314). But the true tendency of an act or statement to deceive should take into account the nature of the parties and the nature of the market and circumstances under which the representations are made. Even though this is not, in fact, the standard our prior decisions have enunciated, the Attorney General's own analysis of tendency or capacity relies on the utility of the information in the commercial lending and commercial insurance settings. Accordingly, Supreme Court failed to engage in the analysis necessary to a "tendency or capacity" question by declining to entertain any other relevant factor. The nature of the market and actors may not render the difference wholly immaterial, but the difference may look far less material in context.
Further, in declining to recognize or analyze any factor other than magnitude in reaching its conclusion as to materiality in the context of tendency or capacity, Supreme Court engaged in credibility assessments of the proof and witnesses and resolved questions of fact by resort to its own subjective standard of materiality and rejecting defendants' arguments (in the course of, as we saw above, rejecting subjective standards). While Supreme Court would later serve as the factfinder at the bench trial, it could not do so at the summary judgment stage. Materiality is inherently a factually-intensive question that does not generally lend itself to summary disposition in the context of fraud (see Brunetti v Musallam, 11 AD3d 280, 281 [1st Dept 2004]; see also People v Perino, 19 NY3d 85 [2012] [perjury]; Greenberg, 95 AD3d 474 [fraud under Executive Law § 63(12)]; Johnson v Metropolitan Life Ins. Co., 79 AD3d 450 [1st Dept 2010] [insurance]; Gulf Ins. Co. v Transatlantic Reins. Co., 69 AD3d 71 [1st Dept 2009] [reinsurance]; Dwyer v First Unum Life Ins. Co., 41 AD3d 115 [1st Dept 2007] [Insurance Law § 3105(b)]; Anjay Corp. v Those Certain Underwriters at Lloyd's of London Subscribing to Certificate No. HN01AAF4393, 33 AD3d 323 [1st Dept 2006] [breach of warranty]; Courtney v Dollar Sav. Bank of City of N.Y., 54 AD2d 868 [1st Dept 1976] [material misrepresentation in application for policy of insurance]; Domestic Fin. Corp. v Ahearn, 5 AD2d 741 [3d Dept 1957] [fraud]).
Supreme Court employed an erroneous standard in evaluating the significance of the experts' evidence of acceptable valuation variability, and erroneously evaluated the proof when by wholly discounting evidence as to this particular market and this particular borrower and set of assets, and employed its own subjective standard of materiality, and the significance of fair market value assessments, that did not incorporate the reasonable expectations and practices of the particular market and typical actors. In doing so it also impermissibly made credibility determinations not just of the evidence but also the experts. Moreover, the assertion that "financial statements and real property valuations are to be judged objectively, not subjectively" (Trump, 2023 NY Slip Op 33314[U] at *19) misses the mark in finding materiality, disregarding the whole of the factors that go into assessing materiality under the facts and circumstances of a particular case. And it disregards that the compilation letters accompanying the SFCs indicated that the absence of material misrepresentations could not be assured.
The lenders themselves indicated that they did not require absolute accuracy. For example, Deutsche Bank, when assessing the risk of lending to defendant on the basis of a personal net worth statement, applied an across-the-board reduction to the stated value of many of the assets comprising defendant's holdings, to reach a far more conservative net worth value. This reduction was not merely fractional: it was a full 50%, which already tells us that, in at least this lending arena, numbers possessed a certain amount of elasticity. Further, this reduction is well in excess of the highest overstatement alleged by the Attorney General. Deutsche Bank was aware that real estate values are frequently "overstated" or "optimistic," and that clients and banks could legitimately value assets significantly differently. Defendants at least raised an issue of fact as to whether a discrepancy in value, even if exceptional, was indicative of fraudulence.
Further, whether the Attorney General premises her claims on the particular valuation methods employed by defendants or on the false figures informing them, her argument that what defendants termed "estimates" varied wildly from appraisals of the same assets must be tempered by defendants' evidence such as their expert's unrebutted opinion that a single asset sheet could permissibly value different assets in the same category using different methodologies. Further, the Attorney General did not demonstrate that the failure to discount assets to present value was a failing so pervasive as to, itself, render the SFCs materially insufficient to inform the reasonable lender or insurer recipient. It was generally conceded at trial that different methods will produce greatly varying values, and that a lender conducting an appraisal has a particular motive in choosing a valuation method that is as valid as the differently-motivated method the borrower employs.
Supreme Court imbued the concept of "objectivity" with outsized importance and failed to assess other relevant factors in the calculus of materiality. To be sure, the disparities the Attorney General and Supreme Court have identified are by no means wholly benign. Reviewing the summary judgment record do novo, though, there is a question of fact whether, in light of all relevant factors, the SFCs possessed the tendency or capacity to deceive the reasonable commercial lender in the ultra-high-net-worth lending market or created an atmosphere conducive to fraud. As Supreme Court acknowledged, materiality is but one aspect relevant to determining tendency or capacity to deceive. Defendant is not correct, either — the mere fact that the lenders and insurers were not deterred from doing business with defendant at that time is not dispositive of the tendency or capacity of the SFCs to deceive. But we cannot possibly be confined to the reasonable consumer, as the Attorney General has urged. It has been held that "[i]n weighing a statement's capacity, tendency or effect in deceiving or misleading customers, we do not look to the average customer but to the vast multitude which the statutes were enacted to safeguard — including the ignorant, the unthinking and the credulous who, in making purchases, do not stop to analyze but are governed by appearances and general impressions" (Guggenheimer, 43 NY2d at 273 [emphasis added; discussing Administrative Code § 2203d-4.0]). That is not these people. Statements must be viewed "as a whole" with reference to relevant industry standards and practices of conduct (People v Wells Fargo Ins. Servs., Inc., 16 NY3d 166, 171 [2011]; General Motors Corp., 48 NY2d at 838; Applied Card Sys., Inc., 27 AD3d at 107). The statements must have the capacity to mislead "reasonable" commercial lenders and insurers "acting reasonably under the circumstances" (General Elec. Co., 302 AD2d at 315 [emphasis added]).[FN11]
Recorded property restrictions and the availability of independent assessment indicates that certainly not all relevant and material information was exclusively within defendants' knowledge. Further, the disclaimers accompanying the SFCs were sufficiently specific, at least for actors in this sphere of the commercial contracting market. In clear and specific language, the disclaimers disclaimed reliance on all "values" and "valuation methods" reflected in the SFCs, and warned that "[c]onsiderable judgment is necessary to interpret market data and develop the related estimates of current value," that "the estimates presented herein are not necessarily indicative of the amounts that could be realized upon the disposition of the assets or payment of the related liabilities," and that the "use of different market assumptions and/or estimation methodologies may have a material effect on the estimated current value amounts." Our courts have enforced similar disclaimers, particularly when received by sophisticated actors (see e.g. Citibank v Plapinger, 66 NY2d 90, 95 [1985]; HSH Nordbank AG v UBS AG, 95 AD3d 185, 191 [1st Dept 2012]). Furthermore, the range of permissible valuation methods was not peculiarly within defendants' knowledge so as to negate the effect of the disclaimers, in light of the prevalence of independent appraisals and that various public sources conducted valuations of many of the assets enumerated in the SFCs. By referring to market data, the disclaimers themselves indicated that relevant facts were not exclusively within defendants' knowledge.
The Attorney General may be absolutely correct that the SFCs contained a multitude of false statements certified as accurate, but presenting them, together with such a broad disclaimer, to a sophisticated party with the means and inclination to test their accuracy, at least raises issues of fact whether the SFCs were attempts to conceal falsity in an effort to commit fraud, and whether the reasonable commercial lender or insurer would have been misled by the SFCs' content (see Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v Matthew Bender & Co., 37 NY3d 169, 178-179 [2021]). Cases holding that a disclaimer may not be a defense where "the overall impression of the representations is misleading" (id. at 180) generally involve the consuming public, precisely the persons who are not presumed to "stop to analyze but are governed by appearances and general impressions" (Guggenheimer, 43 NY2d at 273). Thus, the particular stature of the parties to the transactions, the particular environment in which these commercial transactions were consummated, the role of the SFCs and disclaimers in these transactions, and the motivations of the parties to the transactions, militate against a finding of actionable Executive Law § 63(12) fraud as a matter of law.
Contrary to Justice Moulton's view, after having just agreed with defendants that the test of a statement's capacity or tendency to deceive must be viewed through the lens of a sophisticated bank or insurance company, we do not by this discussion reintroduce common-law fraud principles to affirmatively impose an obligation on a party to exercise due diligence or to penalize one who does not. We have explained that these factors have entered the discussion in demonstration of Supreme Court's failure to properly apply the concept of materiality where it chose to do so, and particularly in its discussion of the tendency or capacity of the SFCs to mislead, and the influence of that error on both the summary judgment and posttrial decisions.[FN12] The very thing that separates a bank from a supermarket shopper is the sophistication of the deliberative process. And that includes an element of self-education, as all witnesses have agreed is regular practice in these industries. It is because of the "means and inclination" that we view these defendants in their appropriate context, as one of the many variables that informs a statement's tendency or capacity to deceive.
Materiality is a concept that takes into account all attendant circumstances, one of which being the context in which the statements are being made, another of which being the sophistication of the recipient. This was not an "engraftment" of an additional element on to the statute; it was a direct response to the approach of Supreme Court in both decisions this Court has been called on to analyze. Further, the disclaimers are directly relevant to the issue of the absence of information. The Mazars letters inform the reader that the SFCs fail to do the very thing one would think they were intended to do: accurately reflect the individual's assets and liabilities.[FN13]
We therefore reiterate the well-known principles that guide a court's deliberation when deciding summary judgment motions, and that guide us here.
Pursuant to CPLR 3212(b), summary judgment "shall be granted if, upon all the papers and proof submitted, the cause of action or defense shall be established sufficiently to warrant the court as a matter of law in directing judgment in favor of any party." "Summary judgment has been termed a drastic measure, . . . since it deprives a party of his day in court and will normally have res judicata effects" (Ugarriza v Schmieder, 46 NY2d 471, 474 [1979]).
"[T]he proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient [admissible] evidence to demonstrate the absence of any material issues of fact" (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]; Zuckerman v City of New York, 49 NY2d 557, 562 [1980]; Miller-Francis v Smith-Jackson, 113 AD3d 28, 34-35 [1st Dept 2013]). The motion may be granted only if the movant meets this burden "and, once this prima facie showing is made, the non-movant fails to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action" (Flanders v Goodfellow, — NY3d — 2025 NY Slip Op 02261, *1 [2025] [internal quotation marks omitted]). Given this procedure, "the granting of [a motion for summary judgment] is the procedural equivalent of a trial" (Falk v Goodman, 7 NY2d 87, 91 [1959]). Thus, heavily fact-intensive inquiries, such as reliance on fraudulent statements (see DDJ Mgt., LLC v Rhone Group L.L.C., 15 NY3d 147, 155 [2010]), generally do not lend themselves to summary disposition, and are better suited to resolution by a jury or other factfinder.
Should the proponent of the motion meet its prima facie burden, the granting of summary relief may not be defeated by "hypothetical or unsubstantiated assertions" (Nellenback v Madison County, — NY3d —, 2025 NY Slip Op 02263, *1 [2025], citing Zuckerman v City of New York, 49 NY2d at 562 and Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065, 1068 [1979]); "[b]ald conclusory assertions, even if believable" (Ehrlich v American Moninger Greenhouse Mfg. Corp., 26 NY2d 255, 259 [1970] [internal quotation marks omitted]); "[a] shadowy semblance of an issue" (S. J. Capelin Assoc. v Globe Mfg. Corp., 34 NY2d 338, 341 [1974] [internal quotation marks omitted]); or "charges based upon surmise, conjecture and suspicion" (Shapiro v Health Ins. Plan of Greater NY, 7 NY2d 56, 63 [1959] [internal quotation marks omitted]). The party opposing a motion for summary judgment must put forward at least "[s]ome" evidentiary facts (S. J. Capelin Assoc., Inc., 34 NY2d at 343; Shapiro, 7 NY2d at 63) in admissible form. The court deciding a summary judgment motion must view the evidence submitted in support of and in opposition to a motion for summary judgment in the light most favorable to the nonmovant (see Ortiz v Varsity Holdings, LLC, 18 NY3d 335, 340 [2011]), "draw[ing] all reasonable inferences in favor of the nonmoving party" (Assaf v Ropog Cab Corp., 153 AD2d 520, 521 [1st Dept 1989]).
Determination of a motion for summary judgment — concluding the absence of any material issue of fact — calls on the court to identify the existence of, not to resolve, issues of fact (see Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404 [1957]). Not every factual dispute requires denial of a motion for summary judgment; "factual disputes . . . must relate to material issues" (Forrest v Jewish Guild for the Blind, 3 NY3d 295, 312 [2004]; Rotuba Extruders v Ceppos, 46 NY2d 223, 231 [1978]). In the clearest case, where "the facts are not in dispute and the inferences to be drawn are not in doubt," summary judgment may be granted (see Album Realty Corp. v American Home Assur. Co., 80 NY2d 1008, 1011 [1992]). But "[t]his drastic remedy should not be granted where there is any doubt as to the existence of [material and triable issues of fact], or where the issue is arguable" (Sillman, 3 NY2d at 404 [internal quotation marks and citation omitted]), or where the issue is "fairly debatable" (Stone v Goodson, 8 NY2d 8, 12 [1960]). The motion should also be denied "where more than one conclusion may be drawn from the established facts" (Friends of Thayer Lake LLC v Brown, 27 NY3d 1039, 1043 [2016]).
A court deciding a summary judgment motion cannot make credibility determinations (see Vega v Restani Constr. Corp., 18 NY3d 499, 505 [2012]), meaning that it may not assess the credibility of witnesses and affiants (see Ferrante v American Lung Assn., 90 NY2d 623, 631 [1997]). Such issues should be submitted to and decided by the trier of fact (see Morrone v Chelnik Parking Corp., 268 AD2d 268, 269 [1st Dept 2000]). If issues regarding the credibility of witnesses or evidence arise in the course of assessing whether there exist questions of material fact, summary relief is inappropriate (see Lopez v Senatore, 65 NY2d 1017, 1020 [1985]; Chunn v New York City Hous. Auth., 55 AD3d 437, 438 [1st Dept 2008]; Dallas-Stephenson v Waisman, 39 AD3d 303, 306 [1st Dept 2007]). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment . . ." (Asabor v Archdiocese of N.Y., 102 AD3d 524, 527 [1st Dept 2013] [internal quotation marks omitted]). "The court may not weigh the credibility of the affiants on a motion for summary judgment unless it clearly appears that the issues are not genuine, but feigned" (Glick & Dolleck v Tri-Pac Export Corp., 22 NY2d 439, 441 [1968]).
The court, however, need not abandon common sense, common knowledge or common experience in assessing the sufficiency of the evidence submitted (see Moorhouse v Standard, N.Y., 124 AD3d 1, 9 [1st Dept 2014]; Chimilio-Ramos v Banguera, 62 AD3d 538, 538-539 [1st Dept 2009]). If the fact or conclusion stated is "manifestly untrue, physically impossible, or contrary to common experience" (Price v City of New York, 172 AD3d 625, 629 [1st Dept 2019], appeal dismissed 34 NY3d 989 [2019] [internal quotation marks omitted]), a court may determine that the testimony or statement lacks evidentiary value (see Moorhouse, 124 AD3d at 10), being unworthy of belief, or is, as is often stated, incredible as a matter of law (see Espinal v Trezechahn 1065 Ave. of the Ams., LLC, 94 AD3d 611, 613 [1st Dept 2012]). However, a fact or conclusion that, on first reading, appears contrary to common experience must nevertheless be viewed in its evidentiary context, which may then indicate that it presents a question warranting denial of the motion and requiring assessment by the factfinder (see Feivel Funding Assoc. v Bender, 156 AD3d 416, 417-418 [1st Dept 2017]).
Ultimately, the court does not decide the motion merely on the basis of which party submits the "better" evidence (Grullon v City of New York, 297 AD2d 261, 264 [1st Dept 2002]). Rather, the court assesses the sufficiency of the evidence as it bears on the establishment of the claim or defense (see Grady v Chenango Val. Cent. Sch. Dist., 40 NY3d 89, 108 n 7 [2023]).
Here, Supreme Court resolved numerous factual questions and credibility issues, in many instances after having identified such questions and issues, it implicitly found all of defendants' experts incredible as a matter of law, and failed to view the evidence in the light most favorable to defendants and draw all permissible inferences in defendants' favor.
In the wake of the Attorney General's prima facie showing of entitlement to judgment as a matter of law on her fraud claim, defendants' experts, in many instances with unrebutted testimony, raised issues of material fact as to the purported misstatements contained in the SFCs, their materiality, and their impact, or lack thereof, in the relevant marketplaces.
For example, Bartov, defendants' expert in accounting, in a 35-page affidavit, responded directly to numerous assertions in the Attorney General's memorandum of law. This affidavit was accompanied by a 32-page report and a 43-page report responding to the report of one of the Attorney General's experts submitted in opposition to defendants' summary judgment motion. Among other things, defendants' expert opined that generally accepted accounting principles (GAAP) do not always comport with economic reality, that GAAP does not mandate use of any specific method to estimate the current value of assets in personal financial statements, that professional appraisal is but one acceptable method of valuing real property, and that, therefore, the fact that different valuation methods may produce different values for the same asset is not itself indicative that one of the methods failed to apply GAAP principles or failed to reach a sufficiently accurate value. Another expert, Flemmons, opined that GAAP does not even require that all assets within a category be valued by the same method. Bartov further opined that a large component of materiality is the effect on the recipient of the information, and that a sophisticated recipient such as Deutsche Bank would not view the identified discrepancies as material.[FN14] In fact, any item on a financial statement that is not material by GAAP standards, which generally comport with the objective standard of materiality articulated by Federal courts interpreting securities laws, as stated in Rachmani Corp. (71 NY2d at 726-727) need not conform to GAAP at all.[FN15] He opined that all valuation involves some measure of subjectivity, and opined, realistically and credibly, that, uniquely apropos here, property value may be greatly impacted by intangible and unquantifiable factors, such as buyer "enthusiasm" inspired by the perceived prestige and cachet of a particular "brand." Yet Supreme Court found that this affidavit was "conclusory" (Trump, 2023 NY Slip Op 33314[U] at *29), and that "[d]efendants have failed to identify any authority for the notion that discrepancies of the magnitude demonstrated here could be considered immaterial" (id. at *19). Many of the infirmities Supreme Court identified presented a question of the weight to be afforded defendants' expert proof, which could not have been resolved in deciding the motions.
The Attorney General took issue with defendants' use of a fixed-asset method of valuation for many of the golf properties, because the method did not result in the present value that defendants claimed to have disclosed in the SFCs, and "ignores market conditions and the behavior of informed buyers and sellers" (id. at *29). Bartov disagreed that the method failed to adequately capture present value.[FN16] While this aspect of Bartov's conclusions is not more fully fleshed out, he also asserted that fixed asset was a GAAP-permissible valuation method. Nevertheless, Supreme Court, employing its own understanding and interpretation of accounting, valuation methods, and the real estate and lending markets, opined that "the price for which you can sell it" is what "matters to lenders who want adequate collateral" (id. at *29). Characterizing the fixed-asset method as nothing more than "the price for which you purchase property," as Supreme Court did (see id.), was, even by the Attorney General's expert's description of defendants' method, an incomplete definition and a mischaracterization of the evidence.
Supreme Court also assessed credibility and failed to perceive a factual question when it rejected the affidavit and testimony of Lawrence Moens, the only other defense expert mentioned in the decision. While true that Moens employed some florid hyperbole in describing the market for a property associated with the Trump brand, specifically Mar-a-Lago, Supreme Court erred when it found his analysis to be wholly subjective and unmoored to evidence, when Moens explained that his extensive personal and professional experience of 45 years in this particularly exclusive market, together with formulas, market conditions including recent sales, property searches, and a multi-year analysis of Palm Beach property sales, informed his conclusions, which Justice Moulton acknowledged.
Every expert opinion is premised, in some measure, on personal professional experience, and is thus subjective to some extent. "In some situations, the nature of the subject matter or the expert's area of special skill will suffice to support the inference that the opinion is based on knowledge acquired through personal professional experience" (Romano v Stanley, 90 NY2d 444, 452 [1997]). We see no reason to disregard Moens' opinions, as Justice Moulton would. Even were they premised solely on his own lengthy experience in a particularly specialized real estate market, they would merely invite cross-examination or competing expert evidence (see People v Oddone, 22 NY3d 369, 376 [2013]). In any event, he professed "skill, training, knowledge and experience [that] were adequate to support an assumption that the opinion he rendered was reliable" (Price v New York City Hous. Auth., 92 NY2d 553, 559 [1998]). A court cannot substitute its own judgment for that of expert opinion with which it disagrees (see Matter of State of New York v Richard V., 228 AD3d 109, 123-125 [1st Dept 2024]; Scalisi v Oberlander, 96 AD3d 106, 122 [1st Dept 2012]; Evans v State of New York, 130 AD3d 1352, 1355 [3d Dept 2015], lv denied 26 NY3d 910 [2015]; see also Blonder & Co. v Citibank, N.A., 28 AD3d 180, 189-191 [1st Dept 2006, Tom, J., dissenting]).
That the Attorney General bases some of her claims on defendants' inputs, not their methodologies, does not render defendants' methodology evidence irrelevant to the issue of materiality. Bartov stated that GAAP does not identify or mandate a singular starting point from which all methodologies must derive, consistent with the opinion that an "appraisal," contrary to Supreme Court's view, is not the sole acceptable approach to property valuation, or that property valuation possesses no element of subjectivity. Furthermore, while Supreme Court relied on purely objective market-value professional appraisals as the immutable benchmarks of property valuation (People v Trump, 2023 NY Slip Op 33314[U] at *19),
"The opinion [as to the value of property] is generally based upon the condition and location of comparable properties, but it is nevertheless an opinion. A property of equal size and condition next to a gas station will be worth less than one in the midst of other homes with an ocean view. An opinion as to value is based on weighing and evaluating the total mix of information about the property, including conflicting and contradictory data, intangible considerations and considerations unique to the property . . . The truth or correctness of an opinion is analyzed differently than the truth or correctness of an objectively verifiable fact" (U.S. Bank, N.A. v UBS Real Estate Sec. Inc., 205 F Supp 3d 386, 432-433 [SD NY 2016]).
While Justice Moulton believes that defendants' evidence was insufficient to "grapple with the facts that pertain to this case," defendants' experts directly challenged the core premise underlying the Attorney General's claims and her summary judgment motion that "[a]bsent competing appraisals for the same time periods or other evidence establishing a change in the property or its value — which defendants do not offer — the appraisers' values constitute unrebutted evidence of what the SFC values should have been and against which the much higher values listed in the SFCs should be assessed."
The premise of defendants' evidence was that the foundation of the claims themselves was flawed in several respects, thus raising issues as to soundness of the theory on which her claims lie. Among other things, defendants' experts opined that appraisals are but one way to value property, and even GAAP differentiates appraisals from "[r]ecent transactions involving similar assets and liabilities in similar circumstances" (in other words, fair market value). They opined that appraisals are subjective, at every level and within every component, are subject to significant variability, and themselves may be merely an input from which a final valuation is derived.
They further opined that market value and estimated current value both generally seek the same metric but are derived differently, estimated current value being more flexible, and that it is neither inappropriate nor deceptive to employ an estimated current value approach.[FN17] They explained that estimated current value may place less emphasis on market-derived data; that is why defendants argued that it was a "different measure" of value. Market value, as its name implies, derives from markets, and defendants' evidence explained that many of the assets and asset types in defendant's portfolio are simply too unique, or their markets too esoterically driven, for there to be applicable and relevant market data, or sufficient data to render a market analysis reliable, thus requiring other valuation methods. For example, Moens explained that Mar-a-Lago is so uniquely situated as to have no true comparator, and a potential market of approximately 12 people worldwide. An attempt to "appraise" such an asset, within the meaning apparently ascribed by the Attorney General and Supreme Court, may therefore be, if not futile, inherently suspect.
Defendants' experts also opined that there are multiple types of appraisals, and that appraisals may differ depending on the intended audience; accordingly, "appraisal" and "market value" are not necessarily always synonymous. Further, that an appraisal is premised on investment potential as opposed to market price does not necessarily mean that it does not also capture "present" value.
Supreme Court conflated or disregarded these many concepts in granting summary judgment to the Attorney General. Moreover, while, as defendants' proof suggests, "estimating the value of commercial property is a difficult task, a task which is dependent upon numerous factors" (United Jersey Bank v Kensey, 306 NJ Super 540, 559, 704 A2d 38, 48 [Super Ct App Div 1997]), it bears noting that Supreme Court repeatedly revealed what it believed to be the appropriate applicable standard for the professional expertise necessary to value commercial real estate holdings of the nature at issue here: the capability of the average high school student. Thus, defendants raised issues as to the reliability of the proof on which the Attorney General relied in depicting actual value and serving as the benchmarks from which to measure inaccuracy and deception, because there is no such thing as a single perfectly accurate and correct appraisal, and no such appraisal at any particular point in time. Further, because the Attorney General has relied, in part, on the cumulative effect of the purported errors in describing defendants' overstatement of wealth, defendants have raised an issue of fact as to the aggregate errors and, therefore, as to the tendency and capacity of the SFCs to deceive.
Defendants also showed that Supreme Court erred in its adoption of the Attorney General's arguments and dismissal of much of their proof. For example, Supreme Court faulted defendants for not basing their valuations on existing appraisals, for purposes of finding deception and also in determining the purported overinflation in value. The wisdom of relying on appraisals, as alluded to above, notwithstanding, the appraisals were sometimes many years out of date, and Supreme Court's findings disregarded a likely change in value due to a fundamental aspect of the real estate market that defendants' experts discussed: its fluctuation.
As another example, defendants raised an issue as to the infirmity of the Attorney's General claim that they had included "secret" brand premiums in the values of the assets after having claimed not to. The notes to the SFCs stated:
"This financial statement does not reflect the value of Donald J. Trump's worldwide reputation; however, the brand value has afforded Mr. Trump the opportunity to participate in licensing deals around the globe as reflected on the statement of financial condition herein (see Note 5). Mr. Trump's name conveys a high degree of quality and profitability. This prestige significantly enhances the value of the properties reflected in this financial statement, as well as that of future projects. The brand along with the level of quality of Mr. Trump's residential developments has allowed the selling price per square foot in Trump properties to be amongst the highest among prominent real estate developers. The goodwill attached to the Trump name has significant financial value that has not been reflected in the preparation of this financial statement" (emphasis added).
As explained by defendants' experts, "goodwill" appears to be a term of art that refers to the unique intangible asset attendant to position and recognition that enhances the value of a corporate entity, and may not be reliably quantifiable until disposition of the corporation. It is to be differentiated from the "brand value" that enhances the value of an asset, such as real estate or a golf club, and may therefore form a component of the asset's value. As the above note recites, while the reputation or goodwill has not been reflected in the SFCs, the brand value has. Another note to the SFCs states, "As stated in Note 1, this financial statement does not reflect the value of Donald J. Trump's worldwide reputation, except to the extent it has become associated with properties either operative or under development." Defendants therefore did not, as Supreme Court found, "'double dip,' both purporting not to include a brand premium while simultaneously including one" (Trump, 2023 NY Slip Op 33314[U] at *28).
A conclusion that defendants raised issues of fact precluding summary judgment on the standalone fraud claim does not require us to exhaustively recounted the entirety of the other affidavits that defendants submitted in opposition to the Attorney General's motion (they submitted a total of 15 affidavits in the course of all dispositive motion practice). Of course, GAAP compliance, alone, does not dictate whether an SFC contains a fraudulent statement or whether the statement is material, but where defendants were required merely to raise an issue of fact to defeat summary judgment, they did so.[FN18] The Mazars letters, themselves, indicated the pervasiveness of GAAP departures, and certain of the alleged misrepresentations, such as the misstatement of the size of the triplex, ambiguities regarding brand premiums, and inclusion of the Vornado interest, could not have been attributed to variations in permissible valuation procedures.
In light of the singular importance Supreme Court placed on materiality in determining tendency or capacity to deceive in the context of the summary judgment decision on the fraud cause of action, the findings at summary judgment are relevant to the Attorney General's burden of proof with respect to the remaining illegality causes of action. Supreme Court found that the Attorney General raised issues of fact as to "whether defendants violated [the underlying Penal Code] statutes, intentionally and materially." That is not a pristinely accurate statement of the Attorney General's burden, but summary judgment was nevertheless appropriately denied in light of the competing proof. Neither ground cited for reversal of the summary judgment decision — statute of limitations and valuation — would have disposed of the illegality causes of action in their entirety as a matter of law.
It appears that defendants are correct when they argue that Supreme Court's errors affected the conduct of the trial and thus the evaluation of the illegality causes of action. By injecting materiality — which is not an element of an Executive Law § 63(12) fraud claim, but it is an element of two of the three criminal statutes underlying the illegality causes of action — into the fraud discussion, and then relying on its flawed analysis of materiality in its assessment of the illegality causes of action, Supreme Court's error permeated the trial.
This raises an additional infirmity in the summary judgment decision. By denying summary judgment on the illegality causes of action to defendants on the basis of the Attorney General's identification of issues of fact, Supreme Court implicitly found that defendants met their prima facie burden on summary judgment. Granting summary judgment to the Attorney General on the first cause of action was thus inherently contradictory, in light of the significant overlap between the fraud and illegality causes of action in their evidentiary standards and proof, particularly with respect to materiality.
While the magnitude of disparities between reported and actual amounts, alone, may in the appropriate context render misstatements material, that analysis must still consider all relevant factors to reach that conclusion (see Valicenti Advisory Servs., 198 F3d at 65-66). It is apparent that Supreme Court did not undertake such an analysis, and, at both summary judgment and trial, considered the disparities in a vacuum.
Importantly, this means that the above-mentioned errors committed at the summary judgment stage so permeated the trial that a new trial is warranted, at which the Attorney General should have the additional burden of proving liability on the fraud cause of action, in light of Supreme Court's erroneous resolution of the summary judgment motions.
The court's reasoning related to and focus and reliance on magnitude of disparity, to find the misstatements material for the purpose of finding their tendency or capacity to deceive, continued into trial, being the sole determiner of materiality there, and being relevant to the court's assessment of each defendant's intent for purpose of the criminal statutes. Intent is an element common to each illegality cause of action; the error was thus so pervasive as to have prejudiced defendants.
For example, in the posttrial decision, Supreme Court stated, "When two appraisals rely on starkly different assumptions, that is not evidence of a difference of opinion, that is evidence of deceit" (Trump, 2024 NY Slip Op 30493[U] at *76), "leading the Court to wonder in what universe is $200 million immaterial" (id. at *58). The significance here is manifest: as mentioned above, depending on the context, even "staggering" amounts of money may not be material (ECA & Local 134 IBEW Joint Pension Trust of Chicago, 553 F3d at 204), and the Attorney General did not argue that the mere difference in assumptions was indicative of fraud.
The cumulative effect of this error, superimposed on the erroneous inclusion of evidence related to and consideration of time-barred loans and other transactions, as set forth below, requires a new trial (see Kelly v Metropolitan Ins. & Annuity Co., 82 AD3d 16, 24 [1st Dept 2011]; Collier v Postum Cereal Co., 149 App Div 143 [1st Dept 1912]).[FN19]
Justices Moulton and Friedman take issue with the remedy we believe is appropriate under the law: a new trial. To be clear: no party so much as hinted that a new trial cannot be ordered, or that we should consider only certain forms of relief. Rather, defendants requested reversal of the judgment, and the Attorney General requested affirmance. The proper disposition of this appeal under the substantive and procedural law applicable to the particular record before us is a remand (see CPLR 5522[a]).
Justice Moulton has expressed concerns that a new trial will not occur, or, if it does occur, that it will not occur for an unacceptable period of time. Justice Friedman has expressed concerns that a new trial or the prospect of one will be disruptive to President Trump and undermine our national interests. These are understandable concerns. But they are concerns that the parties have not raised (not in their briefs and not on any post-argument submissions), and they are based on the determinations of actors over whom we have no control. We should trust the sophisticated parties before us —the Attorney General, the sitting President of the United States, and the various well-counseled individual and entity defendants — to raise material points for our consideration, particularly such extraordinary issues as the applicability and scope of presidential immunity, and national security (see Misicki v Caradonna, 12 NY3d 511, 519-520 [2009]).
We are well aware of the size of the record, and the time and effort already expended in the litigation of this historic action.[FN20] We did not reach this conclusion lightly or without thorough consideration. But we cannot avoid the finding reached by our analysis merely because the result would be inconvenient or laborious. The same standard of justice applies to every party appearing before a court regardless of standing in the community or popular regard. While our decision here has not given us occasion to comment on the record of the trial of this action, a trial record that is impaired, regardless of its number of pages, cannot retroactively salvage an earlier summary judgment decision, cannot be "sufficient" to serve as a valid predicate on which to exercise de novo evaluation, and does not serve to remedy the reasons for ordering a new trial in the first place. No matter how "voluminous and detailed" the record available to a court engaged in an "inherently fact-intensive determination," liability as a matter of law cannot be found on conflicting evidence susceptible to multiple inferences (see Friends of Thayer Lake LLC, 27 NY3d at 1043-1044). The path that Justice Moulton takes simply disregards too many fundamental errors and the skewed record they produced.
B. 
Statute of Limitations
An important question on which both the parties and our colleagues disagree, which has generated a considerable amount of semantic contortion, and which further underscores the necessity of the decision we make today, is the impact of our decision in the prior appeal on the Attorney General's recovery of disgorgement and other relief, specifically, how that prior decision should properly bear on the application of the statute of limitations to various claims supporting the Attorney General's causes of action. Supreme Court's determination of the issue in the summary judgment decision not only informed its findings but also dictated the scope of the evidence and arguments entertained at, and likely influenced the recovery granted after, the trial. Defendants argue that Supreme Court's treatment of our prior decision in Trump I (217 AD3d 609) with respect to the statute of limitations erroneously permitted recovery on time-barred claims, which constituted the majority of the Attorney General's claims and a significant portion of the disgorgement award. The Attorney General asserts that Supreme Court's reading and interpretation of our prior decision was correct.
An analysis of the timeliness of the Attorney General's claims requires us to interpret our prior decision addressing the issue of the statute of limitations, and the parties' tolling agreement, which, together, determine which of the claims are timely and the defendants against whom they may be asserted.
1. Trump I
In the course of both summary judgment motions, defendants argued that our 2023 decision required dismissal of all claims premised on loans and other transactions that closed more than six years (or the applicable tolled period) prior to commencement of the action. Supreme Court rejected defendants' arguments, finding that, given our use of the word "completed" rather than "closed," claims were timely if the loan or transaction imposed a continuing disclosure requirement that extended into the six-year limitations period, because a loan or other transaction was not "completed" until the parties had exhausted their required contractual performance.
Supreme Court cited two of our cases applying the continuing wrong doctrine to find that any SFC submitted within the limitations period, not just those pertaining to loans and other transactions that were "completed" within the limitations period, was timely and actionable, because each submission of a financial document to a lender or insurer required a separate exercise of judgment and authority and thus constituted a separate, actionable wrong triggering a new claim within the meaning of CWCapital Cobalt VR Ltd. v CWCapital Invs., LLC (195 AD3d 12, 19-20 [1st Dept 2021]) and Matter of Yin Shin Leung Charitable Found. v Seng (177 AD3d 463, 464 [1st Dept 2019]).
Defendants argue, and we agree, that Supreme Court erred by, in the summary judgment decision, employing an artificial distinction between "completed" and "closed" transactions (see Trump, 2023 NY Slip Op 33314[U] at *17-*18), and then in calculating damages and awarding other relief based on any SFC submitted after July 13, 2014, regardless of the transaction to which it related and regardless of whether the contract was consummated within the statute of limitations (see Trump, 2024 NY Slip Op 30493[U] at *84, *91-92).
The law of the case doctrine is "a rule of practice which provides that once an issue is judicially determined, either directly or by implication, it is not to be reconsidered by Judges or courts of coordinate jurisdiction in the course of the same litigation" (Holloway v Cha Cha Laundry, 97 AD2d 385, 386 [1st Dept 1983]). "An appellate court's resolution of an issue on a prior appeal constitutes the law of the case and is binding on the Supreme Court, as well as on the appellate court . . . [and] operates to foreclose reexamination of [the] question absent a showing of subsequent evidence or change of law" (Sea Trade Mar. Corp. v Hellenic Mut. War Risks Assn. [Bermuda] Ltd., 79 AD3d 601, 602 [1st Dept 2010], lv denied in part and dismissed in part 17 NY3d 783 [2011] [internal quotation marks omitted and emphasis added]). Despite Justice Moulton's assessment of what he believes was intended by the prior appeal decision, the language, context and structure of that decision must lead us to a different conclusion.
The continuing wrong doctrine generally serves to permit recovery for timely wrongs in a course of conduct that commenced outside the statute of limitations, which would therefore otherwise be time-barred (understandable, as the doctrine has its roots in trespass) (see e.g. 509 Sixth Ave. Corp. v New York City Tr. Auth., 15 NY2d 48, 51-53 [1964]). While we have often stated that the doctrine operates to toll the running of the limitations period to the date of the last wrongful act or that we deem the statute of limitations to have accrued on the date of the last wrongful act (see 225 ADC Realty Corp. v Popular Jewelry Corp., 222 AD3d 510, 511 [1st Dept 2023]; Marcal Fin. SA v Middlegate Sec. Ltd., 203 AD3d 467, 468 [1st Dept 2022]; Palmeri v Willkie Farr & Gallagher LLP, 156 AD3d 564, 568 [1st Dept 2017]; Harvey v Metropolitan Life Ins. Co., 34 AD3d 364, 364 [1st Dept 2006]), in practice we nevertheless salvage only claims arising during the ordinarily-applicable statute of limitations (see CWCapital Cobalt VR Ltd., 195 AD3d at 19-20; Henry v Bank of Am., 147 AD3d 599, 601-602 [1st Dept 2017]; Great Jones Studios Inc. v Wells, 190 AD3d 587, 588 [1st Dept 2021]; Butler v Gibbons, 173 AD2d 352, 353 [1st Dept 1991]).
CWCapital Cobalt and Henry illustrate how the continuing wrong doctrine is applied. In CWCapital Cobalt, the defendant agreed to manage the plaintiff's assets and maximize their value, expressly obligating defendant to act with reasonable care and in good faith, with the same skill and attention that it exercised in managing assets for itself and others, and in a manner followed by reasonable and prudent institutional managers of national standing. The defendant also managed conflicts of interest in performance of its duties, and specifically pledged that it would not cause the plaintiff to enter into any transaction with the defendant except as entered into at arms' length for fair market value. We found that the continuing wrong doctrine tolled the statute of limitations because the agreement imposed a continuing and ongoing duty on the defendant to "act[] as [the plaintiff's] eyes and ears with respect to the [subject] trusts and had a responsibility to do everything in its power to prevent any activities that could possibly be to [the plaintiff's] detriment" (CWCapital Cobalt VR Ltd., 195 AD3d at 19). Therefore, each instance in which the defendant failed to act in accordance with its responsibilities and failed to protect the plaintiff was a discrete and independent act giving rise to a new claim of discrete, separable harm (see id. at 19-20).
In Henry, the plaintiff claimed that, without his consent, he was enrolled in credit protection and privacy plans, for which he was automatically charged a monthly fee. The defendants argued that the continuing wrong doctrine applied to toll the statute of limitations, but we explained that:
"The doctrine may only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct. The distinction is between a single wrong that has continuing effects and a series of independent, distinct wrongs. The doctrine is inapplicable where there is one tortious act complained of since the cause of action accrues in those cases at the time that the wrongful act first injured plaintiff and it does not change as a result of continuing consequential damages. In contract actions, the doctrine is applied to extend the statute of limitations when the contract imposes a continuing duty on the breaching party. Thus, where a plaintiff asserts a single breach—with damages increasing as the breach continued—the continuing wrong theory does not apply" (Henry, 147 AD3d at 601-602 [internal citations and quotation marks omitted]).
The Attorney General has never claimed that the continuing wrong doctrine operated to capture acts occurring outside the limitations period; she acknowledges that only conduct occurring within the limitations period is actionable. The Attorney General was arguing continuing wrong under its ordinarily-employed sense: that the fact that the series of repeating conduct and harms commenced outside the limitations period does not preclude a cause of action premised on instances of that conduct occurring within the period.
Supreme Court was not incorrect in describing the effect of the continuing wrong doctrine to the statute of limitations of the Attorney General's claims — that it applies where the original wrong in the series of wrongs occurred outside the ordinarily-applicable statute of limitations to render timely only those harms in the series occurring during the applicable statute of limitations, and that the doctrine does not operate to permit recovery on the wrongs occurring outside that statute of limitations (see CWCapital Cobalt VR Ltd. 195 AD3d at 19-20; Great Jones Studios Inc., 190 AD3d at 588; Henry, 147 AD3d at 601-602; Knobel v Shaw, 90 AD3d 493, 496 [1st Dept 2011]; Butler, 173 AD2d at 353).
We did not, however, merely find that the continuing wrong doctrine did not delay or extend the statute of limitations, which would otherwise be correct; the effect of our decision was to reject the application of the continuing wrong doctrine.
The Attorney General's division of her allegations and proof by transaction was useful for the administrative wrangling of a massive amount of evidence, to provide a measure by which monetary relief could be granted, to meet Executive Law § 63(12)'s requirement of repetition or persistence by demonstrating the number of institutions and actors defendants allegedly defrauded and the sweep of their actions, and to develop a cogent, compelling narrative. But Executive Law § 63(12) requires only a course of repeated or persisting fraudulent acts in the course of transacting business, not successfully-consummated contractual relationships (see Matter of People v MacDonald, 69 Misc 2d 456, 458 [Sup Ct, NY County 1972] ["Generally, this subdivision has been construed quite broadly so that its salutary provisions are applied to all business activity accompanied by repeated acts of illegality"]). Executive Law § 63(12), and the Attorney General's allegations, are not limited to fraudulent contracts; by its terms Executive Law § 63(12), reaches all fraudulent acts (see e.g. Gaidon, 94 NY2d at 345 [discussing General Business Law § 349]). Thus, all fraudulent or illegal conduct occurring within the statute of limitations, so long as it is repeated or persistent, is actionable, regardless of the contract with which it might be associated, and regardless of whether the conduct is associated with any particular contract or relationship at all. Accordingly, the Attorney General's primary argument was that she did not need to resort to the continuing wrong doctrine to establish the timeliness of her claims. The doctrine, however, is not what drives our determination here, and it is for that reason that defendants' failure to more timely assert their argument, as Justice Moulton has observed, does not greatly influence our holding.
The clearest indicators of the meaning and import of our prior holding, and the reasons why we cannot interpret the prior decision in the manner employed by Supreme Court and urged by Justice Moulton and the Attorney General, lie in our citations to Boesky v Levine (193 AD3d 403, 405 [1st Dept 2021]) and Rogal v Wechsler (135 AD2d 384, 385 [1st Dept 1987]) in finding that "claims are time barred if they accrued — that is, the transactions were completed" outside the limitations period (Trump, 217 AD3d at 611). The Attorney General and Justice Moulton are correct that the cases we cited dealt solely with common-law fraud asserted by a private citizen; they did not address fraud as the concept exists in Executive Law § 63(12). But that is not their most significant aspect.
The plaintiffs in Boesky and Levine alleged that they were fraudulently induced to execute contracts. In Boesky, while a legal malpractice claim was reinstated on the basis of continuous representation, the fraudulent inducement claim was dismissed because the complaint was filed more than six years after the plaintiffs entered into the subject tax shelters, and more than two years after the plaintiffs' purported discovery of their fraudulent nature. In Rogal, a claim for fraudulent inducement was reinstated after Supreme Court erroneously held that it accrued at the time of the allegedly fraudulent misrepresentations, instead of when the fraudulently induced agreement was executed. The statute of limitations for a fraudulent inducement claim runs from a plaintiff's completion of the act that the fraudulent misrepresentations induced the plaintiff to perform (see Prichard v 164 Ludlow Corp., 49 AD3d 408, 408 [1st Dept 2008]) which, in the case of a fraudulently-induced contract or document, runs from its execution (see Matter of Medallion Fin. Corp. v Rucker, 223 AD3d 497, 498 [1st Dept 2024]), which, in the case of a loan, generally occurs at its "closing" (see e.g. Fandy Corp. v Lung-Fong Chen, 262 AD2d 352, 353 [2d Dept 1999]). This occurs at a single point in time. The claims accrued when the parties "entered into the allegedly fraudulent transactions" (Boesky, 193 AD3d at 405), that is, "at the time of the execution of the contract" (Rogal, 135 AD2d at 385). In Boesky and Rogal, the "completion of the transaction" was the execution of the contract, which is why the single discrete act of executing a contract or entering into a contractual relationship was the salient point of analysis in those cases for timeliness purposes, and which is why they are inapplicable to an Executive Law § 63(12) claim requiring repetition or persistence.
The Attorney General's claims include, but are not limited to, the fraudulent inducement of the subject loans, insurance policies and other transactions. The allegations are far broader both factually and as to theory of liability, encompassing much more than their fraudulently induced execution. They encompass acts of numerous persons occurring over a number of years and directed at multiple entities. But by tying accrual of "claims" to the "completion of the transaction," specifically within the meaning of Boesky and Rogal, and by defining the claims by their contract date (see Trump, 217 AD3d at 611), we limited timely actionable claims to those emanating from a contract entered into within the limitations period, reducing the activities and transactions on which the Attorney General's Executive Law § 63(12) claims, and recovery, could be premised.[FN21]
We agree with Justice Friedman that the language of our prior decision would have been quite different (and, frankly, illogical) had we intended to convey the meaning of "completion" that Supreme Court employed, that is, the full completion of the performance required at the expiration of the term specified by the contract documents. And we certainly agree with Justice Moulton that using the word "closed" might have conveyed a far clearer message to the parties. But given the contextual circumstances as described above, the omission of the word does not lead to a different conclusion. Correctness — whether or not the prior decision reflected an accurate or complete statement of the law — is simply not a part of the calculus when giving appropriate preclusive effect to the binding authority of a prior appellate decision (see P.A. Bldg. Co. v City of New York, 10 NY3d 430, 442 n 8 [2008]; Bradley v Earl B. Feiden, Inc., 8 NY3d 265, 272-273 [2007]; Matter of Farber v U.S. Trucking Corp., 26 NY2d 44, 49 [1970]). We may not interpret it in a manner that evinces or suggests that we "reconsider, disturb or overrule" it (Matter of Dondi v Jones, 40 NY2d 8, 15 [1976]), and we may neither correct nor modify it (see Van Valkenburgh, Nooger & Neville v Hayden Publ. Co., 44 AD2d 412 [1st Dept 1974], affd 36 NY2d 803 [1975]). We, and Supreme Court, are obligated to adhere to and follow it (see Matter of Part 60 RMBS Put-Back Litig., 195 AD3d 40, 48 [1st Dept 2021]; Hornstein v Podwitz, 229 App Div 167, 169-170 [1st Dept 1930], affd 254 NY 443 [1930]). Our decision in Trump I therefore constrains and directs our analysis of the issue (see U.S. Bank N.A. v DLJ Mtge. Capital, Inc., 237 AD3d 509, 511 [1st Dept 2025]).
Given the nature of an Executive Law § 63(12) claim, whereby the Attorney General may be granted injunctive relief enjoining the continuance not only of "such business activity" but also of "any fraudulent or illegal acts" (emphasis added), the resulting reduction of the transactions ostensibly giving rise to monetary relief, while by no means minor, as described below, did not, as Justice Moulton warns, represent a "seismic" change in the centrality of SFCs to, or the essence of, the Attorney General's claims, or the possibility of the Attorney General obtaining recovery. Our prior decision did not, however, define the relevance of SFCs otherwise excludable in considering the grant of relief.
Given the standards enunciated above, it is quite possible that the generation and usage of the population of SFCs, even as reduced by correct application of our prior holding to the statute of limitations, was no less "repeated" or "persistent" for the purpose of applying the statute to find the Attorney General entitled to relief. Further, repetition or persistence, within the meaning of Executive Law § 63(12), did not require repeated use of the same SFC. That definition is too narrow. As alluded to above, repetition or persistence may be found in a "basic pattern of doing business" (see ITM, Inc., 52 Misc 2d at 43), suggesting similarity rather than identicality; conduct of sufficient duration (see United Parcel Serv., Inc., 253 F Supp 3d at 664-665); conduct affecting a sufficient number of individuals (see Matter of People v Wilco Energy Corp., 284 AD2d at 471); or, where the instances of conduct of any individual actor are insufficiently numerous, the aggregation of the conduct of similarly-situated and similarly-motivated actors (see Compact Assoc., Inc., 22 AD2d at 131-132).
By defining the accrual of the Attorney General's claims — claims which, by their nature, are wholly dependent on the repetition or persistence of fraudulent or illegal statements or actions, something that cannot be determined until the accumulation of a sufficient number of occurrences — as bound by the consummation of the contractual relationships [FN22] underpinning them, the salient distinction to be drawn by Supreme Court, if any, was not between "completion" and "closure," but between completion of a "transaction," as opposed to a "contract." Because, for Executive Law § 63(12) claims, fraudulence or illegality cannot be divorced from repetition or persistence, implicit in our prior decision was that the starting point for consideration of any actionable course of repetition or persistence was a contract date (see People v Trump, 217 AD3d at 611).[FN23] The effect of Supreme Court's holding was the impermissible application of the continuing wrong doctrine (see CWCapital Cobalt VR, 195 AD3d at 15-20; Yin Shin Leung Charitable Found., 177 AD3d at 463-464) to reach SFCs emanating from transactions we had deemed untimely, in derogation of our express finding and contrary to the law of the case.[FN24]
This also led Supreme Court to deny defendants' numerous admissibility objections at trial based on the statute of limitations. Supreme Court later changed its rationale, asserting after trial that "statutes of limitation bar claims, not evidence" (Trump, 2024 NY Slip Op 30493[U] at *4 n 1 [emphasis added]). Defendants took issue with this interpretation and correctly, in our view, argued that an "evidentiary" ruling cannot be used to "modify or expand the scope of the available relief" determined by an Appellate Division.
Justice Moulton states that our prior decision is "properly understood" in the context of Ivanka Trump's motion to dismiss; however, divorcing any single defendant's motion from the decision's language in its full context is illogical, seeing as how we did not do so ourselves. Further, Ivanka Trump's motion, its resolution and our prior decision cannot be evaluated in the absence of the entirety of the allegations against her, not merely those actions that occurred within the statute of limitations, as Justice Moulton has isolated.
Justice Moulton also claims that the allegations against Ivanka Trump did not describe the fraudulent inducement of loans and other contractual relationships, and asserts that our analysis by way of reference to Boesky and Rogal "misses the mark." Fraudulent inducement, however, is a species of fraud, and fraud underlies the Attorney General's section 63(12) claim asserted in the first cause of action of the complaint.
In contrast to the other defendants, against whom the allegations were far broader both factually and as to theory of liability, encompassing more activity and encompassing activity occurring at different stages of the contractual relationships, the allegations against Ivanka Trump were that she generally handled all licensing, "negotiated and secured financing for Trump Organization properties," "negotiated the lease with the government and a loan related to the Old Post Office property," and "negotiated loans on Trump Organization properties at Doral and Chicago," being "aware that the transactions included a personal guaranty from Mr. Trump that required him to provide annual Statements of Financial Condition and certifications."
With respect to the Doral loan, it was alleged that she initiated the formal process for soliciting the loan, met with bank representatives, negotiated terms, exchanged term sheets, and later sought an additional loan to be secured by the property. With respect to the OPO loan, it was alleged that she communicated with the federal government regarding the bid, responded to "deficiency comments raised by the GSA [concerning], among other topics, Mr. Trump's Statements of Financial Condition, including their departures from GAAP and contained detailed information about Mr. Trump's financial capabilities as well as his ability to perform the obligations under the lease at issue," and, in response to the GSA's questioning of the use of the SFCs, "participated in an in-person presentation to address GSA's concerns about those topics and others."
It was alleged that she "was familiar with the Statements of Financial Condition, making presentations on them to the GSA in 2011, and using them to facilitate loans from Deutsche Bank in 2012 and 2013," and remained responsible for the loans, a component of which was the annual submission of SFCs and confirmation of no material changes in net worth. It was further alleged that, through her positions, responsibilities and experience, she was familiar with both the financial performance of the properties incorporated into the SFCs and the actual revenue derived from licensing.
In a context where the allegations were to be given their every favorable intendment, a reasonable reading of the allegations against her, specifically, was that, being capable of discerning the veracity of the values of at least some of the categories of assets enumerated in the SFCs, she knowingly sought to secure loans through their use. On the prior appeal, the Attorney General went further, arguing that the collective effect of her allegations was that Ivanka Trump "was involved in defendants' decade-long scheme, particularly in the context of a closely held business run by a single family." Accordingly, that Ivanka Trump was not an active participant in the creation of SFCs was not dispositive of the viability of a cause of action against her, whether or not one considers the continuing benefit to defendants of the perpetuation of the business deals her efforts had secured. It was this continuing benefit, not merely her 2016 efforts in relation to a refinancing and a draw request, as Justice Moulton recounts, that underlay a continuing wrong argument. It would not have made sense to apply the continuing wrong doctrine to the discrete 2016 efforts alone which, in any event, did not come to fruition.
Our reading of the briefs submitted on the prior appeal informs our view of the import of our prior finding. Our references to Boesky and Rogal were not an "analogy," as Justice Moulton states, but a direct citation to this Court and, more importantly, to defendants — all defendants. Despite the above-described differences between the nature of the allegations against Ivanka Trump and the other defendants, every single defendant appealing the denial of the five motions to dismiss the compliant, not merely Ivanka Trump, cited Boesky and Rogal, characterizing the Attorney General's claims against them as sounding in fraudulent inducement, claims that, as they correctly argued, accrue when a transaction closes. Both Ivanka Trump and the other defendants argued against the application of the continuing wrong doctrine for this reason — that the doctrine is not properly applied to capture performance occurring after the initial acts of execution of the loans, being mere consequences thereof. If the other defendants did not raise that specific argument until their reply, Ivanka Trump raised it in her principal brief. Therefore if, as Justice Moulton asserts, the argument were truly unpreserved for our review, we would have had no need to discuss "completion" at all. We might also have mentioned that the issue was unpreserved for our view. For an action that, as Justice Moulton asserts, does not involve fraudulent inducement, it is an extraordinary coincidence that the only cases we could find to cite in a discussion of purportedly general timeliness principles were fraudulent inducement cases. Further, if, as Justice Moulton asserts, submission of an SFC, itself, were the engine of the Attorney General's claims, as we viewed them, then closing dates would have been wholly irrelevant to the discussion of timeliness.
The structure of our prior decision, as mentioned above — a general discussion not limited to any particular defendant, followed by findings successively qualifying the initial sentence, and a mention of Ivanka Trump occurring solely at the conclusion of this paragraph — demonstrates that it is pure speculation for Justice Moulton to conclude that Trump I's comments regarding continuing wrong, and citations to Boesky and Rogal, were made only with respect to Ivanka Trump. And the immediately foregoing discussion demonstrates that he is, in fact, wrong. If that is what we truly meant, then we would have referred to her in the first sentence, without having to return to her at the end of the paragraph, and we would not have had to refer to tolling in the manner that we did, in two separate sentences. By later, separately referring to defendants bound by the tolling agreement, it is clear that the reference to tolling in the first sentence refers solely to tolling occasioned by the coronavirus pandemic, tolling to which the claims against all defendants were subject. The first sentence is a general sentence, made without reference to any particular defendant, indicating that it is applicable to all. Then, we narrowed and qualified the prior sentence by identifying a factor — the tolling agreement — that may further narrow the defendants against whom the claims are timely. We then left it to Supreme Court to determine who is bound by the tolling agreement. Again, we then narrow a general statement explaining why one of the defendants need not be included in that analysis. Then we narrowed further to explain why no claim against that defendant remained viable. We believe this interpretation is more coherent, ordered, and logical than that offered by Justice Moulton.
In any event, his discussion does nothing to provide any plausible alternative explanation for the more central point requiring the exclusion of many of the loans on which the Attorney General's recovery was premised for the purpose of awarding relief to her: that we defined the accrual of claims by the completion of the transaction which, by our citation to Boesky and Rogal in the same context and in the same manner as urged and argued by all defendants, articulated the closing date of the transaction (defendants described it as "reaching" or "executing" a contract) as the cutoff for a viable claim emanating from it.
We have not insinuated that this Court lacked understanding of the continuing wrong doctrine. A plain reading of our prior decision indicates that our treatment of the accrual of the statute of limitations for Executive Law § 63(12) purposes was not dependent on our treatment of the continuing wrong doctrine. Neither Justice Moulton nor we can properly speculate, in this context, what we "would" or "would not have" considered or concluded on the prior appeal, but Justice Moulton's recharacterization and relitigation of our prior decision is too labored.
2. Tolling
The individual defendants and the Trust challenge the application of the tolling agreement to them (defendants concede that the corporate defendants are subject to the agreement). On this topic, we and our colleagues share the same view: that the agreement is binding on all defendants.
To determine which statute of limitations date controls for each defendant, we look to the tolling agreement signed by the Attorney General and the Organization's counsel, as prescribed by our prior order. The agreement is between the Attorney General and the Organization, which is defined in the agreement to include "The Trump Organization, Inc.; DJT Holdings LLC; DJT Holdings Managing Member LLC; and any predecessors, successors, present or former parents, subsidiaries, and affiliates, whether direct or indirect; and all directors, officers, partners, employees, agents, contractors, consultants, representatives, and attorneys of the foregoing, and any other Persons associated with or acting on behalf of the foregoing, or acting on behalf of any predecessors, successors, or affiliates of the foregoing," i.e. all of the defendants (Ivanka Trump, previously dismissed from the action, was no longer a director or officer as of the signing of the agreement).
"Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole. The words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning" (Ellington v EMI Music, Inc., 24 NY3d 239, 244 [2014] [internal citations and quotation marks omitted]). Here, the plain language of the tolling agreement binds the individual defendants and the Trust, whose relationships to the Organization, as defined in the tolling agreement, are clearly within the contemplation of the agreement, and it is not disputed that the signatory on behalf of defendants was competent to bind the Organization. With respect to the Trust, defendants claim that only the trustee can bind the trust under EPTL 11-1.1(b)(7). But that section only enumerates a trustee's powers; it does not state that they are exclusive.
To the extent defendants claim that the agreement could not bind individuals without their personal signatures, the definition in the agreement clearly contemplated the individuals, who were all "directors or officers" of the Organization and thus within the scope of persons and entities bound by the agreement. The "signature" cases cited by defendants are irrelevant. Here, the tolling agreement is expressly between the Attorney General and the Organization, as defined therein, which includes all defendants. Accordingly, Supreme Court was correct to hold that all defendants were subject to the tolling agreement because it was signed by someone who represented that he had authority to bind them, as they were defined by the agreement (see Matter of People v JUUL Labs, Inc., 212 AD3d 414, 417 [1st Dept 2023] ["the motion court correctly concluded that defendants are bound by the tolling agreement into which JUUL entered with the People"]). Unmistakable indication of intent to be bound that can be inferred from the face of the document will bind non-signatories(see e.g. Johnson v Proskauer Rose, LLP, 2014 NY Slip Op 30262[U], *19-22 [Sup Ct, NY County 2014], affd on other grounds 129 AD3d 59 [1st Dept 2015]), and here the definition of "the Trump Organization" in the tolling agreement's footnote is indicative of such clear intent.
3. Application
Therefore, considering the effect of our prior determination and all applicable tolls afforded by the agreement and the various Executive Orders issued during the coronavirus pandemic, the correct date for determining the timeliness of all claims against all defendants is July 13, 2014. Supreme Court thus erred when it considered instances of false statements with respect to the Doral and Chicago loans, both of which closed prior to July 13, 2014, in calculating damages, awarding injunctive relief, and in directing judgment against any defendants alleged to have participated in only those transactions. The exclusion of untimely transactions significantly reduces Supreme Court's disgorgement award.[FN25] The $168,040,168 award based on interest rate differentials must be reduced by the $72,908,308 attributable to the Doral loan and the $17,443,359 attributable to the Chicago loan, for a reduced total of $77,688,500, assuming Supreme Court used the correct metrics in making the award.[FN26]
The timely transactions therefore include the Old Post Office (OPO) and Ladder Capital loans, Zurich's surety bond underwriting and Everest's director and officer (D&O) underwriting.[FN27] The OPO loan closed on August 12, 2014, was reviewed annually from 2015 to 2021, and was repaid on May 11, 2022. The Ladder Capital loan closed in November 2015, the bond underwriting issued yearly from 2014 to 2021, and the affected D&O underwriting occurred on January 30, 2017 and February 5, 2018.[FN28]
Because Executive Law § 63(12) affords the Attorney General relief to enjoin only "such conduct," "such conduct" must be interpreted to refer to the actionable conduct, and here we previously found that the only actionable conduct was that emanating from transactions completed within the limitations period, even though similar (if not identical) in nature and effect to those excluded by our prior decision. Supreme Court, however, did not enjoin any of the conduct forming the basis of the Attorney General's claims, such as the preparation, presentation or use of statements of financial condition or the valuation of assets enumerated therein.
The impact of Supreme Court's erroneous interpretation of our prior holding with respect to the statute of limitations on its posttrial disgorgement award is not harmless. This is true not merely mathematically, but also foundationally. Given the unique nature of the Executive Law § 63(12) cause of action and the relief afforded by it, we cannot know the evidentiary significance of otherwise-excludable SFCs and transactions to the primary determinations required for a successful Executive Law § 63(12) claim. We cannot know whether or to what extent the consideration of otherwise-excludable SFCs or transactions influenced the finding of repetition or persistence of defendants' acts or statements, or whether their consideration produced a course of repetition or persistence that influenced the decision to grant any aspect of the injunctive and other non-monetary relief awarded, whether at the motion or trial stage, the type of relief, the nature of the relief, or the severity of the relief, such as its duration or breadth.[FN29] While the granting of such relief is not mandatory when the cause of action is made out, it bears noting that this is the primary form of relief envisioned by Executive Law § 63(12).
Accordingly, Supreme Court's statute of limitations finding, together with the other fundamental errors described above, merits, among other things, a new trial.
VI. Sanctions for Frivolous Conduct
In granting the Attorney General's motion for sanctions, Supreme Court highlighted that various of defendants' arguments made in opposition to summary judgment — standing, capacity, parens patriae, the effect of the SFCs' disclaimers, scienter, and the availability of disgorgement as a remedy — had been raised and rejected during the course of past motion practice (see People v Trump, 2023 NY Slip Op 30027[U] at *2-*3; People v Trump, 2022 NY Slip Op 33771[U], *6 [Sup Ct, NY County 2022]). Defendants had raised the arguments in opposition to the Attorney General's October 2022 application for a preliminary injunction, and in support of their five November 2022 CPLR 3211 motions to dismiss.
In the course of deciding the dismissal motions, Supreme Court characterized defendants' arguments as "borderline frivolous even the first time defendants made them" and chided defense counsel for not having "known better" (Trump, 2023 NY Slip Op 30027[U] at *3, *5). Supreme Court nevertheless declined to impose sanctions as "unnecessary, having made its point" (id. at *5). Significantly, Supreme Court appears to have raised the issue of sanctions sua sponte; in opposing the dismissal motions, the Attorney General had not cross-moved for sanctions, even while noting defendants' "recycled" arguments.
In the summary judgment decision, Supreme Court found that repetition of the arguments, among other things, violated the law of the case and constituted frivolous conduct, and sanctioned each of the five attorneys who signed their names to defendants' briefs in the course of the summary judgment motion practice in the amount of $7,500, to be paid to the Lawyer's Fund for Client Protection. Defendants only earned Supreme Court's ire by submitting the expert affidavit of Justice Leonard Austin, formerly of the Appellate Division, Second Department, who opined as to the legal viability of defendants' arguments and the procedural necessity and reasonable justification for raising them again.
We and our colleagues agree that granting the motion for sanctions was an improvident exercise of discretion; that defense counsels' conduct could not be fairly characterized as "egregious," "preposterous," "inscrutable," "risible," "obstreperous," or "bogus"; and that such determination should be reversed on the non-parties' appeal. That Supreme Court's prior decisions had been affirmed on appeal did not render defendants' repetition of the arguments insupportable: our pronouncements with respect to the Attorney General's authority to pursue the action and the availability of disgorgement as a remedy were statements of general law appropriate for a CPLR 3211 dismissal analysis where the sole question was the complaint's statement of a cognizable cause of action (see People v Trump, 217 AD3d at 610).
VII. Conclusion
This appeal amalgamates decisions (strategic or otherwise) by the parties, determinations of the trial court, and a prior order of our Court. It charges us with the duty to resolve the issues raised by the parties. We do that by applying the substantive and procedural law to the factual record, the same as we would for any other parties. That we may find a particular resolution unsatisfactory or inconvenient should not be relevant. What is relevant — determinative, actually — is the resolution required under the law.
In light of the foregoing, we need not and do not further address defendants' arguments regarding the trial court's assessment of the evidence supporting the illegality causes of action and the propriety of the assessment of monetary and other relief in favor of the Attorney General.
FRIEDMAN, J. (concurring in part and dissenting in part)
Executive Law § 63(12) empowers the Attorney General, acting "in the name of the people of the state of New York," to bring a lawsuit seeking injunctive relief, restitution and damages (among other remedies) against any person who "engage[s] in repeated fraudulent or illegal acts or otherwise demonstrate[s] persistent fraud or illegality in the carrying on, conducting or transaction of business." As this Court has noted, the purpose of section 63(12) is to provide the Attorney General with a vehicle by which to advance the public interest in "securing an honest marketplace" (People v Coventry First LLC, 52 AD3d 345, 346 [1st Dept 2008], affd 13 NY3d 108 [2009]) and to "protect[] consumers from deceptive and misleading practices" (People v Concert Connection, 211 AD2d 310, 320 [2d Dept 1995], appeal dismissed 86 NY2d 837 [1995]).[FN1] The provision is intended to protect not only "the average customer but . . . the vast multitude . . . , including the ignorant, the unthinking and the credulous who, in making purchases, do not stop to analyze but are governed by appearances and general impressions" (Guggenheimer v Ginzburg, 43 NY2d 268, 273 [1977] [referring to section 63(12) along with certain other antifraud statutes]; see also Matter of People v Northern Leasing, Inc. 193 AD3d 67, 75 [1st Dept 2021], lv dismissed 37 NY3d 1088 [2021]; People v General Elec. Co., Inc., 302 AD2d 314, 314 [1st Dept 2003]). To serve that remedial purpose, section 63(12) is "liberally construed" to protect "the public . . . [from being] fraudulently exploited" (People v Greenberg, 95 AD3d 474, 483 [2012] [internal quotation marks omitted], affd 21 NY3d 439 [2013]). Accordingly, the test for fraud under section 63(12) is "whether the targeted act has the capacity or tendency to deceive or creates an atmosphere conducive to fraud" (Northern Leasing, 193 AD3d at 75 [internal quotation marks omitted], quoting General Elec., 302 AD2d at 314).
In determining whether the Attorney General's proof has met the standard of a "capacity or tendency to deceive," certain elements of a claim for common-law fraud may be relaxed. For example, it has been held that reliance is not an element of a claim under section 63(12) (e.g. Matter of People v Trump Entrepreneur Initiative LLC, 137 AD3d 409, 417 [1st Dept 2016]). Relieving the Attorney General of the burden of proving reliance facilitates the use of the provision to reach schemes directed at the public markets for securities or consumer goods or services, where it may be difficult to prove that any particular victim of the scheme directly relied upon the defendant's misstatement.[FN2] It has also been held that, in an action under section 63(12), the Attorney General need not prove scienter (Trump Entrepreneur Initiative, 137 AD3d at 417) or loss to victims (People v Ernst & Young, LLP, 114 AD3d 569, 569-570 [1st Dept 2014]).
This action essentially turns section 63(12) on its head. The leniency with which the courts have construed the requirements for pleading and proving fraud under section 63(12) — a leniency that has been extended for the purpose of facilitating the use of the provision to prevent the exploitation of unsophisticated consumers, investors and small businesses — is here being used by Attorney General Letitia James to apply section 63(12) to a scenario to which that provision has never before been applied, or even thought to apply. Specifically, the Attorney General in this case has utilized the flexibility afforded her under section 63(12) to unwind complex financial transactions that were negotiated, face-to-face and at arm's length, between a privately held real estate organization — that of defendant Donald J. Trump, the former president and current president — and ultra-sophisticated banks, insurance companies and government entities, which were advised by equally sophisticated lawyers, accountants, and other business professionals.
The Attorney General complains, and Supreme Court found, that the statements of financial condition (SFCs) that President Trump provided to the counterparties in connection with the transactions at issue overvalued certain of his assets. However, each of the SFCs included written disclaimers advising, in no uncertain terms, that President Trump's valuations of his various properties were estimates that had not been audited and were not beyond dispute. Each counterparty was further warned that it should do its own due diligence and draw its own conclusions about President Trump's net worth, which each counterparty actually did, as it was obligated to do for its own protection as a matter of New York law (see e.g. Danann Realty Corp. v Harris 5 NY2d 317, 320, 322 [1959]). Moreover, President Trump paid all the principal, interest, and premiums he owed, and no counterparty ever registered any complaint about the deals before the Attorney General began publicly accusing President Trump of issuing fraudulent SFCs. Had any counterparty been dissatisfied with its transaction, it would have had the incentive and resources to seek redress for violation of its rights through private litigation — litigation that, according to the Attorney General, would have yielded scores of millions of dollars of damages in some cases. No such lawsuit was ever filed.
On this appeal from the nearly half-billion dollar judgment against President Trump and his codefendants, two of my colleagues have cited scores of cases in an attempt to shoehorn this case into section 63(12). They have gone so far as to claim that the Attorney General, by bringing this action, has possibly saved the world from a replay of the financial meltdown of 2008; how this might be is not explained. Despite their efforts, they are unable to point to a single precedent — not even one — for the use of section 63(12) to target transactions such as those at issue here — bilateral, negotiated, arm's-length transactions between highly sophisticated parties, which had no effect on any public market, and which were, so far as the parties to the transactions were concerned, complete successes. Given the absence of any public interest in unwinding these deals, I would not stretch the scope of section 63(12) to reach them.
Moreover, even if bringing this action were within the scope of the Attorney General's power under section 63(12), Supreme Court erred both in granting her summary judgment as to liability on her first cause of action and in rendering a decision in her favor on all causes of action after trial. As explained below, the Attorney General simply failed to prove her case. Accordingly, I would reverse the judgment and dismiss the complaint. Thus, while I concur in the decretal's vacatur of the constitutionally unsound (and otherwise defective) half-billion dollar disgorgement award, I respectfully dissent insofar as the decretal affirms the judgment as to liability and as to the award of nonmonetary relief to the Attorney General.
I note that, of the four justices voting for the decretal, two — Justice Higgitt and Justice Rosado — do not actually agree with the resolution of the appeal for which they are voting. As stated in Justice Higgitt's opinion, he and Justice Rosado believe that the grant of summary judgment to the Attorney General (as to liability on the first cause of action) should be reversed, the judgment vacated, and the matter remanded for a new trial on all causes of action. I commend Justices Higgitt and Rosado for their selflessness in putting aside their personal views to allow this Court to dispose of this appeal. However, I find it remarkable that, although a three-justice majority of this five-justice panel believe that the judgment in favor of the Attorney General should not stand, as she has not carried her burden of proving a violation of the statute, the result of the appeal is the affirmance of the judgment, albeit as modified to eliminate the disgorgement award. To draw a sports analogy, it is as if a team is awarded a touchdown without crossing the goal line. In any event, it seems to me that the result I would reach is more consistent with the outlook of Justices Higgitt and Rosado than the affirmance of the judgment, as modified, for which they are voting.
This leads me to explain why, given that I am alone on this panel in my view that the complaint should be dismissed, I am not voting for the result favored by Justices Higgitt and Rosado — namely, vacatur of the judgment and remand for a new trial. First, I do not believe that we can ignore the fact that ordering a new trial of a case in which the primary defendant and witness is the sitting president of the United States (and will remain so for approximately another 3½ years) would disrupt the political life of the United States and would undermine its national interest, particularly at a time of high global tension, with ongoing conflicts in Europe and the Middle East.[FN3] Second, while it is obvious from the divergence of opinions among the justices of this panel that this case calls out for further appellate review, an order by this Court directing a retrial is not immediately appealable to the Court of Appeals unless the appellant stipulates to be bound by the prior judgment in the event his further appeal is unsuccessful (CPLR 5601[c], 5602[b][1]; see Trezza v Metropolitan Transp. Auth., 23 NY3d 1011, 1011 [2014]; Maynard v Greenberg, 82 NY2d 913, 914-915 [1994]). It seems inconceivable that defendants would stipulate to a judgment carrying a half-billion dollar award against them.[FN4] Finally, even if Justice Higgitt is correct that neither side should have been granted summary judgment on their dueling pretrial motions, I agree with Justice Moulton that the record before us — more than 100 volumes, comprising nearly 50,000 pages — is more than sufficient to decide the case without holding another trial. In that regard, I agree with defendants, and respectfully disagree with my colleagues, on the standard of proof applicable to the Attorney General's claims. In my view, the Attorney General should be required to prove her claims under section 63(12) by clear and convincing evidence, not by a mere preponderance of the evidence (see People v Wyatt, 89 AD3d 112, 127 [2d Dept 2011] [proof by clear and convincing evidence is "deemed necessary to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with a significant deprivation of liberty or stigma"] [internal quotation marks omitted], lv denied 18 NY3d 803 [2012]; see also Addington v Texas, 441 US 418, 424 [1979] [the intermediate standard of proof is "typical(ly) use(d) . . . in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing," where "(t)he interests at stake are deemed to be more substantial than mere loss of money"]).[FN5]
Background

For purposes of this writing, I believe that only a brief summary of the background of this appeal is necessary.
During the time period relevant to this action, President Trump controlled and beneficially owned (either directly or, while he served as president, through defendant Donald J. Trump Revocable Trust [the Trust], of which he is sole beneficiary) approximately 500 entities that do business as "the Trump Organization." Ten of the entities within the Trump Organization have been named as defendants in this action.[FN6] Also named as defendants are four individuals other than President Trump who served as executives of the Trump Organization: Allen Weisselberg, the former Chief Financial Officer; Jeffrey McConney, Controller; and President Trump's two eldest sons, Donald Trump, Jr., and Eric Trump.[FN7]
As more fully discussed below, in successfully campaigning for her current office in 2018, the Attorney General repeatedly vowed to pursue President Trump and his associates (including members of his family) through any available avenues of legal process. In March 2019, only two months after she took office, the Attorney General opened an investigation of President Trump's business practices. On an appeal to this Court from a proceeding to enforce a subpoena issued in connection with that investigation, the Attorney General asserted that the investigation had been triggered by congressional testimony given on February 27, 2019, by Michael D. Cohen, a former legal counsel to President Trump and a former Trump Organization executive (see Matter of People v Trump Organization, Inc., 205 AD3d 625, 626 [1st Dept 2022], appeal dismissed 38 NY3d 1053 [2022]).[FN8]
On September 21, 2022, the Attorney General filed this civil enforcement action pursuant to Executive Law § 63(12) against President Trump and the other defendants. According to the Attorney General, on more than two dozen occasions in the decade or so ending in 2021, President Trump issued false and misleading personal SFCs in his entities' business dealings with lenders, insurers, and others to gain financial benefits, including lower interest rates and insurance premiums. It is the Attorney General's position that the issuance of the SFCs violated section 63(12), which prohibits "repeated fraudulent or illegal acts" and "persistent fraud or illegality" in the conduct of business. Specifically, the first cause of action alleges that the issuance of the SFCs constituted "fraud" under section 63(12) itself, and the second through seventh causes of action allege that the issuance of the SFCs constituted "illegal acts" under a number of provisions of the Penal Law (see Penal Law §§ 105.00, 175.05, 175.10, 175.45), as more fully discussed below.
The gravamen of the complaint is that defendants improperly qualified for favorable commercial real estate loans and insurance policies through the submission of the allegedly "inflated" SFCs, which improperly represented the value of the assets and net worth of President Trump, who personally guaranteed the obligations of his entities in the transactions at issue. The complaint alleges that defendants submitted misleading SFCs "to induce banks to lend money to the Trump Organization on more favorable terms," to "satisfy continuing loan covenants" (which required submission of annual SFCs to verify that President Trump's net worth remained at the contractually required level), and to "induce insurers to provide insurance coverage for higher limits and at lower premiums."
The Attorney General claims that President Trump used allegedly fraudulent SFCs in connection with: (1) three loans from Deutsche Bank that closed in 2012 and 2013 (for properties known as the Doral, Trump Chicago and the Old Post Office in the District of Columbia); (2) one loan from Ladder Capital that closed in 2015 for the refinancing of 40 Wall Street; (3) surety bond insurance policies from Zurich North American issued between 2007 and 2021; (4) a Directors & Officers (D&O) policy underwritten by HCC Global in 2016; and (5) the procurement from the City of New York of an operating license for a golf course at Ferry Point in the Bronx in 2012. The matters that were allegedly misrepresented in the SFCs are set forth in the course of the discussion below.
Discussion
On appeal, defendants make two intertwined arguments in support of their view that, apart from any issue concerning the statute of limitations or the propriety of the relief granted by the judgment, the Attorney General's maintenance of this action constitutes a misapplication of section 63(12). First, defendants argue that the Attorney General lacks standing to bring this action because her doing so "vindicates no public purpose" (quoting People v Grasso, 54 AD3d 180, 196 [1st Dept 2008] [Grasso II]), in that defendants' conduct had no impact on the public interest, and any injury that may have been caused was sustained solely by defendants' ultra-sophisticated counterparties, which were fully capable, without the Attorney General's assistance, of monitoring their own interests and seeking redress for any violations of their own rights. Second, defendants argue that the now fully developed evidentiary record establishes that no fraud within the purview of section 63(12) was committed, since President Trump's SFCs neither "ha[d] the capacity or tendency to deceive" nor "create[d] an atmosphere conducive to fraud" (Northern Leasing, 193 AD3d at 75 [internal quotation marks omitted], quoting General Elec., 302 AD2d at 314). I believe that each of these arguments has merit and independently requires reversal of the judgment and dismissal of the complaint.
I. Because This Action Serves No Public Purpose, It is Unauthorized by Executive Law § 63(12)
Defendants' argument against the Attorney General's standing to maintain this action under section 63(12) — an argument they also made on their unsuccessful appeal from the denial of their motion to dismiss — is that even if their counterparties could have held them to account for any provable private injury in timely commenced proceedings, the Attorney General has no standing to sue defendants for the same conduct under section 63(12) because defendants' conduct had no impact on the public interest. Rather, defendants argue, any injury that may have occurred was sustained solely by defendants' ultra-sophisticated counterparties — financial institutions that were fully capable, without the Attorney General's assistance, of monitoring their own interests and seeking redress for any violations of their own rights. As the only "victims" of defendants' alleged wrongdoing were these financial giants, which enjoyed access to the highest level of legal, financial, and accounting advice in the bilateral, arm's-length transactions at issue, defendants conclude that this matter does not fall within the class of litigation that the Attorney General has standing to prosecute and defend — namely, "actions and proceedings in which the state is interested" (Executive Law § 63[1]).
Both Justice Moulton and Justice Higgitt reject defendants' standing argument. Justice Moulton (but apparently not Justice Higgitt) would reject the argument out of hand, taking the position that it is precluded, under the doctrine of law of the case, by our earlier decision affirming the denial of the present defendants' motion to dismiss (People v Trump, 217 AD3d 609, 610 [1st Dept 2023] [Trump I]).[FN9] However, both of my colleagues would reject the argument on the merits, agreeing with each other that the state's interest in "securing an honest marketplace" (Coventry First LLC, 52 AD3d at 346) is so broad as to encompass the pursuit of remedies for alleged misconduct in bilateral, arm's-length transactions between equally sophisticated commercial parties, without any need for a showing that anyone other than those sophisticated commercial parties was affected, or potentially could be affected, by the alleged misconduct. I respectfully disagree, as to both the merits and the effect of this Court's prior decision.
I turn first to the question of whether defendants' present argument is precluded by this Court's decision on the earlier appeal. At that juncture, in rejecting defendants' attempt to have the action dismissed at the pleading stage based on the absence of a state interest, we wrote: "The Attorney General is not suing on behalf of a private individual, but is vindicating the state's sovereign interest in enforcing its legal code — including its civil legal code — within its jurisdiction" (Trump I, 217 AD3d at 610). It must be borne in mind that this statement was made in reviewing the disposition of a pre-answer motion to dismiss, made at the outset of the action, before the development of a full record. The Court's decision does not state that the Attorney General could ultimately prevail in this action without establishing some sort of state interest, differentiated from the interests of the sophisticated institutional "victims" of defendants' alleged misconduct, of the kind that has historically been recognized as conferring parens patriae standing "to commence an action to protect a public interest" (People v Grasso, 11 NY3d 64, 69 n 4 [2008] [Grasso I]; see also id. ["To invoke the (parens patriae) doctrine, the Attorney General must prove a quasi-sovereign interest distinct from that of a particular party and injury to a substantial segment of the state's population"]; Grasso II, 54 AD3d at 196 [the Attorney General had no standing to maintain a suit to recover funds for the benefit of a for-profit corporation, into which a not-for-profit corporation had been converted, because the suit "vindicates no public purpose"]).[FN10] Accordingly, in my view, the doctrine of law of the case does not preclude us from considering defendants' standing argument on the merits.[FN11]
Justice Moulton takes the position that our earlier decision does preclude us from considering defendants' standing argument, reasoning that "[i]f defendants' arguments pertaining to the scope of Executive Law section 63(12) were persuasive, we would have dismissed the complaint in Trump I because the AG would not have had the standing or capacity to pursue the case and would not have alleged facts in support of an element of the claim or an enforceable right of recovery" (internal quotation marks omitted). While this might be a plausible reading of Trump I, nowhere does the decision state that, in allowing the case to proceed beyond the pleading stage, it was the Court's intention to relieve the Attorney General of her burden, as articulated by the Court of Appeals, "to prove a quasi-sovereign interest distinct from that of a particular party and injury to a substantial segment of the state's population" (Grasso I, 11 NY3d at 69 n 4 [emphasis added]).[FN12] In light of Grasso I and the other case law limiting parens patriae standing, and given the absence of any precedent authorizing an action under section 63(12) under these circumstances, Trump I should not be read to preclude consideration of the question of whether section 63(12) authorizes entry of judgment in favor of the Attorney General in a case in which, as here, a record extending to tens of thousands of pages gives no hint of how such a judgment would "vindicate[] [any] public purpose" (Grasso II, 54 AD3d at 197).[FN13] To that question I now turn.
Neither Justice Moulton nor Justice Higgitt cites any precedent holding that privately actionable conduct — standing alone, and without proof of any grounds for a belief that the public good would be jeopardized if enforcement of the relevant rules were left to private litigation by the parties concerned — suffices to support a judgment in favor of the Attorney General under section 63(12). Indeed, Justice Higgitt candidly admits that in this case, "we are confronted with an unprecedented use of the statutory power" conferred by section 63(12).
Justice Higgitt is correct in stating that the manner in which section 63(12) is being used in this action is unprecedented. Earlier uses of section 63(12) all involved a specifically public interest, apart from any injury to sophisticated commercial parties fully able to monitor their own interests and to seek redress through private litigation for any violations of their rights. For example, such actions often target deceptive or otherwise unlawful commercial conduct directed toward the general public, most of whom are unsophisticated and whose individual losses may not be large enough to justify private litigation.[FN14] Section 63(12) has also been used to attack deceptive conduct that influences the price of a publicly traded security, which is bought and sold anonymously on exchanges where traders rely on the issuer's public disclosures and do not conduct independent due diligence (see People v Credit Suisse Sec. [USA] LLC, 31 NY3d 622, 627 [2018] [investment bank misled investors by "misrepresent(ing) the quality of the mortgage loans underlying the securities" that the investment bank created and sold]; People v Greenberg, 21 NY3d 439, 446 [2013] [deceptive accounting practices leading to public disclosures "creating an impression of a healthy insurance business and bolstering AIG's stock price"]; Ernst & Young, 114 AD3d 569 [auditor's certification of Lehman Brothers' misleading financial statements prior to the latter's collapse]; People v Exxon Mobil Corp., 65 Misc 3d 1233[A], 2019 NY Slip Op 51990[U] [Sup Ct NY County 2019] [allegedly deceptive public disclosures by a publicly held energy company concerning climate change risk]). But neither the Attorney General nor either of my colleagues has identified any prior case in which section 63(12) was used, as it is being used here, simply to assert a claim that a sophisticated commercial party was duped, in a face-to-face, arm's-length transaction, into accepting a lower interest rate, or a lower insurance premium, than it would have accepted absent the alleged deception.
In this case, the Attorney General has not even attempted to demonstrate that the transactions she is scrutinizing had any effect whatsoever on any person or entity not a party to them. The transactions in questions did not involve any unsophisticated consumers, small investors, or small businesses. There was no effect on the price of any publicly traded security because the Trump Organization does not issue any publicly traded securities (cf. Credit Suisse, 31 NY3d at 627; Greenberg, 21 NY3d at 446; Ernst & Young, 114 AD3d 569; Exxon Mobil, 2019 NY Slip Op 51990[U], *19). There is no claim, and no evidence, that these transactions had any anticompetitive effect (cf. People v Coventry First LLC, 13 NY3d 108, 112 [2009] [bid rigging in the life settlement market]; People v Liberty Mut. Holding Co., Inc., 15 Misc 3d 1110[A], 2007 NY Slip Op 50574[U], *2 [Sup Ct NY County 2007] [bid rigging in the property and casualty insurance market], affd as mod 52 AD3d 378 [1st Dept 2008]) or that they carried the slightest potential to destabilize the financial system (cf. Credit Suisse, 31 NY3d at 627 [deceptive marketing of residential mortgage backed securities]; Ernst & Young, 114 AD3d 569 [certification of the misleading financial statements of Lehman Brothers, the broker-dealer whose collapse was a trigger of the 2008 meltdown]). Indeed, the Attorney General has presented no evidence that the transactions in question, even if they were as tainted as the Attorney General claims, would have any natural effect on the future credit and insurance transactions of the Trump Organization itself, inasmuch as the counterparties to future transactions would have the right and obligation to perform their own due diligence for each such transaction.
In light of the foregoing considerations, Justice Moulton's invocation of "antitrust law, . . . [the] Securities and Exchange Commission, and [the] Martin Act," is inapt. No one questions the power of government to protect the public by policing the marketplace, including transactions between sophisticated parties, through duly enacted and promulgated regulatory programs. This is not at all what is at issue here.[FN15] Rather, the Attorney General is construing section 63(12) to empower her to unwind a successful private transaction between sophisticated parties, without the slightest showing of a broader public effect of any kind, based on nothing more than the claim that false statements were (in the words of Supreme Court) "used repeatedly or persistently . . . to transact business." Since the phrase "repeatedly or persistently" is not further defined, conceivably the use of as few as two alleged falsehoods in conducting business would fall within the scope of the statute, under the Attorney General's analysis.
As to Justice Moulton's suggestion that "a counterparty may have little incentive to pursue a claim because its interests are aligned with the fraudster's" — in such a situation, how could the counterparty have been defrauded? Justice Moulton's suggestion that in some cases "it might be too costly for the counterparty to pursue a claim" has no relevance to the present case, in which the counterparties are vastly wealthy financial institutions and it is the Attorney General's theory that they were defrauded of hundreds of millions of dollars. If these banks and insurance companies did not think it worth their while to go to court to recover the damages that the Attorney General claims they suffered, it is not clear what public interest the Attorney General is vindicating by asserting claims the supposed victims did not care to pursue. It is no answer to say, as Justice Moulton does, that the purpose of section 63(12) is "to protect the public at large." While this is of course true, the question here is whether "the public at large" has any interest in the transactions at issue.
Most incongruous of all is Justice Moulton's attempt to justify the Attorney General's intervention in these private transactions on the ground that President Trump's alleged misrepresentation of his financial condition could "cascade . . . into [a] disaster" on the order of the system-wide liquidity crisis that attended the collapse of the residential mortgage-backed securities market in 2008. Justice Moulton's resort to high-minded but overblown rhetoric concerning "the wreckage of the residential mortgage-backed securities market" highlights his need to cast the run-of-the-mill transactions at issue into what they manifestly were not — high-risk financial acrobatics imperiling the global economy — for the purpose of shoehorning the subject transactions into the scope of section 63(12) as it has always been understood.[FN16] The theory of the causation of the 2008 economic meltdown, under which the use of section 63(12) might have helped to avert it, is that the crisis was caused, at least in part, by systemic, industry-wide misrepresentation of the risk of default posed by certain categories of home loans that were assembled into portfolios backing publicly traded debt securities. However, as previously noted, none of the transactions at issue in this case resulted in the issuance of publicly traded securities, or had any effect on publicly traded securities, which the Trump Organization does not issue. Furthermore, the loans to the entities controlled by President Trump were not part of a broad category of debt whose risk was so systematically misrepresented or underestimated as to threaten the liquidity of the financial system. Finally, no one claims that barring some unforeseeable economic breakdown, a person of President Trump's undisputed wealth — which was always at least $2 billion during the relevant period, even according to the Attorney General — presented a substantial risk of defaulting on his obligations in the transactions at issue.
There is a debate as to whether one of the chief causes of the failure in risk assessment that led to the 2008 financial crisis (assuming that such a failure occurred) was a lack of government regulation or, as some argue, misguided and incompetent government regulation. Although Justice Moulton's opinion appears to take a side in that debate, I do not see how that controversy has any relevance to our task in deciding this appeal. The Attorney General's prosecution of this action is not part of any coherent "prophylactic" government regulatory program, however wisely or poorly conceived, but an unprecedented ad hoc intervention in successful, discrete, private transactions affecting only the sophisticated parties directly involved.[FN17]
Justice Higgitt rejects my view that transactions between sophisticated parties, with no discernable effect on anyone else, should be excluded from the scope of the Attorney General's power under section 63(12), on the ground that markets are "rapidly evolving and increasingly convoluted," and our state "claim[s] to be on the forefront" of these developments. Justice Higgitt offers this commentary in support of his view that a financial institution like Deutsche Bank, in dealing face-to-face with a high-net-worth customer applying for a loan, should be treated by the Attorney General with the same protective solicitude that her office would afford to consumers misled about their dishwashers (General Elec., 302 AD2d at 314) or subjected to deceptive credit-card telemarketing (Telehublink, 301 AD2d at 1007) or to stock market investors who rely on publicly available information (Greenberg, 21 NY3d at 446). Notwithstanding the rhetorical flourish, Justice Higgitt is unable to suggest how any of the transactions at issue actually impaired the public interest, nor does he offer any concrete reason why, in the absence of such a public interest, the monitoring and defense of the private interests of sophisticated commercial entities should not be left to the managers of those entities.
In adopting the Attorney General's reading of the statute, my colleagues are empowering her office to attack, at will, virtually any business transaction, regardless of its success or failure, and in the absence of any discernable effect on the public. This is because — as a moment's reflection will disclose — a substantial business deal that goes awry (which none of the transactions at issue did) typically will give rise to a claim by the losing party that, in hindsight, the transaction was induced by some misrepresentation made by the counterparty. This is not surprising, since it is easy for inaccuracies to creep into the description of large business enterprises and certain kinds of representations — such as estimates of value, the kind of representation chiefly at issue here — are inherently subjective and disputable. Indeed, every day on which appeals are argued before this Court, at least one of the appeals (and frequently more than one) involves allegations of fraud in business transactions between sophisticated persons or entities — allegations frequently more serious than those made by the Attorney General in this case. By the reasoning of my colleagues, the Attorney General has the power to involve her office in any one of these disputes and to bring her own suit under section 63(12) against any defendant accused of "repeated" fraud, even if the counterparty's suit falls short under the more exacting rules applicable to common-law fraud claims. By holding that section 63(12) authorizes the Attorney General to pore over the records of private transactions, even successful deals, years after they closed, in the hope of finding at least two inaccurate or disputable statements on which to predicate a lawsuit, without any need to identify a greater public interest at stake, my colleagues invite arbitrary, unpredictable, and inevitably selective use of the judicial system for political ends, and not to "vindicate[] [any] public purpose" (Grasso II, 54 AD3d at 196).
And regrettably, the record makes plain that in this matter, we see an attempt to use section 63(12) and the judicial system for political ends. The proof of this is found not in anything written by me but in the words of the Attorney General herself. Specifically, as previously noted, the Attorney General, in her 2018 election campaign for her current office, repeatedly promised the voters that her top priority, upon being sworn in, would be to bring down President Trump and his real estate empire. The Attorney General made these statements long before February 27, 2019, the date of the supposed trigger for her investigation of President Trump and the other defendants — namely, the testimony before the House of Representatives Committee on Oversight and Reform (the House Oversight Committee) of Michael Cohen, the convicted perjurer and disbarred attorney, in which he claimed that the SFCs of President Trump, his former client, contained inflated valuations of his assets.
By far, the bulk of Cohen's testimony before the House Oversight Committee concerned matters having no relevance to this action. Cohen's testimony about the SFCs at the February 27th hearing was restricted to a handful of repetitive, conclusory, and unsubstantiated assertions that the SFCs contained inflated valuations (e.g., "It was my experience that Mr. Trump inflated his total assets when it served his purposes, such as trying to be listed among the wealthiest people in Forbes, and deflated his assets to reduce his real estate taxes"). Cohen — who, as he admitted at the hearing, is "not a CPA" — offered no analysis demonstrating that the valuations in the SFCs were inflated, nor did he claim to have had a role in preparing the SFCs.[FN18] Furthermore, the next day, in testimony before the House Permanent Select Committee on Intelligence, Cohen admitted that he did not recall President Trump ever "ask[ing] [him] to inflate the numbers" in the SFCs.
Given the sketchiness of Cohen's congressional testimony about the SFCs, and his dubious credibility as a man who had just pleaded guilty to (among other offenses) willful tax evasion and making a false statement to a bank on a credit application, it is inconceivable that his testimony would have triggered an investigation by the Attorney General but for the political considerations involved. Those political considerations are amply attested by the Attorney General's earlier campaign promises to use her office's powers to pursue President Trump in any way she could, as detailed in part below.
The Attorney General's campaign promises to pursue President Trump are matters of public record and are cited in the record of this appeal. For example, on September 28, 2018, the NowThis Impact YouTube channel posted a video in which the Attorney General, about two months before the election, referred to President Trump as "this illegitimate president" and stated:
"I believe that this president is incompetent. I believe that this president is ill-equipped to serve in the highest office of this land. And I believe that he is an embarrassment to all that we stand for. He should be charged with obstructing justice. I believe that the president of these United States can be indicted for criminal offenses and we would join with law enforcement and other attorneys general across this nation in removing this president from office" (YouTube, NowThis Impact channel, Sept. 28, 2018, Why Letitia James Wants to Take on Trump as NY's Attorney General, https://www.youtube.com/watch?v=D1yj0NKSsuU [last accessed July 24, 2025]).
The Attorney General made numerous similar statements while campaigning for her current office in 2018, all before Michael Cohen's testimony. On June 27, 2018, after the announcement of her candidacy, the Attorney General stated on Twitter (now known as X) that she "look[ed] forward to working . . . to help Democrats take on Donald Trump" (Tish James, X.com, https://x.com/TishJames/status/1011984553899159553 [June 27, 2018, 10:48 a.m.]). Although the web page has since been removed, her website apparently promised "a review of Trump-related real estate transactions," purportedly on the ground that the Trump Organization had "suddenly started paying cash for properties after years of operating their businesses exclusively by borrowing money." In a campaign speech delivered on July 18, 2018, the Attorney General referred to President Trump as an "illegitimate president" and stated that she "look[ed] forward to going into the office of Attorney General every day" and "suing him" (Facebook.com, July 19, 2018, https://www.facebook.com/watch/?v=203059860348974 [last accessed July 24, 2025]). In an August 2018 interview with Yahoo News, the Attorney General declared that President Trump "has to worry about three things: [then-special counsel Robert] Mueller, [Michael] Cohen, and Tish James. We're all closing in on him" (Hunter Walker, New York race could spark new Trump investigation, Yahoo!news, [Aug. 6, 2018], https://www.yahoo.com/news/new-york-race-spark-new-trump-investigation-131610480.html [last accessed July 16, 2025]). In the same interview, the Attorney General criticized former Attorney General Eric Schneiderman for not pursuing a case against President Trump under the emoluments clause of the United States Constitution and promised that she "as the next attorney general will be very aggressive and will not miss a beat" (id.). On August 6, 2018, the Attorney General tweeted, "I've got my eyes on Trump Tower" (Tish James, X.com, https://x.com/TishJames/status/1026555470788485120 [Aug. 6, 2018, 3:47 p.m.]) and declared that her takedown of President Trump was "just getting started" (Tish James, X.com, https://x.com/TishJames/status/1026582341198774275 [Aug. 6, 2018, 5:34 p.m.]). On August 21, 2018, the Attorney General tweeted that President Trump was "running out of time" and warned that, upon taking office, she would investigate him and his "cronies" (Tish James, X.com, https://x.com/tishjames/status/1031949451324284929 [Aug. 21, 2018, 1:01 p.m.]). On September 1, 2018, the Attorney General stated she would "take on [President Trump] & his business in New York" (Tish James, X.com, https://x.com/TishJames/status/1035901214016372737 [Sept. 1, 2018, 10:44 a.m.])
Between winning the election in November 2018 and the Cohen testimony the following February, the Attorney General continued making statements in a similar vein but extended her threats beyond President Trump even to his family. For example, she stated in an interview published on NBCNews.com on December 12, 2018, that "[w]e will use every area of the law to investigate President Trump and his business transactions and that of his family as well," and that the investigation would envelop "anyone in his orbit" (Allan Smith, Incoming New York attorney general plans wide-ranging investigations of Trump and family, NBC News [Dec. 12, 2018], https://www.nbcnews.com/politics/donald-trump/incoming -new-york-attorney-general-plans-wide-ranging-investigations-trump-n946706 [last accessed July 16, 2025]).
Justice Moulton states that upon assuming office, the Attorney General was "confronted" by Cohen's testimony, as if Cohen's unsubstantiated and unelaborated accusations concerning the SFCs — allegations no different than those made in hundreds of business tort actions filed in this state every year — somehow compelled the Attorney General, notwithstanding any personal reluctance she may have felt, to start the investigation leading to this proceeding. Of course, as shown by the campaign promises described above, the Attorney General did not need to be "confronted" with any compelling evidence to initiate an investigation of President Trump. Moreover, Cohen's vague testimony about the SFCs was no more compelling than the allegations in hundreds of lawsuits pending in New York County Supreme Court at the time. Why did the Attorney General choose to start investigating President Trump — who timely made every payment required of him in the subject transactions, and whose conduct in these matters had not elicited a complaint from any counterparty to whom he had provided the SFCs — rather than any of the hundreds of businesspersons and entities actually being sued for misrepresentation in the courts of this state? The question answers itself.
Justice Moulton asserts that "the 'political' choice [for the Attorney General] would have been to not bring this case, thereby avoiding a fight with a powerful adversary." In view of the Attorney General's numerous campaign promises to go after President Trump if she were elected, Justice Moulton's statement could not be more at variance with the facts. The implicit characterization of the Attorney General's commencement of this action as the apolitical course also ignores the polarized political environment that prevails today. And while no one would deny that President Trump is "a powerful adversary," in litigation brought against him in his individual capacity by the Attorney General, even a person of his wealth and prominence cannot match the resources available to the government.
To be clear, I do not contend that the Attorney General's campaign promises or the infirmity of Cohen's congressional testimony would preclude her from bringing proceedings against President Trump had her investigation uncovered recognized grounds for suit in defense of the public interest, whether under section 63(12) or some other provision of law. However, after having conducted an investigation of approximately three years' duration, all that the Attorney General came up with was a claim that defendants had inflated property valuations in bilateral, arm's-length dealings with ultra-sophisticated financial institutions that are fully able to monitor their own interests and to seek redress for any violations of their rights. None of the sophisticated counterparties had raised any complaint about the targeted transactions, and President Trump had timely paid every dollar he owed. Nothing in the alleged misconduct (if there was any misconduct) has the slightest bearing on the public interest. No Attorney General had ever before brought suit based on such a set of facts.
In sum, the words of the Attorney General herself establish, beyond a reasonable doubt, that contrary to the view of my colleagues, this action was commenced not to vindicate the public interest in "securing an honest marketplace" (Coventry First, 52 AD3d at 346) — or, in Justice Moulton's words, to maintain "market hygiene" — but out of partisan political motives. Whatever one may think of President Trump's character and policies, section 63(12) was not enacted for the Attorney General to use as a stick with which to beat the opponents of her political party. But this is the way section 63(12) is being used here — arbitrarily, selectively, and politically — and the way it will be used in the future, as the unfortunate result of my colleagues' approval of the entry of judgment for the Attorney General under section 63(12) based on successful, private transactions between sophisticated parties that had no effect on the public interest. As expressed by one of the amici curiae, our approval of the entry of judgment for the Attorney General in this case will "allow[] political partisans to arbitrarily pick and choose whom to punish and whom to favor" (NY St Cts Elec Filing [NYSCEF] Doc No. 173, Brief of Job Creators Network Foundation, amicus curiae, in support of defendants-appellants, at 7).
The precedent for arbitrary, selective, politically motivated use of section 63(12) this Court is creating by placing its stamp of approval on the judgment in this case will deter those doing business in the state from opposing the Attorney General and her party politically, whether through speaking out, running for office, making political donations, or any other form of political involvement. Moreover, as several of the amici point out, our approval of the Attorney General's unprecedented use of section 63(12) is likely to deter business investment in our state. To quote one of the amici: "Supreme Court's vast expansion of Executive Law § 63(12) creates the risk that honest businesspeople engaged in good-faith dealing that are mutually profitable for all parties could find themselves ensnared in litigation, subject to massive fines, and tarred as fraudsters merely because they found themselves on [the Attorney General's] bad side" (NYSCEF Doc No. 173 at 10). This case shows that this concern is not just theoretical.
The deterrent effect on political activity and investment will be multiplied by the absence, in an action brought under section 63(12), of the elements of scienter, reliance, and damages that are part of a common-law fraud cause of action. To quote another one of the amici: "[T]he statute provides a license for the Attorney General to pursue anyone based on any alleged inaccuracy and regardless of whether anyone has been harmed, just as she did here. By removing the inherent protections of traditional fraud law, [section 63(12)] enables political opponents to be prosecuted, albeit civilly, under a regime of strict liability, regardless of any actual culpability or mental state" (NY St Cts Elec Filing [NYSCEF] Doc No. 177, Brief American Center for Law and Justice, amicus curiae, in support of defendants-appellants, at 19). As one of President Trump's former political rivals put it, the judgment before us is likely to "creat[e] fear of arbitrary enforcement against entrepreneurs who seek public office or raise their voices as citizens in a way that politicians dislike" (Jeb Bush & Joe Lonsdale, Elon Musk and Donald Trump Cases Imperil the Rule of Law, The Wall Street Journal, Feb. 21, 2024, available at https://www.wsj.com/opinion/trump-and-musk-cases-imperil-the-rule-of-law-new-york-delaware-courts-business-266a5559 [last accessed July 22, 2025]).
My colleagues' elimination of any requirement that a judgment under section 63(12) be supported by proof of some public interest in the matter, combined with the absence of key elements of a common-law fraud claim (i.e., scienter, reliance and damages), will inevitably make the use of the statute so selective and arbitrary as to create serious doubts as to its constitutionality, as applied, under the First Amendment to the United States Constitution, which "prohibits government officials from wielding their powers selectively to punish or suppress speech" (National Rifle Assn. of Am. v Vullo, 602 US 175, 198 [2024] [emphasis added]).[FN19] In Vullo, the United States Supreme Court held — unanimously, and only last year (after the judgment appealed from was entered) — that the National Rifle Association (NRA) stated a claim for violation of its First Amendment rights by alleging that the superintendent of this state's Department of Financial Services had "pressured regulated entities to help her stifle the NRA's pro-gun advocacy by threatening enforcement actions against those entities that refused to disassociate from the NRA and other gun-promotion advocacy groups" (id. at 180). The targeting of regulated companies doing business with a disfavored political advocacy group, the Court held, would constitute the "use [of] the power of the State to punish or suppress disfavored expression" (id. at 188). Given the amorphous and essentially limitless scope that my colleagues read into section 63(12), we may expect that the provision will be regularly used as a tool of "viewpoint discrimination" of precisely the kind that Vullo condemned under the First Amendment as "uniquely harmful to a free and democratic society" (id. at 187).
Although not directly on point, another decision that the United States Supreme Court issued last year, Gonzalez v Trevino (602 US 653 [2024]), presents an illuminating analogy to this case. The plaintiff in Gonzalez, a member of a city council, had been arrested on charges of violating a Texas anti-tampering statute. She brought an action in federal court against the mayor and the police chief, among others, alleging that the arrest had been made in retaliation for her political activities and was therefore a violation of her First Amendment rights, even though she conceded that probable cause supported her arrest (id. at 656-657). The Supreme Court held that, to support the plaintiff's claim that she had been the victim of impermissible selective enforcement of the anti-tampering law, it sufficed for her to offer "survey" data indicating that "no one has ever been arrested for engaging in . . . [the] kind of conduct [for which she had been arrested] — especially when the . . . prohibition is longstanding and the conduct at issue is not novel" (id. at 658).
Although defendants are not asserting an affirmative selective enforcement claim against the Attorney General, this action certainly appears to constitute an instance of selective enforcement of section 63(12) in retaliation for President Trump's exercise of his First Amendment right to participate in the political process.[FN20] Neither the parties, the amici, nor any of us on the bench have identified any precedent for a suit under section 63(12) based on bilateral, arm's-length transactions between equally sophisticated commercial parties, where there was no showing of any possible impact on the public at large or, indeed, on anyone other than the parties directly involved.[FN21] Stated otherwise, never before has the Attorney General brought a section 63(12) action that asserts nothing more than a fraud claim that, if valid, one corporate titan could have asserted (but did not actually assert) against another corporate titan. The absence of any precedent for a section 63(12) action under these circumstances is confirmed by a study conducted by the Associated Press of 150 reported actions brought under the statute, which found that the Trump Organization is "the only big business . . . that was threatened with a shutdown without a showing of obvious victims and major losses" (Bernard Condon, Dissolving Trump's Business Empire Would Stand Apart in History of NY Fraud Law, Associated Press News, Jan. 29, 2024, https://apnews.com/article/trump-fraud-business-law-courts-banks-lending-punishment-2ee9e509a28c24d0cda92da2f9a9b689 [last accessed July 22, 2025]).
Moreover, there is no question that the kind of "fraud" with which defendants are charged — providing counterparties with estimates of property values that some experts will say are inflated (and other experts will find defensible) — is conduct that is not only "not novel" but is a typical occurrence in the real estate industry. Indeed, as more fully discussed below, the rule of the Financial Accounting Standards Board (FASB) under which the SFCs were prepared (Accounting Standards Compilation [ASC] 274 [Personal Financial Statements]) specifically contemplates that reported estimates of property value in a personal financial statement will be no more than subjective and disputable estimates that do not necessarily conform to Generally Accepted Accounting Principles (GAAP), as the disclaimers in the SFCs prominently advised the sophisticated parties to whom they were directed. And as defendants' experts explained to the trial court (as more fully discussed below), it is to be expected that the owner of a property and a potential lender will assign different values to a unique commercial property. In the words of one well-known business executive, "you might as well find guilty every real estate developer on Earth" (Tim Hains, O'Leary: "What Fraud?: NY Judge Fines Trump for Doing Something Real Estate Developers Do Every Day," RealClearPolitics, Feb. 20, 2024, https://www.realclearpolitics.com/video/2024/02/20/oleary_new_york
_judge_fined_trump_for_doing_something_real_estate_developers_do_every_day.html [last accessed July 22, 2025]).
Justice Moulton takes the position that, because the broad language of section 63(12), read in the abstract and without reference to how the statute has actually been used over the previous seven decades, does not seem literally to preclude the Attorney General's unprecedented use of it in this case, we must approve that use of it as a matter of statutory construction. However, even assuming that Justice Moulton is correct in stating that section 63(12) "does not textually limit the type of case that the Attorney General may bring [thereunder]," it does not follow that a court must allow the Attorney General to stretch the statute's scope to its extreme limits in a manner never before seen in the history of New York jurisprudence. As I have discussed, the way in which the statute is being used in this case raises grave constitutional concerns under the First Amendment.[FN22] I would adhere to the rule that "[a] statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score" (Tauza v Susquehanna Coal Co., 220 NY 259, 267 [1917] [Cardozo, J.] [internal quotation marks omitted]; see Delgado v State of New York, 39 NY3d 242, 274 [2022] [Wilson, J., concurring] ["We . . . look not to the most natural construction of the statute, but the interpretation that avoids constitutional impropriety"]; Overstock.com, Inc. v New York State Dept. of Taxation & Fin., 20 NY3d 586, 593 [2013]; McKinney's Cons Laws of NY, Book I, Statutes, § 150[c]).
Here, our mandate to avoid statutory constructions likely to "precipitate embarrassing constitutional questions" (Matter of Jacob, 86 NY2d 651, 668 n 5 [1995]) counsels us to construe section 63(12) so as to tether the immense power it confers upon the Attorney General to some showing of a concrete public interest, as historically understood. No such public interest has been shown here. This being the case, I would dismiss the entire action on the ground that the full record reveals the subject transactions to be beyond the Attorney General's purview under section 63(12) (cf. People v Domino's Pizza, Inc., 2021 NY Slip Op 30015[U], *1, *26 [Sup Ct, NY County 2021] [where the Attorney General sued a restaurant franchisor under section 63(12) for allegedly defrauding its franchisees into using a deficient store management software program (PULSE), the court, in dismissing the claim after trial, observed that "(t)hese are bilateral business transactions between Domino's and its individual franchisees, many of whom own multiple franchises. . . . Domino's makes a compelling argument that any disputes regarding the performance of PULSE should be in the nature of private contract litigation between Domino's and its franchisees, not a law enforcement action under a statute designed to address public harm flowing from persistent or repeated fraud and deception"]).
Justice Moulton seeks to avoid addressing the constitutional concerns raised by his construction of section 63(12), which I have discussed above, chiefly by dismissing them as not having been preserved for our review. As Justice Moulton acknowledges, however, defendants did unsuccessfully raise such constitutional arguments in their opposition to a proceeding for enforcement of a subpoena before this action was commenced, in support of their motion to dismiss this action, and on their ensuing appeals (see Trump I, 217 AD3d at 610; Trump Org., Inc., 205 AD3d at 625-627). Even if defendants did not raise these constitutional arguments on their motion for summary judgment, they did maintain their position that this action, because the matters involved do not implicate the public interest, is beyond the Attorney General's power under section 63(12).[FN23] Further, on this appeal, in support of their argument concerning the construction of the statute, defendants have noted that the Attorney General's near-limitless interpretation of her own powers under section 63(12) would "authorize [her] to pursue virtually any individual or business," thereby "transform[ing] the statute into a vehicle for arbitrary and standardless enforcement, which raises grave constitutional concerns." Defendants further contend that the Attorney General's "interpretation [of section 63(12)] raises grave constitutional problems by authorizing [her] to violate the First Amendment through targeted or retaliatory enforcement on the basis of political viewpoint."[FN24] Thus, the question of the scope of the power granted by section 63(12) is squarely before us on this appeal and, in deciding that issue, we have a duty to be cognizant of the constitutional concerns that defendants have raised and that, indeed, are apparent from the face of the record. Contrary to Justice Moulton's suggestion, to follow our duty to resolve an issue of statutory construction duly presented to us, and to do so with sensitivity to serious constitutional concerns, is not to render an "advisory opinion."[FN25]
Notably, if the Attorney General's and my colleagues' view of the scope of section 63(12) were correct, it would be surprising that the Attorney General's office did not make that argument in Grasso II (54 AD3d 180). In Grasso II, the Attorney General, as authorized by Not-for-Profit Corporation Law (N-PCL) § 720(b), asserted statutory causes of action for unlawful transfer of corporate assets and breach of fiduciary duty against a former officer of a not-for-profit corporation, based on the officer's receipt of an allegedly excessive compensation package (see Grasso I, 11 NY3d at 68). During the pendency of the action, the not-for-profit corporation was converted into a for-profit corporation. We held in Grasso II that the Attorney General's authority to prosecute the statutory claims under the N-PCL "lapsed" upon the conversion of the entity into a for-profit corporation (Grasso II, 54 AD3d at 183) because, after the conversion, "[t]he Attorney General's continued prosecution of these causes of action . . . vindicates no public purpose" (id. at 196). On that appeal, Attorney General Spitzer did not argue that his standing to assert the claims survived the conversion by virtue of his power to sue for "fraud" and "illegality" under section 63(12) — which would appear to be the implication of the view of the scope of section 63(12) advocated by the present Attorney General in this action. Indeed, section 63(12) is not cited anywhere in Attorney General Spitzer's brief on the Grasso II appeal or in either the majority opinion or the dissenting opinion in this Court. Thus, the present Attorney General's position that her power under section 63(12) extends to alleged misconduct in bilateral transactions between sophisticated parties that have no impact on anyone else, much less on the general public, appears to be a new invention of her own devising, fashioned specifically for the purpose of prosecuting the present defendants.
Justice Moulton's discussion of Grasso II completely misses the mark. If the scope of section 63(12) extends as broadly as my colleagues and the Attorney General claim, why is it that the then-Attorney General, after he lost standing under the N-PCL in Grasso II due to the corporate conversion, did not seek to continue to maintain the action under section 63(12)? Under the reasoning of the present Attorney General and my colleagues, section 63(12) would have applied to the corporate misconduct alleged in Grasso II, regardless of the inapplicability of the N-PCL and regardless of the absence of any public interest. That the possibility of the Attorney General retaining standing in Grasso II under section 63(12) occurred neither to this Court nor to the Attorney General at that time speaks volumes about the poor grounding of the extremely broad theory of the scope of section 63(12) propounded by the present Attorney General, and adopted by my colleagues, in this case.
Before leaving the issue of the Attorney General's standing, I return briefly to the effect, under the doctrine of law of the case, of our decision on the previous appeal. As previously discussed, I do not believe that our rejection of defendants' argument against the Attorney General's standing on the appeal from the denial of the motion to dismiss binds us, as law of the case, on this subsequent appeal from the final judgment entered upon a fully developed record that fails to disclose any public purpose served by this litigation (see Chrystie LLC v LeDoux, 82 AD3d 681, 682 [1st Dept 2011] ["The law of the case doctrine is inapplicable where . . . a summary judgment motion follows a motion to dismiss"] [internal quotation marks omitted]). However, even where the doctrine of law of the case applies by its own terms, "[e]very court retains a continuing jurisdiction generally to reconsider any prior intermediate determination it has made" (Aridas v Caserta, 41 NY2d 1059, 1061 [1977]; see also People v Evans, 94 NY2d 499, 503 [2000] ["law of the case is necessarily amorphous in that it directs a court's discretion but does not restrict its authority"] [internal quotation marks omitted]; id. at 504 [describing law of the case as a "flexible doctrine"]). As Justice Moulton himself recognizes, it is appropriate for a court to depart from the law of the case "where there is a need to correct clear error" (National Mortgage Consultants v Elizaitis, 23 AD3d 630, 630 [2d Dept 2005]; see also Gliklad v Cherney, 140 AD3d 598, 598 [1st Dept 2016]).
Notwithstanding the law of the case doctrine, we should exercise our power to reconsider our previous ruling on the standing issue in view of the extraordinary circumstances presented by this action. The extraordinary circumstances to which I refer are (1) the grave constitutional concerns raised by the unprecedented expansion of the scope of section 63[12 represented by this action, (2) the fact that the action is being levied against the sitting president of the United States, thereby interfering with the political life of the entire nation, and (3) the Attorney General's unmistakably political motivation for bringing this action, as evidenced by her own public statements. Accordingly, even if the law of the case doctrine would otherwise apply, I believe that we should depart from it, reverse the judgment, and dismiss the complaint on the ground that the action concerns matters outside the purview of the Attorney General under section 63(12). However, as stated at the outset of this opinion, even if the Attorney General had standing to pursue this action, I would reverse the judgment on the ground that the Attorney General has failed to prove her case. In the next two sections of this opinion, I will explain my reasons for reaching that conclusion.
II. The Record Establishes that Defendants Are Not Liable On the First Cause of Action, As the SFCs Were Not "Fraudulent" Under Executive Law § 63(12).
As previously noted, the test for fraud under section 63(12) is whether the targeted act "has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud" (General Elec., 32 AD2d at 314).[FN26] In adjudicating this case, Supreme Court quoted this standard but disregarded it. In the order disposing of the summary judgment motions, the court held that the Attorney General was required only to prove that the SFCs were "false and misleading," and that the defendants had "repeatedly or persistently used the [SFCs] to transact business" to sustain the standalone Executive Law § 63(12) claim—nothing more. Likewise, in its decision after trial, the court held that plaintiff need only prove that "defendants used false statements in business." Thus, under Supreme Court's view, falsity was all that is required to be shown. In effect, the court adopted a strict liability standard for business representations. This was error.
Like Justice Moulton, I am not persuaded by the Attorney General's attempt to salvage Supreme Court's analysis by recasting it as excluding "mere trifles or falsity irrelevant to the business being conducted," but including matters by which "an ordinary person, even the ignorant, the unthinking, and the credulous individual, would have been deceived" (internal quotation marks omitted). In my view, the standard of "a capacity or tendency to deceive" must be applied with the nature of the defendant's counterparties in mind, as well as the business context in which the statements at issue were made. In this case, defendants were not issuing representations to the impersonal securities market or to the general public, much less to "the ignorant, the unthinking [or] the credulous," but to highly sophisticated banks, insurance companies and governmental entities. Whether the SFCs had "a capacity or tendency to deceive" must be determined in light of the identities of the counterparties to which they were actually directed and in light of how the SFCs would have been "understood in the relevant marketplace" (HSH Nordbank AG v UBS AG, 95 AD3d 185, 193 [1st Dept 2012]).
Viewing the SFCs in light of the sophistication of the counterparties to which they were provided, and in light of the nature of the marketplace in which they were disseminated (including the legal rules governing that marketplace), it is plain, upon a review of the entire record now before this Court, that the SFCs had no "capacity or tendency to deceive" and did not "create[] an atmosphere conducive to fraud" (Northern Leasing, 193 AD3d at 75 [internal quotation marks omitted], quoting General Elec., 302 AD2d at 314). In summary, the valuations set forth in the SFCs were inherently subjective and subject to debate; the SFCs were replete with disclaimers alerting counterparties to departures from GAAP and advising them to do their own due diligence and to reach their own conclusions as to asset values, as the law in any event required them to do for their own protection; and the cover letter from the compiling accountant told the reader in no uncertain terms that the accountant "ha[d] not audited or reviewed the accompanying financial statement" and therefore could not certify its compliance with GAAP. Moreover, the record establishes that, given President Trump's undisputed extraordinary wealth, any inaccuracies there may have been in the valuations set forth in the SFCs had no impact on the terms of the subject transactions.
Justice Moulton rightly rejects the Attorney General's argument that whether President Trump's SFCs had the tendency to deceive should be viewed from the perspective of "the ignorant, the unthinking and the credulous" (Guggenheimer, 43 NY2d at 273). However, he then undoes the significance of that determination by taking the position that whether a given SFC had a tendency to deceive should be determined without reference to the way in which SFCs are actually used by their intended audience of financial and commercial institutions. I do not believe that this reasoning can withstand scrutiny. The record establishes that it is the universal practice among the sophisticated recipients of SFCs to treat such a document as the starting point for the user's independent investigation and analysis of the value of the preparer's assets. In determining whether an SFC has a tendency to deceive, it is simply not realistic to ignore the way such documents are actually used in the real world and instead pretend that users take them at face value. This does not mean that no SFC can ever be "fraudulent" within the meaning of section 63(12), but it does mean that an SFC cannot logically be deemed fraudulent under the statute in the absence of some obstruction to the user conducting the usual due diligence and independent analysis. No such obstruction has been shown here.
Contrary to Justice Moulton's mischaracterization of my position, I am not arguing that the determination of whether a defendant has violated section 63(12) should be "tie[d] . . . to whether a counterparty exercised due diligence or justifiably relied on the [allegedly] fraudulent conduct." I agree that whether the particular counterparty in fact conducted due diligence, or in fact justifiably relief on the subject representation, is not a necessary element of the Attorney General's case under the statute. However, to reiterate, whether a defendant's representations to professionals in a given industry had a "capacity or tendency to deceive" or created "an atmosphere conducive to fraud" (General Elec., 302 AD2d at 314) cannot be determined in a vacuum, without considering the generally accepted conventions and usages of that industry. If the universal practice in the relevant industry is not to take representations such as the SFCs at face value, to hold that the SFCs nonetheless had a "capacity or tendency to deceive" is to fashion an artificial construct of fraud — to treat the sophisticated, professional recipients of the SFCs as if they were naive consumers or small investors. Nothing in section 63(12) or the case law thereunder requires us to ignore reality in this fashion.[FN27]
A. The Valuations in the SFCs Were Subjective Estimates Subject To Dispute, Were So Understood in the Credit Industry, and the SFCs Contained Extensive Disclaimers Instructing Users To Rely on Their Own Due Diligence, Not Defendants' Valuations; Therefore, the SFCs Were Not "Fraudulent" Within the Meaning of Executive Law § 63(12).
Turning first to the nature of the asset valuations, Supreme Court apparently took the view that valuations are "objectively" either right or wrong.[FN28] However, expert testimony in the record establishes that, for a unique asset for which a current market value cannot be obtained with certainty, an appraiser has a choice of different methodologies by which to value the asset, and these different methodologies may yield significantly different valuation figures. As defendants' accounting expert Dr. Eli Bartov testified, a valuation is "an opinion on price derived from a valuation model" and, as an opinion, "can never be objective." Valuations of an asset are "subject to substantial variation," depending on the definitions, assumptions, and methodologies chosen by those preparing the valuation.[FN29] Thus, the valuation process is inherently subjective, and the Attorney General's disagreement with the valuations of certain assets set forth in the SFCs, and with the supporting opinions of defendants' experts, did not establish "fraud" within the meaning of section 63(12).[FN30]
President Trump's SFCs for 2011 through 2021 were prepared in the format of a personal financial statement, a document that is not audited and so does not include an accountant's certification that the financial condition is stated in accordance with GAAP (in fact, the compiling accountant of a personal financial statement explicitly disclaims expressing any such opinion). [FN31] Personal financial statements are governed by the aforementioned ASC 274 promulgated by the FASB for use by individuals to issue compilation reports on their assets and liabilities. As explained by defendants' experts, preparers of compilation reports are afforded significant latitude by ASC 274 to choose the valuation methods they may use to value assets and liabilities. ASC 274 leaves it to the discretion of the preparer which method and assumptions to use so long as they are reasonably consistent with economic theory. Issuers of SFCs, such as President Trump, may rely on methods and assumptions in formulating estimated current values that may be inherently different from those used by appraisers and lenders, and there is no requirement that the same method be used for all assets in the same group.
ASC 274 uses a unique definition of value — namely, "Estimated Current Value," which applies only to personal financial statements and allows a preparer to employ forward-looking, hypothetical estimates of future value, based on the preparer's long-term planned course of action for the asset (see ASC 274-10-55-6 ["Information that may be used in determining the estimated current values of investments in real estate . . . includes . . . (t)he discounted amounts of projected cash receipts and payments relating to the property or the net realizable value of the property, based on planned courses of action"] [emphasis added]). At trial, Dr. Bartov testified that this means that ASC 274 allows a preparer to value the asset based on its anticipated value "someday" in the future, "when you complete all your plans" for the asset. Dr. Bartov offered a hypothetical example of this:
"So let's say you have a lot today that you bought it for a million dollars today. And you plan to build a hotel that will take you five years to build. But, after five years you believe that once you complete the building of the hotel you can sell the hotel for fifty million dollars. . . . So the value today of this lot is not one million dollar[s], it's fifty million [after expense]. But fifty million is what you're going to get five years from now. So, . . . you have to compute the present value, the current value is the present value of the fifty million dollars; meaning, you have to discount the future value to the present. And this is where the 'current' [is] coming from. Estimated current value, is not the value of the transaction that would happen currently that would happen today. 'Estimated current value' mean[s] that you take your prediction about the future and you collapse it to the present to compute the present value or the current estimate [of] the value."
In alleging that President Trump used inappropriate valuation methods, the Attorney General failed to consider the wide latitude that ASC 274 affords preparers in choosing asset valuation methods and the assumptions underlying them, including projections of future value based on a planned course of action. As Dr. Bartov testified, "the fact that some people with varying level[s] of expertise . . . come up with different values than what is in the statement of financial condition . . . [does not constitute] evidence that anything is wrong with the valuation in the statement of financial condition. It just means that these people have different opinions."
In sum, as Dr. Bartov opined in his expert report:
"[A]ccording to FASB, statements of financial condition (also referred to as compilation reports), like all financial reports, are not designed to show the value of a reporting entity; but they provide information to help existing and potential investors, lenders and other creditors to estimate the value of the reporting entity. Thus, they serve only as the beginning, not the end, of the complex and highly subjective valuation process users such as banks and insurance companies engage in as they perform their own diligence. Users . . . know that any estimates set forth in financial reports, even when prepared in conformity with GAAP, truly are estimates that invariably are subject to substantial estimation error" (emphasis added; internal quotation marks omitted).
As Robert Unell, defendants' banking expert witnesses, put it, "lenders are trained not to rely" on an SFC, which provides the user with "a roadmap to do [its] own independent analysis." Unell opined that if the SFC raised concerns for a bank considering a potential loan to defendants, the bank "had an opportunity to challenge those assumptions that were utilized in the preparation of the [SFC]."
Beyond the inherently subjective nature of the valuations of President Trump's assets set forth in the SFCs (which was well understood within the financial industry, and codified by ASC 274), the SFCs contained extensive and explicit disclaimers advising users not to rely on the valuations but to do their own due diligence and to reach their own conclusions concerning the values of those assets. As required by ASC 274, each of President Trump's SFCs for 2011 through 2021 contains, as an integral part thereof, notes setting forth information — including notices of potential departures from GAAP — to help the user interpret the reported numbers. Critically, the notes to each SFC include the following sweeping disclaimer:
"Assets are stated at their estimated current values and liabilities at their estimated current amounts using various valuation methods. Such valuation methods include, but are not limited to, the use of appraisals, capitalization of anticipated earnings, recent sales and offers, and estimates of current values as determined by Mr. Trump in conjunction with his associates and, in some instances, outside professionals. Considerable judgment is necessary to interpret market data and develop the related estimates of current value. Accordingly, the estimates presented herein are not necessarily indicative of the amounts that could be realized upon the disposition of the assets or payment of the related liabilities. The use of different market assumptions and/or estimation methodologies may have a material effect on the estimated current value amounts" (emphasis added).[FN32]
Dr. Bartov, the accounting expert, testified that the foregoing paragraph warns sophisticated users that "they should not rely on the raw data that is produced in this statement but, rather they have to do their own analysis. They have to develop their own valuation model, their own assumptions and come up with their own values." This is because the SFC's estimate of current value is an "opinion [that] involve[s] prediction about the future. And, nobody can foresee the future. So, every prediction is subject to a substantial predicting error. And what this tell[s] the user is 'Hey, you do your own valuation analysis and come with your own values, our values will be wrong for sure.'" Or, stated otherwise, "it communicates to the user . . . that they cannot take the raw data[,] the numbers, in the statement, by their face value. And rather, they have to do their own analysis." Referring to the last sentence of the above-quoted paragraph (beginning "The use of different market assumptions . . . "), Dr. Bartov testified that this statement "draw[s] the user['s] attention to the facts that the assumption[s] are estimates that are subjective. And they [the users] have to do their own analysis . . . ."
In addition, each SFC was prefaced by a letter entitled "Independent Accountants' Compilation Report" (compilation letter) from the accountants who compiled the SFCs, noting that the SFCs contained numerous departures from GAAP and setting forth a litany of those departures, along with a description of each departure. Each year's compilation letter contained warnings to users in the following (or very similar) language (emphasis added):
"We have not audited or reviewed the accompanying financial statement and, accordingly, do not express an opinion or provide any assurance about whether the financial statement is in accordance with accounting principles generally accepted in the United States of America. . . .
"The objective of a compilation [by the accountant] is to assist Donald J. Trump in presenting financial information in the form of a financial statement without undertaking to obtain or provide any assurance that there are no material modifications that should be made to the financial statement. . . .
"The effects of the departures from accounting principles generally accepted in the United States of America as described above [in the compilation letter], have not been determined.
"Because the significance and pervasiveness of the matters discussed above [i.e., departures from GAAP] make it difficult to assess their impact on the statement of financial condition, users of this financial statement should recognize that they might reach different conclusions about the financial condition of Donald J. Trump if they had access to a revised statement of financial condition prepared in conformity with accounting principles generally accepted in the United States of America."
The compilation letter prefacing each SFC is incorporated by reference in the SFC and is thus an integral part of each SFC. The compilation letters, together with the notes to the SFCs, identify and describe the numerous departures from GAAP as well as the subjective nature of the property valuations. Thus, sophisticated users of the SFCs were placed on notice to perform their own diligence, which sophisticated users such as defendants' counterparties would have performed even in the absence of such disclaimers.
Justice Moulton treats the fact that SFCs are not audited but simply "compiled" pursuant to ACS 274 as rendering them conducive to fraud. In fact, the disclosed nature of the SFCs tends to negate any tendency to deceive. Again, the SFCs on their face contain multiple disclaimers forthrightly advising users that they are reading unaudited compilations of information provided by the preparer, which information has not been independently verified and is likely replete with deviations from GAAP and subjective estimates of value from the perspective of the preparer. Thus, the sophisticated users of President Trump's SFCs were placed on notice that they should not rely on the SFCs as if they provided the level of assurance of an audited financial statement. No user of the SFC was lulled into believing that the valuations in the SFC were objective, professionally verified or to be taken at face value. Justice Moulton's approach essentially judges the unaudited, avowedly GAAP-deviant SFCs by the standards applicable to a public corporation's audited financial statements in a Form 10K. This is tantamount to abolishing ACS 274 by judicial fiat.
It seems to me that Justice Moulton draws the opposite of the correct conclusion from the fact that (in his words) a compiled SFC under ACS 274 "provides the lowest level of assurance to the user because the [compiling] accountant is not required to perform any procedures to verify the accuracy or completeness of the information provided by management." Since the SFCs expressly informed users of the low level of assurance they provided, they had no tendency to deceive. If the SFCs had promised users a higher level of reliability than they actually possessed, that would have been deceptive — but no such false promise was made.
In view of the disclaimers expressly and specifically directing the SFC's sophisticated users not to rely on the asset valuations set forth therein, and advising such users — consistent with industry practice — to conduct their own analyses and reach their own conclusions (which the users did), the SFCs simply cannot be described as having "the capacity or tendency to deceive" or as "creat[ing] an atmosphere conducive to fraud" (Northern Leasing, 193 AD3d at 75 [internal quotation marks omitted], quoting General Elec., 302 AD2d at 314). Indeed, these disclaimers would have barred the successful assertion of a fraud claim by any of defendants' counterparties had any of those counterparties chosen to bring such an action, which they did not. In the context of common-law fraud, written disclaimers of reliance are given full effect to preclude a sophisticated party from recovering based on alleged misrepresentations that the party had agreed not to rely upon (see Danann Realty, 5 NY2d at 320 [plaintiff, which alleged that it had been induced to purchase a building lease by the sellers' false oral representations concerning the building's operating expenses, was barred from suing the sellers for fraud by its contractual disclaimer of "rel(iance) on any representations as to the very matter as to which it now claims it was defrauded"]; Cestone v Johnson, 179 AD3d 557, 558 [1st Dept 2020] [affirming dismissal of fraud claims based on a provision in a note purchase agreement under which the plaintiff buyer represented that she had "adequate information concerning the business and financial condition of (the maker of the note) . . . and . . . (the) guarantor under the Note" and "independently and without reliance upon Seller . . . made her own analysis and decision to enter into this Agreement"] [internal quotation marks omitted]; HSH Nordbank, 95 AD3d at 201 [dismissing plaintiff HSH's fraud claim based on allegations that HSH was induced to enter into a credit default swap by defendant UBS's misrepresentations concerning the transaction's risk level, where HSH "disclaimed any right to rely on UBS for advice on these matters, as to which HSH could have conducted or obtained independent research," and the offering circular for the transaction "warn[ed] that HSH 'must rely on its own examination of the merits and risks involved'"] [brackets, ellipsis, and italics omitted]).
Moreover, in general, "New York law imposes an affirmative duty on sophisticated investors to protect themselves from misrepresentations . . . by investigating the details of the transactions" they are considering (Global Mins. & Metals Corp. v Holme, 35 AD3d 93, 100 [1st Dept 2006], lv denied 8 NY3d 804 [2007]; see also HSH Nordbank, 95 AD3d at 194-195 ["as a matter of law, a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it"] [internal quotation marks and brackets omitted]). As the Court of Appeals has put it:
"If the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations" (Centro Empresarial Cempresa S.A. v America Movil, S.A.B. de C.V., 17 NY3d 269, 278-279 [2011] [internal quotation marks and brackets omitted]).
While facts "peculiarly within the . . . knowledge" of the party making the representation may be excluded from the counterparty's obligation of due diligence, information is not deemed to be "peculiarly" within the knowledge the former in this sense simply because it is located in that party's files or is otherwise more readily available to that party. For example, in Centro Empresarial, the Court of Appeals held that the plaintiffs "failed to allege that they justifiably relied on defendants' fraudulent statements" concerning TWE, an entity managed by the defendants, because "plaintiffs knew that defendants had not supplied them with the financial information necessary to properly value the TWE units, and that they were entitled to that information. Yet they chose to cash out their interests . . . without demanding . . . access to the information" (id. at 278, 279; see also HSH Nordbank, 95 AD3d at 197-198 [plaintiff HSH could not complain that defendant UBS did not disclose its internal analyses of the proposed transaction where HSH, in the course of its due diligence, "(n)ever asked UBS . . . to produce any alternative analysis of the transaction in its possession"; "(i)n the context of arm's length dealing between sophisticated parties, . . . UBS had no obligation to disclose internal analyses for which HSH made no request"]; Permasteelisa, S.p.A. v Lincolnshire Mgt., Inc., 16 AD3d 352, 352 [1st Dept 2005] [affirming dismissal of the plaintiff's fraud claim where the plaintiff buyer had "acknowledged that (it) had all information necessary to make an informed decision with respect to the transaction" and had "neglected to seek examination of the books and records of the company it was acquiring, relying on an unaudited financial statement that allegedly proved inaccurate"]; Abrahami v UPC Constr. Co., 224 AD2d 231, 234 [1st Dept 1996] [plaintiffs, who were "sophisticated businessmen . . . [having] a duty to exercise ordinary diligence and conduct an independent appraisal of the risk they assuming," failed to establish justifiable reliance in support of their fraud claim where, in spite of being on notice of the "possible precarious financial condition" of the company in which they were considering investing, they failed "to conduct an audit, or some form of independent due diligence, with regard to the financial condition" of the company]). Here, the Attorney General does not identify any information that she believes to render the SFCs false or misleading that defendants' sophisticated counterparties could not have discovered through their own due diligence.
Justice Moulton asserts that the SFCs were deceptive "because the inflated estimated current values [therein] were calculated based on undisclosed false facts and fallacious assumptions known to the Trump Organization but kept from its counterparties."[FN33] It is not clear to me what "facts and assumptions" Justice Moulton is referring to, other perhaps than the one clear error of existing fact that the Attorney General has identified in this case.[FN34] It would have been obvious to users of the brief SFCs (each was only about 20 pages long) that they did not describe President Trump's extensive asset portfolio in granular detail. A user desiring more information about the assets than was set forth in the SFC had the right to request information in the possession of the Trump Organization, which in fact occurred. For example, a 2013 Deutsche Bank credit report states that personnel from the bank visited President Trump's offices to verify his reported liquidity by "review[ing] bank and brokerage statements," from which they concluded that his liquidity was "83% of the client reported amount." This is exactly the kind of due diligence in which sophisticated commercial parties are expected to engage for their own protection (see e.g. Centro Empresarial, 17 NY3d at 279).
For all of the foregoing reasons, I believe that the valuations in the SFCs challenged by the Attorney General (which I will discuss in more detail below), however contestable the assumptions on which they were based may have been, were not fraudulent within the meaning of section 63(12) — indeed, as subjective estimates of the unliquidated, inchoate values of unique properties, they were not even false or misleading — and so did not violate the "fraud" prong of the statute.
B. The Subjective Valuations in the SFCs Were Not Relied Upon in the Credit in the Credit Industry, Were in Fact Not Relied Upon by the Counterparties, And Had No Impact on the Terms of the Transactions
Given my conclusion that the SFCs, in the context in which they were used, neither had any capacity or tendency to deceive nor created an atmosphere conducive to fraud — and were not even false in the first place — I need not reach the question of whether the discrepancies between the SFCs' valuations and those of the Attorney General's experts would be considered material if the Attorney General's valuations were deemed to be "true" and the SFCs' valuations were deemed to be false. Nonetheless, since the parties and my colleagues devote so much attention to this issue, I will also discuss it. Moreover, even if the Attorney General was not required to show reliance as part of her case, the record evidence that the SFCs in fact were not relied upon by President Trump's counterparties, and that the SFCs in fact did not impact the subject transactions, confirms defendants' expert evidence establishing that the SFCs were not conducive to fraud in the professional context in which they were used.
Although she also contends that the SFCs were materially false, the Attorney General, relying on two decisions of this Court (Greenberg, 95 AD3d at 479, 485; General Elec., 302 AD2d at 315), primarily argues that there is no materiality requirement for a "stand-alone" claim under section 63(12) based only on the defendant's alleged "persistent fraud."[FN35] However, it bears reiteration that the test for liability under section 63(12) is whether the statements at issue have the capacity or tendency to deceive, or create an atmosphere conducive to fraud. As one court has observed, even though "it would be unduly restrictive to require that [the Attorney General] prove her case on behalf of the State according to the rigid elements applied to a private cause of action," still, "evidence regarding falsity, materiality, reliance and causation plainly is relevant to determining whether the Attorney General has established that the challenged conduct has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud" (Domino's, 2021 NY Slip Op 30015[U], *23). As the Domino's court suggested, it may be possible to determine a statement's "capacity or tendency to deceive" without reference to its objective materiality in cases where the alleged victims include "the ignorant, the unthinking and the credulous" (General Elec., 302 AD2d at 314 [internal quotation marks omitted]). In this case, however, where the victims posited by the Attorney General are a group of some of the most sophisticated financial actors in the United States, materiality — including the question of whether the alleged misstatements had any impact on the terms of the transactions — is plainly a relevant consideration in determining whether defendants committed "fraud" within the meaning of section 63(12).[FN36] Accordingly, I agree with Justice Moulton that, at least in cases concerning transactions between sophisticated parties, materiality is an element of a claim under section 63(12).
As previously discussed, the practice in the credit industry is for the user of an SFC not to rely on the subjective valuations in the statements but to use the statements as a starting point for the user's own due diligence and independent analysis of the net worth of the person issuing the statement. Thus, it is not surprising that the record establishes that, in the transactions challenged by the Attorney General, defendants' counterparties did their own due diligence into President Trump's net worth and entered into the transactions based on their independent valuations of his assets, which were substantially lower than the valuations set forth in the SFCs. Deutsche Bank, for example, extended the loans for the Doral, Chicago and OPO projects after independently assessing President Trump's net worth at about half the amount reported in the SFCs, an adjustment that the bank viewed as "not unusual or atypical."
At his deposition in this matter, Tom Sullivan, an executive in Deutsche Bank's Private Wealth Management division during the relevant period, explained Deutsche Bank's approach as follows:
"[A]ll our clients — or many of our clients have a different view of their financial net worth than the bank may have. And so there's a process when you underwrite a loan, where you're independently assessing the client's financial profile away from what is disclosed and that's done in all transactions that we are involved in. . . .
"So clients have — very wealthy clients usually have a wide range of assets, especially when you get into real estate or fine art. They typically have a much higher view on what those assets are worth than the bank may have, and the bank takes a very conservative view when they underwrite a transaction and we try to make it independent of what the client is representing. So the bank comes up with their own assessment in terms of what they think these assets are worth, what the debt is worth and come up with their own net worth, away from what the client represents. . . .
"[A] client may have a view for any number of reasons, almost an infinite number of reasons of why they value something in a certain way and we don't get into a debate on what their view is. We may question it. But ultimately, at the end of the day, we're making an independent credit decision on what we view it to be. And so most of our underwritings, you'll see a difference between what the value a client presents and what the bank ultimately underwrites to, to a more conservative standard. . . .
"[I]t's more of an art than a science, but we try to independently determine what we think the assets are worth and then we underwrite and make our credit decisions based on that. Not what necessarily a client will tell us their assets are worth."
When he was subsequently asked whether he had "any reason to believe that . . . Deutsche Bank was misled in any aspect of any credit decision it made based on information that President Trump included in any [SFC]," Sullivan gave the following response:
"No, but it . . . gets back to what I talked about earlier. We were focused on our own independent view, so we didn't spend a lot of time determining what was, you know — what was disclosed. I mean, there was information disclosed to us and we had — we developed an independent view. And so our decision-making was based on that, and I think we were comfortable with the assessment we did independently."
Similarly, David Cosby Williams, another Deutsche Bank executive, testified at trial that "a difference of opinion in asset values between the client and the bank" is not "a disqualifying factor to extend credit." Williams elaborated, "it's not an industry standard that these financial statements are audited. . . . [The clients] are largely relying on the use of estimates. . . . [W]e account for that and make some adjustments as a conservative measure." Similarly, Williams testified that, because an individual's reported net worth is "largely subjective," Deutsche Bank, "as part of our due diligence and underwriting process, . . . [will] subject clients' reported information through or to some adjustments to account for that." For example, a Deutsche Bank's credit report noted that, for the year ended June 30, 2013, President Trump's SFC reported his net worth as $4.9 billion, but Deutsche Bank's adjusted that figure down to $2.6 billion, a reduction of almost 50 percent. Williams testified that it was "not unusual or atypical for any client's provided financial statements to be adjusted to this level, or to this extent." Williams testified that President Trump would have qualified for the preferred loan pricing (meaning an interest rate in the range of 2.0 to 2.5 percent) of Deutsche Bank's Private Wealth Management division if his adjusted net worth had been as low as $100 million.
In performing its independent assessment of President Trump's wealth, Deutsche Bank gave different levels of scrutiny to different categories of assets. Because liquidity is the key factor in assessing a person's ability to meet his obligations under a loan guarantee, Deutsche Bank independently validated President Trump's liquidity by directly reviewing his bank account and brokerage statements. For properties used as collateral on a loan, Deutsche Bank commissioned independent appraisals. Deutsche Bank also independently evaluated certain non-collateral high-profile "trophy" real estate properties owned by President Trump. Assets that were neither collateral nor in the "trophy" category were considered less important and were valued based on very rough "ballpark" or "haircut" estimates.[FN37]
Dr. Bartov and Mr. Unell, defendants' expert witnesses, reviewed Deutsche Bank's credit reports on President Trump for the years in question. These experts testified that the credit reports documented that Deutsche Bank, based on its due diligence and independent analysis, applied a substantial downward adjustment — generally in the neighborhood of 50 percent — to President Trump's self-reported net worth each year. The reports showed that Deutsche Bank's credit decisions were made based on the more conservative adjusted net worth figures derived from the bank's independent analysis, and were not based on President Trump's net worth as reported in the SFCs.
Contrary to the Attorney General's contention, that Deutsche Bank applied "haircuts" on the order of 50% to certain valuations in President Trump's SFCs, illustrates that the SFCs had no tendency or capacity to deceive their intended recipients. First, as defendants point out, haircuts were not applied to assets used as loan collateral (for which independent, formal appraisals were commissioned) or to landmark assets deemed to be "trophy properties" (which were assessed by Deutsche Bank's Valuation Services Group). More fundamentally, however, that it was the general practice of Deutsche Bank (like other banks) to apply a 50% haircut to a customer's reported valuation demonstrates that Deutsche Bank expected President Trump, like any other high-net-worth customer, to provide valuations based on optimistic assumptions about future contingencies that a lender could not prudently use as the basis for underwriting a loan. Thus, if the SFCs had presented the conservative, green eyeshade valuations for which the Attorney General advocates, Deutsche Bank would have applied the haircut to those figures and valued the underlying assets at half of their actual conservative valuations.
The foregoing leads me to observe that the premise of the Attorney General's action appears to be that President Trump should not have offered his counterparties the optimistic asset valuations that banks expect to receive, as a matter of course, from their high-net-worth loan customers. This brings to mind the scene from the 1942 Hollywood classic, Casablanca, in which Captain Louis Renault closes down Rick's CafÉ because he is "shocked, shocked to find that gambling is going on in here." In this case, the Attorney General seems to be similarly "shocked" to find that the real estate business is going on in New York City.
Finally, the asset valuations in the SFCs had no impact on the terms of the transactions in question. Deutsche Bank's Private Wealth Management Division classified a client as "ultrahigh net worth," and eligible for the low interest rates on guaranteed, recourse loans available to clients in that category, at a net worth of $100 million and liquid assets of $10 million. Ladder Capital, which provided the loan for 40 Wall Street, required President Trump to maintain a net worth of $160 million and liquidity of at least $15 million. The Attorney General does not contend that President Trump's net worth and liquidity ever declined to anywhere near these minimum levels — indeed, by the Attorney General's own admission in her appellate brief, President Trump's net worth throughout the relevant period was always at least $2 billion, a figure many times the minimum net worth required to qualify for the favorable terms extended to his organization by the counterparties.[FN38] Nor does she offer any plausible theory of how, given President Trump's undisputed billionaire status, any overstatement of his net worth in the SFCs had any effect on the terms of the transactions.[FN39]
The evidence also establishes that any excessive valuations in the SFCs did not have any material impact on the Ferry Point License, which, as previously noted, was a license from the City of New York to operate, maintain, and manage a golf course and related facilities in Ferry Point Park in the Bronx. The City's Department of Parks and Recreation had previously invested $120 million in the project but had been unable to get it off the ground. The City's purpose in requiring a net worth disclosure from President Trump was to ensure that the person to be granted the license "had the financial capability to deliver on their obligations including making sure the course was operating and working every day." While NYC considered President Trump's financials in reviewing his offer, the financial capability of the offeror was the "lowest" of the selection criteria. Rather, the selection process focused heavily on the "experience of the operator in running high-end golf courses," for which President Trump was uniquely qualified. Further, once the Ferry Point License was in place, the City required only annual "no material adverse change" letters. Defendants were not required to submit annual SFCs to the City under the contract. Further, the only consequence of a failure to submit an annual "no material adverse change" letter would have been an increase of the security deposit to a maximum of $470,000.
Nor was there evidence that the purportedly fraudulent SFCs had any impact on defendants' insurance policies. With respect to the relatively "modest" $6 million Zurich policy, the value of defendants' hard assets were "not very significant" to Zurich because "any repayment would be coming from the cash that they [had] on hand," and liquidity was "far more important" to the insurer than "hard assets". In 2018 and 2019, the Trump Organization reported $76.2 million and $87 million of cash on hand, respectively, only $24.4 million of which is disputed. Zurich did not rely on the SFCs for some years, instead relying on media publications like Forbes and USA Today to support its underwriting decisions. Even after the Attorney General's allegations became public, Zurich continued supporting the surety bond program — and continues doing business with the Trump Organization to this day — because Zurich was "pleased" with the "good-standing relationship" they had with President Trump. Further, in connection with the additional $5 million defendants sought to add to the HCC D&O Policy after Trump was elected in 2016, HCC reviewed "very few financials." HCC's interest was primarily targeted at assessing defendants' bankruptcy risk. The premium for the new coverage was $295,000. HCC focused on Trump's reported liquidity of $192 million as a "meaningful" figure, which far exceeded the premium and total coverage limit, given that even $25 million of liquidity "would have been enough on the balance sheet to cover their retention."
A further word is in order concerning our consideration of the intertwined concepts of materiality and reliance in this case, notwithstanding the support the Attorney General brings for her position that materiality and reliance need not be shown to establish liability on a stand-alone section 63(12) claim based solely on persistent fraud. In my view, as previously noted, the decisions relieving the Attorney General of the burden of proving materiality did so to allow the Attorney General to use section 63(12) to reach wrongdoing directed at "the ignorant, the unthinking, and the credulous" (Guggenheimer , 43 NY2d at 243), who might be deceived by misrepresentations that fall short of being objectively material. Similarly, the suspension of the element of reliance allows section 63(12) to be used to reach misrepresentations directed at the impersonal public markets, where it may be difficult to prove reliance on a given statement by any particular victim (see Amgen, 568 US at 461), or, given the availability of injunctive relief, to stop fraudulent schemes before they have caused harm.
The foregoing rationales have no application whatsoever to the case before us (see Grasso II, 54 AD3d at 195 n 9 [noting the principle that "the rationale of a legal rule no longer being applicable, that rule itself no longer applies"] [internal quotation marks omitted]). As we have already discussed at length, this action places at issue completed, meticulously negotiated, bilateral transactions between parties of the highest level of sophistication in business and finance, who dealt with each other at arm's length, with the assistance of equally sophisticated legal counsel and business advisors. The alleged wrongdoers comprise a privately held real estate organization that issues no publicly traded securities, so their misrepresentations, if any, would have had no impact on the public markets. In this scenario, estimated valuations that were hedged about with disclaimers and understood in the relevant industry to be subjective, speculative, and not to be relied upon — and, in fact, were so understood by defendants' counterparties, who did not regard the valuations in the SFCs as material and did not rely upon them — cannot be deemed to have "ha[d] the capacity or tendency to deceive or [to have] create[d] an atmosphere conducive to fraud" (Northern Leasing, 193 AD3d at 75 [internal quotation marks omitted], quoting General Elec., 302 AD2d at 314). Accordingly, the Attorney General has not proven a violation of section 63(12).
C. The Record Establishes that Most of the Challenged Valuations in the SFCs Were Appropriate Under ASC 274
The Attorney General's attacks on particular valuations in the SFCs ignore the substantial flexibility afforded by ACS 274 to issuers of personal financial statements. Supreme Court adopted these positions without stating which governing accounting standard was violated and simply dismissed defendants' extensive expert evidence explaining that the alleged misstatements actually complied with ACS 274. Justice Moulton, in affirming Supreme Court's determinations concerning the valuations, although he pays lip service to the principle that valuation is a subjective inquiry, similarly discusses the issues as if the question to be answered were which side's valuation was more reliable. This approach is simply incorrect. The question to be answered with regard to each valuation at issue is whether the Attorney General has carried her burden of proving that the valuation has no reasonable, good-faith basis. This she has not done.
While Justice Moulton does not dismiss the opinions of defendants' experts as "dreams" in the manner of Supreme Court, he discounts those expert opinions on the ground that, even though they may provide plausible explanations for the valuations at issue, the experts do not refer to direct evidence of how the Trump Organization arrived at the valuations. What Justice Moulton overlooks is that the burden of proof in this action belongs to the Attorney General, not to defendants. To be entitled to prevail, the Attorney General was required to present affirmative proof that the SFCs were deceptive in the professional, commercial context in which they were used. Instead, all she presented were three experts who disagreed with certain valuations set forth in the SFCs. However, it is undisputed — even by the Attorney General — that a unique asset may be valued by different methodologies, based on different assumptions and premises, and that the fact that two different methodologies produce disparate values for the same asset does not mean that one valuation is true and the other false. Accordingly, whatever the merit of Justice Moulton's criticism of defendants' experts, the Attorney General simply has not proved her case.
In the case of 40 Wall Street and Seven Springs, the findings of misstatements were based on the existence of formal appraisals valuing the property more conservatively than defendants did in the SFCs. However, ACS 274 does not require that valuations in a personal financial statement be supported by a formal appraisal, and as one of the defendants' experts explained (without contradiction), "the mere existence of . . . disparate valuations for a given property does not in itself establish any specific valuation is inaccurate or inflated."
In the cases of Trump Park Avenue and Aberdeen, Supreme Court found the valuations to be false because they were based on calculations assuming that existing restrictions on the use of the property (in the case of Trump Park Avenue, rent stabilization of certain apartments; in the case of Aberdeen, the number of homes that local authorities would allow to be built) would be lifted. However, as previously discussed, ACS 274 permits a valuation to be based on the reporting person's expectation that his long-term plans — including changes in use restrictions — will come to fruition. In fact, with regard to Trump Park Avenue, 6 of the 12 rent-stabilized units became deregulated due to vacancies between 2013 and 2019. Again, while defendants' valuation of Trump Park Avenue substantially exceeded a 2010 Oxford Group appraisal of the property, ACS 274 did not require President Trump to base his valuations on formal appraisals.
The most glaring error in Supreme Court's fact-finding was its determination that Mar-a-Lago, President Trump's world-famous oceanfront estate in Palm Beach County, Florida, is worth only between $18 million and $27.6 million. Before turning to the evidence on that subject, the lack of logic in the position of the Attorney General, Supreme Court and Justice Moulton should be noted. In seeking to uphold the $18-$27.6 million valuation, they ask us to accept that President Trump agreed to certain restrictions on the use of Mar-a-Lago that reduced its value to somewhere between two and five percent of the value it would otherwise have had. The irrationality of such a course is blatant and, by itself, warrants rejection of the proposition.
In any event, unrebutted evidence refutes the Attorney General's contention that the value of Mar-a-Lago — a debt-free asset that in recent years has generated more than $50 million in annual revenue — is depressed by restrictions in covenants and deeds that exclude its use as a private residence (as President Trump is currently using it). Defendants presented expert testimony establishing that the covenants and deeds in question did not prohibit the estate's use as a private residence, and that, as of 2021, it would be worth more than $1.2 billion if placed on the market.
The Attorney General points to the SFCs' valuation of Mar-a-Lago as the exemplar of defendants' fraud. She does not claim that the valuation of Mar-a-Lago violated GAAP but that defendants ignored restrictions requiring that the property be used as a "social club." These restrictions are set forth in a number of publicly filed documents — a 1993 "Use and Preservation Plan" (1993 agreement), a 1995 "Deed of Conservation and Preservation" (the 1995 deed) and a 2002 Deed of Development Rights (the 2002 deed) (collectively, the documents). Although it is undisputed that President Trump actually uses Mar-a-Lago as his primary personal residence, the Attorney General argues that the documents prohibit him from selling it as a private residence. The Attorney General claims that, as a result of these restrictions, the SFCs' valuation of Mar-a-Lago in the range of $347 million to $739 million was "grossly inflated" and less reliable than the Palm Beach County Appraiser's tax assessment of $18-$27.6 million. Supreme Court accepted the Attorney General's arguments, as Justice Moulton now does, but I disagree.
Although the documents do require that President Trump and any subsequent owner maintain Mar-a-Lago's use as a social club, nothing in the documents prevents the owner from using the estate, at the same time, as his or her private residence, just as President Trump is actually using it now. As defendants' expert on land use John K. Shubin explained, "title to the property and its residential use rights are freely transferable by its owner."[FN40]
Under Florida Law, "covenants are strictly construed in favor of the free and unrestricted use of property" and ambiguous covenants are "resolved against the party claiming the right to enforce the restriction" (Norwood-Norland Homeowners' Assn., Inc. v Dade County, 511 So 2d 1009, 1014 [Fla Dist Ct App 1987]). The documents are clear that Mar-a-Lago is a hybrid estate with intertwined residential and social components. Thus, the documents can only be construed to exclude residential use of Mar-a-Lago if they clearly delineate the residential component and unambiguously eliminate it. They do neither. To the contrary, the documents preserve the residential component.
The 1993 agreement granted the Trump Organization a special use exception that allowed it to use Mar-a-Lago as a social club in addition to its use as a private residence. The 1993 agreement is clear that the Trump Organization contemplated that adding a club component might be construed as a change in the character of the estate and therefore explicitly preserved the residential component and disavowed any change to its usage:
"The proposed Club at Mar-A-Lago is a planned use of the existing Mar-A-Lago mansion and grounds in a manner similar to which Ms. Marjorie Merriweather Post originally used the estate. . . . Ms. Post used Mar-A-Lago as a residence during the winter months of the year and as a place to entertain her house guests . . . Mr. Trump uses the estate in much the same manner. . . .
"In its conversion from a so-called Large Residential Estate to a private social club, the actual usage of Mar-a-Lago will not change. No new activity will occur which cannot, does not or has not taken place in the past under the existing zoning of this property."
Neither the 1995 deed nor the 2002 deed eliminated the residential component of Mar-a-Lago's use. The 1995 deed explicitly preserves President Trump's right to "exercise the rights and privileges contemplated by, and engage in those uses of the Property permitted by the [1993 Agreement]." While the 2002 deed, by which President Trump and the club surrendered "all of their rights to develop the Property for any usage other than club usage" (emphasis added), restricted the owner's right to modify the property, it simply does not prohibit residential use. This is consistent with the 1993 agreement and the 1995 deed, which similarly require the use of the property as a club preserve while allowing President Trump — and any future owner to whom he might sell it — to use the estate as a private residence. Further, contrary to Justice Moulton's statement that "the 'Land' as described in the [2002 deed] was conveyed to the National Trust for use as a social club," the 2002 deed conveyed to the National Trust only "any and all . . . rights to develop the Property for any usage other than club usage." Fee ownership of the property itself — land and improvements alike — remained in the hands of the Mar-a-Lago Club, L.L.C., with President Trump holding a contingent reversionary interest.[FN41]
The 2002 deed contains several "whereas" clauses, one of which states that the grantors "intend to forever extinguish their right to develop or use the Property for any purpose other than club." The Attorney General points to this clause as support for the proposition that Mar-a-Lago may not be utilized as a private residence. However, it is a well-settled legal principle that a whereas clause "cannot create any right beyond those arising from the operative terms of the document" (Grand Manor Health Related Facility, Inc. v Hamilton Equities Inc., 65 AD3d 445, 447 [1st Dept 2009]; see Matter of Legion of Christ, Inc. v Town of Mount Pleasant, 151 AD3d 858, 860 [2d Dept 2017]; see also Orlando Lake Forest Joint Venture v Lake Forest Master Community, 105 So 3d 646, 647 [Fla Dist Ct App 2013]["the whereas clause is prefatory and not binding"]). Therefore, since the operative terms of the 2002 deed nowhere prohibit the owner from using the estate as a private residence, the whereas clause cannot be construed as imposing such a restriction.[FN42]
Even if Mar-a-Lago can be deemed to be exclusively a "club," President Trump or any potential purchaser may still reside there. As Mr. Shubin noted, there is nothing in the club's bylaws that would prevent President Trump or any purchaser from limiting club membership to himself and his family and residing in the estate, so long as the critical features are preserved. Moreover, Mar-a-Lago is zoned R-AA (Large Residential Real Estate), which, in addition to allowing the property to be used as a single-family home, provides that "a private club may provide living quarters for its bona fide employees." Thus, any potential purchaser can simply designate himself as an "employee" and reside there.
President Trump's residential use of the Mar-a-Lago is the very definition of "open and notorious." Yet, in the approximately three decades since President Trump signed the 1993 agreement, no one ever raised an objection. To the contrary, the attorney for Palm Beach County was of the opinion that President Trump was allowed to reside at Mar-a-Lago. The town attorney noted that the 1993 agreement "did not incorporate a direct prohibition on [] President Trump residing at the Club" and that the Zoning Code allows President Trump to reside there as a bona fide employee. Mr. Shubin also opined that the National Trust regularly inspects the property and has never complained about President Trump living there.
Despite the overwhelming evidence to the contrary, Supreme Court adopted the Attorney General's flawed interpretation of the documents and ignored Mr. Shubin's unopposed and well-reasoned testimony. While Supreme Court did not give a reason for ignoring Mr. Shubin's testimony, Justice Moulton justifies it "as an improper attempt to usurp the court's function as the sole determiner of issues of law." I disagree.
The issue here is not so much the meaning under Florida law of the various restrictions that have been placed on the use and development of Mar-a-Lago but how those restrictions affect the estate's market value — that is, how a buyer and seller will view these restrictions in the context of a sale. On this issue, Mr. Shubin testified that, because no interested person ever objected to President Trump's residential use of the property, and because the documents do not imply otherwise, "if I were representing a buyer and the buyer were to say to me, I want to live there, can I live there? The answer is yes." Mr. Shubin's extensive experience with these particular issues is precisely the expertise that can be helpful to a New York court grappling with the implications of land use restrictions on property in Florida (People v Rivers, 18 NY3d 222, 228 [2011] [expert testimony is appropriate where it can "clarify an issue calling for professional or technical knowledge"]).
The lower court's valuation of Mar-a-Lago at $18-$27 million is also contrary to the law, unopposed expert testimony, and common sense. The court based its valuation on a tax assessment prepared by the Palm Beach County Assessor. However, the law recognizes that tax assessments can be based on many different factors, are sometimes arbitrary and are not necessarily indicative of the property's actual value (see Matter of Briffel v County of Nassau, 31 AD3d 79, 83 [2d Dept 2006] ["case law also clearly distinguishes between an assessment or assessed value on the one hand, and the full market value or full value of the property on the other"], affd sub nom. O'Shea v Board of Assessors of Nassau County, 8 NY3d 249 [2007]; see also Matter of FMC Corp. [Peroxygen Chemicals Div.] v Unmack, 92 NY2d 179 [1998]; see also generally Tax Equity Now NY LLC v City of New York, 182 AD3d 148 [1st Dept 2020], affd as mod sub nom. Tax Equity Now N.Y. LLC v City of New York, 42 NY3d 1 [2024]). Defendants' expert on real estate valuations, Frederick E. Chin, testified that "assessed values do not necessarily equal market values and offer 'minimal value to appraisers.'" Another expert called by defendants, Lawrence A. Moens, testified that the tax assessment for Mar-a-Lago has absolutely nothing to do with the actual value of the property. According to Mr. Moens, Mar-a-Lago was actually worth between $655 million and $1.4 billion and defendants' valuations were "reasonable and, in many cases, conservative."
Supreme Court erroneously dismissed Mr. Moens' testimony. Mr. Moens based his opinion on approximately 50 years of experience selling billions of dollars' worth of luxury residential real estate in Palm Beach County. Mr. Moens valued Mar-a-Lago based on basic formulas, local market conditions, recent sales, as well as the property's unique characteristics such as location, size, structures, and architecture, and took the purported restrictions into account, concluding that:
"[t]his unique property offers to an elite purchaser the unparalleled opportunity to own an exclusive and extensive family compound in the most desirable section of Palm Beach. . . . The property is one of only two contiguous parcels in the Estate Section spanning from the Intracoastal Waterway to the ocean. The property enjoys an expansive 368 feet of oceanfront, with extraordinary accompanying oceanfront facilities and has approximately 600 feet along the Intracoastal Waterway. There is simply no way anyone could recreate this type of facility in this section of the Island of Palm Beach."
Ironically, Justice Moulton disregards Mr. Moens testimony as "conclusory," yet adopts the tax assessment's $18-$27 million valuation in full, despite there being no analysis or expert evidence supporting its validity. Justice Moulton finds the tax assessment's valuation accurate because it considered the purported restrictions while Mr. Moens did not. However, Mr. Moens' report explicitly states that "I have reviewed the opinion of John K. Shubin. His conclusions regarding the permissible use of Mar-a-Lago as a single-family residence are consistent with my conclusions as to the value of the property." Moreover, nothing in the record supports Justice Moulton's assertion that the tax assessor "considered the property's restrictive use." There is no indication that the tax assessor agrees with the Attorney General's interpretation of the property's club-related restrictions.
Even a layperson can recognize that $18-$27 million is a severe undervaluation of Mar-a-Lago. Palm Beach County is known to be one of the most expensive areas of the world, where it is not uncommon for residential properties to sell for over $100 million. As an example, in 2019, a 4.72-acre property in Palm Beach sold for $105 million. It is thus inconceivable that Mar-a-Lago, which is approximately four times that size (more than 16 acres), and has many other valuable features, could be worth over 80% less.
In sum, there is no conceivable way that defendants' valuation of Mar-a-Lago can be deemed fraudulent. Their valuation using comparable residential properties is one of several valuation methods permitted by GAAP and is consistent with the deed restrictions that do nothing to prohibit its sale or use as a private residence. And, as Mr. Moens testified, defendants' valuation of $347-$739 was approximately half of what he believed was its actual value.
Justice Moulton argues that the SFCs were deceptive because defendants "lumped" Mar-a-Lago together with several other properties without breaking out its individual value and valued Mar-a-Lago as if it were unencumbered by restrictions. I disagree.
Aside from the issue of whether the valuations were deceptive, there is nothing inherently deceptive in lumping Mar-a-Lago together with other properties. All of the properties in the category are similar in nature and the counterparties could have simply requested the individual valuations if they wished to have them. To the extent that Justice Moulton appears to be insinuating that defendants intentionally lumped them together to conceal their value, Justice Moulton himself notes that it was the accountants that compiled the SFCs, and did so based on the data contained in Jeff McConney's supporting spreadsheets. Each supporting spreadsheet broke out the individual valuations for each property in the category and there are no allegations that they were removed at defendants' insistence. Therefore, the more plausible conclusion is that the accountants themselves made the decisions not to include them in the SFCs. Defendants relied on their accountants' representation that the SFCs were "compiled in accordance with Statements on Standards for Accounting and Review Services issued by the American institute of Certified Public Accountants (AICPA)," as they were entitled to do. Thus, absent any allegation that presenting the SFCs in this format is inconsistent with the AICPA, it cannot be said that defendants' dissemination of the SFCs was fraudulent.
The Attorney General's assertion that the club component of Mar-a-Lago substantially depresses its value also ignores the nature of the property. The 1993 Agreement is clear that Mar-a-Lago was specifically built and designed as a hybrid estate serving both residential and social purposes:
"Mar-a-Lago was fashioned to be a setting for this grand lifestyle. It included not only gracious quarters for the family . . . but numerous other suites for guests who would visit . . . [t]itled and untitled royalty from all over the world were expected. The Mansion was sized for entertaining in the most grand fashion — small and large dinners, parties, dances were to be in a no less gracious setting anywhere in the world. . . . Recognizing that the space requirements would result in an extremely large mass, Mrs. Post directed that the structure be segmented into intermediate components to reduce the bulk of the building. . . . The family and guest suites . . . provide privacy and intimacy at the opposite end of the scale of grandeur established in the spaces for entertaining."
That social purpose is served today through the club component of the estate. To reiterate, as the 1993 Agreement states, "Mr. Trump uses the estate in much the same manner as Ms. Post," "the actual usage of Mar-a-Lago will not change" and "[n]o new activity will occur which cannot, does not or has not taken place in the past." It is not apparent to me why enshrining the very essence of the estate in a series of legal documents has a negative impact on its value. Moreover, Mar-a-Lago has numerous unique characteristics that make it more valuable than its neighboring estates. As Mr. Moens opined, Mar-a-Lago simply cannot be recreated in terms of size, location and architecture.[FN43]
Justice Moulton concludes that defendants' valuation of Mar-a-Lago was "deceptive" because "much" of the estate is occupied by club amenities that the owner is restricted from altering. Even if we assume that it is true that the restrictions in question would tend to reduce the property's market value, Justice Moulton does not explain (other than by reliance on the tax assessment, which is not relevant to market value) why the restrictions would push the property's market value from multiple hundreds of millions of dollars all the way down to the $18-$27 million range.
In sum, notwithstanding any legal restrictions requiring the preservation of the club aspect of Mar-a-Lago, it is known worldwide that, for many years, President Trump has used the estate as a private residence for himself and his family. No interested person or institution has ever objected to President Trump making his home at Mar-a-Lago, and the legal documents pertaining to the estate do not prohibit him from doing so. Nothing in the record supports the view that a hypothetical purchaser of Mar-a-Lago would not be able to use the estate as a private residence, just as President Trump is doing. Accordingly, the Attorney General has identified no element of falsehood in the valuations of Mar-a-Lago set forth in the SFCs. Certainly, nothing in the record supports the view of Justice Moulton and Supreme Court that the tax assessment of the property as being worth a mere $18-$27 million is more reliable than the higher, and more realistic, valuations set forth in the SFCs.
The Attorney General also makes much of her allegation that defendants "added secret brand premiums to golf properties despite representing that no brand premium was included." She contends that defendants falsely represented that the valuations did not include a premium for the brand value attached to the Trump name, while secretly inflating the values of the golf club properties by either 15% or 30% based on the brand value associated with the Trump name. However, defendants' expert explained that the SFCs distinguished between the brand value associated with the golf club properties and the overall brand value of the Trump name. Specifically, the expert explained that it is an accounting convention that goodwill is incorporated into the valuation of specific operating assets (such as golf clubs), but overall brand value is not set forth as a separate stand-alone asset. Indeed, a confirmation of this explanation is found in note 5 of the SFCs themselves, which states: "[T]his financial statement does not reflect the value of Donald J. Trump's worldwide reputation, except to the extent it has become associated with properties either operative or under development" (emphasis added). Thus, while the SFCs did not include the brand value of Trump name as a stand-alone asset, users were notified that the goodwill value associated with the brand was incorporated into the valuation of particular properties already operating or under development.
Further, while defendants do not contest that they represented President Trump's Triplex apartment as being 30,000 square feet (when it was less than 11,000 square feet) in certain SFCs, they contend that this was an inadvertent oversight, which in fact was corrected shortly after Forbes published a report that made the error public in 2017 (long before the investigation leading to this action had begun). The Attorney General offered no evidence that the error concerning the Triplex was anything but inadvertent. In any event, given that the actual square footage of the Triplex has been publicly available at least since 1994 in an amendment to the condominium offering plan (which is where Forbes found it), the error cannot be considered to have had a capacity or tendency to defraud the sophisticated institutional counterparties to whom the SFCs were provided.
Finally, the Attorney General claims that the SFCs should not have included the cash held by the Vornado partnerships, which President Trump did not control, under the category of cash. However, the SFCs indicate that the reported cash balances included amounts held in operating entities and that assets were reported separately for closely held businesses, which were GAAP departures. The SFCs also reported as a GAAP departure that it "reports some closely held business entities in a manner that states certain cash positions separately from their related operating entities." Further, counterparties wishing to verify President Trump's personal liquidity could, upon request, inspect his bank and brokerage statements, as Deutsche Bank did at least one year.
III. The Evidence Does Not Support Liability on The Second Through Seventh Causes of Action.
In addition to her stand-alone cause of action under the "fraud" prong of section 63(12), the Attorney General asserts six additional causes under the "illegality" prong of section 63(12), in which she alleged that defendants use of the SFCs violated certain sections of the Penal Law. Specifically, the Attorney General alleges that all defendants violated Penal Law § 175.10, the prohibition of falsifying business records (second cause of action), and Penal Law § 175.45, the prohibition of issuing a false statement (fourth cause of action). The sixth cause of action alleges that defendants Weisselberg and McConney committed insurance fraud in violation of Penal Law § 176.05. Finally, the third, fifth and seventh causes of action allege that all defendants engaged in a conspiracy to commit each of the aforementioned substantive offenses (Penal Law § 105.00). Supreme Court determined that both intent and materiality were required to establish the second through seventh causes of action, unlike the stand-alone claim under section 63(12) asserted in the first cause of action. After trial, the court found defendants liable on each of these causes of action (collectively, the Penal Law causes of action).
In my view, the Attorney General failed to prove her case under any of the Penal Law causes of action for the same reason she failed to prove her case on the stand-alone section 63(12) cause of action — the valuations in the SFCs, as plainly labeled subjective estimates of value of unique assets, simply were not false, even if disputable, in the professional context in which they were used.[FN44] That being the case, I really need not say more about the Penal Law causes of action. However, some comment is warranted on the dubious evidence on which the Attorney General relied to establish the intent element of these causes of action.
To prove intent in support of the Penal Law causes of action against President Trump, the Attorney General relied almost entirely on the testimony of Michael Cohen, the disbarred lawyer who pleaded guilty to (among other offenses) willful tax evasion, making false statements to a financial institution, and perjury. As summarized by Justice Moulton, Cohen testified that he and defendant Allen Weisselberg were, on occasion, "direct[ed]" by President Trump to "reverse engineer" the valuations in the SFCs to reach a "desired goal." To this end, Cohen testified, he would search for comparable properties on the Internet and base valuations of President Trump's assets on the results of his search so as to reach the predetermined goal. For several reasons — perhaps the same reasons that the Attorney General has, as previously noted, avoided referring to Cohen by name in her appellate brief, and has limited her citation of his testimony to the absolute minimum — Supreme Court's crediting of this testimony does not, in my view, warrant the deference that Justice Moulton extends to it.
Initially, as Justice Moulton acknowledges, Cohen's credibility is undeniably undermined by the crimes to which he pleaded guilty in federal court, which included willful income tax evasion (over a period of five years), making a false statement on a personal credit application to a financial institution, perjurious testimony before a congressional committee, and making an illegal political campaign contribution. A harsh but illuminating light is cast on Cohen's character by the Government's sentencing memorandum, dated December 17, 2018, that was submitted in his case to the United States District Court for the Southern District of New York.[FN45] Cohen's unreliability as a witness is further demonstrated by his testimony in this case specifically disavowing his guilty pleas to the tax evasion and false statement charges. Cohen went so far as to testify, under oath, that he had been lying to the federal court when he pleaded guilty to those offenses.
Further, in his original February 2019 congressional testimony charging that President Trump's SFCs were "inflated" — which the Attorney General claims furnished the trigger for this investigation, although she had been threatening to pursue President Trump throughout the preceding months during her campaign for that office — Cohen (who is not an accountant) nowhere stated that he personally played any role in preparing the SFCs. As previously noted, Cohen's conclusory allegations about the SFCs were a very small part of his testimony before the House Oversight Committee, which was primarily focused on other aspects of Cohen's relationship with President Trump. If Cohen had been the key figure in preparing the SFCs that he claims to have been in his testimony in this action, one would have expected him to provide that information to the House Oversight Committee in his February 2019 testimony — only about two years after he left the Trump Organization — to provide a foundation for his allegation that the values in the SFCs were inflated. Yet, Cohen said nothing to indicate that he had been instrumental in preparing the SFCs. Cohen did say, however, that he had presented SFCs to Deutsche Bank in connection with President Trump's contemplated bid to purchase the Buffalo Bills football team, to Forbes Magazine for publicity purposes, and to certain unidentified insurance companies. It is strange that in his testimony in this action, after the lapse of several more years, Cohen revealed for the first time that the SFCs were his own handiwork and offered previously undisclosed details about how he had fabricated the net worth figures that President Trump supposedly wanted.
Moreover, Cohen's claim to have been the architect of the SFCs is completely uncorroborated by any other evidence in the vast, nearly 50,000-page record of this case. No other witness testified that Cohen was involved in preparing the SFCs. Perhaps more significantly, the Attorney General does not identify a single piece of documentary evidence, out of the veritable mountain range of documents that her office examined in the course of its pursuit of this matter, to show that Cohen — who, to reiterate, was not an accountant or any other kind of financial professional — was involved in preparing the SFCs (as opposed to using them after they had been prepared). By contrast, the record contains numerous emails concerning the SFCs between defendant Jeffrey McConney, who had primary responsibility within the Trump Organization for preparing them, and Donald Bender, the accountant who was the Trump Organization's contact professional at Mazars, the accounting firm that compiled the SFCs.
Most tellingly, Cohen gave testimony before a congressional committee that directly conflicts with his testimony about the SFCs in this action. On February 28, 2019, Cohen gave the following testimony before the House Permanent Select Committee on Intelligence (the House Intelligence Committee), under questioning by Daniel Goldman, the senior advisor and director of investigations for the majority staff of that committee:
"Q. And then, finally, there was some discussion [during Cohen's testimony before the House Oversight Committee the previous day] of the personal financial statements of Donald Trump for 2011 and 2013 that you provided to the Oversight Committee and to this committee. Is that —
"A. As well as 2012.
"Q. Sorry. As well as 2012. Right.
"Do you have any knowledge of everything that the Trump Organization might have used those personal financial statements for?
"A. No.
"Q. So would you consider that to be evidence of fraud?
"Let me take a step back. Do you believe those financial statements to be inaccurate?
"A. Yes.
"Q. Why do you believe that?
"A. Well, first of all, despite the letter from Jonathan Lowe of Predictive, which talks about the value of the Trump brand, I don't believe that $3 billion number is legitimate.
"Q. What about the other numbers that are on there?
"A. And then — I was going backwards. Sorry.
"And then, as far as the assets are concerned — and this is something that's also pretty well known — Mr. Trump makes determinations based upon — he makes determinations based on the value of the asset based upon his personal feeling.
 "Q. Did Mr. Trump direct you or Mr. Weiselberg [sic] to inflate the numbers for his personal statement?
"A. I'm sorry. Did he ask me to inflate the numbers? Not that I recall, no.
"Q. Did you overhear any conversation with Alan Weisselberg [sic] about these numbers?
"A. Conversation between Mr. Trump and Alan Weiselberg [sic]?
"Q. Uh-huh.
"A. No. The statements I heard from Mr. Trump directing me and Alan Weiselberg [sic] were, he wanted to rise in the Forbes 400 list, and he directed that Alan [sic] and I go and meet with the writer for Forbes and give her the information, explain to her the value of the assets, which were already — which were inflated.
"Q. So the value of the assets on those personal financial statements were, to your understanding, inflated.
"A. Yes." (Deposition of Michael Cohen, Executive Session of the Permanent Select Committee on Intelligence, 116 Cong. [2019], at 148-150 [emphasis added]).
Cohen's testimony that he did "not . . . recall" receiving any direction from President Trump "to inflate the numbers" in the SFCs is plainly inconsistent with his testimony in this action that President Trump told him to do just that. Further, even if he had not testified to not "recall[ing]" having received any such direction, his failure to testify to his supposedly central role in preparing the SFCs, when asked for the basis of his belief that the SFC valuations were inflated, completely discredits his testimony in this action — four years more distant from the relevant events — that he was involved in preparing the SFCs so that they would reflect President Trump's desired values.
At the trial of this action, Cohen, upon being confronted with his testimony before the House Intelligence Committee, disavowed it, telling Supreme Court that he had been lying when he told the congressional committee that he did "not . . . recall" being directed to inflate the numbers in the SFCs. Upon cross examination by President Trump's counsel before Supreme Court, Cohen testified as follows:
"Q. Mr. Cohen, were you being honest in front of the Permanent Select Committee when you testified on February 28, 2019?
"A. No.
"Q. So you lied under oath in February of 2019? Is that your testimony?
"A. Yes."
However, later the same day, upon cross examination by counsel for Donald Trump, Jr., and Eric Trump, Cohen reversed himself and testified that his testimony before the House Intelligence Committee, to the effect that he had no recollection of being directed to inflate the SFCs, had been truthful — thereby admitting, by necessary implication, that he had lied before Supreme Court in this action when he disavowed his testimony before the House Intelligence Committee:
"Q. Two months after you pled guilty to lying to Congress, before you had to report to prison, you lied to Congress again [in February 2019], correct?
"A. No. . . .
"Q. You didn't lie to Congress again?
"A. Mr. Trump did not —
"THE COURT: No. No. No speech.
"THE WITNESS: This will go on forever unless he lets me explain.
"Q. I'm sure they are going to try to rehabilitate you. I don't know how.
"A. So the answer is no.
"Q. The answer is no. So now you are saying when you talked earlier about the fact that that was a lie to Congress, now that's a lie?
"A. No. I made a mistake.
"Q. So you made a mistake —
"A. I made a mistake.
"Q. — when you testified under oath —
"A. Because it's —
"THE COURT: Mr. Cohen. You're interrupting the lawyer. Just wait and let him finish the question.
"THE WITNESS: Okay.
"Q. So let me get this straight. So now you're saying when you testified earlier that you lied to Congress in February of '19 and you just testified in the last five minutes that you lied and you testified to Congress in February of '19, now you are saying, 'I didn't lie when I testified to Congress in February of '19.' Is that what you are saying?
"A. Yes.
"Q. So now you're saying that that statement is a true statement, correct?
"A. Correct.
"Q. You are now saying under oath after all of the examination of the Attorney General and all the cross-examination, you're now saying that Mr. Trump did not direct you or Mr.Weisselberg to inflate the numbers on his personal statement? Is that what you're saying, sir; yes or no?
. . .
"THE COURT: I direct the witness to answer yes or no and the question was yes or no.
"A. I stand with the response, 'Not that I recall, no.'
"Q. . . . So you're saying that this was truthful testimony, yes or no?
"A. Yes.
"Q. Okay. So Mr. Trump then never directed you to inflate the numbers in his personal statement; yes or no? Yes or no?
"A. Correct."
After the foregoing exchanges between Cohen and defense counsel, upon redirect examination, counsel for the Attorney General, by way of an attempt to rehabilitate Cohen's credibility, was permitted, over objection, to invite Cohen to give his "explanation" of his testimony before the House Intelligence Committee. Cohen then gave the explanation quoted (without context) by Justice Moulton, in which Cohen asserted that President Trump, "like a mob boss . . . tells you what he wants without specifically telling you." However, Cohen did not explain why he did not tell the House Intelligence Committee — in response to a question asking him directly whether President Trump had instructed him to inflate the numbers in the SFCs — that Cohen had inferred such an instruction from statements President Trump made that did not include a literal request to inflate the numbers.
In describing the Attorney General's evidence of President Trump's intent, Justice Moulton refers chiefly to Cohen's testimony, and endorses Supreme Court's finding that Cohen was somehow credible. This raises the question: which Cohen is it whom Supreme Court and Justice Moulton find credible?
Without Cohen's testimony — the sole basis for the Attorney General's "reverse engineering" theory of how the values in the SFCs were reached — the Attorney General's case that President Trump had fraudulent intent with regard to the SFCs falls apart. The only evidence to which the Attorney General and Justice Moulton point as supposed corroboration of Cohen's account are a handful of lines from the testimony of Patrick Birney, an executive who joined the Trump Organization in 2015. Specifically, the Attorney General and Justice Moulton rely on Birney's testimony that, at some unspecified point in time between 2017 and 2019, when he was working on the preparation of SFCs under defendant Weisselberg's supervision, Weisselberg told him that President Trump "wanted his net worth on the [SFC] to go up."[FN46] This vague testimony (which Birney gave by answering "yes" to a leading question), insofar as it was offered to show what President Trump told Weisselberg, is inadmissible hearsay. And it bears emphasis that Birney gave no testimony connecting Cohen (who left the Trump Organization in 2017) to the preparation of the SFCs. Given that the applicable standard of proof is clear and convincing evidence (as previously discussed), the Attorney General has failed to prove fraudulent intent on the part of President Trump in support of the second through fifth and seventh causes of action.
Finally, I will briefly discuss the one objective factual error that was used as a basis for the valuation of an asset in certain of the SFCs — namely, the assumption that the Triplex apartment, located at Trump Tower, was approximately 30,000 square feet in size, rather than its actual size of approximately 10,000 square feet. The Attorney General did not explain the origin of this error as part of her case, but the weight of the evidence plainly shows that the error originated from a September 2012 email sent by Kevin Sneddon, a real estate broker then employed by Trump International Realty, to his supervisor, Cathy Kaye, and defendant Jeff McConney. In this email, Sneddon stated that the Triplex was "30,000 square feet," and valued the unit in the range of $120 million to $180 million based on that square footage figure (using a value per square foot of $4,000 to $6,000). McConney testified that he relied on Sneddon's valuation because Sneddon was a broker and "knew the property a lot better than [McConney] did." Although Sneddon testified that he did not recall sending this email, it emerged at trial that an Assistant Attorney General had told him, in a pre-interview conversation, that it was important to the Attorney General's case that Sneddon say he was not the person who came up with the 30,000 square foot number. There is no evidence tending to show that the valuation of the Triplex based on the excessive square footage number was anything other than an unintentional error.
As evidence of defendants' culpability, Justice Moulton points to an email from the Trump Organization's Vice President of Marketing, Amanda Miller, in connection with a Forbes inquiry. Specifically, on Friday, March 3, 2017, Forbes emailed the Trump Organization a list of over 50 questions regarding various assets and transactions related to the Trump Organization and gave them until the following Monday to answer. One of those question asked why "President Trump has told Forbes in the past that [the Triplex] occupies 33,000 square feet" when property records "shows [the Triplex] is 10,993.39 square feet." An email from Amanda Miller on Monday morning indicates that the Trump Organization began formulating a response to the Forbes inquiry by "combing through the most important questions." About an hour later, Amanda Miller followed up with the email at issue, which states that "I spoke to Allen W. re: [Trump World Tower] + [Trump Tower] — we are going to leave those alone." Justice Moulton presents the email out of context and in a way that implies that the Trump Organization knew that the square footage of the Triplex was incorrect but intentionally held off on correcting the SFCs. However, the questions were about more than just the Triplex and the phrase "leave those alone" in the email apparently meant that they would not respond to those questions from Forbes. Moreover, while the 2016 SFCs, which were based on the incorrect square footage, were submitted several weeks after receiving the Forbes inquiry, the square footage was corrected by the time the 2017 SFCs were disseminated, long before this investigation started.
IV. Most of the Judgment is in Any Event Subject To Vacatur as Time-Barred Pursuant to This Court's Decision on the Earlier Appeal Holding That the Continuous Wrong Doctrine Did Not Delay or Extend Any Limitation Period.
Since my view is that the complaint should be dismissed in its entirety, both for the Attorney General's lack of standing and for the failure of her proof, and given that I am in dissent, I need not reach the issue of the statute of limitations. Nonetheless, I note that I agree with Justice Higgitt on this issue to the extent he holds that, with regard to defendants bound by the relevant tolling agreement, the Attorney General's claims are time-barred to the extent they are based on the issuance of SFCs pursuant to transactions that closed before July 13, 2014. This is the necessary implication of our holding in the previous decision that "claims are time barred if they accrued — that is, the transactions were completed — before [the applicable cut-off date]" (Trump I, 217 AD3d at 611).[FN47]
However, even if Justice Moulton is correct that a new and independent claim accrued upon the issuance of each postclosing SFC, it should be noted that pursuant to our holding in Trump I that "[t]he continuing wrong doctrine does not delay or extend these [limitation] periods" (id.), the issuance of an allegedly false or misleading SFC after July 13, 2014, did not serve to revive claims arising from transactions that were "completed" (i.e., closed or consummated) before that date. Accordingly, Supreme Court erred to the extent it relied on post-closing SFCs to grant relief based on transactions that closed before the statute of limitations cut-off date. This is so whether the relief comprised disgorgement of "ill-gotten interest savings" or disgorgement of profits from the ultimate sale of the asset. While a postclosing SFC within the limitations period might have provided a basis for relief to the Attorney General, she has not made any attempt to quantify the benefits, if any, that President Trump derived (whether legitimately or not) from the postclosing SFCs, as opposed to the benefits that he derived from the closing of the original transactions, which set the terms of the deals.[FN48]
The bulk of the disgorgement imposed by the judgment — in aggregate, $350,980,057, including prejudgment interest — comprises benefits derived by defendants (allegedly wrongfully) from the closing of four transactions before July 13, 2014. The four time-barred transactions, their respective dates, the respective amounts of disgorgement the judgment awarded based on them (including prejudgment interest), and the nature of the disgorged benefit in each case are as follows: (1) the OPO contract (2012) ($156,568,094) (profit from sale); (2) the Ferry Point contract (February 2012) ($63,580,274) (profit from sale); (3) the Doral loan (June 11, 2012) ($105,573,227) (interest savings); and (4) the Chicago loan (November 9, 2012) ($25,258,462) (interest savings). The Attorney General's claims for disgorgement of these benefits are time-barred and, even if the judgment could otherwise be sustained, this portion of the award would have to be vacated.
Contrary to Justice Moulton's assertion, any interest savings that defendants realized from a transaction that closed outside the limitations period (i.e., before July 14, 2014) flowed directly from the original closing, which set the interest rate, and are not attributable to postclosing SFCs issued within the limitation period, which did not affect the interest rate. Thus, any claim to disgorge interest rate savings that President Trump supposedly realized since July 14, 2014, on loans that closed before that date, is time-barred. Had a lender declared a default based on postclosing SFCs that corrected misstatements hypothetically made at the time of closing, such a default would have entitled the lender to demand early repayment of the loan, but would not have entitled the lender to reset the interest rate to what it would have been absent the (hypothetical) misstatements, as Justice Moulton mistakenly appears to believe. While it is conceivable that an economist could have calculated a plausible value of an option to demand early repayment of the loan, the Attorney General offered no such evidence in this case.
V. The Disgorgement Award is Unsupported By the Record and Constitutionally Infirm.
Even if the Attorney General had proven that defendants violated section 63(12), and even if all of those violations had occurred within the limitations period, the judgment's award of $464.5 million in "disgorgement" damages and prejudgment interest — purportedly to strip defendants of any benefit that they may have derived from the allegedly fraudulent SFCs — could not stand. The record establishes that there is no causal connection between any wrongly inflated valuations in the SFCs and the benefits the judgment seeks to disgorge (which were erroneously calculated in any event). Moreover, the disgorgement award is so large as to violate the excessive fine and due process clauses of the federal and state constitutions.
"Disgorgement is distinct from the remedy of restitution because it focuses on the gain to the wrongdoer as opposed to the loss to the victim. Thus, disgorgement aims to deter wrongdoing by preventing the wrongdoer from retaining ill-gotten gains from fraudulent conduct" (People v Ernst & Young, LLP, 114 AD3d 569, 569 [1st Dept 2014] [citation omitted]). Since a gain is not "ill-gotten" unless it was obtained by wrongful means, imposition of the remedy of disgorgement requires a showing that the gain in question was caused by wrongdoing. "[T]he disgorged amount must be causally connected to the violation" (J.P. Morgan Sec. Inc. v Vigilant Ins. Co., 91 AD3d 226, 232-233 [1st Dept 2011] [internal quotation marks omitted], revd on other grounds 21 NY3d 324 [2013]).
Here, as discussed under point I above, the record establishes that the allegedly inflated valuations in the SFCs had no impact on the terms of any of the subject transactions. To reiterate, the counterparties in fact did not rely on President Trump's subjective estimations of the value of his assets, but, in accordance with industry practice and the SFC's disclaimers, did their own due diligence and relied on their independent, and far more conservative, assessments of President Trump's net worth. Moreover, as previously noted, the Attorney General admits in her appellate brief that her own office believes that President Trump's net worth throughout the relevant period was always at least $2 billion, a figure many times the minimum net worth required to qualify for the favorable terms his organization received in the subject transactions. In sum, there being no causal connection between the allegedly excessive valuations in the SFCs and any benefit defendants realized from the subject transactions, the entire disgorgement award would have to be vacated on that independent ground.[FN49]
Even if there were a basis for awarding disgorgement, Supreme Court improperly calculated the amount to be disgorged. The judgment directs disgorgement of both the allegedly wrongful interest rate savings on the OPO loan and also the proceeds realized from the ultimate sale of the OPO. The Attorney General's theory underlying the disgorgement award — which the court adopted — was that defendants should not be permitted to retain the profits realized from the loans because those loans would not have been secured without the fraudulent SFCs. However, to assume a world where the loans (and the profits from those loans) did not take place also necessary negates the interest-rate differential savings that the defendants obtained in securing the loan. This amounts to an impermissible double recovery, leaving defendants worse off than they would have been had they never become involved with the property (see State of New York v Solil Mgt. Corp., 128 Misc 2d 767, 773 [Sup Ct, NY County 1985], affd 114 AD2d 1057 [1st Dept 1985] [holding that petitioner was "not entitled to punitive damages or treble damages" under section 63(12)], lv denied 67 NY2d 606 [1986]).
In addition, the disgorgement award is an excessive fine prohibited by the federal and state constitutions. "Both the Federal and State Constitutions prohibit the imposition of excessive fines" (County of Nassau v Canavan, 1 NY3d 134, 139 [2003]). The Excessive Fines Clause of the Eighth Amendment limits the government's power to "extract payments, whether in cash or in kind, as 'punishment for some offense'" (id., quoting Austin v United States, 509 US 602, 609-610 [1993]). A fine is excessive where it is "grossly disproportional to the gravity of a defendant's offense" (id. at 140). Further, when a civil penalty "serves, at least in part, deterrent and retributive purposes, it is thus punitive and subject to the Excessive Fines Clause" (id. at 139-140).
The disgorgement award in this case is punitive in nature because no victims are parties to this action, the penalty seeks to deter rather than compensate, and the disgorgement will be paid exclusively to the government (see Kokesh v Securities & Exch. Commn., 581 US 455, 461-465 [2017]). In making the award, Supreme Court used punitive and retributive language, stating that it was aimed to "deter wrongdoing by preventing the wrongdoer from retaining ill-gotten gains." The court described defendants' conduct as a "venial sin," noting that defendants demonstrated a "complete lack of contrition and remorse" that it found to be almost "pathological." Thus, inasmuch as the disgorgement award was clearly designed to punish the offender and is to be paid exclusively to the government rather than to victims (if any), it clearly constitutes a fine for purposes of constitutional analysis.
In considering whether a fine is "grossly disproportional" to the alleged offense (and thus in violation of the Excessive Fines Clause), courts will consider factors such as "the seriousness of the offense, the severity of the harm caused and the potential harm had the defendant not been apprehended, the maximum fine to which the defendant could have been subject, and defendant's economic circumstances" (see e.g. Matter of Prince v City of New York, 108 AD3d 114, 121 [1st Dept 2013]; see also United States v Bajakajian, 524 US 321, 334-335 [1998]). As previously discussed, even if the valuations in the SFCs are considered to have been technically "fraudulent" within the meaning of section 63(12), the alleged misconduct prompted no complaints and had no victims, since the counterparties did not rely on the valuations and profited handsomely from the transactions. There is also virtually no risk of continued or potential harm given the clear disclaimers and the understanding in the relevant marketplace that valuations in personal financial statements are subjective and not to be relied upon by counterparties, who are expected to conduct their own diligence (see HSH Nordbank AG v UBS AG, 95 AD3d 185, 193 [1st Dept 2012]).
Further, while section 63(12) itself does not provide for a maximum fine to be imposed, consideration of the alleged criminal violations underlying the second through seventh causes of action reveals that the "crimes" were in fact class A misdemeanors, each of which carry a maximum fine of $1,000 for individuals and $5,000 for corporations (see Canavan, 1 NY3d at 140; Penal Law §§ 80.05[1], 80.10[a][b]). Yet, based on these claims, Supreme Court assessed financial penalties of $363,894,816, plus pre-judgment interest, for a total disgorgement award of approximately $464 million. The Attorney General's assertion that "disgorgement will always be proportional . . . to the defendant's illegal profit" does not overcome the self-evident excessiveness of this award.
The excessive disgorgement award also violates the due process clause of the Fourteenth Amendment, which "prohibits the imposition of grossly excessive or arbitrary punishment on a tortfeasor" (State Farm Mut. Auto. Ins. Co. v Campbell, 538 US 408, 416 [2003]). Undertaking a similar analysis, New York and federal courts, in determining whether a punitive award is "grossly excessive," will consider (1) the degree of reprehensibility of the defendant's conduct, (2) the disparity between the actual and potential harm suffered by plaintiff and the punitive award, and (3) the difference between the punitive damages awarded and the civil penalties imposed in similar cases (id. at 418; see also Matter of 91st St. Crane Collapse Litig., 154 AD3d 139, 157-158 [1st Dept 2017]).
Despite Supreme Court's finding that defendants' actions "shocked the conscience," all that was involved here was what would have been — had any of defendants' counterparties had any complaints about the transactions — "an ordinary commercial dispute between . . . [private] parties, with no widespread impact" (Sawtelle v Waddell & Reed, 304 AD2d 103, 113 [1st Dept 2003]; see id. at 111-113). And while the Attorney General contends that defendants committed "serious" offenses with a great "severity of . . . harm," she fails to address the absence of actual injuries, losses, or complaining victims. Further, while she attempts to distinguish Canavan and Austin as involving "forfeitures" rather than disgorgement, those cases provide for the governing standard of excessiveness for any penalty that constitutes a "fine" under the Excessive Fines Clause, not just civil and criminal forfeitures.
In sum, the disgorgement award cannot stand because the benefits sought to be disgorged were not causally connected to the alleged misconduct and because the disgorgement violates the excessive fine and due process clauses of the federal and state constitutions. Accordingly, I concur with Justice Moulton that the disgorgement award should be vacated.
VI. The Sanction Award Against Defense Counsel Was Improvident.
Given that I would reverse the judgment in its entirety and dismiss the complaint, it necessarily follows that, upon the appeal of nonparty appellants, I concur with all of my colleagues in the reversal of the imposition of sanctions against defense counsel in Supreme Court's order disposing of the summary judgment motions. While 22 NYCRR 130-1 permits a court to exercise its discretion in imposing costs and sanctions where a party or counsel engages in "frivolous conduct," "frivolous conduct" is defined as taking positions that are "completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law" (22 NYCRR 130-1.1[c][1]). In determining whether conduct was frivolous, a court must consider "the circumstances under which the conduct took place, including the time available for investigating the legal or factual basis of the conduct, and . . . whether or not the conduct was continued when its lack of legal or factual basis was apparent, should have been apparent, or was brought to the attention of counsel or the party" (id. § [c][3]).
Supreme Court improvidently exercised its discretion in sanctioning defense counsel for raising "frivolous" arguments in this action (see e.g. Matter of Kings County Hosp. v M.R., 226 AD3d 513, 513 [1st Dept 2024]). The arguments raised by defense counsel in their summary judgment motion and in opposition to the Attorney General's summary judgment motion plainly do not constitute "frivolous" conduct within the meaning of the rule. For the reasons already discussed in connection with defendants' appeal, the arguments of their counsel on the summary judgment motions were, in my view, meritorious, and certainly could not be characterized as "completely without merit." Further, to the extent defendants raised similar arguments concerning the Attorney General's standing and capacity and concerning disgorgement at the preliminary injunction and pleading stages of the case, it was appropriate for them to do so, considering the distinct standards applicable at each procedural posture of the case and the need to preserve arguments for appellate review.
Supreme Court's sanctioning of defense counsel — essentially for playing the role they are supposed to play in our adversarial judicial system — raises serious doubts about the trial court's objectivity and impartiality in presiding over and adjudicating this action. From their writings, it appears that Justice Moulton and Justice Higgitt tacitly share this concern.
Another example of the trial court's troubling attitude toward this case was the manner in which it treated defendants' experts. At trial, defendants submitted testimony by 12 highly qualified experts in relevant fields. In its posttrial decision, Supreme Court ignored ten of these experts and summarily dismissed the remaining two, accusing one of them of offering "unsubstantiated dream[s]" and the other of giving testimony "ensconced in numerous lines of academic jargon."
At the same time that it treated the defense experts so dismissively, the court placed great faith in the testimony of Michael Cohen, a convicted felon and disbarred attorney who admitted to having initially lied in his testimony in this action. Specifically, and as discussed earlier, Cohen initially testified that he was tasked by President Trump to "reverse engineer" the SFCs to achieve greater asset values but — after being confronted by defense counsel with his contrary admission during his congressional testimony in 2019 — backtracked and admitted that President Trump "never directed [him] to inflate the numbers on his personal statement." Cohen also acknowledged that he was a deeply biased witness, admitting on the stand that he harbored "significant animosity towards President Trump" and that he has "made a career out of publicly attacking President Trump." Nonetheless, the court credited all of Cohen's testimony and found defendants liable on the second through seventh causes of action based on his testimony.
Finally, even if the trial court's findings of liability are defensible, the grotesquely excessive disgorgement award that the trial court imposed, amounting to nearly a half billion dollars, is not. Indeed, even Justice Moulton, who writes to affirm the liability findings, finds it necessary to vacate the disgorgement award in its entirety. As I have already discussed, the disgorgement award is completely disconnected from any harm conceivably caused by the conduct at issue, violates the constitutional prohibition of excessive fines, and seems to have been intended to destroy President Trump's business organization. In essence, the award amounted to something close to a commercial death penalty. There can be little doubt that something other than a passion for justice and fair play lies behind the imposition of such punishment, on the part of both those who sought it and the court that imposed it. Everyone who lives or does business in New York has a right to expect better from the Attorney General and a court of the state that considers itself the business capital of the world.
Conclusion
In concluding, I again note that so far as we know, section 63(12) has never been used in the way it is being used in this case — namely, to attack successful, private, commercial transactions, negotiated at arm's length between highly sophisticated parties fully capable of monitoring and defending their own interests. All parties to these private transactions profited handsomely from the deals, from which there was no discernable negative effect on the public interest. This action does not serve to protect the consuming public (cf. General Elec., 302 AD2d at 314), which, as previously noted, was the original intent of section 63(12). This action does not protect the integrity or operation of the public securities market (cf. Greenberg, 21 NY3d at 446; Ernst & Young, 114 AD3d at 569-570), given that defendants do not issue publicly traded securities. Nor does this action protect small investors (cf. Coventry First, 13 NY3d 108) or small businesses (cf. Northern Leasing, 193 AD3d 67) or serve to vindicate public health standards (cf. Amazon.com, 550 F Supp 3d 122).
I am not surprised that no precedent for the use of section 63(12) being made in this action can be found, as I doubt that the legislature, in adopting section 63(12), did so with the purpose of protecting the J.P. Morgans and John D. Rockefellers of the world from being taken advantage of by other business titans. Yet, this is essentially what this action does. As the amici have pointed out, this inherently selective use of section 63(12) to attack financial disclosures in private commercial transactions between sophisticated parties will discourage investors and businesses from doing business and making investments in New York, and may prompt real estate investors to abandon the New York market. In view of these considerations, and given the constitutional concerns raised by a reading of the statute that invests the Attorney General with essentially limitless power to prosecute her political enemies based on transactions that did not threaten the public interest in any way, I would not construe section 63(12) to permit entry of judgment in favor of the Attorney General under these circumstances. In any event, given the commercial context of the transactions at issue and the sophistication of the parties involved, the Attorney General has fallen far short of proving conduct by defendants that "ha[d] the capacity or tendency to deceive or create[d] an atmosphere conducive to fraud" (Northern Leasing, 193 AD3d at 75 [internal quotation marks omitted]).
I am troubled that my colleagues are affirming Supreme Court's liability finding, notwithstanding that three out of the five members of this panel clearly believe that the judgment should be vacated, as the Attorney General has not yet proven her case. Nonetheless, what emerges from this Court's vacating the $500 million disgorgement award, with which I concur, is the frustration of what appears to me to have been the Attorney General's true aim in bringing this action. Plainly, her ultimate goal was not "market hygiene," as posited by Justice Moulton, but political hygiene, ending with the derailment of President Trump's political career and the destruction of his real estate business. The voters have obviously rendered a verdict on his political career. This bench today unanimously derails the effort to destroy his business.
For all of the foregoing reasons, I would reverse the judgment and dismiss the complaint. Accordingly, while I join in vacating the disgorgement award and the imposition of sanctions on defense counsel, I respectfully dissent to the extent the decretal affirms the judgment.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE 
DIVISION, FIRST DEPARTMENT.
ENTERED: August 21, 2025

Footnotes

Footnote 1: See Hearing with Michael Cohen, Former Attorney to President Donald Trump: Hearing Before the Comm. on Oversight & Reform, 116 Cong [2019] [Statement of Michael Cohen] [Cohen's Oversight Committee Testimony].

Footnote 2: During a portion of the relevant period, President Trump was a citizen not holding office. However, for purposes of this appeal there is no need to delineate his status and he is referred to solely as President Trump herein. 

Footnote 3: The SFCs submitted to Congress for 2011-2013 are cited in the complaint except that the complaint cites to a later version of the 2013 statement. Numerous press outlets circulated the 2011-2013 statements to the public (see e.g. Christal Hayes, Here's the evidence Michael Cohen shared with Congress, showing hush money payments and Trump's Finances, USA Today, Feb. 27, 2019, available at https://www.usatoday.com/story/news/politics/2019/02/27/michael-cohen-evidence-documents-given-congress-trump/3003149002/ [last accessed July 26, 2025]; See Trump's Checks to Michael Cohen and Other Documents, NY Times, Feb. 27, 2019, https://www.nytimes.com/interactive/2019/02/27/us/politics/cohen-testimony-documents.html [last accessed July 26, 2025]; Katie Mettler, Here are the Documents Michael Cohen Brought to Congress, Wash Post, Feb. 27, 2019, available at https://www.washingtonpost.com/politics/2019/02/27/here-are-documents-michael-cohen-brought-congress/ [last accessed July 26, 2025]).

Footnote 4: In August 2021, the Attorney General and the Trump Organization entered into a tolling agreement, which tolled the limitations period for bringing an action against defendants from November 5, 2020, through October 31, 2021 (the Tolling Agreement). The Tolling Agreement was later extended through May 31, 2022.

Footnote 5: Nine amici curiae have sought leave to file amicus briefs. On August 22, 2024, this Court granted five amici leave to file amicus briefs. The four outstanding amici motions for leave to file amicus briefs are granted, and all amicus briefs have been considered by the panel (22 NYCRR 1250.4[f]).
Footnote 6: Justice Friedman cites the inapt case Lujan v Defenders of Wildlife (504 US 555, 561 [1992]) to support the fiction that somehow standing is still a live issue at this late stage. Lujan involved the standing requirements for "[t]he party invoking federal jurisdiction." Contrary to New York law, federal courts hold that at the pleading stage, "general factual allegations of injury resulting from defendant's conduct may suffice" but at the summary judgment stage, Federal Rules of Civil Procedure rule 56(e) requires "specific facts" (id.). Moreover, in Lujan, the standing issue pertained to whether the plaintiff suffered a direct injury that was not common to the public (id. at 575). Here, the Attorney General obtains standing by virtue of a New York State statute when she sues on behalf of the people of New York.

Footnote 7: People v Grasso (54 AD3d 180 [1st Dept 2008]) does not support Justice Friedman's standing argument. There, the Attorney General lost his standing to sue under N-PCL 720 (b), which grants limited authority to the New York State Attorney General to bring certain actions on behalf of not-for-profit corporations. The then Attorney General lost standing under the statute because the New York Stock Exchange converted from a not-for-profit company to a for-profit company (Grasso, 54 AD3d at 183). Here, standing has not been lost because the facts pertinent to standing have not changed since the complaint was filed.

Footnote 8: The public has an interest in deterring fraudulent activity to encourage and maintain New York's financial markets (see Annual Message of the Gov., 1959 McKinney's NY Sess Laws 1690, 1700; see also People v Greenberg, 95 AD3d 474, 480 [1st Dept 2012] [the Attorney General properly brought claims pursuant to the Executive Law § 63(12) and the Martin Act to "deter future fraud, and maintain the public trust"], affd 21 NY2d 439 [2013]; Matter of People v Applied Card Sys., Inc., 11 NY3d 105, 125 [2008] [noting "the importance of permitting [the Attorney General] to seek restitution to deter Executive Law and Consumer Protection Act violations"]).

Footnote 9: In Lochner v New York (198 US 45 [1905]) the United States Supreme Court struck down a New York State Law that sought to establish maximum working hours for bakers on the ground that such regulations violated a "liberty of contract" that the Court's majority found in the Due Process Clause of the 14th Amendment. In one of the most famous dissents in the history of the Supreme Court, Justice Holmes excoriated the majority for elevating a type of laissez faire economics in order to negate legislative choices grounded in contrary economic theory (id. at 74-77). For a discussion of Holmes' dissent, and a short but memorable description of the punishing working hours and unsanitary conditions in tenement bakeries in the period, see Melvin I. Urofsky, Dissent and the Supreme Court: Its Role in the Court's History and the Nation's Constitutional Dialogue, 137-149 [Sept. 2015]. Lochner gave its name to a lengthy period in which the Supreme Court struck down federal and state legislation, passed during the Progressive Era and the Great Depression, designed to improve working conditions and address other social ills (see 1 Laurence Tribe, American Constitutional Law, §§ 8.1-8.7 [3d ed 2000]). The Lochner era is generally considered to have come to an end in 1937 with West Coast Hotel v Parrish (300 US 379 [1937]).

Footnote 10: The statute's legislative history is one repository of such opposition. When passed in 1956, section 63(12) was denounced as "a far-reaching provision" that was "drawn in too loose a manner" (Mem from NY State Dept Audit & Control to Gov Averell Harriman, Bill Jacket, L 1956, Rep of NY State Bar Assn Comm on State Leg, at 12). When section 63(12) was amended in 1965 to equate its definition of "fraud" with that of Martin Act's (General Business Law §§ 352 et seq.), section 63(12) was criticized as "giv[ing] an 'unconscionable' degree of power to the enforcement arm of the government" (Mem from NY State Council of Retail Merchants, Inc. to Gov. Nelson Rockefeller, Bill Jacket, L 1965, ch 666 at 7).

Footnote 11: In fact, the Legislature has expanded the Attorney General's use of Executive Law § 63(12), rather than curbing it. In 2018, the Court of Appeals determined that the three-year statute of limitations under CPLR 214 (2), which governs actions to recover upon a liability imposed by statute, applied to Martin Act claims involving defendants' fraudulent conduct in creating and selling residential mortgage-backed securities (People v Credit Suisse Sec. [USA] LLC, 31 NY3d 622 [2018]). With respect to the applicable statute of limitations under Executive Law § 63(12), the Court remitted the case to the motion court for further proceedings in accordance with the opinion (id. at 634). Then, on June 21, 2019, "[i]n response to that opinion," the Legislature expressly provided for a six-year statute of limitations under CPLR 213[9] for Executive Law § 63(12) claims (New York v Pennsylvania Higher Educ. Assistance Agency, US Dist Ct, SD NY, 19 Civ 9155, Ramos, J., 2022).

Footnote 12: Justice Friedman's selective enforcement retaliation argument does not appear in defendants' briefs in this appeal. The only First Amendment arguments that defendants make in this appeal are limited to summarily arguing 1) that the Executive Law § 63(12) is unconstitutional because it targets falsity alone (which, as later explained, is not the case) and 2) that upholding the Judgment in any form will result in future viewpoint discrimination. In the context of the latter argument, defendants cite National Rifle Assn. of Am. v Vullo which found, on a motion to dismiss, that "the NRA plausibly alleged that Vullo violated the First Amendment by coercing DFS-regulated entities to terminate their business relationships with the NRA in order to punish or suppress the NRA's advocacy" (602 US 175, 198 [2024]). Defendants (and Justice Friedman) cite Vullo to illustrate their speculation that, in the future, section 63(12) will be used as a tool of viewpoint discrimination. Vullo did not involve selective enforcement of a statute.

Footnote 13: In opposing the Attorney General's motion for summary judgment—and moving for summary judgment to dismiss the complaint—defendants characterized the Attorney General's statements as "politically incendiary rhetoric" or "politically charged insults and accusations," not as constitutional violations.

Footnote 14: The Younger abstention doctrine provides that federal courts should generally refrain from interfering in ongoing state proceedings (Younger v Harris, 401 US 37 [1971]).

Footnote 15: SORA adjudications can result in lifelong limitations on where an ex-offender may reside, and impose regular reporting requirements. Civil commitment of mentally ill patients under the Texas statute at issue in Addington could be indefinite.

Footnote 16: The elements of common-law fraud are: "misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury" (see Ambac Assur. Corp. v Countrywide Home Loans, 31 NY3d 569, 578-579 [2018] [internal quotation marks omitted]).

Footnote 17: At trial, President Trump admitted that he did not control the partnership "[i]n the true sense."

Footnote 18: At trial, Trump Organization accountant Mark Hawthorn testified that the Trump Organization no longer prepares SFCs.

Footnote 19: President Trump's long time personal accounting firm Mazars USA, LLP, formerly known as WeiserMazars LLP (Mazars) compiled the 2011 through 2020 SFCs. The accounting firm of Whitley Penn compiled the 2021 SFC, after Mazars terminated their relationship with the Trump Organization.

Footnote 20: The difference between a compilation and an audit is explained by the authoritative body that sets professional standards for certified public accountants, known as the American Institute of Certified Public Accountants (AICPA). Accounting and Review (AR) § 80.03 provides that: 
 "A compilation differs significantly from a review or an audit of financial statements. A compilation does not contemplate performing inquiry, analytical procedures, or other procedures performed in a review. Additionally, a compilation does not contemplate obtaining an understanding of the entity's internal control; assessing fraud risk; testing accounting records by obtaining sufficient appropriate audit evidence through inspection, observation, confirmation, or the examination of source documents (for example, cancelled checks or bank images); or other procedures ordinarily performed in an audit. Accordingly, the accountant will not express an opinion or provide any assurance regarding the financial statements."

Footnote 21: Justice Friedman shares defendants' view that the court disregarded the relevant test and "adopted a strict liability standard for business representations" by holding that "falsity was all that is required." Although Supreme Court could have more clearly described its application of the standard, it did not disregard it. The court expressly noted that "it is settled" that the fraudulent conduct must have "the capacity or tendency to deceive, or create[] an atmosphere conducive to fraud" (People v Trump, 2023 NY Slip Op 33314 [U], *18, citing General Elec. Co., 302 AD2d at 314-315). The court also cited to People v Northern Leasing Sys., Inc. (70 Misc 3d 256 [Sup Ct, NY County 2020], affd 193 AD3d 67 [2021], lv dismissed 37 NY3d 1088 [2021]), which confirmed this "test" for fraud under Executive Law § 63(12) (id. at *5). Defendants unconvincingly argue in this appeal that the trial court's interpretation of Executive Law § 63(12) violates the First Amendment because false speech can be protected under the First Amendment, as illustrated by United States v Alvarez (567 US 709 [2012]). A plurality in Alvarez held that The Stolen Valor Act, which made it a crime to falsely claim receipt of military decorations or medals, violated the respondent's right under the First Amendment to introduce himself, fallaciously, as a recipient of the Congressional Medal of Honor and a wounded retired marine at a board meeting of a water district (id. at 713-714). In explaining that "falsity alone may not suffice to bring the speech outside the First Amendment," the United States Supreme Court also specified that "[w]here false claims are made to effect a fraud or secure moneys or other valuable considerations, say, offers of employment, it is well established that the Government may restrict speech without affronting the First Amendment" (id. at723). That is the case that we have here.

Footnote 22: Justice Friedman argues that lumping Mar-a-Lago together with other properties does not evince a fraudulent scheme because he surmises that the accountants made the decision not to include the individual valuations in the SFCs. Even if we could speculate on that point, defendants chose to produce SFCs in a compilation format and to consistently provide those SFCs, which did not break out the individual valuations for each property.

Footnote 23: As reflected in the Excel spreadsheets referred to as "Jeff's [i.e. McConney's] Supporting Data," which were only given to the accountants who compiled the SFCs, the estimated current values were based on the "Value if sold to an individual." The value was determined by taking the "selling price" of Palm Beach property and extrapolating a "value per acre," and then multiplying that number by the total acres of Mar-a-Lago. An additional amount was also added for "Construction of Grand Ballroom and beach cabanas adjusted for inflation" and furniture, fixtures and equipment, with a deduction for "Member Deposits" and "Member Deposits Non-Refundable." 

Footnote 24: Supreme Court held that Executive Law § 63(12) does not require a showing of materiality, although it found in the alternative that the SFCs were material (see People v Trump, 2023 NY Slip Op 33314 [U], *19).

Footnote 25: Justice Higgitt distinguishes Greenberg (95 AD3d 474), because it applied a "more than trivial" formulation "specific to the Martin Act, and not properly applicable in the Executive Law § 63(12) context, even given the historic similarities." However, Greenberg, which involved both Martin Act and Executive Law § 63(12) claims, did not adopt a different materiality test than the test articulated in TSC Indus.,which was later adopted by Rachmani. Greenberg reasoned that "an essential element of the Attorney General's Martin Act claims is that the alleged fraudulent transactions be material, i.e., that they have more than a trivial effect on net income or shareholder equity" (id. at 483, citing TSC Indus.,426 US at 449). By citing to page 449 (which has no reference to "trivial" effects), Greenberg adopted the test articulated in TSC Indus. It is also inconsistent for Justice Higgitt to conclude that Rachmani is applicable to the Executive Law § 63(12) context, but not Greenberg. As expressed by the Rachmani court, it adopted the objective materiality test articulated in TSC Indus. to decide "what would constitute a material omission which would be actionable under the Martin Act" (71 NY2d at 726). 

Footnote 26: The United States Supreme Court remanded the action to the Court of Appeals because the record did not establish that the omissions were materially misleading as a matter of law under the specific facts of that case (id. at 463-464).

Footnote 27: The standard announced in TSC Indus. applies not only to information that is "withheld," but also to "misrepresented information" (Basic Inc. v Levinson, 485 US 224, 240 [1988] [adopting the standard for cases involving § 10(b) of the Securities and Exchange Act (15 USCS § 78A et seq.) and SEC Rule 10b-5]). 

Footnote 28: Weisselberg testified at trial that "[a]ccording to our accounting firms that we spoke with, they always felt that five percent was the number that we can use — that should be utilized to determine materiality." He also agreed that it was fair to say that anything over five percent would be material. 

Footnote 29: Even considering those minimum requirements, Williams did not testify, as Justice Friedman asserts, "that President Trump would have qualified for the preferred loan pricing (meaning an interest rate in the range of 2.0 to 2.5 percent) of Deutsche Bank's Private Wealth Management division if his adjusted net worth had been as low as $100 million." The relevant exchange occurred at trial on Williams' direct examination by defendants' counsel:
 "Q. What, if anything, to your knowledge, concerning President Trump's financial condition, would have qualified him to stay within that range of 2.0 to 2.5 percent for commercial real estate in the Americas?

 "A. So, again, he — we had established that he already met the minimum requirements, so the range here as a guideline or recommended range for clients that meet those minimum requirements."
Williams did not testify that, among the "range" of interest rates, President Trump automatically qualified for a 2.0 to 2.5 percent interest rate—one of the best possible deals—because he reported a net worth satisfying the bank's minimum requirements (i.e., a net worth in excess of $100 million and $10 million in liquid assets) for preferred loan pricing.

Footnote 30: Thus, for example, Ivanka Trump emailed Weisselberg and two other Trump Organization employees, Jason Greenblatt, and David Orowitz, regarding the proposed Doral Loan stating "[i]t doesn't get better than this. lets discuss this asap . . . I am tempted not to negotiate this though." Greenblatt responded "Iwill review, but not immediately that this is a FULL principal and interest and operating expense personal DJT guaranty. Is DJT willing to do that? Also, the net worth covenants and DJT indebtedness limitations would seem to me to be a problem?" Ivanka Trump responded, in relevant part "[t]hat we have know[n]from day one. We wanted to get a great rate and the only way to get proceeds/ term and principle where we want them is to guarantee the deal. As the market has illustrated getting leverage on resorts right now is not easy."

Footnote 31: For most of the assets, Deutsche Bank did not conduct due diligence but merely applied a standardized, across-the-board "haircut," typically 50%. For example, President Trump reported to a net worth of $4.9 billion in the 2013 SFC and Deutsche Bank reduced the reported amount to $2.6 billion. The purpose of the haircut was to prepare for any adverse scenario where the client's financial position is under stress. Had defendants not used various deceptive strategies to inflate the estimated current values of President Trump's assets, the haircut would have been based on lower values, which would have resulted in lower adjusted valuations. There is also no evidence that Deutsche Bank discovered any of defendants' misrepresentations or adjusted any valuations to account for them.

Footnote 32: We disagree with Justice Friedman's view that materiality and reliance are "intertwined concepts." Rather, they are distinct concepts that defendants conflate to bolster their argument that the inflated valuations in the SFCs were not material.

Footnote 33: As Professor Bartov acknowledged, ASC 274 requires that "personal financial statements shall include sufficient disclosures to make the statements adequately informative." Yet, in his deposition, the professor acknowledged the many instances in which the SFCs omitted key information that could not be gleaned from the SFCs, such as the fact that the valuations for Mar-a-Lago did not account for the deed restrictions, and the fact that the unsold condominium units at Trump Park Avenue were rent stabilized apartments, yet were valued as if they were free market apartments. 

Footnote 34: ASC 274-10-55-1 describes the methods that may be used to calculate estimated current value. It provides in relevant part:

 "Recent transactions involving similar assets and liabilities in similar circumstances ordinarily provide a satisfactory basis for determining the estimated current value of an asset and the estimated current amount of a liability. If recent sales information is unavailable, other methods that may be used include any of the following:
 a)The capitalization of past or prospective earnings
 b)The use of liquidation values
c)
The adjustment of historical cost based on changes in a specific price index
 d)
The use of appraisals
e)
The use of the discounted amounts of projected cash receipts and payments."
Footnote 35: Certainly, as defendants' expert Professor Eli Bartov explained, GAAP valuation is an opinion on price. As such, valuation injects elements of subjectivity and imprecision. However, that is not the equivalent of finding that GAAP allows the preparer to value an asset at any price that the preparer chooses, unmoored to reasonableness or good faith.

Footnote 36: As the professor correctly explains in his affidavit, estimated current value is defined in ASC 274 as "the amount at which the item could be exchanged between a buyer and seller, each of whom is well informed and willing, and neither of whom is compelled to buy or sell."

Footnote 37: In his expert report, Professor Bartov stated: "[i]n carrying out this assignment, I have reviewed legal filings submitted in this case, discovery documents, and publicly available documents." Appendix B to his report enumerates the materials that he reviewed under the categories denominated as legal documents, depositions and exhibits, Deutsche Bank documents, publicly available documents, and accounting standards. These materials, however, shed no light on President Trump's actual business plans and assumptions, and such knowledge is crucial to determining whether the valuations were generated in accordance with GAAP.

Footnote 38: At his deposition, Professor Bartov explained that under ASC 274 a preparer is entitled to take the long-term view about the future, but his explanations were always limited to market predictions (i.e., whether the market would go up or down). 

Footnote 39: Justice Friedman relies on Professor Bartov's trial testimony explaining the "someday" value for an asset "when you complete all your plans" as support for Justice Friedman's conclusion that the estimated current values for Trump Park Avenue were not inflated as projections of future value based on planned courses of action. However, the professor's hypothetical example of a plan to build a hotel and sell it in five years did not involve a property with a restricted use, and did not speak to how the estimated current values for Trump Park Avenue were calculated in this case.

Footnote 40: Professor Bartov does not cite the deposition testimony upon which he relies to reach his conclusion. At his deposition, President Trump testified that with regard to the Triplex, "I had heard the number was high. And I think that the square footage was off somehow." He further testified, "I can see how they got to it because if you look at — if you look at a 10,000 foot floor, they figure he has three floors. But you don't measure apartments that way." Presumably, the reference to "they" is a reference to the Trump Organization. However, no one from the Trump Organization ever testified that they mistakenly calculated the square footage in this manner. The inflated valuations cannot be attributable to inadvertent error where the explanation for the error is based entirely on speculation. 

Footnote 41: That ASC 274 gives the preparer significant latitude to choose the valuation methods and assumptions does not address whether the valuation is justifiable. Professor Bartov's affidavit cites to "the father of value investing," the late Professor Benjamin Graham, who stated that "the combination of precise formula with highly imprecise assumptions can be used to establish or rather justify, practically any value one wishes" (emphasis added). However, if a preparer could justify "practically any value one wishes," absent reasonableness or good faith, then the SFCs would be functionally meaningless, and GAAP would no longer be a set of standards intended to meet the "ultimate goal . . . to ensure financial statements are complete, consistent, and comparable, and to make it easier for investors to analyze and identify useful information from financial statements" (Greenberg v Spitzer, 69 Misc 3d 1214[A], 2020 NY Slip Op 51318[U], *5 n 5 [Sup Ct, Putnam County 2020]). 

Footnote 42: Of course, appraisals can be used to generate estimated current value for real estate investments under ASC 274-10-55-6. It provides in relevant part:

"Information that may be used in determining the estimated current values of investments in real estate (including leaseholds) includes any of the following:
 a)
Sales of similar property in similar circumstances
b)
The discounted amounts of projected cash receipts and payments relating to the property or the net realizable value of the property, based on planned courses of action, including leaseholds whose current rental value exceeds the rent in the lease
 c)
Appraisals based on estimates of selling prices and selling costs obtained from independent real estate agents or brokers familiar with similar properties in similar locations
 d)
Appraisals used to obtain financing
e)
Assessed value for property taxes, including consideration of the basis for such assessments and their relationship to market values in the area."

Footnote 43: At trial, the professor also undermined the reliability of his own opinion when he explained why he used the word "generally" in his affidavit. Professor Bartov testified that "in accounting, every word matters. But not when you write a report to Courts." Because he was "writing an opinion," which defendants submitted on summary judgment, he testified that he may not have been "as careful" as he should have been. 

Footnote 44: Trump I held that for defendants bound by the Tolling Agreement, claims are untimely if they accrued "before July 13, 2014" (Trump I, 217 AD3d at 611). Consequently, timely claims accrued on or after July 13, 2014.

Footnote 45: That an Assistant Attorney General stated that "Donald Trump is not a party to the Tolling Agreement" at oral argument on a separate issue does not change this result, as judicial estoppel does not apply to counsel's statements not relied upon by the court. (see e.g. Matter of Stewart v Chautauqua County Bd. of Elections, 14 NY3d 139, 149-150 [2010] [finding judicial estoppel inapplicable where the trial court did not clearly adopt a prior inconsistent position]).

Footnote 46: Defendants do not argue that the claims based on the insurance transactions are time-barred.

Footnote 47: Contrary to Justice Friedman's position, the Attorney General did quantify the benefits that defendants derived from the submission of post-closing SFCs (i.e., $168,040,168 in interest rate savings on the Doral Loan, the OPO Loan, the Trump Chicago Loan, and the 40 Wall Street Loan), which is distinguishable from the closing benefits of "set[ting] the terms of the deals." At trial, the Attorney General's witness, Michiel McCarty, testified that the Trump Organization saved $168,040,168 as the result of lower interest rates on the Doral Loan, the OPO Loan, the Trump Chicago Loan, and the 40 Wall Street Loan. To calculate the savings, McCarty compared the difference between the lower interest rates on the four loans and the higher interest rates that Deutsche Bank's Commercial Real Estate Department offered the Trump Organization for the same projects, without President Trump's personal guaranty. McCarty calculated the interest rate savings from July 14, 2014, as follows: $72,908,30 for the Doral Loan (through May 26, 2022), $53,423,209 for the OPO Loan (through May 11, 2022), $17,443,359 for the Trump Chicago Loan (through October 27, 2023) and $24,265,291 for the 40 Wall Street Loan (through October 27, 2023). Justice Friedman's view that the interest savings flowed directly from the original closing dates, because the closing documents set the interest rates, ignores the fact that the same closing documents required annual post-closing SFCs as a condition to keeping the loans in good standing, including the favorable interest rates.

Footnote 48: Where a contract imposes a continuing obligation or duty, a cause of action based upon breach of the continuing obligation is not time-barred with respect to claims arising within the statutory period (see CWCapital Invs. LLC, 195 AD3d 12; Matter of Edelen, 219 AD3d 931, 934 [2d Dept 2023], lv denied 41 NY3d 903 [2024]). Each repeated or persistent use of a fraudulently inflated or illegal SFC would have constituted a separate, actionable wrong, not a "one-time decision on a specific contract date" (CWCapital Invs. LLC, 195 AD3d at 20; see also Matter of Yin Shin Leung Charitable Found. v Seng, 177 AD3d 463, 464 [1st Dept 2019]) [the continuing wrong doctrine applied to each alleged unauthorized use of corporate funds because "each [unauthorized use] required a separate exercise of judgment and authority"]).

Footnote 49: In their motion to dismiss before Supreme Court, defendants made one argument concerning the statute of limitations: that CPLR 213(9) could not be applied retroactively. In their consolidated reply in support of that motion, defendants addressed the continuing wrong doctrine in the context of the Attorney General's argument that the statute of limitations was tolled until 2021, the date of the last wrongful act. In rebutting this argument, defendants observed that the continuing wrong doctrine is properly applied every time a new, separately actionable wrong occurs. We agree.

Footnote 50: After January 2017, Donald Trump Jr. and Eric Trump acted as agents with power of attorney to execute certificates of compliance for the loans on behalf of President Trump.

Footnote 51: The statute defines "repeated" as the "repetition of any separate and distinct fraudulent or illegal act" and "persistent" as the "continuance or carrying on of any fraudulent or illegal act or conduct" (id.).

Footnote 52: The Attorney General alleged in her complaint that defendants violated "Penal Law § 176.05 (Insurance Fraud)." However, that citation is to the Penal Law definition of "insurance fraud" and a "fraudulent insurance act." Defendants continued to litigate this case as if the Sixth Cause of Action was premised on Penal Law § 176.05. They also argue in their briefs that the Penal Law provisions "are no more than class A misdemeanors" which is not disputed by the Attorney General. Thus, the proper citation is to Penal Law § 176.10 (insurance fraud in the fifth degree) which is the only class A misdemeanor for insurance fraud (the rest being felonies).

Footnote 53: While Justice Friedman correctly points out that this testimony is hearsay, at trial defendants' counsel agreed that the testimony was properly admitted "to establish what Mr. Weisselberg told Mr. Birney" and the "fact that Mr. Weisselberg told Mr. Birney that and whatever Mr. Birney's state of mind resulting from that" (see e.g. People v Ricco, 56 NY2d 320, 328 [1982] ["whether it is not catalogued as hearsay at all or termed an 'apparent exception' to the hearsay rule . . . a relevant extrajudicial statement introduced for the fact that it was made rather than for its contents, as here for the purpose of a proving its maker's state of mind, is not interdicted by the hearsay rule"]). Thus, although the statement could not be taken for the truth of the matter, it was relevant to Birney's state of mind in valuing the assets with Weisselberg and McConney.

Footnote 54: Justice Higgitt appears to undercut this argument by reasoning that materiality "is not necessarily dispositive of the issue of criminal intent, which must be assessed separately from the standalone fraud claim, even if the result is ultimately the same."

Footnote 55: Kelly v Metropolitan Ins. & Annuity Co. (82 AD3d 16 [1st Dept 2011]), cited by Justice Higgitt, does not compel a different result. In Kelly, plaintiffs were deprived of a fair jury trial given the cumulative effect of the court's interruption of plaintiffs' expert's testimony, the court's limitations of the expert's testimony, and the court's expressed criticism and dislike of the expert in view of the jury (id. at 20). The plaintiffs were prejudiced because "[a] reasonable view of the evidence, certainly, could support a verdict in plaintiffs favor" but the court's conduct "effectively preempted the possibility of a plaintiffs' verdict" (id.). While not explained in Kelly, the evidence was presumably insufficient to meet the high standard for overturning a jury verdict, leaving, unlike here, a new trial as the only remedy available to rectify the court's errors (see Lolik v Big V Supermarkets, 86 NY2d 744, 746 [1995] [a jury verdict cannot be overturned unless "the evidence so preponderated in favor of the plaintiff that the verdict could not have been reached on any fair interpretation of the evidence"] [internal quotation marks and brackets omitted]).

Footnote 56: Penal Law § 176.15 (the fourth degree), a class E Felony, applies to a fraudulent insurance act for "value in excess of one thousand dollars." Penal Law § 176.20 (the third degree), is a class D Felony, applies to a fraudulent insurance act for "value in excess of three thousand dollars." Penal Law § 176.25 (the second degree), is a class C Felony, applies to a fraudulent insurance act for "value in excess of fifty thousand dollars." Penal Law § 176.30 (the first degree) which is a class B Felony, applies to a fraudulent insurance act for "value in excess of one million dollars."

Footnote 57: The United States Supreme Court has been faulted by legal commentators for failing to announce a detailed test for excessiveness (see e.g. Barry L. Johnson, Purging the Cruel and Unusual: the Autonomous Excessive Fines Clause and Desert-Based Constitutional Limits on Forfeiture After U.S. v Bajakajian, 2000 U Ill L Rev 461 [2000]; John T. Holden, Exploring The "Excess" in Excessive: Reimagining the Eighth Amendment's Excessive Fines Clause in the Wake of Stars Interactive, 65 Ariz L Rev 877 [2023]).

Footnote 58: Some legal commentators have questioned this equitable/punitive distinction, noting that equitable remedies can have punitive consequences (see Theresa Galbadon, The Insidious Effects of Soundbites: Why Fences Aren't Punishment, 72 Amer U L Rev 1, 11-12 [2022]). That debate does not affect our analysis as the disgorgement in this case is clearly punitive.

Footnote 59: While a schedule of fixed monetary fines for violations of Executive Law § 63(12) might provide an additional means to sanction parties, perhaps more calibrated and easier to calculate than disgorgement, the statute does not provide such a remedy. That is a matter for the Legislature. This court has no power to engraft such a schedule on to the statute.

Footnote 60: President Trump and the Trump Organization settled the matter in 2016 (see NYSCEF Doc No. 336, Memorandum of Agreement, in People v The Trump Entrepreneur Initiative LLC, Sup Ct, NY County, index No. 451463/2013).

Footnote 61: The Trump Organization and Old Post Office LLC settled the matter in 2022 (see District of Columbia v 58th Presidential Inaugural Committee et al. [DC Super Ct May 6, 2022, No. 2020-CA-000488-B] [Settlement Order]).

Footnote 62: President Trump and the Donald J. Trump Foundation settled the matter in 2019 (NY St Cts Elec Filing [NYSCEF] Doc No. 139, Stipulation of Final Settlement, in Matter of People v Trump, Sup Ct, NY County, index No. 451130/2018). Pursuant to a Judgment of Dissolution, the Foundation was dissolved (see id. at 37-39).

Footnote 63: We take judicial notice that a notice of appeal was filed in this matter (see NYSCEF Doc No. 1, notice of appeal, People v The Trump Corp., App Div, 1st Dept, case No. 2023-00306).

Footnote 64: The Independent Monitor similarly found that absent remedial steps, "misstatements and errors may continue to occur, which could result in incorrect or inaccurate reporting of financial information to third parties" (NYSCEF Doc No. 1681, Independent Monitor Report at 12, in People v Trump).
Footnote 65: Despite the Greenberg court's observation, other courts have sanctioned permanent injunctions pursuant to Executive Law § 63(12) (see e.g. Matter of People v Ivybrooke Equity Enters., LLC, 175 AD3d 1000, 1000-1001 [4th Dept 2019] [reinstating permanent injunction]; Matter of People v Imported Quality Guard Dogs, Inc., 88 AD3d 800, 801-802 [2d Dept 2011] [permanent injunction properly granted pursuant to Executive Law § 63(12) upon prima facie showing of General Business Law §§ 349, 350 violations]; People v Cuttita, 1 Misc 3d 904(A), *9, 2003 NY Slip Op 51506[U] [Sup Ct, Sullivan County 2003] ["A permanent injunction prohibiting the operation of an unlicensed adult care facility or family type adult home is the appropriate remedy to insure [sic] that the statute will not be flouted"], affd 12 AD3d 881 [3d Dept 2004], lv denied 4 NY3d 706 [2005]).

Footnote 1: At that time, defendants also submitted an order to show cause seeking a stay of the impending trial until after determination of the summary judgment motions, which they believed would significantly streamline the issues and proof, in light of the prior appeal decision. Supreme Court declined to sign the order to show cause, finding it to be "meritless."

Footnote 2: Notwithstanding our analysis, as reflected in our writing, that vacatur of the judgment and a new trial is the appropriate resolution, Justice Rosado and I, after much consideration, with great reluctance and with acknowledgement of the incongruity of the act, join the decretal modifying the judgment to the extent of vacating the disgorgement and sanctions awards. Under the truly extraordinary circumstances here, where none of the writings enjoys the support of a majority, we are moved to take this action to permit this panel to arrive at a decision and to permit the parties and the Court to avoid the necessity of reargument (see Judiciary Law § 82). Moreover, joining the decretal effectuates the core point of agreement among the members of this panel: that the judgment, as entered by Supreme Court, cannot stand. The parties must have a decision on this matter and, concomitantly, the option of further review of this matter by the Court of Appeals, as recognized by Justice Friedman. We must therefore agree with Justice Friedman in his observation that a remarkable situation has necessitated a remarkable solution.

Footnote 3: But consider Matter of Food Parade, Inc. (7 NY3d at 570-572), interpreting Nassau County Administrative Code, chapter XXI, title D, § 21-10.2, which is substantively similar to the New York City code provision that the Guggenheimer Court analyzed, in which the Court of Appeals gave the unthinking customer some credit when it found that a supermarket's display of products was not a deceptive implicit representation that they were unexpired, if their expiration dates were present and unobscured.

Footnote 4: Because of Executive Law § 63(12)'s derivation, history, and purpose, reference to relevant analogous federal statutes governing commercial conduct is often useful to determine whether a defendant has violated Executive Law § 63(12) (see Matter of People v Applied Card Sys., Inc., 27 AD3d 104, 107 [3d Dept 2005], lv dismissed 7 NY3d 741 [2006]).

Footnote 5: In direct response to Matter of State of New York v Bel Fior Hotel, the statute was amended to extend the definition of persistent or repeated fraud or illegality from "the continuance or carrying on of any fraudulent or illegal act or conduct" to include "repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person" (see L 1981, ch 476, § 1, effective July 7, 1981).

Footnote 6: The Comptroller disapproved of the addition of paragraph 12 because he did not believe that the availability of judicial review would be a sufficient check on the Attorney General's power as so augmented (see id.).

Footnote 7: Contrary to Justice Moulton's view, we do not "undercut" our argument by insisting on the evaluation of evidence under the appropriate standards.

Footnote 8: The parties appear to agree that the Rachmani standard governs the materiality required by the Penal statutes underlying the illegality causes of action.

Footnote 9: The various metrics of materiality contained in securities cases may be of limited use here, because they often derive from SEC-issued industry-specific bulletins defining various guidelines (see e.g. ECA & Local 134 IBEW Joint Pension Trust of Chicago, 553 F3d at 197-198), and it does not appear that the institutional underwriting and high-net-worth banking industries apply the same guidelines in the same manner as the SEC to assess materiality. Securities acts, and, specifically, their materiality requirements, are not intended to paternalistically shield investors from potentially confusing or cumulative information or to protect the simplest of investors, but, among other things, to eliminate trivial "noise" information while promoting full disclosure (see Basic Inc., 485 US at 234).

Footnote 10: The "more than trivial" formulation (see e.g. Greenberg, 95 AD3d at 483) is specific to the Martin Act, and not properly applicable in the Executive Law § 63(12) context, even given the statutes' historic similarities. Contrary to Justice Moulton's commentary, this is not a distinguishment of the philosophy, reasoning or applicability of Greenberg. It is simply a recognition that no reported case anywhere in the country, including Greenberg, has used the phrase when referring directly to an Executive Law § 63(12) claim.

Footnote 11: This is why Supreme Court's posttrial suggestion that "he knew [materiality] when he saw it" (Trump, 2024 NY Slip Op 30493[U] at *77) was a plainly insufficient standard of analysis.

Footnote 12: Justice Moulton's observation that "the materiality analysis applicable at the summary judgment stage has no bearing on Penal Law § 175.45 and Penal Law § 176.05" is made while simultaneously acknowledging that those statutes "use, but do not define, the words 'material' or 'materially,'" and disregards that, as mentioned above, the parties appear to agree that the Rachmani standard governs the materiality required by the Penal statutes underlying the illegality causes of action and the frequency, at trial and in the posttrial decision, with which Supreme Court referred to what it had "already found."

Footnote 13: The letters stated,
 "Accounting principles generally accepted in the United States of America require that personal financial statements and related footnotes to the financial statements . . . include all assets and liabilities of the individual whose financial statements are presented. The accompanying statement of financial condition does not reflect the above noted items. The effects of these departures from accounting principles generally accepted in the United States of America have not been determined."

Footnote 14: To be sure, Bartov overstated the importance of the particular recipient in his materiality analysis, but the overall tenor of his premise was, correctly, that materiality shifts with the attendant circumstances, one of which is the sophistication of the actors.

Footnote 15: But this is circular, and itself fails to recognize that materiality in this context requires consideration of all components in context. Thus, one cannot know — and it is not relevant — whether any individual entry is immaterial for GAAP purposes when viewed in isolation.

Footnote 16: Bartov testified for the Attorney General in People v Exxon Mobil Corp. (65 Misc 3d 1233[A], 2019 NY Slip Op 51990[U] [Sup Ct, NY County 2019]).

Footnote 17: Although the Attorney General pointed to expert Steven Laposa's deposition testimony that the two are interchangeable, at least one case appears to have differentiated the two (see Baldwin v Bader, 2008 US Dist LEXIS 56236, *96-97 [D Me July 23, 2008, No. 07-46-P-H]).

Footnote 18: That multiple Justices of this panel conclude that summary judgment in the Attorney General's favor was not warranted on the standalone fraud claim strongly suggests that the existence of triable issues of fact on that claim is at least arguable.

Footnote 19: In addition to the reductions upon correct application of the statute of limitations, as seen below, Supreme Court's disgorgement award must be reduced further to exclude the awards corresponding to defendants' profits from the 2022 sale of the OPO lease and the 2023 sale of the Ferry Point license for other reasons. Not only would the award constitute double recovery with respect to the OPO loan (see State of New York v Solil Mgt. Corp., 128 Misc 2d 767 [Sup Ct, NY County 1985], affd 114 AD2d 1057 [1st Dept 1985], lv denied 67 NY2d 606 [1986]), but there was no proof that the gains constituted "fraudulently obtained profits" (Applied Card Sys., Inc., 11 NY3d at 125 [internal citations omitted]). There was no proof that the sales were themselves fraudulent in any manner, no proof that defendants would not have otherwise obtained the original loan or license to enable development and operation, and no proof that the sales would not have closed at the same terms in the absence of fraudulent misstatements inducing the original loan and license. As Justice Moulton pointed out, many other relevant factors influenced the consummation of the sales. For similar reasons, the award corresponding to Weisselberg's severance payment must also be vacated. There was no proof that he received the payment because of the acts alleged against him. Accordingly, excluding all erroneous profit and interest-rate-differential awards would reduce Supreme Court's disgorgement award from $363,894,815 to $77,688,500.

Footnote 20: We are not certain that recreating the record would be Sisyphean — it is a feat that has already been accomplished once. And, of course, retrials are ordered with some frequency in both the civil and criminal contexts even after the significant passage of time.

Footnote 21: This is why the parties' prior briefing does not, as Justice Moulton asserts, so much demonstrate defendants' misunderstanding of our prior decision as demonstrate the incongruity of that decision that defendants have identified. The Attorney General argued for the application of the continuing wrong doctrine only in the alternative; her primary argument was that she need not resort to it at all in the context of an Executive Law § 63(12) claim. In relation to the doctrine, an Executive Law § 63(12) claim is unique in that it already has continuity built into it and, as the Attorney General acknowledges, neither the doctrine nor the statute permits recovery for wrongs committed outside the limitations period. Thus, a reading of the prior decision evincing a more harmonious consideration of the interplay between the doctrine and an Executive Law § 63(12) cause of action would most likely not have substantively described the doctrine's effect with respect to the delay or extension of limitations periods, but might have disposed of the doctrine more succinctly.

Footnote 22: "Completion" in this sense contemplates the time at which the parties are bound.

Footnote 23: We do not, as Justice Moulton does, read the prior decision as excluding post-closing SFCs for purposes of giving rise to a cause of action. A cause of action under Executive Law § 63(12) requires persistence or repetition. Accordingly, as here, the yearly submission of SFCs for each loan transaction constituted its own pattern of repetition. Repetition or persistence could also be found in the use of an SFC across multiple transactions or multiple banks and insurers. The only constraint imposed by our prior decision is to the universe of transactions that may form the basis for a claim.

Footnote 24: As Justice Friedman notes, the Attorney General might otherwise have been able to attempt to differentiate the gains or benefits derived by defendants at closing from those derived by submission of post-closing SFCs, so as to obtain additional relief on the basis of SFCs excluded by our prior finding. She did not, but, in any event, there was no indication that defendants were ever in danger of being found in default of their contractual obligations; accordingly, there very well may have been no discernable difference between the effect of a rate-setting and a postclosing SFC, as Justices Friedman and Moulton debate.

Footnote 25: The reduction of actionable transactions does not require considering partial summary judgment within any individual cause of action by parsing the complaint by transaction. The causes of action were generally stated, and, except for the insurance fraud causes of action, not dependent on any particular transaction.

Footnote 26: Ladder Capital's pre-closing executive summary indicated that the personal guarantee was accepted in lieu of ongoing reserves for insurance, tenant improvements, leasing commissions, capital expenditures, and ground lease payments, and outstanding up-front reserves for tenant improvements and leasing commissions and free rent. The appropriate measure of damages could therefore be the usage value of funds reserved for those expenditures, but the parties appear to have confined themselves to the interest rate differential formulation.

Footnote 27: We note that Supreme Court did not award monetary relief with respect to the insurance transactions, which are nevertheless relevant to various other aspects of the causes of action.

Footnote 28: Nearly every other component of the disgorgement award — those emanating from Weisselberg's severance payment and the sale of the Ferry Point license and OPO leasehold — must be vacated for other reasons, as mentioned above.

Footnote 29: Given the aggregation of properly considered SFCs admitted into evidence, it is unclear whether additional SFCs could have been excluded from the trial evidence as cumulative, assuming that such an objection is available and appropriate in the context of an Executive Law § 63(12) claim.

Footnote 1: Section 63(12), in its original form (L 1956, ch 592, which included the language quoted in the first sentence of this opinion), was proposed by then-Attorney General Jacob K. Javits as a consumer fraud provision (see State Dept of Law Mem, 1956 NY Legis Ann at 92-95 [discussing, among other deceptive schemes, food freezer plans, bait-and-switch advertising of storm windows, chinchilla marketing, and door-to-door dish sales]).

Footnote 2: Cf. Amgen Inc. v Connecticut Retirement Plans & Trust Funds, 568 US 455, 461 (2013) (noting that in an action under the federal securities laws arising from a market transaction, a rebuttable presumption of reliance is employed because "requiring proof of direct reliance would place an unnecessarily unrealistic evidentiary burden on a plaintiff who has traded on an impersonal market" [internal quotation marks and brackets omitted]).

Footnote 3: It is not an answer to say that a new trial could await the end of President Trump's term in office, since this Court recently held that presidential status does not bar a state court from exercising jurisdiction over a defendant (see Zervos v Trump, 171 AD3d 110, 114, 128 [1st Dept 2019], appeal dismissed 36 NY3d 1083 [2021]). In view of Zervos, and also considering the Attorney General's promises to use her office to pursue President Trump going back to 2018 (as more fully discussed in my opinion) and the extraordinary resources she has committed to doing so, I question Justice Moulton's prediction that ordering a new trial would cause the case to fade into "oblivion." Moreover, President Trump's codefendants in this action are entitled to a speedier resolution of the claims against them.

Footnote 4: I do not see how Justice Moulton's citation of CPLR 5519(e) addresses my concern about ordering a new trial in this matter, which we are not doing in any event. CPLR 5519(e) does not render directly appealable to the Court of Appeals an order of this Court that remands a case to Supreme Court for a new trial. Furthermore, contrary to Justice Moulton, not all of the judgment has been stayed.

Footnote 5: I also note that neither the Attorney General nor defendants have suggested, in the alternative, that we order a new trial of this matter.

Footnote 6: The entities named as defendants in this action are The Trump Organization, Inc., Trump Organization LLC, DJY Holdings LLC, DJT Holdings Managing Member, Trump Endeavor 12 LLC, 401 North Wabash Venture LLC, Trump Old Post Office LLC, 40 Wall Street LLC, and Seven Springs LLC.

Footnote 7: One of President Trump's daughters, Ivanka Trump, was also named as a defendant, but was dismissed from the case by this Court (on statute of limitations grounds) upon the earlier appeal in this action, which was taken from the denial of motions to dismiss the complaint (see People v Trump, 217 AD3d 609, 611-612 [1st Dept 2023]).

Footnote 8: Notably, although Cohen — a now-disbarred lawyer and convicted felon — was a prominent witness for the Attorney General at the trial of this matter (as reflected in Justice Moulton's opinion), the Attorney General's brief on this appeal does not once refer to him by name, and contains only one citation to his trial testimony. I will have more to say about Cohen later in this opinion.

Footnote 9: As previously noted, Trump I modified the order there under review to grant, on statute of limitations grounds, Ivanka Trump's motion to dismiss the complaint as against her.

Footnote 10: See also People v Lowe, 117 NY 175, 194, 195 [1889] [a statute authorizing the Attorney General to bring an action against corporate directors and officers "in behalf of the People of the state" (former Code of Civ Pro § 1782) "could not have been intended . . . (to authorize the Attorney General) in (her) absolute discretion, by a suit in the name of the People, and at their expense and risk, (t0) intrude into a mere private quarrel and carry on a litigation for purely private ends, in which the People in no proper sense have a shadow of right or interest. . . . The private parties who feel aggrieved in such cases have ample remedies to redress their wrongs by proceedings in their own names"] [emphasis added]; People v Ingersoll, 58 NY 1, 30 [1874] [the Attorney General had no authority, under the doctrine of parens patriae, to sue to recover money for a municipal corporation because "a corporation with full power to acquire and hold property, create debts . . . and sue and be sued, with a competent board of governors, is not within th(e) class of incompetents in need of the exercise of this nursing quality of the State government"]; People v Albany & Susquehanna R.R. Co., 57 NY 161, 167 [1874] ["The people of this State have no general power to invoke the action of the courts of justice, by suits in their name of sovereignty for the redress of civil wrongs, sustained by some citizens at the hands of others"]; accord Alfred L. Snapp & Son, Inc. v Puerto Rico ex rel. Barez, 458 US 592, 607 [1982] [to establish a quasi-sovereign interest supporting parens patriae standing, "more must be alleged than injury to an identifiable group of individual residents"]; People v Seneci, 817 F2d 1015, 1017 [2d Cir 1987] [a state suing as parens patriae "cannot merely litigate as a volunteer the personal claims of its competent citizens"]).

Footnote 11: As I shall discuss subsequently, even if the law of the case doctrine would otherwise apply, I believe that the unique circumstances presented — and, in particular, the constitutional concerns raised by the Attorney General unprecedented use of the statute in this case — justify departing from the doctrine in this instance. In either case, I do not, as Justice Moulton asserts, "ignore[]" this Court's prior consideration of this issue in Trump I.

Footnote 12: While the Court of Appeals in Grasso I was not addressing a claim asserted under section 63(12), no appellate authority has been brought to our attention in which it was held that a claim under section 63(12) may be successfully prosecuted without proof of the state's quasi-sovereign interest, as articulated in Grasso I.

Footnote 13: Justice Moulton tries to make something of the fact that the issue of standing is often called a "threshold" inquiry. However, that a complaint may contain sufficient allegations of standing for pleading purposes does not necessarily mean that standing will not be at issue upon a summary judgment motion or at trial (see Lujan v Defenders of Wildlife, 504 US 555, 561 [1992]). In other words, a pleading motion depends on allegations, while upon a summary judgment motion or at trial, the proponent of the claim must present actual evidence.

Footnote 14: See generally Matter of People v Applied Card Sys., Inc., 11 NY3d 105 (2008) (direct-mail credit card solicitations); People v Apple Health & Sports Clubs, 80 NY2d 803 (1992) (operating health club without posting legally required bond); State of New York v Cortelle Corp., 38 NY2d 83 (1975) (scheme to obtain distressed residential properties through sale-leaseback agreements); People v Northern Leasing Sys., Inc., 193 AD3d 67 (1st Dept 2021)(marketing of finance leases for credit card processing equipment); People v Orbital Pub. Group, Inc., 169 AD3d 564 (1st Dept 2019) (marketing of periodical subscriptions); People v General Elec. Co., Inc., 302 AD2d 314 (1st Dept 2003) (manufacturer's misrepresentation to consumers about defective dishwashers); Matter of People v Telehublink Corp., 301 AD2d 1006 (3d Dept 2003) (telemarketing of credit cards); People v Concert Connection, 211 AD2d 310 (2d Dept 1995) (illegal ticket scalping); Matter of People v Compact Assoc., 22 AD2d 129 (1st Dept 1964) (vacuum cleaner marketing); see also State of New York v General Motors Corp., 547 F Supp 703, 704 (SD NY 1982) (deceptive and illegal practices in "sale, warranting, and repair of automobiles"). The statute has also been used to protect workers from an employer's violation of workplace health regulations (see New York v Amazon.com, Inc., 550 F Supp 3d 122 [SD NY 2021]).

Footnote 15: Needless to say, neither is anyone involved in this litigation calling for a return to the long-abandoned jurisprudence of Lochner v New York (198 US 45 [1905]) or to the era of laissez-faire economics, now part of the distant past and essentially beyond living memory. Justice Moulton's professed concerns on that score are entirely misplaced. As discussed hereinafter, the problem with my colleagues' validation of the Attorney General's unprecedented use of section 63(12) in this case is that unlike the maximum hours law at issue in Lochner, it opens the door to completely unpredictable and arbitrary government action against businesses that, for whatever reason, incur the disfavor of the Attorney General.

Footnote 16: Justice Moulton asserts that the congressional testimony of Michael Cohen that supposedly triggered the investigation of President Trump (whom the Attorney General had been threatening to sue for months before Cohen testified) somehow took the transactions at issue out of the realm of the "run-of-the-mill." However, Cohen's vague and unsubstantiated contentions about the SFCs that were used in connection with those transactions were themselves run-of-the-mill business tort allegations of the same kind filed in hundreds or thousands of cases in the courts of this state every year. If anything about this case is not "run-of-the-mill," it is the Attorney General's repeatedly making politically motivated promises to use her office to pursue one man and his businesses. She started making those promises long before Cohen gave his supposedly pivotal testimony. Also far from "run-of-the-mill" is the hyper-fast-tracking of the processing of this action, which is unheard-of in cases of this complexity. To take one example, Supreme Court set a trial date five days after it decided the parties' motions for summary judgment.

Footnote 17: Justice Moulton unfairly dismisses the amici supporting defendants as presenting views "based in general preferences for less governmental intervention in markets." While that may be the general orientation of certain of the amici, that orientation is not essential to their argument in this case. That argument, which is also my argument, is that extending the scope of section 63(12) to reach transactions between sophisticated parties that have no negative impact on the public renders all businesses in the state vulnerable to arbitrary, politically selective prosecution by the Attorney General, as is manifestly occurring here. One need not share the economic views of Milton Friedman or subscribe to the libertarian philosophy of the late Harvard Professor Robert Nozick to regard this as a negative development, both for the business community and the general public.

Footnote 18: In his testimony before the House Oversight Committee, Cohen gave only three examples of the use of the SFCs in which he claimed to have participated. Specifically, he told the Committee that the SFCs were provided to Deutsche Bank in connection with the preparation of President Trump's unsuccessful bid to purchase the Buffalo Bills football team, to certain unidentified insurance companies in negotiating policy premiums, and to Forbes Magazine to influence Forbes's ranking of President Trump on its list of the nation's wealthiest people.

Footnote 19: In view of this express holding, I am at a loss to understand Justice Moulton's statement that the decision "did not involve selective enforcement of a statute."

Footnote 20: I do not understand Justice Moulton's assertion that my statement in the foregoing sentence constitutes a "conclusory" finding. During her campaign for her current office, the Attorney General repeatedly promised, in words I have quoted, to use that office's powers to pursue President Trump through legal process. She obviously made those promises because she believed such a course of action would be politically popular. Once in office, she promptly initiated an investigation of President Trump, based on the vague testimony of a convicted perjurer, looking into matters that do not implicate the public interest and have never before been the subject of a suit under section 63(12). Under these circumstances, I do not understand how Justice Moulton can imagine that the Attorney General's commencement of legal proceedings against President Trump has nothing to do with her campaign promises to do exactly that.

Footnote 21: The different scenarios in which actions under section 63(12) have been brought previously, with cited examples, are set forth above at footnote 14 and the paragraph in the text to which that footnote is appended. The present action does not fit within any of these categories.

Footnote 22: Insofar as the Attorney General's reading of the section 63(12) would empower her office to target a defendant selectively simply out of animus, that reading also raises serious concerns under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (see Frederick Douglass Found., Inc. v District of Columbia, 82 F4th 1122, 1147 [DC Cir 2023] [noting that "enforcement decisions . . . rooted in 'animus'" would violate the Equal Protection Clause]).

Footnote 23: It should be borne in mind that, throughout the proceedings before Supreme Court, the court threatened defense counsel with sanctions for raising arguments that had previously been rejected.

Footnote 24: In view of the appellate arguments by defendants from which I have just quoted, the concerns I have expressed about the potential for arbitrary and politically selective use of section 63(12), as that statute is interpreted by the Attorney General and my colleagues, certainly are — contrary to Justice Higgitt's assertion — "points to which the parties have directed our attention" and, therefore, rightly have a "place in guiding our analysis of the questions presented to us." 

Footnote 25: For reasons discussed elsewhere in this writing, I do not believe that the doctrine of law of the case precludes our consideration upon this appeal of the issue of the scope of the power granted by section 63(12).

Footnote 26: Section 63(12) defines the words "fraud" and "fraudulent" to include "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."

Footnote 27: Justice Moulton points to HSH Nordbank (95 AD3d 185) as demonstrating that "even a sophisticated counterparty with the means and inclination to test the risks of a transaction can incur huge losses . . . because the counterparty is 'lax' in protecting itself." However, it does not follow from the fact that sophisticated parties may suffer from their own laxity in particular cases that the representations on which they unjustifiably rely have "a capacity or tendency to deceive" sophisticated recipients, who are assumed to act as such. I note that, by the reasoning of Justice Moulton and the Attorney General, the latter's office should have stepped in to sue the HSH Nordbank defendant under section 63(12), but no such intervention occurred.

Footnote 28: Supreme Court based this view on a statement by the Court of Appeals, in a case involving a challenge to a real property tax assessment, that the petitioner had rebutted the presumption of the validity of the taxing authority's valuation of the property by presenting an appraiser's "objectively reasonable conclusion" that the property had been overvalued (Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack, 92 NY2d 179, 191 [1998]). Nothing in FMC Corp. suggests that there can be only one valid valuation of a real property asset.

Footnote 29: Similarly, an accounting expert who did not give evidence in this matter (a professor of accounting and finance at New York University) has noted:
 "Despite widely held beliefs that corporate financial statements convey historical, objective facts, practically every material item on the balance sheet and income statement, with the exception of cash, is based on subjective estimates about future events" (Baruch Lev, Intangibles: Management, Measurement, and Reporting, at 81 [2001]).

Footnote 30: At the very least, as previously stated, in view of the 12 expert witnesses whose affidavits defendants submitted on the summary judgment motion to establish the propriety of the SFCs, defendants raised a triable issue as to liability under the first cause of action. Accordingly, as previously discussed, I agree with Justice Higgitt that Supreme Court erred in granting the Attorney General summary judgment as to liability on that claim — although, as also previously discussed, I disagree with Justice Higgitt's conclusion that the case should be retried. In addition, as more fully discussed below, the valuations in the SFC, while certainly disputable, were not so lacking in factual and logical basis as to be deemed "false" for purposes of section 63(12) when presented to sophisticated financial professionals, who would not rely on them in any event. In fact, certain asset valuations advocated by the Attorney General and accepted by Supreme Court — such as the valuation of President Trump's palatial Mar-A-Lago estate at only $18-$27 million — plainly do not comport with either the preponderance or the weight of the evidence.

Footnote 31: Because personal financial statements prepared in accordance with ASC 274 are not audited, the Federal Reserve advises banks not to rely on such statements.

Footnote 32: In the SFCs for 2016 and later years, the reference to "Mr. Trump" in this passage is replaced by a reference to the Trust.

Footnote 33: This statement echoes the poorly supported assertion in the Attorney General's appellate brief that defendants "us[ed] blatantly false and misleading information, data and assumptions in valuing Mr. Trump's assets."

Footnote 34: The clear factual error to which I refer is the tripling of the square footage of President Trump's triplex condominium apartment (the Triplex). This error has not been shown to have been intentional and was corrected long before the investigation leading to this action was commenced. Moreover, the true size of the Triplex is a matter of public record that any interested SFC user could have discovered through due diligence.

Footnote 35: The Attorney General does not make this contention with regard to claims brought under section 63(12) (such as the second through seventh cause of action in this matter) that are based on alleged violations of specific sections of the Penal Law that do include materiality as an element of the offense. Notably, the two statutes to which section 63(12) is most often compared — the Martin Act (General Business Law § 352 et seq.) and General Business Law § 349 — each has a materiality requirement.

Footnote 36: See also People v Exxon Mobil Corp., 63 Misc 3d 1233(A), 2019 NY Slip Op 51990(U), *5, *29 (Sup Ct, NY County 2019) (securities issuer was not liable under section 63(12) where the Attorney General adduced no evidence that the issuer's challenged statements had "any market impact" and the Attorney General "produced no testimony . . . from any investor who claimed to have been misled by any disclosure"); People v Tempur-Pedic Intl., Inc., 30 Misc 3d 986, 993 (Sup Ct, NY County 2011) (dismissing a claim against manufacturer under section 63(12) where the Attorney General "submitted no evidence to show that retailers were misled or deceived in any way to believe that they had entered into contracts to restrain discounting").

Footnote 37: Similarly, Ladder Capital, which refinanced 40 Wall Street, focused its due diligence on the value and cash flow of the property being financed and on President Trump's liquidity. Ladder Capital reviewed President Trump's personal income tax returns and 40 Wall Street's rent roll, operating statements, and ground lease. In addition, the lender obtained an independent appraisal of the property from Cushman & Wakefield.

Footnote 38: In the first sentence of her appellate brief, the Attorney General asserts that the SFCs inflated President Trump's net worth "by as much as $2.2 billion a year." President Trump's annual SFCs from 2011 through 2021 estimated his net worth at figures ranging from $4.26 billion to $6.12 billion. Thus, by the Attorney General's own estimation, President Trump's net worth was never less than $2 billion during these years.

Footnote 39: The Attorney General presented an expert witness, Michiel McCarty, who calculated the supposed "personal guarantee interest rate differential" on the loans from Deutsche Bank and Ladder Capital that the Attorney General attributes to the allegedly inflated valuation of President Trump's assets in the SFCs. However, McCarty simply assumed that the allegedly inflated values in the SFCs caused the lenders to offer defendants interest rates lower than they otherwise would have. The Attorney General presented no factual evidence to show that the valuations in the SFCs had any impact on the terms of the loans.

Footnote 40: Mr. Shubin has 30 years of experience with complex land use and zoning matters in Florida. He also has particular expertise in "the propriety of efforts to either maintain private social/golf clubs on property or remove them."

Footnote 41: Based on the mistaken assertion that they "conveyed" the Land, Justice Moulton appears to assume that defendants would have only the "mansion" to sell in a potential sale. However, aside from the practical impossibility of severing the "mansion" from the Land, this assumption would render Justice Moulton's discussion of the restrictions in the deeds superfluous. Why would those restrictions matter if President Trump owned only the mansion? Moreover, if defendants do not own the land, the Attorney General would have made that argument front and center in her briefs, but it does not appear in her filings. Finally, I see no basis for Justice Moulton's assumption in the relevant documents themselves.

Footnote 42: None of the other provisions of the 2002 deed can be interpreted as prohibiting Mar-a-Lago from being used or sold as a single private residence. To the contrary, one clause states that the intention is "to establish as explicitly as possible that the Preservation Easement perpetuates the club usage of the Property, consistent with the other limitations set forth in that Easement" (emphasis added). The provision prohibiting subdividing the property for "use as single family homes" (emphasis added) implies that continued use of the property as a single family home, without subdividing it, is permitted. The restriction on "interior renovation . . . for the sale of the Property as single family residential estate," also implies that it may be used and sold as single family residential estate, albeit without any interior renovation.
Footnote 43: Mr. Moens testified that there is only one other estate in Palm Beach that spans from the lake to the ocean and that property is only four acres. He also testified that it took an investor approximately 13 years and $600 million to piece together a 20-acre estate, which was not surrounded by water. He also testified that, even if the architectural style of Mar-a-Lago could be replicated, it would cost approximately $7,000-$9,000 per square foot compared to the Palm Beach average of $1,400 per square foot.

Footnote 44: As more fully discussed at the end of this section, the one objective error of fact that the Attorney General has identified that was used as a basis for a valuation in the SFCs — the multiplication of the actual size of the Triplex by three — has not been shown by the Attorney General to have been anything other than an unintentional error, and one that was corrected before the Attorney General began her investigation.

Footnote 45: The sentencing memorandum is part of the official record of Cohen's February 27, 2018, testimony before the House Oversight Committee, to which Justice Moulton cites. I draw attention to the following comments at pages 25-26 of the sentencing memorandum, concerning the facts underlying Cohen's convictions for tax evasion and making a false statement to a financial institution:
 "[Cohen] concealed significant amounts of income from the IRS, and lied about his financial status in dealings with banks. . . . For at least half a decade, Cohen willfully evaded paying taxes. Cohen, who himself studied tax in law school and displayed an awareness of complicated tax laws in real estate transactions, took purposeful steps to avoid paying taxes on millions of dollars in income over a five-year period. He made private loans at double-digit interest rates and did not report the millions of dollars in income it generated. . . . Cohen also failed to report hundreds of thousands of dollars in consulting income and legal work, and underreported payments he received from his ownership of taxi medallions. . . .

"[T]he nature of Cohen's criminal conduct is apparent from the manner in which he dealt with his own accountant: Cohen provided incomplete information to his accountant, lied about the existence or value of certain assets and income sources, and rebuffed questions that would have revealed income he deliberately concealed. Moreover, Cohen's crimes were not ones of necessity . . . .

 "Cohen similarly flouted his obligation to be truthful in business when seeking financing. . . . [H]e submitted a false statement to a bank that failed to disclose more than $20 million in liabilities as well as tens of thousands in monthly expenses. . . . [T]his was no mere error of omission . . . Cohen was specifically asked [by the bank] about the omission, and covered it up by misleadingly telling [the bank] that the liabilities had been expunged, when in fact they had been re-established at another bank."
With regard to the tax evasion charge, the sentencing memorandum also notes, at page 6, that Cohen "repeatedly attempted to minimize the seriousness of his decision not to report millions of dollars of income over a period of years by blaming his accountant for not uncovering the unreported income," even though "the accountant was not provided with records that would have allowed him to reasonably identify the unreported income."

Footnote 46: Of course, President Trump had no involvement with the SFCs between 2017 and 2019 because those years coincided with his first term as president. And the record shows that, even when he was actively involved in managing his business, he relied on Weisselberg, McConney, and Mazars for the preparation of the SFCs.

Footnote 47: I agree with my colleagues that all defendants before us on this appeal are bound by the tolling agreement between the Trump Organization and the Attorney General.

Footnote 48: Supreme Court highlighted the fact that it based the disgorgement awards on benefits derived from the closing of the original transactions, not on any benefit supposedly attributable to the postclosing SFCs, in stating, in the posttrial decision, "no false SFCs, no deal."

Footnote 49: As previously noted, Supreme Court also ordered defendant Allen Weisselberg to disgorge the $1 million severance payment he received upon leaving the Trump Organization. Apart from the lack of record support for the liability finding against Weisselberg (as previously discussed), the disgorgement of his severance is subject to vacatur on the ground that there is no evidence of a causal connection between the alleged misconduct and the severance payment, in contrast to the case relied on by Supreme Court (Securities & Exch. Commn. v Razmilovic, 738 F3d 14 [2d Cir 2013], cert denied 572 US 1018 [2014] [severance payment ordered to be disgorged where it was tied to the financial performance of the company, which was allegedly manipulated by the defendant's fraud]). The case relied on by the Attorney General on appeal is similarly distinguishable (see Securities & Exch. Commn. v Toure, 4 F Supp 3d 579, 589 [SD NY 2014] [bonus calculated on the basis of performance influenced by the misconduct]). Weisselberg received his severance upon retiring from the Trump Organization after more than 50 years of service and a severance payment of the magnitude he received would naturally be expected. No evidence supports the Attorney General's assertion that "the severance payment was made in part as a reward for [Weisselberg's] misconduct and in exchange for his agreement not to cooperate with [the Attorney General's] investigation."